JENNIFER D. BENNETT (Bar No 235196)
jennifer.bennett@dentons.com
DENTONS US LLP
One Market Plaza, Spear Tower, 24th Floor
San Francisco, California  94105
Telephone:  (415) 267-4000

RICHARD SALGADO (Tx Bar 24060548)
richard.salgado@dentons.com
DENTONS US LLP
2000 McKinney Avenue, Suite 1900
Dallas, Texas 75201-1858
Telephone:  (214) 259-0935

DOUGLAS H. CARSTEN (Bar No 198467)
dcarsten@wsgr.com
JOSHUA MACK (Bar No 253523)
jmack@wsgr.com
WILSON SONSINI GOODRICH & ROSATI P.C.
12235 El Camino Real
San Diego, CA 92130
Telephone:  (858) 350-2300

Attorneys for Plaintiffs MedImpact Healthcare
Systems, Inc., MedImpact International, LLC and
MedImpact International Hong Kong, Ltd.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

MEDIMPACT HEALTHCARE SYSTEMS, INC., a California corporation; MEDIMPACT INTERNATIONAL LLC, a California limited liability company; and MEDIMPACT INTERNATIONAL HONG KONG LTD., a Hong Kong company,

      Plaintiff,

v.

IQVIA HOLDINGS INC., a Delaware corporation; IQVIA INC., a Connecticut corporation ; IQVIA AG, a Swiss company; OMAR GHOSHEH, individually; and AMIT SADANA, individually.

      Defendants.

Case No. '19CV1865 BEN LL

**COMPLAINT FOR
(1) MISAPPROPRIATION OF TRADE SECRETS UNDER CAL. UNIFORM TRADE SECRETS ACT;
(2) MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA, 18 U.S.C. § 1836;
(3) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (4) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;
(5) INTENTIONAL INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP; (6) INDUCING BREACH OF CONTRACT; (7) UNFAIR COMPETITION (8) RICO ACT, 18 U.S.C. § 1962(c); (9) UNJUST ENRICHMENT; (10) BREACH OF FIDUCIARY DUTY; (11) CONSPIRACY; AND (12) CONVERSION.**

**DEMAND FOR JURY TRIAL**

Plaintiffs MedImpact Healthcare Systems, Inc., MedImpact International LLC, and MedImpact International HK Limited (together, "Plaintiffs" or "MedImpact"), file this lawsuit against Defendants IQVIA Holdings Inc. and IQVIA Inc., IQVIA AG (collectively "IQVIA"), and Omar Ghosheh ("Dr. Ghosheh") and Amit Sadana ("Mr. Sadana"), individually, as follows:

## I.

## INTRODUCTION

1.     Defendants conspired to systematically steal MedImpact's intellectual property and technology and use it to unlawfully compete against MedImpact in the international market for pharmacy benefits management services.  In tandem with that theft, Defendants have deliberately interfered with and continue to interfere with MedImpact's existing contracts and prospective business relationships throughout the Middle East and around the world.

2.     This case began with what MedImpact now recognizes was misplaced trust.  Through several decades of effort and the investment of hundreds of millions of dollars, MedImpact became the largest privately-held pharmacy benefits manager ("PBM") in the United States, serving approximately 50,000,000 lives domestically and employing more than 1,300 employees (the vast majority of whom are based in San Diego).  Wanting to apply its experience and expertise abroad, MedImpact formed a joint venture with a UAE company, Dimensions Healthcare, LLC ("Dimensions") to expand into the Middle East's Gulf Region where no other PBMs were yet operating at that time, in 2011 to 2012.  The joint venture was MedImpact Arabia ("MIA").

3.     Desiring for the joint venture to succeed, MedImpact—subject to confidentiality agreements—made itself an open book to its joint venture partner, sharing its closely guarded and proprietary trade secret information.  In person both in San Diego and in Dubai, as well as through technological means, MedImpact's

COMPLAINT

employees taught Dimensions about all aspects of PBMs and, together, MedImpact and Dimensions launched the first PBM in the region.

4.      Everything changed when IQVIA—at the time, IMS Health—entered the picture with a scheme to offer its own PBM platform without enduring the laborious, time-consuming, and expensive process necessary to do so.  IQVIA's scheme centered on its acquisition of MedImpact's joint venture partner, Dimensions, with the understanding that Dimensions would willingly breach its agreement with MedImpact and bring the joint venture's customers and relationships plus MedImpact's trade secrets and confidential information to IQVIA.  Indeed, after acquiring MedImpact's joint venture partner Dimensions, Defendant IQVIA, Dimensions, Dr. Ghosheh, and Mr. Sadana joined in a targeted scheme to compete against MIA and MedImpact, steal MIA customers, meet with regulators and governments around the world, and disclose and use MedImpact trade secrets to advance IQVIA's interests and their own interests globally.

5.      Almost overnight, Defendant IQVIA—despite having no previous PBM experience or knowledge—transformed from being a non-participant in the PBM industry to making PBM proposals to clients and working with health agencies all around the world with Dimensions' assistance.  IQVIA accomplished this while Dimensions was still MedImpact's joint venture partner in MIA.

6.      By stealing MedImpact's trade secrets and engaging in the unlawful conduct described below, IQVIA bypassed years of research and avoided development time and tens of millions of dollars of investment expense.  In doing so, it caused damages to MedImpact in amounts that exceed tens of millions of dollars.  MedImpact also alleges, on information and belief, that IQVIA obtained—through Dimensions—access to patient healthcare data through the use of MIA's products/services or Dimensions' AIMS, ICM and other similar products because a large proportion of IQVIA's business involves the selling of data to third parties.

- 3 -

COMPLAINT

7.     Defendants Dr. Ghosheh, co-founder of Dimensions, and Mr. Sadana, a senior level IQVIA executive, also act in the dual capacity as board members of MIA, of which MedImpact and Dimensions are shareholders.  Instead of honoring their fiduciary duties and obligations as board members, both have actively participated in the scheme to acquire and use MedImpact's trade secrets and confidential information so that Dimensions and IQVIA can improperly compete against the joint venture and MedImpact.  MedImpact is informed and believes that Defendants Dr. Ghosheh and Mr. Sadana visited and specifically targeted MIA customers with the intent to steal them away from the joint venture by offering a competing PBM product.  Dr. Ghosheh and Mr. Sadana successfully entered into contracts with MIA customers and prospective customers proposing products based on MedImpact's trade secrets, all while serving on the Board of MIA, in serious breach of the fiduciary duties they owed to the joint venture and MedImpact, and in breach of Dimensions' agreements with MedImpact.  In so doing, Dr. Ghosheh advanced not only IQVIA's improper interests but his own interests in monetizing trade secrets to which he had gained access.

8.     This is a civil action for misappropriation of trade secrets under the California Uniform Trade Secrets Act ("CUTSA") and the Defend Trade Secrets Act ("DTSA"), intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, intentional interference with a contractual relationship, inducing breach of contract, unfair competition, Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(c) violations, breach of fiduciary duties, unjust enrichment, conspiracy, and conversion.

9.     MedImpact seeks damages for its injuries due to Defendants unlawful conduct, and a permanent injunction enjoining the Defendants from possessing, misappropriating and using MedImpact's confidential trade secret information.

COMPLAINT

## II.

## PARTIES

10.   Plaintiff MedImpact Healthcare Systems, Inc. ("MedImpact") is, and at all relevant times herein was, a privately held California corporation with its principal place of business in the County of San Diego, State of California. MedImpact was founded in San Diego, California, in 1989 and provides pharmacy benefit management ("PBM") services to its clients.   MedImpact is the largest privately held PBM provider in the United States, serving over 50 million members across 64,000 pharmacies.   MedImpact currently employs close to 1,000 people in its San Diego headquarters and more than 1,300 employees overall.   MedImpact partners with the nation's finest health plans, hospitals, self-funded employers, state and local governments, and universities, including the University of San Diego, to provide pharmacy benefit management services.   Over the course of 30 years, MedImpact has invested hundreds of millions of dollars to develop its proprietary PBM platform.

11.   Plaintiff MedImpact International LLC ("MIL"), is a limited liability company established and existing under the laws of California.   MIL is a wholly owned subsidiary of MedImpact Healthcare Systems, Inc.   MIL commenced international business operations in 2011 and is active in the Middle East and Chinese markets, and is actively pursuing business opportunities in other geographies to expand its international presence.

12.   Plaintiff MedImpact International Hong Kong Ltd. ("MI-HK"), is a private Hong Kong corporation, and is a wholly owned subsidiary of MIL, which is a wholly owned subsidiary of MedImpact Healthcare Systems, Inc.

13.   Defendant IQVIA Holdings, Inc. ("IQVIA") is a corporation organized under the laws of Delaware with its principal place of business in Durham, North Carolina.   Based on information and belief, IQVIA is a global provider of advanced

COMPLAINT

analytics, technology solutions, healthcare data and contract research services to the life sciences industry to customers throughout the United States, including this judicial district, and that it maintains a physical presence and employs personnel in this judicial district. Additionally, and based on information and belief, IQVIA has one of the largest collections of healthcare information in the world, which includes more than 600 million comprehensive, longitudinal, non-identified patient records spanning sales, prescription and promotional data, medical claims, electronic medical records, genomics, and social media. Their growing data set contains over 30 petabytes of information sourced from more than 140,000 data suppliers and covering approximately one million data feeds globally. Based on this data, IQVIA delivers information on over 85% of the world's pharmaceuticals.

14. Defendant IQVIA, Inc., is a corporation organized under the laws of Delaware with its principal place of business in Danbury, Connecticut, and is wholly-owned subsidiary of IQVIA. IQVIA, Inc. has a location at 10188 Telesis Ct. #400, San Diego, California 92121.

15. Defendant IQVIA AG ("IMS") is a wholly-owned subsidiary of IQVIA, with its primary place of business in Switzerland.

16. Defendant Dr. Omar Ghosheh ("Dr. Ghosheh"), an individual and a board member of MedImpact Arabia and co-founder of Dimensions, owed and breached his fiduciary obligations to MedImpact and is a resident of Dubai, United Arab Emirates.

17. Defendant Amit Sadana ("Mr. Sadana"), an individual and a board member of MedImpact Arabia, owed and breached his fiduciary obligations to MedImpact and is a resident of Dubai, United Arab Emirates.

18. MedImpact, is informed and believes, and based thereon alleges that at all relevant times mentioned herein, each and every defendant was the agent, servant, employee, joint venturer, partner, subsidiary, and/or co-conspirator of each

COMPLAINT

other defendant, and that, in performing or omitting to perform the acts herein alleged, each was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, joint venture, partnership, subsidiary and/or conspiracy, and each other defendant ratified and affirmed the acts and omissions of the other Defendant.  MedImpact is further informed based on information and belief that each Defendant, in taking the actions alleged herein and/or ratifying the actions alleged herein, acted within the course and scope of such authority and, at the same time, for their personal financial and individual gain, as well as in the course and scope of such employment, agency and as an alter ego therein.  Additionally, Dr. Ghosheh acted at times distinctly from IQVIA or Dimensions to advance his own interests and those of the greater scheme.

19.     Whenever this Complaint refers to any actions of IQVIA, such allegations shall mean that the directors, officers, employees or agent of said entity did perform or authorize the alleged acts or actively engaged in the management, direction and control of such entity and were acting within the course and scope of their employment.  Whenever this Complaint refers to any actions of IMS Health Holdings, Inc. ("IMS Health") or Quintiles Transnational Holdings Inc. ("Quintiles"), such allegations shall mean that the directors, officers, employees or agent of said entity performed or authorized the alleged acts or actively engaged in the management, direction and control of such entity and were acting within the course and scope of their employment.

20.     Whenever this Complaint refers to any actions of Dr. Ghosheh or Mr. Sadana individually, such allegations shall mean that Dr. Ghosheh and Mr. Sadana as directors, officers, employees or agents of said entity performed or authorized the alleged acts or actively engaged in the management, direction and control of such entity acting outside the scope their duties and obligations and in breach of their fiduciary obligations to the said entity for personal gain.

COMPLAINT

### III.

### GENERAL ALLEGATIONS

**A.    MedImpact's Aspirations to Expand PBM Services Globally.**

21.    In or around 2010 to 2011, MedImpact was interested in expanding its PBM platform globally, including into the Middle East's Gulf Region which at that time had no PBM providers.  MedImpact formed MIL to expand its PBM services in the international market.  In or around 2011, MIL began discussions with Dimensions, both in San Diego and in Dubai.  MIL identified Dimensions as a possible joint venture partner because of its regulatory contacts and presence in the UAE.  At the time, Dimensions sold limited health IT software and integration products aimed primarily at pharmacy providers in the medical insurance market.  Dimensions did *not* have real-time online adjudication capabilities in the PBM market.

**B.    The Joint Venture Agreement.**

22.    On March 21, 2011, MIL and Dimensions began working together under a Non-Disclosure Agreement ("NDA"), pursuant to which Dimensions agreed to strictly maintain the confidentiality of MedImpact's confidential and proprietary trade secret information and not to use the information for any purpose other than the transaction contemplated in the NDA.  After the parties signed the NDA, MIL began sharing MedImpact's closely guarded proprietary and trade secret information with Dimensions.  Subsequently, on February 1, 2012, MIL and Dimensions entered into a Joint Venture Agreement ("JV Agreement"), under which they agreed to establish MedImpact Arabia ("MIA") to provide PBM services to the Gulf Region.  The JV Agreement also obligated Dimensions to maintain the confidentiality of "confidential and proprietary information or trade secrets" and "not utilize the Confidential information for any purpose other than as necessary to conduct the Business pursuant to this Contract (including as

COMPLAINT

contemplated by the Services and License Contract)."  In other words, Dimensions agreed not to use or disclose MedImpact's confidential and trade secret information to anyone other than those with a need to know and who were bound by the terms of the JV Agreement.  On the same day, MIL and Dimensions entered into a service level agreement (the "SLC"), with similar confidentiality provisions.  Additionally, by entering into the JV Agreement, Dimensions agreed that any business opportunity that arose under the agreement within the Territory as defined in the agreement would strictly belong to the joint venture.  The Territory, as of the date of the JV Agreement, included members of the Gulf Co-operation Council, Jordan, Lebanon, and any other country the parties to the JV Agreement agreed in writing. Dimensions knew and agreed to the terms of the NDA, JV Agreement, and SLC. On January 1, 2014, with the consent of Dimensions, Plaintiff MIL assigned its rights and interest in the joint venture to Plaintiff MI-HK.

> **(1)** **MedImpact's Contributions to the Joint Venture and the Joint Venture's Rapid Success.**

23.   MedImpact spent decades developing its highly successful PBM platform in San Diego prior to the formation of the joint venture.  MedImpact's platform is supported on servers located in San Diego.  MedImpact agreed to license its San Diego platform to MIA for the exclusive use in the Territory in order to generate clients for MIA.  MedImpact spent 30 years and invested hundreds of millions of dollars in developing, refining, and collating all of the intellectual property in its PBM platform, including the business, financial, operational, technical and clinical know-how, and real time claims processing/adjudication know-how and capabilities, which were not present in the Territory prior to the creation of the joint venture.

24.   For approximately eight years after the execution of the NDA, the JV Agreement, and SLC, through e-mail, phone calls and in person meetings/training,

COMPLAINT

MedImpact's San Diego employees taught Dimensions about all aspects of PBM, including how to sell PBM services; how to price PBM services; how to contract for PBM services; how to implement PBM services; how to adjudicate claims; how to set up benefits and policies; details of clinical rules; how to develop the editing platform to customize MIL rules; the implementation process; user access testing technology to test claims; how to manage clients effectively; how to report value created to clients; how to use customer service portals in real time to support patients and pharmacists; how to provide online reporting capabilities to clients; and how to set up customer call centers at health plans to support PBM services.

### (2)  MedImpact's Trade Secret and Confidential Information

25.   In connection with teaching Dimensions the above processes, throughout the joint venture with MIL, Dimensions continued to obtain and use MedImpact's trade secret information.   MedImpact entrusted Dimensions with access to MedImpact confidential, proprietary and trade secret information, including, how to on-board clients including, documents that identify all of the information that must be collected from clients on the front end to build out the PBM services including all options and decisions that must be made by (or with) the client in order to structure the benefit design and coverage rules, as identified for example, in MedImpact's implementation questionnaires; information and documents that outline and define features and options of the pharmacy benefit plan and provide granular details on the standard benefit designs, clinical and utilization management protocols on an element-by-element basis, including descriptions of each element and decisions for the client to make with regard to benefits, as identified for example, in MedImpact's benefit templates; detailed listing and structure of data elements/fields as identified in the file type formats/layouts, including, how to structure that information into the system, how to build a system based off that information; the user interface modules within the MedAccess tool

COMPLAINT

that provides specific processes and information in the PBM process, and; adjudication logic, including, the rules and edits used to adjudicate claims and the order in which the rules and edits are applied (the "Trade Secrets").  Dimensions used its status as a joint venture partner of MedImpact to gain access to MedImpact's Trade Secrets.

26.   In summary, MedImpact gave Dimensions access to its highly sensitive proprietary and trade secret information, including, but not limited to: (1) the information and documents Dimensions needed so that Dimensions could provide PBM products and services to MIA's customers; (2) the information and documents needed to translate the information received from the client into data elements in a database that can be used by the system; and (3) MIL's proprietary adjudication logic and rules used to adjudicate claims, including, how to process a claim, what rules apply, in what order to apply the rules, what outputs are generated and how to communicate that back to the pharmacy (*e.g.*, through MedAccess and other technical documentation).  MedImpact contributed its PBM engine along with interfaces for insurance payers to manage and monitor clinical and financial plan data and customer service support software, along with its wealth of business, technological and business experience that it developed over decades.  In addition, MedImpact also brought to the joint venture its MedImpact brand and reputation in the marketplace, which was a significant contribution given MedImpact's long history in this industry in the United States.

27.   Based on MedImpact's contribution of its PBM platform to the joint venture's business operations, MIA realized a rapid success in securing many clients in the Territory, such as Oman Insurance Company ("Oman Insurance"), Vidal Health, AXA, Nextcare, Pentacare, Aafiya, Metlife, Alico MSH, Dubai Insurance, Aetna, Al Buhaira Insurance Company, etc.  Out of its many clients, Oman Insurance was MIA's largest customer, accounting for approximately 25% of

COMPLAINT

MIA's revenues.

**(3)** **MedImpact Takes Extraordinary Steps to Protect its Proprietary and Trade Secret Information.**

28.     MedImpact maintains the secrecy of its proprietary and trade secret information including, the Trade Secrets, by executing confidentiality agreements with all employees, independent contractors, and all other parties provided with MedImpact's confidential information including, all payers, etc.   In addition, MedImpact uses technologically sophisticated firewalls, private networks, and other technical mechanisms to ensure the security and proprietary nature of this information.   MedImpact's proprietary information is password protected on its company computers.   MedImpact also requires its employees, independent contractors, and all other parties to use badges and other security mechanisms to control access to MedImpact's facility in San Diego.   MedImpact also marks confidential information as "confidential" for example, on its implementation questionnaires, file formats, and other documentation containing MedImpact confidential information and Trade Secrets.   MedImpact also provides various levels and controls access of its employees to its confidential information and Trade Secrets depending on their need to know.   MedImpact regularly instructs and repeatedly reminds its employees of the highly sensitive nature of its proprietary information, which needs to be protected from disclosure to third parties at all times.   As a privately held company, MedImpact has less mandatory disclosure obligations to, for instance, shareholders and regulators, allowing MedImpact greater control over its trade secret and competitive information.   Additionally, because MedImpact receives and stores confidential patient healthcare data, MedImpact has maintained its HIPAA compliance for decades and has invested significant resources protecting and securing patient information and data.

COMPLAINT

29.    The NDA, JV Agreement and the SLC between MedImpact and Dimensions all included confidentiality provisions that required Dimensions to maintain the confidentiality of MedImpact's proprietary information and trade secrets and to not disclose the information to third parties.

### (4)    Trade Secrets Provide A Competitive Advantage To MedImpact, and MedImpact Derives Economic Value From The MedImpact Trade Secrets.

30.    MedImpact has developed the MedImpact Trade Secrets over decades and at great expense.  The Trade Secrets enable MedImpact to be the largest private PBM in the United States and provide MedImpact a competitive advantage. MedImpact's Trade Secrets and other confidential information have substantial independent economic value.  By stealing MedImpact's trade secrets and other confidential information, and by engaging in the unlawful conduct described below, Defendants have, at minimum, avoided years of their own research and development time and tens of millions of dollars of investment expense, causing damages to MedImpact in amounts that exceed tens of millions of dollars.

## C.    IMS Health Acquires Dimensions and Merges With IQVIA.

31.    After MedImpact and Dimensions entered into the NDA, they successfully launched their first PBM service in the Middle-East Gulf region that same year on or around October 1, 2011.   From 2011 through 2016, MIA demonstrated continued growth with increasing revenues and customers year-after-year.  Then, in February 2016, after having used MedImpact to succeed in the PBM market in the Middle-East Gulf region and having gained access to MedImpact's proprietary and trade secret information, Dimensions agreed to be bought by IMS Health.   In October 2016, IMS Health merged with Quintiles Transnational Holdings, Inc. creating QuintilesIMS.  At that time, IMS Health and Quintiles were substantial global companies specializing in providing *healthcare data*, not PBM

COMPLAINT

services, to pharmaceutical companies.   PBM data however, is useful to a healthcare data company.   In November 2016, QuintilesIMS rebranded itself as IQVIA Holdings, Inc. or IQVIA.   In short, IQVIA was primarily a healthcare data collection and analytics company, and a large proportion of IQVIA's business involved the selling of healthcare and pharma data to third parties.   The newly formed company represented to MedImpact's officers and employees in San Diego that this acquisition would not affect the JV.   IQVIA decided Dimensions should terminate the JV with MedImpact.

.

**(1)** **In violation of the JV Agreement, Dimensions develops AIMS, a competing product to the PBM platform and ICM, terminates the joint venture, and conspires with IQVIA to misappropriate and steal MedImpact's trade secret information and clients.**

32.   Following Dimensions' acquisition by IMS Health, Dimensions sold its own competing PBM platform called Adjudication Insurance Management System ("AIMS").   Dimensions' website describes AIMS as:

> *"Adjudication Insurance Management System:*
>
> *Adjudication Insurance Management System (AIMS) is a platform for insurance companies and third party administrators (TPAs) that enables automated real-time adjudication for the vast majority of the healthcare authorizations and claims with advanced modules to administer its processing capabilities in relation to plans & products parameters such as benefits, groups members, networks and others aspects. AIMS offers as well e-authorization and e-claim management modules for those transactions that requires human intervention by the processers. AIMS has a transaction management & tracking module that enables users to real-time track transaction received and generated by AIMS. Moreover, AIMS has a dynamic reporting, dashboard and analytical module with a user-friendly interface to create standard and ad-hoc reports and dashboards. AIMS can be integrated with*

- 14 -

COMPLAINT

*other products such as post office, providers' transaction managers, decision support systems and much more."*

33.    IQVIA embarked in a systematic scheme with Dimensions to target and steal MedImpact customers, to undermine and ultimately destroy the joint venture, and to misappropriate MedImpact's trade secrets for their own benefit. Dimensions colluded with IQVIA to steal its first customer from MIA.   After Dimensions was acquired by IQVIA (then IMS Health), Dimensions violated the JV Agreement by closely collaborating with IQVIA on business development opportunities such as meeting with the joint venture's clients, including the largest customer Oman Insurance Company ("Oman Insurance"), preparing customer proposals using IMS and IQVIA branded materials, and sharing opportunities and financial information related to the opportunities.  Indeed, Defendants used and are using the MedImpact Trade Secrets to develop and offer PBM services, even though, on information and belief, they have failed to tell their customers that they are relying on MedImpact's Trade Secrets and confidential information to develop their PBM products and services.  To perpetrate a scheme to steal MedImpact's proprietary trade secret information and customers, IQVIA's senior level employees such as Alistair Grenfell, and certain members of the Board of Directors of MIA, in particular, Dr. Ghosheh and Mr. Sadana, were also involved.

34.    In 2017, IQVIA and Dimensions stole the joint venture's largest client Oman Insurance by offering Dimensions' competing product AIMS to replace MIA's PBM product.  Indeed, Mr. Sadana, the Senior Vice President & GM, Africa, Middle East and South Asia (AMESA) at IQVIA (and the Chairman of the joint venture's Board of Directors) were involved in the contract between Oman Insurance and Dimensions.  On or about September 28, 2017, Ahmed Al Tabbakh, the Head of Medical and Life Claims at Oman Insurance, admitted it was using a product called AIMS to replace MIA's PBM platform.  Then, on October 1, 2017,

- 15 -

COMPLAINT

Oman Insurance formally informed MIA and MIL that it was terminating its PBM Agreement with MIA.  In and around late September/October 2017, Mr. Dale Brown, President of MIL and General Manager of MIA, confronted Mr. Sadana with this development.  At this meeting, Mr. Sadana characterized AIMS as a "black box," misrepresenting what AIMS was to Mr. Brown and knowing about the contract between Dimensions and Oman Insurance replacing MIA's PBM product with AIMS.

35.     The fact and timing of Oman Insurance's change from MIA's product to Dimensions' was a direct result of IQVIA's conduct.  IQVIA and Dimensions had misappropriated MedImpact's Trade Secrets and targeted Oman Insurance with the express purpose of diverting MIA's business to IQVIA.  Once this was achieved, and as further demonstrated below, Dimensions was in a position to abandon the joint venture and continue the claims adjudication business with IQVIA, but without MIL's involvement.  In turn, Oman Insurance had no need for MedImpact's PBM and so terminated the agreement.  In approximately mid-October 2017, Dimensions acknowledged AIMS was similar to MedImpact's PBM.

36.     MedImpact later learned that it was approximately one month after Oman Insurance had signed a separate agreement in order to replace MIA's PBM product with Dimensions' AIMS product that Dimensions notified MedImpact of its intent to terminate the JV Agreement in which IQVIA took a prominent role and participated in several meetings regarding the termination of the JV Agreement. But, MedImpact later learned, prior to issuing its notice of termination, Dimensions was secretly developing its own PBM platform by using MedImpact's confidential and Trade Secret information to compete with MIA in the Territory in violation of the JV Agreement.  Before partnering with MedImpact to form MIA, Dimensions did not have any experience with PBM, and did not provide any services in the PBM market.  Dimensions developed its AIMS and ICM products based on

COMPLAINT

MedImpact's confidential, proprietary and trade secret information.

37.     Recently, MedImpact learned that around the time that Dimensions terminated the JV Agreement, IQVIA and Dimensions jointly set out to purposefully transition each of MIA's PBM clients to AIMS.   Specifically, MedImpact learned in 2019 that in September 2017, Dimensions' Mr. Yousef Ghosheh prepared a detailed analysis for IQVIA's senior management Mr. Alistair Grenfell, providing Mr. Grenfell a customer-by-customer detailed analysis of MIA's clients, its pricing and contract status and summarizing which JV customers Dimensions and IQVIA hoped to switch away from MIA's PBM to AIMS and another Dimensions product, CDS.

> **(2)     IQVIA discloses and uses MedImpact's proprietary trade secret information and interferes with MIA's existing contractual and prospective business relationship with the help of Dimensions' and its appointed members to MIA's Board of Directors.**

38.     Prior to its merger with IMS Health, which had acquired Dimensions, IQVIA did *not* have claims adjudication capability.   But, with the help of Dimensions and appointed members to MIA's Board of Directors, namely Dr. Ghosheh and Mr. Sadana, IQVIA misappropriated MedImpact's confidential and proprietary trade secrets, which it then used to enter into the claims adjudication market including, by interfering with an existing contractual relationship between MIA and its existing clients, such as Oman Insurance.   Dr. Ghosheh and Mr. Sadana, by violating their fiduciary obligations to MIA as its directors, aided and abetted IQVIA by marketing including, on IQVIA branded materials, Dimensions' competing product AIMS in competition against MIA's PBM platform to MIA's existing clients.

39.     The MedImpact Trade Secrets include, but are not limited to, how to on-board clients including, documents that identify all of the information that must

COMPLAINT

be collected from clients on the front end to build out the PBM services, including all options and decisions that must be made by (or with) the client in order to structure the benefit design and coverage rules, as identified for example, in MedImpact's implementation questionnaires; information and documents that outline and define features and options of the pharmacy benefit plan and provide granular details on the standard benefit designs, clinical and utilization management protocols on an element-by-element basis, including descriptions of each element and decisions for the client to make with regard to benefits, as identified for example, in MedImpact's standard benefit templates; detailed listing and structure of data elements/fields as identified in the file type formats/layouts, including, how to structure that information into the system, and how to build a system based off that information; the user interface modules within the MedAccess tool that provides specific processes and information in the PBM process, and; adjudication logic, including, the rules and edits used to adjudicate claims and the order in which the rules and edits are applied.  MedImpact's Trade Secret information consists of detailed information as to how to develop, implement, operate, market, sell and price a PBM.

40.     Dimensions acquired MedImpact's Trade Secrets through the joint venture and then unlawfully used the information to develop and sell a competing product called AIMS and ICM.  Dimensions, including, Dr. Ghosheh, with the help of IQVIA, including, Mr. Sadana, circumvented the contractual restrictions in the JV Agreement, the NDA and SLC by unlawfully disclosing and using MedImpact's Trade Secrets and offered IQVIA PBM opportunities in the Territory and around the globe.

41.     In mid-September 2017, MedImpact representatives from San Diego met with representatives of IQVIA (including Alistair Grenfell, an IQVIA senior executive, and Mr. Sadana, Chairman of MIA Board of Directors) and Dimensions

COMPLAINT

(including Dr. Ghosheh) to discuss Dimensions' termination notice.  MedImpact specifically inquired about the renewal status of the contracts of certain clients, in particular MIA customer Oman Insurance.  As previously stated, Oman Insurance was a lucrative account for MedImpact and the joint venture, and was, in fact, the biggest client of the joint venture.  MedImpact invested a substantial amount of time and resources procuring the account and stood to receive significant benefit over the course of the relationship.  Unfortunately, on or about September 28, 2017, MedImpact learned from Oman Insurance's representative that Oman Insurance had replaced MIA's PBM platform with Dimensions' AIMS product.

42.    In and around the same time MedImpact was meeting with representatives from both Dimensions and IQVIA, Dimensions and IQVIA were conducting their own internal meetings and conspiring to switch MIA customers to Dimensions and/or IQVIA.  Dimensions' Mr. Yousef Ghosheh, brother of Dr. Ghosheh, prepared a detailed analysis for IQVIA senior management, Alistair Grenfell, providing him with a comprehensive analysis of MIA's customers, including, MIA's pricing structure and contract status, and summarizing for IQVIA which MIA clients they hoped to switch from MIA's PBM platform to Dimensions' AIMS, and another Dimensions competitive product, CDS.  IQVIA, with the help of Dimensions, appointed MIA Board of Directors, interfered with MIA's relationship with Oman Insurance, and interfered with MIA's other existing clients such as Vidal Health, ADNIC, Metlife, AXA, and Aafiya, and MIA's prospective business and economic relationships with Al Koot, GIG, and Warba.

43.    Then, on or about the time of Dimensions' termination notice, Oman Insurance first indicated it would renew its contract with MIA and that only pricing would need to be discussed.  Oman Insurance never did so.  MedImpact subsequently discovered that Oman Insurance instead entered into a contract with Dimensions and IQVIA.  Mr. Amit Sadana, an IQVIA employee and the Chairman

COMPLAINT

of the Board of Directors of MIA, executed the Oman Insurance contract separately with Dimensions and IQVIA outside the JV Agreement.  Despite MedImpact's efforts to retain Oman Insurance as a client of MIA, Oman Insurance later informed MedImpact that it had entered into another agreement and would not be renewing the contract with the joint venture.

44.    On information and belief, IQVIA continues to use MedImpact's Trade Secrets, confidential information, and know-how around the globe.

45.    MedImpact, for example, became aware that RX Health in Ghana advertises on its website that it has developed "RxClaim," "an electronic healthcare processing claim system that provides real time adjudication capabilities as well as speed and accuracy in processing claims."  The website further confirms that RX Health is "proud to be an IMS Health partner of choice for their data and software technologies in Ghana and Nigeria."  As previously explained, IQVIA was formerly IMS Health.  In 2018, Yousef Ghosheh of Dimensions travelled to Ghana with an IQVIA Business Development Manager, and upon information and belief, assisted IQVIA to secure this client using MedImpact's Trade Secrets and know-how.

46.    Based on information and belief, IQVIA is also offering an "all in one pharmacy management system" in the Palestinian market as part of the Palestinian Drug Information & Call Center.  Amongst other things, this offers drug-to-drug interactions and contraindications, as well as other pharmacy services and e-prescribing services which, on information and belief, are based on MedImpact's Trade Secrets and know-how stolen from MedImpact.

47.    Based on information and belief, IQVIA, with the help of Dr. Ghosheh, has also partnered with Sehati in Saudi Arabia in connection with Saudi Heathen Insurance Bus ("SHIB"), a large national e-health project.  Amongst other things, on information and belief, the health care platform developed as part of SHIB will provide PBM services based on MedImpact's Trade Secrets and know-

COMPLAINT

how.

**D.**     **Dr. Ghosheh and Amit Sadana Breached Their Fiduciary Obligations and Duties of Loyalty to MedImpact, a Shareholder In MIA.**

48.     When MIL and Dimensions entered into the JV Agreement, they each owned fifty-percent (50%) interest in the joint venture, and under Section 7.1 of the JV Agreement, they each had the option to appoint three (3) members to MIA's Board of Directors. Dimensions' and IQVIA's current appointees to MIA's Board of Directors include respectively, Dr. Ghosheh and Mr. Sadana, with Mr. Sadana being the Chairman. Pursuant to Section 7.2(a), MIA's Board of Directors were responsible for directing "the overall management, supervision and control of the Business of the Company." Furthermore, under Sections 4.1(a) and (b) of the JV Agreement, the principal purpose of forming the Company, *i.e.*, MIA, was "*to engage in the business of providing information technology consultative services* and *software* to companies and other entities undertaking activities related to the healthcare sector in the Territory . . . (the 'Business')," and that "*[a]ny* Business opportunity in the Territory offered or made available to a Shareholder shall promptly be disclosed to the Company" (emphasis added). Dr. Ghosheh and Mr. Sadana, as members of MIA's Board of Directors, breached their fiduciary obligations and duties of loyalty to MedImpact, a shareholder, and the joint venture by secretly creating opportunities for personal gain and diverting those opportunities to Dimensions and IQVIA, and by stealing the joint venture's existing clients.

49.     For example, in 2017, Dr. Ghosheh and Mr. Sadana engaged in an orchestrated effort and negotiated a contractual agreement between MIA's largest client Oman Insurance and Dimensions. Mr. Sadana of IQVIA signed the contract with Oman Insurance. Additionally, on information and belief, with the assistance of Dr. Ghosheh, IQVIA engaged in a concerted effort to sever MIA's contractual

- 21 -

COMPLAINT

ties with its other clients such as Vidal Health, ADNIC, AXA, Metlife, and Al Koot, and interfered with MIA's prospective business relationships with Al Koot, GIG, and Warba.  In short, Dr. Ghosheh and Mr. Sadana acted outside the scope of their corporate responsibilities and in violation of their fiduciary obligations and duties of loyalty owed to MIA and conspired with IQVIA to damage the joint venture.

50.     Furthermore, through the orchestrated efforts of Dr. Ghosheh and Mr. Sadana, Dimensions marketed its AIMS and related products and services over MIA's PBM platform to MIA's existing and prospective clients.  Dr. Ghosheh and Mr. Sadana had fiduciary obligations to further MIA's Business opportunities in the Territory and not to compete with MIA.

**E.     IQVIA, Dr. Ghosheh And Mr. Sadana Cause Significant Damages To MedImpact.**

51.     The loss of Oman Insurance and other client accounts and the decrease in pricing with others caused significant damage to MedImpact.  Over the course of multi-year contracts with its clients, MedImpact stood to gain significant profits.  As a result of IQVIA's wrongful conduct and interference with existing contracts and prospective business opportunities, not to mention its unlawful use of MedImpact's Trade Secrets, those existing and prospective clients have now been lost.  MedImpact consistently lost significant revenues from 2016 onwards and those revenues have continued to decline with IQVIA competing with MedImpact using MedImpact's confidential proprietary information.

52.     For example, solicitation of Oman Insurance by Dimensions and IQVIA was based upon MedImpact's Trade Secrets and know-how, including, the technology itself, pricing structure and preferences.

53.     Based on information and belief, IQVIA is also offering an "all in one pharmacy management system" in the Palestinian market as part of the Palestinian

COMPLAINT

Drug Information & Call Center.  Amongst other things, this offers drug-to-drug interactions and contraindications, as well as other pharmacy services and e-prescribing services which are based on the Trade Secrets and know-how stolen from MedImpact.

54.   Also, in July 2018, a then-client of the joint venture, ADNIC, confirmed to MedImpact that IQVIA, Dr. Ghosheh and Dimensions were circumventing the JV Agreement in an attempt to steal clients from the joint venture.  A representative of ADNIC asserted that IQVIA had approached ADNIC to sell them Dimensions' (and thus, not the joint venture's) PBM system.

55.   MedImpact, for example, became aware that RX Health in Ghana advertises on its website that it has developed "RxClaim," "an electronic healthcare processing claim system that provides real time adjudication capabilities as well as speed and accuracy in processing claims."  The website further confirms that RX Health is "proud to be an IMS Health partner of choice for their data and software technologies in Ghana and Nigeria."  As previously explained, IQVIA was formerly IMS Health.  In 2018, Yousef Ghosheh travelled to Ghana with an IQVIA Business Development Manager, and upon information and belief, assisted IQVIA to secure this client using MedImpact's Trade Secrets and know-how.

56.   Based on information and belief, IQVIA, with the help of Dr. Ghosheh, has also partnered with Sehati in Saudi Arabia in connection with Saudi Heathen Insurance Bus ("SHIB"), a large national e-health project.  Amongst other things, on information and belief, the health care platform developed as part of SHIB will provide PBM services based on MedImpact's Trade Secrets and know-how.

57.   Dimensions conspired with IQVIA and unlawfully disclosed MedImpact's Trade Secrets to IQVIA, and worked in collaboration with IQVIA to sell products developed using MedImpact's proprietary confidential trade secret

COMPLAINT

information.

58.     Based on information and belief, MedImpact also alleges that Dimensions is providing IQVIA with access to patient healthcare data through the use of MIA's products/services or Dimensions' AIMS and other similar products because a large proportion of IQVIA's business involves the selling of healthcare and pharma data to third parties.   Any implication that MIA or MedImpact is involved in the sale of healthcare data causes serious harm to MIA and MedImpact's reputation.

59.     The unlawful misappropriation of MedImpact's Trade Secrets, unfair competition and other wrongful acts by IQVIA, Dimensions, Dr. Ghosheh, and Mr. Sadana represent a mere tip of the iceberg, and that these Defendants have engaged in a pattern and practice of using and misappropriating MedImpact's confidential and proprietary information to unlawfully compete with MedImpact and to otherwise injure its status and reputation in the PBM industry.

60.     Defendants acted in concert by carrying out different parts of the wrongful acts asserted herein together and in cooperation and concert with one another.  For example, some Defendants directly copied or oversaw the copying of MedImpact's Trade Secrets shared with the JV, and others misrepresented the status of certain client accounts to both MedImpact and actual and current customers of the JV, while others were responsible to determining which of the JV customers would be prime for stealing from the joint venture, and others were responsible for selling the competing products to JV customers.   Defendants benefitted from the acts of each other and managed, or could have managed, the acts of other Defendants.  They either knew, should have known, or were willfully blind of, the wrongful acts of each other.  The harmful consequences of the acts of Defendants were fully foreseeable by all Defendants.  As a result, all Defendants are legally responsible for the wrongful acts of each of the Defendants described in

COMPLAINT

detail below.  These coordinated acts formed a RICO enterprise.

## IV.

## JURISDICTION AND VENUE

61.     This Court has specific jurisdiction over IQVIA Holdings, Inc., IQVIA Inc., IMS, Dr. Ghosheh and Mr. Sadana because the defendants possess the requisite "minimum contacts" with this forum, including but not limited to physical visits to MedImpact in San Diego, mail sent to MedImpact in San Diego, e-mail sent to MedImpact San Diego employees, phone calls with MedImpact employees in San Diego, and numerous other contacts and communications in and into California over the span of many years in furtherance of the acts giving rise to this litigation, as well as the intentional misappropriation of intellectual property belonging to a California company.  All aspects of this case ultimately lead back to trade secrets and other valuable assets owned and protected in California, a deliberate scheme to target and exploit a California company, and damages suffered in California.

62.     Upon information and belief, IQVIA Holdings, Inc.'s California locations include a location at 10188 Telesis Ct. #400, San Diego, California 92121.  IQVIA Holdings, Inc. employs people within this forum, provides services within the forum, conducts business and enters into agreements within this forum, and its actions caused injury to MedImpact within this forum.

63.     Upon information and belief, IQVIA, Inc.'s California locations include a location at 10188 Telesis Ct. #400, San Diego, California 92121.  IQVIA, Inc. employs people within this forum, provides services within the forum, conducts business and enters into agreements within this forum, and its actions caused injury to MedImpact within this forum.

64.     Upon information and belief, IMS conducts business and provides services within this forum, and its actions caused injury to MedImpact within this

- 25 -

COMPLAINT

forum.

65.   Dr. Ghosheh frequently travels to this forum for business, conducts business within this forum, and his actions caused injury to MedImpact within this forum.   Particularly, Dr. Ghosheh has traveled to this forum to meet with employees of MedImpact regarding the subject matter related to the subject matter of this litigation.   Dr. Ghosheh has sent e-mail to MedImpact employees in San Diego, and participated in phone calls with MedImpact employees in San Diego in furtherance of the acts giving rise to this litigation.   Upon information and belief, Dr. Ghosheh misappropriated MedImpact's confidential and proprietary information that was developed in this forum, and converted the same for the benefit of himself and IQVIA.

66.   Mr. Sadana conducts business within this forum, and his actions caused injury to MedImpact within this forum.   Particularly, Mr. Sadana has sent e-mail to MedImpact employees in San Diego, and participated in phone calls with MedImpact employees in San Diego in furtherance of the acts giving rise to this litigation.   Upon information and belief, Mr. Sadana misappropriated MedImpact's confidential and proprietary information that was developed in this forum, and converted the same for the benefit of himself and IQVIA.

67.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as there is complete diversity between the Plaintiffs and all Defendants and the amount in controversy exceeds $75,000.00.   Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs allege a claim under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 and 18 U.S.C. § 1962(c) (RICO).   Subject matter over any related state law claims is appropriate under 28 U.S.C. § 1367 and the doctrines of ancillary and pendent jurisdiction.

68.   Venue is proper in this district under 28 U.S.C. § 1391, because a

COMPLAINT

substantial part of the acts and the injuries arising from the trade secret misappropriation, unfair competition and interference with economic relationships complained of herein have occurred and are occurring in this judicial district, and because the intellectual property that is subject of the action is situated here.

## V.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION -- Misappropriation of Trade Secrets Under California Uniform Trade Secrets Act ("CUTSA") Against All Defendants.**

69.     MedImpact hereby incorporates by this reference Paragraph 1 through 68, inclusive, as if set forth fully herein.

70.     At all times relevant herein, MedImpact was in possession of its Trade Secrets as defined by California Civil Code section 3426.1(d).  This information has independent economic value in that it enables MedImpact to offer and provide PBM services customized to the unique needs and circumstances of its customers and has made MedImpact the largest private PBM provider in the United States. The information is not generally known to the public or to the managed pharmacy benefits industry, and derives independent economic value from not being known to the general public or to the relevant industry.

71.     MedImpact has expended hundreds of millions of dollars over decades and other resources in developing its Trade Secrets, know-how and proprietary information.  In addition, MedImpact goes to great lengths to protect the secrecy of this information by executing confidentiality agreements with all employees, independent contractors, payers, and all other parties provided with MedImpact's Trade Secrets and confidential information, maintaining sophisticated firewalls, private networks, and other technical mechanisms to ensure the security of MedImpact's confidential information, labeling certain written communications as confidential, employing passwords and several other security mechanisms to

COMPLAINT

protect MedImpact's confidential information. For example, MedImpact requires employees to read employee handbooks governing the treatment of confidential and trade secret information; to attend training on the protection of confidential and trade secret information; and for departing employees, to return all documents and MedImpact computers or devices, and MedImpact then terminates the access of those departing employees to all computers and systems. MedImpact also has controlled access doors throughout its facilities. Further, MedImpact has computer access restrictions on computers themselves, but also MedImpact databases and tools, such as MedAccess.

72.     MedImpact shares its confidential information and trade secrets only on a need-to-know basis with its employees and certain customers and partners subject to strict confidentiality agreements with an express obligation to protect confidentiality. It is MedImpact's practice to require any third party including, payers, with access to MedImpact's confidential and trade secret information to sign a MedImpact non-disclosure agreement ("NDA") prior to disclosing confidential information.

73.     MedImpact is informed and believes, and based thereon alleges, that beginning in at least mid-2017, and continuing to date, IQVIA, with the assistance of Dimensions, Dr. Ghosheh and Mr. Sadana, misappropriated MedImpact's confidential and proprietary information and Trade Secrets and converted the same to its own use to enter the PBM market abroad.

74.     Additionally, and based on information and belief, by improperly receiving, issuing, and further disclosing the foregoing trade secret material, IQVIA misappropriated MedImpact's Trade Secrets in violation of California Civil Code §§ 3426.1(b) and 3426.3.

75.     MedImpact is informed and believes, and based thereon alleges, that IQVIA knew or should have known that the information provided to it by

COMPLAINT

Dimensions, Dr. Ghosheh, and Mr. Sadana was taken from and belonged to MedImpact. MedImpact is further informed and believes, and based thereon alleges, that IQVIA encouraged Dimensions to do so and willingly accepted information from Dimensions, Dr. Ghosheh, and Mr. Sadana that it did not otherwise have, and solicited Dimensions, Dr. Ghosheh, and Mr. Sadana for information knowing that it came from MedImpact. MedImpact is further informed and believes, and on that basis alleges, that IQVIA performed no due diligence to ensure that Dimensions did not share confidential MedImpact information with IQVIA and actually encouraged Dimensions and Dr. Ghosheh to misappropriate MedImpact information for the benefit of IQVIA.

76. As a proximate result of Defendants' acts as alleged herein, MedImpact has suffered damages, and will continue to suffer damages, unless Defendants are enjoined from using the confidential trade secret information they misappropriated and ordered to immediately return said information, and unless MedImpact obtains actual damages consisting of the loss of customers and revenues. While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that the value of the actual and potential customer contracts and associated revenues lost though Defendants' wrongful conduct exceeds tens of millions of dollars. Alternatively, and at a minimum, MedImpact is entitled to a reasonable royalty for Defendants' wrongful misappropriation and use of MedImpact's Trade Secrets, in an amount to be proven at trial.

77. Defendants, in engaging in the aforementioned acts, are guilty of malice and oppression in that they deliberately intended to harm MedImpact's business and improve their own by misappropriation and acted in conscious disregard of MedImpact's rights. Defendants' conduct therefore warrants the assessment of punitive damages in an amount appropriate to punish Defendant and

COMPLAINT

deter others from engaging in similar conduct.

78.     Defendants' wrongful conduct in misappropriating MedImpact's Trade Secrets, confidential customer and competitive business information and disclosing and utilizing said information will continue unless and until enjoined and restrained by order of this Court.  Without such Court intervention, Defendants' conduct in misappropriating MedImpact's proprietary information will cause great and irreparable injury to MedImpact's business, in that MedImpact has lost and will continue to lose existing and potential customers.

79.     MedImpact has no adequate remedy at law for the injuries currently being suffered in that Defendant will continue to wrongfully solicit MedImpact's existing and potential clientele and customers and utilize information that was wrongfully misappropriated from MedImpact, including but not limited to trade secrets, know-how, confidential and proprietary technical information and know-how and customer information that is not generally available to the public at large. MedImpact is entitled to a temporary, preliminary and permanent injunction against Defendants as prayed herein.

80.     MedImpact is informed and believes, and on that basis alleges, that Defendants' conduct was, and is, malicious, fraudulent, deliberate and willful. MedImpact is therefore entitled to recover from Defendants exemplary damages in the amount of twice the total damages or reasonable royalty awarded, pursuant to California Civil Code §3426.3.

81.     MedImpact is also entitled to an award of attorneys' fees pursuant to California Civil Code § 3426.4.

**SECOND CAUSE OF ACTION -- Misappropriation of Trade Secrets Under Defend Trade Secrets Act (18 U.S.C. § 1836, et seq.) Against All Defendants.**

82.     MedImpact hereby incorporates by this reference Paragraph 1 through 81, inclusive, as if set forth fully herein.

- 30 -

COMPLAINT

83.     MedImpact owns and possesses MedImpact Trade Secrets, know-how and confidential information, as alleged above.

84.     MedImpact's Trade Secret and confidential information relates to products and services used, sold, and ordered in, or intended to be used, sold, and/or ordered in, interstate and foreign commerce.  Specifically, MedImpact's confidential and trade secret information concerning its PBM solution is used by customers throughout the United States.

85.     MedImpact has expended hundreds of millions of dollars and a significant amount of time and other resources in developing its Trade Secrets and confidential information.  In addition, MedImpact goes to great lengths to protect the secrecy of this information by executing confidentiality agreements with all employees, independent contractors, and all other parties provided with MedImpact's confidential information, maintaining firewalls, private networks, and other technical mechanisms to ensure the security of MedImpact's confidential information, labeling certain written communications as confidential, employing passwords and several other security mechanisms to protect MedImpact's confidential information.  For example, MedImpact requires employees to read employee handbooks governing the treatment of confidential and trade secret information; to attend training on the protection of confidential and trade secret information; and for departing employees, to return all documents and MedImpact computers or devices, and MedImpact then terminates the access of those departing employees to all computers and systems. MedImpact also has controlled access doors throughout its facilities. Further, MedImpact has computer access restrictions on computers themselves, but also MedImpact databases and tools, such as MedAccess.

86.     MedImpact shares its confidential information and trade secrets only on a need-to-know basis with its employees and certain customers and partners

COMPLAINT

subject to strict confidentiality agreements with an express obligation to protect confidentiality. It is MedImpact's practice to require any third party including, payers, with access to MedImpact's confidential and trade secret information to sign a MedImpact NDA prior to disclosing confidential information.

87.     MedImpact's proprietary and confidential trade secret information derives independent economic value from not being generally known to and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.  MedImpact's Trade Secrets and confidential and proprietary information are of great value to MedImpact and would give any competitor of MedImpact an unfair competitive advantage.

88.     Specifically, MedImpact's confidential and trade secret information are of great value to MedImpact and such information would give any competitor, who improperly acquired such information, an unfair competitive advantage by: (1) not expending the time and resources to develop the trade secret and confidential and proprietary information as MedImpact has done; (2) quickly developing products and technologies to unfairly compete with MedImpact in order to diminish MedImpact's head start; and (3) other improper advantages.

89.     In violation of MedImpact's rights, IQVIA Defendants willfully misappropriated MedImpact's confidential and proprietary information and converted the same to its own use its efforts to enter the PBM market abroad.

90.     On information and belief, by receiving, improperly using, and further disclosing the foregoing trade secret material, IQVIA misappropriated MedImpact's Trade Secrets in violation of 18 U.S.C. § 1836, et seq.

91.     Upon information and belief, Dimensions, Dr. Ghosheh, and Mr. Sadana solicited and collected MedImpact's Trade Secret information, and used the information as part of a scheme with IQVIA to misappropriate such Trade Secrets

COMPLAINT

to get AIMS up and running and develop competing PBM products in order to compete with and steal MedImpact's business.  Further, upon information and belief, IQVIA acquired, has used and continues to use MedImpact's Trade Secrets, knowing that it was misappropriated and obtained through deceitful means.  Such misappropriation permitted Dimensions and Dr. Ghosheh to develop its competing products, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such Trade Secrets.

92.   MedImpact is informed and believes, and based thereon alleges, that IQVIA knew or should have known that the information provided to it by Dimensions, Dr. Ghosheh, and Mr. Sadana was taken from and belonged to MedImpact.  MedImpact is further informed and believes, and based thereon alleges, that IQVIA encouraged Dimensions, Dr. Ghosheh, and Mr. Sadana to do so and willingly accepted information from them that it did not otherwise have, and solicited Dimensions, Dr. Ghosheh, and Mr. Sadana for the information knowing that it came from MedImpact.  MedImpact is further informed and believes, and on that basis alleges, that IQVIA performed no due diligence to ensure that Dimensions did not share confidential MedImpact information with IQVIA and actually encouraged Dimensions, Dr. Ghosheh, and Mr. Sadana to misappropriate MedImpact information for the benefit of IQVIA.

93.   IQVIA is, on information and belief, still in possession of MedImpact's Trade Secrets, and, on information and belief, is able to access and use this information.

94.   Defendants' misappropriation of MedImpact's Trade Secrets has been intentional, knowing, willful, malicious, fraudulent, and oppressive.

COMPLAINT

95.    If Defendants' conduct is not remedied, they will continue to misappropriate, disclose, and use MedImpact's Trade Secrets for their own benefit and to MedImpact's detriment.

96.    Because MedImpact's remedy at law is inadequate, MedImpact seeks, in addition to damages, permanent injunctive relief to recover and protect its Trade Secrets and other legitimate business interests.  Moreover, Defendants' intentional, willful, and malicious conduct indicates that injunctive or other equitable relief will be inadequate to prevent Defendants' future misconduct.  Therefore, MedImpact further seeks an order under 18 U.S.C. § 1836(b)(2) for the seizure of any and all of MedImpact's Trade Secrets and confidential or proprietary information in the possession, custody, or control of any Defendant in order to recover and protect MedImpact's Trade Secrets and other legitimate business interests.

97.    As the direct and proximate result of Defendants' conduct, MedImpact has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

98.    MedImpact has been damaged by all of the foregoing, and is also entitled to an award of exemplary damages and attorneys' fees.

**THIRD CAUSE OF ACTION -- Intentional Interference with Prospective Economic Relations Against IQVIA and IMS.**

99.    MedImpact hereby incorporates by this reference Paragraph 1 through 98, inclusive, as if set forth fully herein.

100.    MedImpact is informed and believes, and based thereon alleges, that Defendants have not only misappropriated MedImpact's Trade Secrets, confidential technical information and know-how, customer and business information and used the same to solicit existing and potential MedImpact customers, but have also interfered with MedImpact's economic relationships with existing and potential customers through other wrongful acts.  MedImpact is informed and believes, and

COMPLAINT

based thereon alleges, that IQVIA has utilized its position as a parent company of Dimensions (but without being bound to the terms of the JV Agreement) to funnel MedImpact's Trade Secrets through Dimensions and unlawfully compete with MedImpact for customers.  MedImpact is further informed and believes, and based thereon alleges, that Dimensions used this information for the benefit of IQVIA, with IQVIA's full encouragement and knowledge.

101.  MedImpact is informed and believes, and based thereon alleges, that an economic and ongoing business relationships existed between MIHK and Dimensions under the JV Agreement, containing an existing and probable future economic benefit or advantage to MedImpact.  IQVIA knew of the ongoing business relationship between MIHK and Dimensions.  MedImpact is informed and believes, and based thereon alleges, that IQVIA utilized its position as a parent company of Dimensions to terminate the JV Agreement and the economic benefits of that relationship.

102.  As yet another example of Defendants' wrongful conduct designed to interfere with MIA's existing and potential customers and economic relations, MedImpact is informed and believes, and based thereon alleges, that IQVIA solicited and encouraged MIA board members Dr. Ghosheh and Mr. Sadana to breach not only the terms of the JV Agreement, NDA and SLC, but also the duty of fair dealing, loyalty and confidentiality obligations that was owed to MedImpact by soliciting and encouraging Dimensions and Dr. Ghosheh and Mr. Sadana to disclose and use confidential information, such as MedImpact's Trade Secrets and confidential technical information, know-how, pricing and business model information.

103.  As a result of the foregoing wrongful acts by Defendants, Dimensions terminated the JV, at least Oman Insurance terminated its relationship with MedImpact and others decreased their pricing, and thus, MedImpact has been

COMPLAINT

damaged.  While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that it has lost in excess of millions of dollars in contractual benefits as a result of defendants' wrongful conduct that MedImpact stood to gain through its relationship with Oman Insurance and other existing and potential customers.

104.  MedImpact is informed and believes, and based thereon alleges, that Defendants' wrongful acts will continue to cause injury to MedImpact and that such injury will continue unless enjoined and restrained by this Court.

105.  MedImpact is informed and believes, and based thereon alleges, that the acts of Defendants alleged herein were willful, oppressive, fraudulent, despicable and in conscious disregard of the rights of MedImpact and the resulting harm to MedImpact.  Defendants are liable for punitive and exemplary damages in amount to be established according to proof at time of trial.

**FOURTH CAUSE OF ACTION -- Negligent Interference with Prospective Economic Relations Against IQVIA and IMS.**

106.  MedImpact hereby incorporates by this reference Paragraph 1 through 105, inclusive, as if set forth fully herein.

107.  As set forth above, economic and ongoing business relationships existed and exist between MIA and its customers containing an existing and probable future economic benefit or advantage to MedImpact, as a shareholder in MIA.

108.  Additionally, an economic and ongoing business relationships existed between MIHK and Dimensions under the JV Agreement, containing an existing and probable future economic benefit or advantage to MedImpact.

109.  Defendants knew of the existence of the economic and business relationships between MIL and its customers, and MIA and Dimensions.

110.  MedImpact is informed and believes, and based thereon alleges, that

COMPLAINT

defendants were negligent in that they knew or should have known that Dimensions owed a duty to MIL and MIHK to maintain the confidentiality and secrecy of MedImpact's Trade Secrets, proprietary technical information and know-how and customer information, and non-confidential yet competitive business information, yet violated that duty resulting in the misappropriation of said information and the interference and disruption by Defendants with the actual and prospective economic and business relationships between MIHK and Dimensions, as well as between MIA and its customers.

111.   Because the economic relationships between MIHK and Dimensions as well as MIA and its customers were interfered with and disrupted by Defendants, and as a proximate result of Defendants' acts as alleged herein, MedImpact has suffered damages and will continue to suffer damages consisting of the loss of customers and revenues in an amount to be proven at trial, unless Defendants are enjoined.  While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that it has lost in excess of millions of dollars in contractual benefits as a result of Defendants' wrongful conduct that MedImpact stood to gain through the joint venture as well as its relationship with Oman Insurance and other actual and potential customers.

**FIFTH CAUSE OF ACTION -- Intentional Interference With A Contractual Relationship Against IQVIA and IMS.**

112.   MedImpact hereby incorporates by this reference Paragraph 1 through 111, inclusive, as if set forth fully herein.

113.   As set forth above, MIL and Dimensions entered into a binding JV Agreement offering economic benefit or advantage to MedImpact.  MIL's interest and rights in the JV Agreement were assigned to MIHK.

114.   Defendants knew of the existence of the JV Agreement, SLC, and of the economic and business relationships between MIL/MIHK and Dimensions.

- 37 -

COMPLAINT

115.   Defendants intentionally engaged in a pattern of conduct that prevented or hindered the performance of the contract by coercing with Dimensions to share and use MedImpact's Trade Secrets, proprietary technical information and know-how and customer information, and non-confidential yet competitive business information in violation of the JV Agreement, the NDA, and the SLC, and by coercing Dimensions to terminate the joint venture.

116.   MedImpact is informed and believes, and based thereon alleges, that Defendants knew or should have known that Dimensions had a duty act to maintain the confidentiality and secrecy of MedImpact's Trade Secrets, proprietary technical information and know-how and customer information, and non-confidential yet competitive business information, but violated that duty resulting in the misappropriation of MedImpact's confidential trade secret information.

117.   Because the contracts between MIL/MIHK and Dimensions were interfered with and disrupted by the Defendants, and as a proximate result of Defendants' acts as alleged herein, MedImpact has suffered significant damages and will continue to suffer damages consisting due to the loss of customers and revenues in an amount to be proven at trial, unless Defendants are enjoined.  While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that it has lost in excess of millions of dollars in contractual benefits as a result of Defendants' wrongful conduct that MIHK stood to gain through the joint venture as well as its relationship with Oman Insurance and other actual and potential customers.  Additionally, because IQVIA's acts were committed with malice, MedImpact also seeks exemplary and/or punitive damages.

**SIXTH CAUSE OF ACTION – Inducing Breach of Contract Against IQVIA and IMS.**

118.   MedImpact hereby incorporates by this reference Paragraph 1 through 117, inclusive, as if set forth fully herein.

COMPLAINT

119.  IQVIA knew of the existence of valid, binding, and enforceable JV Agreement and SLC between MIL/MIHK and Dimensions.  The JV Agreement obligated Dimensions to act in the best interest of the joint venture, and that, "[a]ny Business opportunity in the Territory offered or made available to a Shareholder shall promptly be disclosed" to the joint venture."

120.  IQVIA induced Dimensions to breach its obligations under the JV Agreement, SLC, and NDA by not only misappropriating MedImpact's Trade Secrets, confidential and proprietary information and disclosing it to IQVIA, but also stealing MedImpact's existing clients and delivering them to IQVIA.

121.  As a result of IQVIA's unlawful acts, Dimensions was induced to breach its obligations under the JV Agreement, SLC, and NDA and because of the breach, MedImpact suffered significant damages.

**SEVENTH CAUSE OF ACTION -- Unfair Competition – Cal. Bus. & Prof. Code § 17200, et seq., Against IQVIA and IMS.**

122.  MedImpact hereby incorporates by this reference Paragraph 1 through 121, inclusive, as if set forth fully herein.

123.  The actions of Defendants described herein in misappropriating MedImpact's Trade Secrets, confidential and proprietary information, and other information and property that belonged to MedImpact, and unfairly and fraudulently soliciting existing and potential customers of MedImpact, constitutes unlawful, unfair and fraudulent business acts and practices violating California Business & Professions Code §§ 17200, et seq. ("UCL").  MedImpact is informed and believes, and based thereon alleges, that IQVIA knew of Dimensions' wrongful acts of unfair competition described herein and encouraged the same, and together with Dimension usurped relationships that MedImpact expended substantial time and resources cultivating with its customers and clients.

124.  As a direct result of Defendants' acts of unfair competition under the

COMPLAINT

UCL, MedImpact has suffered and will continue to suffer harm as described herein, and such harm will continue unless the Court enjoins and restrains Defendants' actions.

125.   Defendants should be required to restore to MedImpact any and all of MedImpact's Trade Secrets, proprietary and confidential information, and other non-confidential yet valuable information and assets, and any other information of MedImpact in Defendants' possession, custody or control.  MedImpact also seeks injunctive relief to stop IQVIA from unfairly soliciting MedImpact's current and potential customers, and to stop Defendants from disparaging MedImpact to MedImpact's existing customers, potential customers and others in the industry.  Further, MedImpact seeks injunctive relief for the return of its information wrongfully obtained through appropriate restitution and any other property wrongfully taken.

126.   As a proximate and legal result of Defendants' wrongful conduct, MedImpact has been damaged in its business relationships with potential and existing clientele and customers, and has suffered harm in the form of lost sales, loss of reputation, loss of the ability to control access to its trade secrets, and loss of goodwill.  As detailed herein, MedImpact seeks an order granting MedImpact and the general public relief from Defendants' deceptive, unfair and fraudulent trade practices.

**EIGHTH CAUSE OF ACTION -- Racketeer Influenced And Corrupt Organizations Act, 18 U.S.C. § 1962(c) Against All Defendants.**

127.   MedImpact hereby incorporates by this reference Paragraph 1 through 126, inclusive, as if set forth fully herein.

128.   IQVIA, Dimensions, Dr. Ghosheh, and Mr. Sadana qualify as "persons" under 18 U.S.C. § 1961(3).

- 40 -

COMPLAINT

129.   IQVIA violated 18 U.S.C § 1962(c) by participating in or conducting the affairs of the joint group with Dimensions, Dr. Ghosheh and Mr. Sadana (the "IQVIA RICO Enterprise") through a pattern of racketeering activity outlined herein.

130.   MedImpact is a "person[s] injured in his or her business or property" by reason of the Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

131.   Defendants, working for and through the IQVIA RICO Enterprise, committed multiple acts of trade secret misappropriation and used MedImpact as part of an unlawful scheme to misappropriate its Trade Secrets to develop AIMS in order to compete with the joint venture's PBM products and steal MedImpact's business.  The IQVIA RICO Enterprise engaged in activities that affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consisted of "persons" associated together for a common purpose. The IQVIA RICO Enterprise has, and has had, an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

132.   While Defendants participated in the conduct of the IQVIA RICO Enterprise, they had an existence separate and distinct from the IQVIA RICO Enterprise.  Further, the IQVIA RICO Enterprise was separate and distinct from the pattern of racketeering in which Defendants have engaged.

133.   Dr. Ghosheh occupied a distinct role outside Dimensions and IQVIA as the Deputy General Manager of the joint venture, through which he enjoyed extensive access to MedImpact's confidential and trade secret information.  Upon information and belief, Dr. Ghosheh played a key leadership role in coordinating and carrying out the theft of MedImpact's Trade Secrets.  As a result, he has

COMPLAINT

willfully played a key central leadership role in the IQVIA RICO Enterprise, and has aided and abetted the Defendants' wrongful acts.

134.   IQVIA, by and through its acquisition of Dimensions, had extensive access to MedImpact's confidential information and its PBM platform.   Upon information and belief, IQVIA played a key role in coordinating and carrying out the theft of MedImpact's Trade Secrets, the termination of the JV Agreement, and the unlawful competition with MedImpact, including the resulting poaching of the joint venture's lucrative customers, such as Oman Insurance.   As a result, also IQVIA has willfully played a key central leadership role in the IQVIA RICO Enterprise, and has aided and abetted in the defendants' wrongful acts.

135.   At all relevant times, Defendants operated, controlled or managed the IQVIA RICO Enterprise, through a variety of actions described herein. Defendants' participation in the IQVIA RICO Enterprise was necessary for the successful operation of its scheme to take and use MedImpact's Trade Secrets and develop competing PBM products to compete with and steal MedImpact's business, because Defendants performed those acts through the coordinated efforts of that Enterprise.

136.   The members of the IQVIA RICO Enterprise all served a common purpose: to wrongfully profit from MedImpact's stolen Trade Secrets, to maximize the revenue and profitability of the IQVIA RICO Enterprise's members.   The members of the IQVIA RICO Enterprise shared the bounty generated by the enterprise, i.e., by sharing the benefit derived from the increased revenue generated by the stolen and wrongfully copied Trade Secrets.   Each member of the IQVIA RICO Enterprise benefitted from the common purpose of the scheme to wrongfully copy and steal MedImpact's Trade Secrets protected under Federal law.

137.   To carry out, or attempt to carry out, the scheme to misappropriate the Trade Secrets, Defendants have conducted or participated in the conduct of the

COMPLAINT

affairs of the IQVIA RICO Enterprise through a pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

138.   Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication traveling in interstate or foreign commerce, writing(s) and/or signal(s), including, as detailed above, Defendants' communications with prospective customers, and communications with other members of the IQVIA RICO Enterprise, as well as IQVIA's communications to MedImpact describing the misleading bases on which they were terminating the JV.

139.   The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

140.   Defendants have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

141.   Defendants' conduct in furtherance of this scheme was intentional. MedImpact has been, and currently is being, harmed as a result of Defendants' intentional conduct.

142.   As described throughout this Complaint, Defendants engaged in a pattern of related and continuous predicate acts.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of wrongfully taking MedImpact's Trade Secrets and obtaining significant monies and revenues as a result.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

- 43 -

COMPLAINT

143.   As a direct and proximate result of Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), MedImpact has been injured in its business and property.   For example, Defendants have directly profited from the use of MedImpact's Trade Secrets and competing products; MedImpact lost revenue from upholding their end of the deal to not compete with the JV; MedImpact's loss of control over its Trade Secrets as Defendants have used and continue to use the materials in promotion of a business which MedImpact has no control over; a loss of goodwill related to the loss of control, and MedImpact has been forced to reduce prices in order to keep work, due to competing bids from Defendants that were submitted using MedImpact's competing products and other confidential and proprietary materials.

**NINTH CAUSE OF ACTION – Breach of Fiduciary Duties and Duty of Loyalties Owed to the Joint Venture and MedImpact, Against Dr. Ghosheh and Mr. Sadana.**

144.   MedImpact hereby incorporates by this reference Paragraph 1 through 143, inclusive, as if set forth fully herein.

145.   Both Dr. Ghosheh and Mr. Sadana in their capacities as MIA's Board of Directors owed fiduciary obligations and duty of loyalty to MIA and MedImpact as its shareholder.   Dr. Ghosheh and Mr. Sadana were bound by their fiduciary obligations and duties of undivided loyalty to act in MIA's best interest and in the interest of MedImpact.   Furthermore, Dr. Ghosheh and Mr. Sadana were obligated such that "*[a]ny* Business opportunity in the Territory offered or made available to a Shareholder shall promptly be disclosed to the Company" (emphasis added).   Dr. Ghosheh and Mr. Sadana breached their fiduciary obligations and duties of loyalty to the joint venture and MedImpact by secretly creating opportunities for personal gain and diverting those opportunities to Dimensions and IQVIA, and by stealing the joint venture's existing clients.

- 44 -

COMPLAINT

146.   Dr. Ghosheh and Mr. Sadana by conducting themselves in a manner that was adverse to MIA's interest of MIA breached their fiduciary obligations and duty of undivided loyalty to MIA and MedImpact, which was a substantial factor in causing significant harm to MedImpact.

147.   As a proximate and legal result of Dr. Ghosheh's and Mr. Sadana's breach of their fiduciary duties, MedImpact has suffered significant in an amount to be proven at trial.  While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that it has lost in excess of millions of dollars in contractual.  Additionally, because Dr. Ghosheh and Mr. Sadana acted with malice, MedImpact also seeks exemplary and/or punitive damages.

**TENTH CAUSE OF ACTION -- Unjust Enrichment Against All Defendants.**

148.   MedImpact hereby incorporates by this reference Paragraph 1 through 147, inclusive, as if set forth fully herein.

149.   Defendants wrongfully received MedImpact's Trade Secrets and confidential and proprietary information, which it relied on to unlawfully compete with MedImpact.

150.   MedImpact is informed and believes and on that basis alleges that the Trade Secrets and confidential and proprietary information wrongfully obtained by Dimensions and Defendant Dr. Ghosheh was given to and shared with Defendant IQVIA, and that it was understood that the Trade Secrets and confidential and proprietary information were wrongfully obtained and shared.

151.   MedImpact is informed and believes and on that basis alleges that Defendants used the Trade Secrets and confidential and proprietary information for their own financial benefit, including but not limited to the develop of a competing PBM product and competing with MedImpact for customers based on the stolen product.

- 45 -

COMPLAINT

152.   MedImpact was never reimbursed for the value of the technical knowledge regarding its Trade Secrets and confidential and proprietary information used by both Defendants. Defendants were unjustly enriched by receiving this information and using it to develop their own PBM product without providing any consideration or value in return to MedImpact for said information.

**ELEVENTH CAUSE OF ACTION -- Civil Conspiracy Against All Defendants.**

153.   MedImpact hereby incorporates by this reference Paragraph 1 through 152, inclusive, as if set forth fully herein.

154.   IQVIA, Dimensions, Dr. Ghosheh, and Mr. Sadana conspired and colluded to misappropriate MedImpact's Trade Secrets and proprietary and confidential information, and to steal MIA's existing clients.  In fact, IQVIA after acquiring Dimensions engaged in the planning to steal MIA's existing clients and interfere with MIA's prospective client relationship to MedImpact's detriment.

155.   In short, there was an agreement between IQVIA, Dimensions, Dr. Ghosheh, and Mr. Sadana to use MedImpact's Trade Secrets and proprietary and confidential information to develop and sell ICM and AIMS, products that would compete with MIA's PBM platform and then use them to enter into the PBM market to steal MIA's clients causing MedImpact significant harm.

156.   As a result, the Defendants are jointly and severally liable to MedImpact, and MedImpact is entitled to punitive damages against the defendants.

**TWELFTH CAUSE OF ACTIONS – Conversion Against IQVIA and IMS**

157.   MedImpact hereby incorporates by this reference Paragraph 1 through 156, inclusive, as if set forth fully herein.

158.   At all times relevant herein, MedImpact exclusively owned and was in possession of certain valuable confidential and proprietary trade secret information as described above.

- 46 -

COMPLAINT

159. Defendants willfully converted MedImpact's Trade Secrets and confidential and proprietary information to their own use and fraudulently claimed ownership of MedImpact's Trade Secrets and confidential and proprietary information as part of a scheme to steal MedImpact's intellectual property relating to PBM, to sell products that compete directly against MedImpact, and to take revenue and profits from the sale of said products for its own, while knowing that the confidential and proprietary information and intellectual property was the property of MedImpact.

160. MedImpact is the rightful owner of this property. MedImpact is lawfully entitled to its possession, and has an absolute and unconditional right to the immediate possession of the confidential and proprietary information and intellectual property.

161. Defendants have wrongfully and without authorization obtained and retained control, dominion, and/or ownership of MedImpact's confidential and proprietary information and intellectual property.

162. Defendants' possession and retention of MedImpact's confidential and proprietary information and intellectual property constitutes conversion and has harmed MedImpact.

163. Defendants are, on information and belief, still in possession of MedImpact's valuable confidential and proprietary information, and, on information and belief, are able to access and use this information.

164. As the direct and proximate result of Defendants' conduct, including the theft of MedImpact's valuable confidential and proprietary information, MedImpact has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

165. Punitive damages are proper to punish Defendants for their willful, intentional, and malicious conversion and to deter future tortious conduct.

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.

## **DEMAND FOR JURY TRIAL**

166.   Plaintiffs respectfully request a jury trial in this action on all issues so triable.

COMPLAINT

# VII.

## PRAYER FOR RELIEF

Based on the foregoing, MedImpact demands judgment against Defendants and hold them jointly and severally liable, as follows:

1.      Judgment in Plaintiffs' favor and against Defendants on all causes of action alleged herein;

2.      A preliminary and permanent injunction to enjoin Defendants, their agents, servants, employees, attorneys, successors and assigns, and all persons, firms, and corporations acting in concert with them, from further misappropriation or unauthorized use of MedImpact's Trade Secrets;

3.      Order Defendants to pay MedImpact compensatory damages based on competent and admissible evidence at trial with interest at the highest rate allowable by law;

4.      Order Defendants to pay MedImpact consequential and actual damages or disgorgement of Defendants' profits unjustly obtained based on competent and admissible evidence at trial with interest at the highest rate allowable by law;

5.      Order Defendants to pay MedImpact punitive damages, including, but not limited to double damages for its intentional misappropriation of MedImpact's Trade Secrets;

6.      Order Defendants to pay MedImpact reasonable attorneys' fees and allowable court costs and expenses; and

7.      Order all other such relief to MedImpact under law and equity as the Court deems just and proper.

- 49 -

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  September 26, 2019          DENTONS US LLP


By:  *s/ Jennifer D. Bennett*
     JENNIFER D. BENNETT
Attorneys for Plaintiffs
Email: jennifer.bennett@dentons.com

COMPLAINT