UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDIMPACT HEALTHCARE SYSTEMS, INC., a California corporation, MEDIMPACT INTERNATINAL LLC, a California limited liability company, MEDIMPACT INTERNATIONAL HONG KONG LTD., a Hong Kong company,<br><br>Plaintiff,<br><br>v.<br><br>IQVIA HOLDINGS INC., a Delaware corporation, IQVIA INC., a Connecticut corporation, IQVIA AG, a Swiss company, OMAR GHOSHEH, individually, and AMIT SADANA, individually,<br><br>Defendant. | Case No.:  19cv1865-GPC(LL)<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DIMSISS FOR LACK OF PERSONAL JURISDICTION WITH LEAVE TO AMEND; DENYING PLAINTIFFS' REQUEST FOR JURISDICTIONAL DISCOVERY; DENYING DEFENDANTS' MOTION TO DISMISS FOR INSUFFICIENT SERVICE OF PROCESS; AND DENYING DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM AS MOOT**<br><br>**[Dkt. Nos. 59, 60.]** |

Before the Court is Defendants' motion to dismiss under Federal Rule of Civil Procedure ("Rule") 12(b)(2) for lack of personal jurisdiction, Rule 12(b)(5) for insufficient service of process, and Rule 12(b)(6) for failure to state a claim.  (Dkt. Nos. 59, 60.)  Oppositions were filed by Plaintiffs as well as replies by Defendants.  (Dkt. Nos.

67, 70, 76, 77.)  A telephonic hearing was held on March 20, 2020.  (Dkt. No. 90.)  Jennifer Bennett, Esq; Randall Kay, Esq.; Nick Hodges, Esq.; and Alyssa Moscrop, Esq. appeared on behalf of Plaintiffs and Bart Rankin, Esq. and Teresa Michaud, Esq. appeared on behalf of Defendants.  (*Id.*)  Based on the reasoning below, the Court GRANTS Defendants' motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) with leave to amend, DENIES jurisdictional discovery, DENIES Defendants' motion to dismiss for insufficient service of process, and DENIES Defendants' motion to dismiss for failure to state a claim as MOOT.

## Background

On September 26, 2019, Plaintiffs Medimpact Healthcare Systems, Inc. ("MedImpact"), Medimpact International LLC ("MIL"), and MedImpact International Hong Kong Ltd. ("MI-HK") (collectively "Plaintiffs" or "Medimpact") filed a Complaint against Defendants IQVIA Holdings, Inc. ("IQVIA Holdings"), IQVIA Inc., IQVIA AG, Omar Ghosheh ("Dr. Ghosheh") and Amit Sadana ("Sadana") (collectively "Defendants")  alleging twelve causes of action for misappropriation of trade secrets under state and federal law and other claims.  (Dkt. No. 1, Compl.)

Plaintiff MedImpact was founded in San Diego, California, in 1989 and provides pharmacy benefit management ("PBM") services to its clients.  (*Id.* ¶ 10.)  PBM manages prescription drug coverage for health plans,[1] and Medimpact has spent more than 30 years and invested hundreds of millions of dollars in California developing, refining, and collating all the intellectual property in its proprietary PBM platform.  (*Id.* ¶¶ 10, 23.)  Its PBM platform includes real-time claims processing and adjudication, as well as business, financial, operational, technical and clinical know-how.  (*Id.* ¶ 23.)  MedImpact is the largest privately-held PBM provider in the United States, serving over 50 million members across 64,000 pharmacies.  (*Id.* ¶ 10.)  It partners with the nation's finest health

---

[1] The PBM platform enables "patients and pharmacies to efficiently obtain insurance approvals for prescribed Medicines."  (Dkt. No. 12-1 at 7.)

plans, hospitals, self-funded employers, state and local governments, and universities, including the University of San Diego, to provide PBM services. (*Id.*) Plaintiff MIL is a wholly owned subsidiary of MedImpact and established and existing under the laws of California and began international business operations in 2011 and is active in the Middle East and Chinese markets. (*Id.* ¶ 11.) MI-HK is a private Hong Kong corporation, and is a wholly owned subsidiary of MIL, which is a wholly owned subsidiary of MedImpact. (*Id.* ¶ 12.)

Seeking to build up its PBM platform globally, around 2010 or 2011, MedImpact formed MIL to expand its PBM services internationally, including the Middle East's Gulf Region which had no PBM providers at the time. (*Id.* ¶ 21.) Around 2011, MIL began discussions with Dimensions to establish a joint venture due to its regulatory contacts and presence in the United Arab Emirates ("UAE"). (*Id.*) Dimensions is a United Arab Emirates company with offices in Abu Dhabi, Dubai, and Ramallah. (Dkt. No. 59-5, Ghosheh Decl. ¶ 2.) Since 2008, Dimensions has provided healthcare informatics and related services to customers in the Middle East. (*Id.*) At the time, Dimensions sold limited health IT software and integration products aimed primarily at pharmacy providers in the medical insurance market and did not have real-time online adjudication capabilities in the PBM market. (Dkt. No. 1, Compl. ¶ 21.) Defendant Dr. Omar Ghosheh, a resident of Dubai, UAE is the co-founder, officer and an employee of Dimensions. (Dkt. No. 59-5, Ghosheh Decl. ¶¶ 1, 2; Dkt. No. 1, Compl. 16.)

On March 21, 2011, MIL and Dimensions began working together under a Non-Disclosure Agreement ("NDA"), pursuant to which Dimensions agreed to strictly maintain the confidentiality of MedImpact's confidential and proprietary trade secret information and not to use the information for any purpose other than the transaction contemplated in the NDA. (Dkt. No. 1, Compl. ¶ 22.) Under the NDA, MIL began sharing MedImpact's closely guarded proprietary and trade secret information with Dimensions. (*Id.*) Subsequently, on February 1, 2012, MIL and Dimensions entered into a Joint Venture Agreement ("JV Agreement"), under which they agreed to establish

MedImpact Arabia ("MIA") to provide PBM services to the Gulf Region.  (*Id.*)  The JV Agreement also required Dimensions to maintain the confidentiality of "confidential and proprietary information or trade secrets" and "not utilize the Confidential information for any purpose other than as necessary to conduct the Business pursuant to this Contract (including as contemplated by the Services and License Contract)."  (*Id.*)  On the same day, MIL and Dimensions also entered into a service level agreement (the "SLC"), with similar confidentiality provisions.  (*Id.*)  Additionally, by entering into the JV Agreement, Dimensions agreed that any business opportunity that arose under the agreement within the Territory would strictly belong to the joint venture.  (*Id.*)  The Territory included members of the Gulf Co-operation Council, Jordan, Lebanon, and any other country the parties to the JV Agreement agreed in writing.  (*Id.*)

On January 1, 2014, with the consent of Dimensions, Plaintiff MIL assigned its rights and interest in the joint venture to Plaintiff MI-HK.  (*Id.* ¶ 22.)  For approximately eight years after the execution of the NDA, the JV Agreement, and SLC, through e-mail, phone calls and in person meetings/training, MedImpact's San Diego employees taught Dimensions about all aspects of PBM.  (*Id.* ¶ 24.)  Throughout the JV with MIL, Dimensions obtained and used MedImpact's trade secret information.  (*Id.* ¶ 25.)

MIA successfully secured many clients in the Territory, such as Oman Insurance Company ("Oman Insurance"), Vidal Health, AXA, Nextcare, Pentacare, Aafiya, Metlife, Alico MSH, Dubai Insurance, Aetna, and Al Buhaira Insurance Company.  (*Id.* ¶ 27.)  Out of its many clients, Oman Insurance was MIA's largest customer, accounting for approximately 25% of MIA's revenue.  (*Id.*)

From 2011 through 2016, MIA demonstrated continued growth with increasing revenues and customers year after year.  (*Id.* ¶ 31.)  Then, according to the Complaint, in February 2016, after having used MedImpact to succeed in the PBM market in the Middle-East Gulf region and having gained access to MedImpact's proprietary and trade secret information, Dimensions agreed to be bought by IMS Health.  (*Id.*)  In October 2016, IMS Health merged with Quintiles Transnational Holdings, Inc. creating

4

QuintilesIMS.  (*Id.*)  At that time, IMS Health and Quintiles were substantial global companies specializing in providing healthcare data, not PBM services, to pharmaceutical companies.  (*Id.*)  In November 2016, QuintilesIMS rebranded itself as IQVIA Holdings, Inc.  (*Id.*)  Defendant IQVIA Holdings, Inc. is a corporation organized under the laws of Delaware with its principal place of business in Durham, North Carolina.  (*Id.* ¶ 13.)  IQVIA Holdings "is a global provider of advanced analytics, technology solutions, healthcare data and contract research services to the life sciences industry to customers throughout the United States . . . and has one of the largest collections of healthcare information in the world, which includes more than 600 million comprehensive, longitudinal, non-identified patient records spanning sales, prescription and promotional data, medical claims, electronic medical records, genomics, and social media."  (*Id.*)  Based on this data, IQVIA Holdings delivers information on over 85% of the world's pharmaceuticals.  (*Id.*)

Defendant IQVIA, Inc., is a corporation organized under the laws of Delaware with its principal place of business in Danbury, Connecticut, and is a wholly-owned subsidiary of IQVIA Holdings.  Defendant IQVIA, Inc. has a location in San Diego, California.  (*Id.* ¶ 14.)  Defendant IQVIA AG is a wholly-owned subsidiary of IQVIA Holdings, with its primary place of business in Switzerland.  (*Id.* ¶ 15.)

During the acquisition, IQVIA Holdings[2] represented to MedImpact's officers and employees in San Diego that the acquisition would not affect the JV but IQVIA Holdings decided Dimensions should terminate the JV with MedImpact.  (*Id.* ¶ 31.)

Following Dimensions' acquisition by IMS Health, Dimensions sold its own competing PBM platform called Adjudication Insurance Management System ("AIMS").  (*Id.* ¶ 32.)  In contravention, Dr. Ghosheh states that Dimensions developed AIMS, in

---

[2] The Court notes that Plaintiffs interchangeably uses "IQVIA" to mean all Defendants (IQVIA Holdings, Inc., IQVIA, Inc. and IQVIA AG), (Dkt. No. 1, Compl. at 2) and/or IQVIA Holdings.  (*Id.* ¶ 31.)  The Court is unable to distinguish what facts apply to which Defendant.

2015, outside the United States before the acquisition of Dimensions and was developed without any involvement of any IQVIA AG or IQVIA Inc. employee. (Dkt. No. 59-5, Ghosheh Decl. ¶ 5.)

The Complaint asserts that IQVIA along with Dimensions engaged in a scheme to target and steal MedImpact customers, to undermine and destroy the joint venture and to misappropriate MedImpact's trade secrets for their benefit. (*Id.* ¶ 33.) In 2017, IQVIA and Dimensions stole the joint venture's largest client Oman Insurance by offering Dimensions' AIMS to replace MedImpact's PBM product. (*Id.* ¶ 34.) Defendant Amit Sadana was involved in the contract between Oman Insurance and Dimensions. (*Id.*) He is a board member of Dimensions and was appointed chairman of the board of MIA after Dimensions' acquisition in February 2016. (Dkt. No. 59-8, Sadana Decl. ¶¶ 4-5.) Sadana is a resident of Dubai, UAE and is Senior Vice President and General Manager at IQVIA AG in Dubai overseeing Africa, Middle East and South Asia. (Dkt. No. 59-8, Sadana Decl. ¶¶ 1, 2.) He was never employed by IQVIA Holdings, Inc. or IQVIA Inc. (*Id.* ¶ 1.) On September 28, 2017, the Head of Medical and Life Claims at Oman Insurance admitted it was using AIMS to replace the PBM platform. (Dkt. No. 1, Compl. ¶ 34.) On October 1, 2017, Oman Insurance formally terminated its PBM agreement with MIA. (*Id.*)

On July 23, 2017, Dimensions provided MedImpact with notice of termination of the JV Agreement. (Dkt. No. 59-5, Ghosheh Decl. ¶8.) On September 11, 2017, IQVIA representatives, including Yousef Ghosheh[3] and Alistair Grenfell[4], a senior executive, met with MedImpact representatives, including Dale Brown, President of MedImpact, in

---

[3] Yousef Ghosheh is distinct from Defendant Dr. Omar Ghosheh.

[4] Alistair Grenfell is a senior level employee at IQVIA. (Dkt. No. 1, Compl. ¶ 33.) Plaintiffs claim that Grenfell is identified as Leadership as the President of its North Europe, Middle East, Africa and South Asia and reports to the CEO of IQVIA Holdings, Inc.'s. (Dkt. No. 67, Ps' Opp. at 13.) Defendants claim that Grenfell is currently an employee of IQVIA, Ltd as of November 1, 2019, and not IQVIA, Inc. or IQVIA Holdings, Inc. Therefore, Plaintiffs will likely seek leave to amend the complaint to add IQVIA, Ltd. (*Id.*; *id.,* n. 5, 6.)

London, England to discuss the termination.   (Dkt. Nos. 67-4, Brown Decl. ¶ 24; Dkt. No. 1, Compl. ¶ 41.)   At the meeting, Grenfell represented that IQVIA's subsidiary, Dimensions, was not going to be a competitor to MedImpact in the PBM market.  (*Id.*) MedImpact also learned that in September 2017, Dimensions' Yousef Ghosheh prepared a detailed analysis for Alistair Grenfell providing a customer-by-customer detailed analysis of MIA's clients, its pricing and contract status and summarizing which JV customers Dimensions and IQVIA hoped to sway away from MIA's PBM.  (Dkt. No. 1, Compl. ¶ 37.)   The day after the London meeting, there was a board meeting of the JV in Dubai with MedImpact representatives, including Brown, and representatives from IQVIA and Dimensions, including Sadana, Yousef Ghosheh and Dr. Ghosheh.  (*Id.* ¶ 25.) When Brown asked about Oman Insurance, nobody from Dimensions/IQVIA informed MedImpact they had already signed an agreement with Oman Insurance in June 2017. (*Id.*)

The Complaint also alleges that Defendants interfered with MIA's other existing clients such as Vidal Health, ADNIC, Metlife, AXA, and Aafiya, and prospective relationships with Al Koot, GIG and Warba.  (Dkt. No. 1, Compl. ¶¶ 42, 54.)  Moreover, IQVIA is offering a competing PBM using MedImpact's trade secrets and confidential information in the Palestine, Ghana, and Saudi Arabia markets.  (*Id.* ¶¶ 45-47.)  As a result, Plaintiffs have suffered damages due to lost revenues from the loss of customers and irreparable injury by Defendants' conduct in misappropriating Plaintiffs' proprietary information and the subsequent loss to their business of existing and potential customers. (*Id.* ¶¶ 76, 78.)

All Defendants move to dismiss for lack of personal jurisdiction under Rule 12(b)(2).  Defendants IQVIA, AG, Dr. Omar Ghosheh, and Amit Sadana additionally move to dismiss under Rule 12(b)(5) for insufficient process of service.  Alternatively, the Defendants move to dismiss the complaint for failure to state a claim under Rule 12(b)(6).

/ / /

# Discussion

## A.    Legal Standard on Rule 12(b)(2)

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction." *In re Western States Wholesale Natural Gas Antitrust Litig. v. Oneok, Inc.,* 715 F.3d 716, 741 (9th Cir. 2013). If the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make "a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Bryton Purcell LLP v. Recordon & Recordon*, 575 F.3d 981, 985 (9th Cir. 2009).  On a prima facie case, the court considers uncontroverted allegations in the complaint as true and the court resolves all contested facts in favor of the non-moving party. *AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996).  At the same time, however, the plaintiff cannot establish jurisdiction by alleging bare jurisdictionally-triggering facts without providing some evidence of their existence. *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.,* 551 F.2d 784, 787 (9th Cir. 1977).

"Where, as here, no federal statute authorizes personal jurisdiction, the district court applies the law of the state in which the court sits." *Marvix Photo, Inc. v. Brand Techs., Inc.,* 647 F.3d 1218, 1223 (9th Cir. 2011) (citations omitted).  California's long-arm statute is "coextensive with the outer limits of due process under the state and federal constitutions, as those limits have been defined by the United States Supreme Court." *Republic Int'l Corp. v.  Amco Eng'rs, Inc.,* 516 F.2d 161, 167 (9th Cir. 1976) (quoting *Threlkeld v. Tucker,* 496 F.2d 1101, 1103 (9th Cir. 1974)).  As such, the Court need only consider the requirements of due process.  Due process requires that nonresident defendants have "minimum contact" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Personal jurisdiction can be either "general" or "specific." *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984).  The Complaint alleges specific jurisdiction over all Defendants. (Dkt. No. 1, Compl. ¶ 61.)

"Personal jurisdiction must exist for each claim asserted against a defendant."

*Action Embroidery Corp. v. Atl. Embroidery, Inc.,* 368 F.3d 1174, 1180 (9th Cir. 2004).

In this case, the parties solely analyze personal jurisdiction with respect to the misappropriation of trade secret claims.[5]  (Dkt. No. 67, Ps' Opp. at 17[6]; Dkt. No. 59-1 at 19.)  The complaint alleges misappropriation of trade secrets under the California Uniform Trade Secrets Act ("CUTSA") and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*  (Dkt. No. 1, Compl. ¶¶ 69-98.)

Under both federal and state misappropriation of trade secret claims, a plaintiff must allege that: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff."  *Alta Devices, Inc. v. LG Elecs, Inc.,* 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018) (citations omitted). However, the DTSA applies only to "misappropriations that occur or continue to occur on or after its date of enactment on May 11, 2016."  *Id.*  A trade secret misappropriation claim can be brought under the DTSA "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA also applies to conduct occurring outside the United States if (1) "the offender is a . . . organization organized under the laws of the United States or a State" or (2) "an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837(1-2).

---

[5] Plaintiffs claim that the Court may exercise jurisdiction over the remaining claims if the Court has personal jurisdiction on one claim.  (Dkt. No. 67, Ps' Opp. at 17.)  Under pendent personal jurisdiction, "a court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery Corp.,* 368 F.3d at 1180 (adopting doctrine of pendent personal jurisdiction). Neither party has substantively argued the application of pendent personal jurisdiction.  Nonetheless because the Court concludes it does not have personal jurisdiction over all Defendants, the Court need not address pendent personal jurisdiction.

[6] Page numbers are based on the CM/ECF pagination.

Moreover, Plaintiffs must demonstrate personal jurisdiction over each defendant individually even for joint and several liability. *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 459 (9th Cir. 2007) ("It is well established that, as a general rule, where a parent and a subsidiary are separate and distinct corporate entities, the presence of one. . . in a forum state may not be attributed to the other[.]"); *Sher v. Johnson*, 911 F.2d 1357, 1365 (9th Cir. 1990) ("Liability depends on the relationship between the plaintiff and the defendants and between the individual defendants; jurisdiction depends only upon each defendant's relationship with the forum."); s*ee also Head v. Las Vegas Sands, LLC*, 298 F. Supp. 3d 963, 973 (S.D. Tex. 2018) ("[A] plaintiff must submit evidence supporting personal jurisdiction over each defendant, and cannot simply lump them all together") (citing *Calder*, 465 U.S. at 790) ("Each defendant's contacts with the forum State must be assessed individually.").

As a threshold matter, the Court and Defendants note that the allegations in the Complaint collectively refers to the three named corporate defendants as "IQVIA" and does not separate out each Defendants' actions in the alleged challenged conduct.[7] (Dkt. No. 1, Compl. at 2.) More importantly, Plaintiffs do not specifically isolate the jurisdictional facts amongst the different IQVIA entities and improperly lump IQVIA defendants together.[8] Because it appears that Plaintiffs are primarily referencing IQVIA Holdings concerning the misappropriation of trade secrets, the Court considers whether it has personal jurisdiction over IQVIA Holdings. As such, the Court GRANTS Defendants' motion to dismiss for lack of personal jurisdiction over Defendants IQVIA AG and IQVIA, Inc. *See Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 849 (N.D. Cal.

---

[7] The Complaint and Plaintiffs' opposition merely describe the corporate structure of each IQVIA defendant but does not allege facts as to each entities' involvement in the challenged conduct. (Dkt. No. 1, Compl. ¶¶ 13, 14, 15; Dkt. No. 67, Ps' Opp. at 13-15.)

[8] In fact, MedImpact admits that "its trade secrets have been misappropriated throughout IQVIA's corporate family including, IQVIA AG, and IQVIA, Inc., and now IQVIA Ltd. of which IQVIA Holdings, Inc. is the parent." (Dkt. No. 67, Ps' Opp. at 13 n. 5.) However, Plaintiffs must show that personal jurisdiction exists as to each corporate defendant.

19cv1865-GPC(LL)

2018) (no personal jurisdiction over one defendant as complaint only referenced group defendants together).

**B.      Specific Jurisdiction**

Specific jurisdiction exists when a case "aris[es] out of or relate[s] to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A.,* 466 U.S. at 414 n. 8.  The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant "focuses on 'the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* 571 U.S. 277, 284 (2014).  Specific jurisdiction is limited to ruling on "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S, 915, 919 (2011) (citation omitted).  "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the States." *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1771, 1781 (2017).  A court must look "to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. Therefore, "mere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290.  Rather, "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Id.*   Specifically, a court may exercise specific jurisdiction over a defendant only where "the defendant's suit-related conduct" "create a substantial connection with the forum [s]tate." *Williams v. Yamaha Motor Co. Ltd*., 851 F.3d 1015, 1022-23 (9th Cir. 2017) (quoting *Walden*, 571 U.S. at 284-85).

The Ninth Circuit conducts a three-prong test to determine whether a non-resident defendant is subject to specific personal jurisdiction,

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or

relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir. 2004) (citing *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).  "The plaintiff bears the burden of satisfying the first two prongs of the test."  *Id.*  If the plaintiff meets that burden, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable."  *Id.* (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

### 1.  Purposeful Direction

Under the first prong, the Ninth Circuit applies the purposeful direction test enunciated in *Calder v. Jones*[9] to claims sounding in tort.  *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802-03 (9th Cir. 2004); *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017).  Under the three-part *Calder* "effects" test to evaluate purposeful direction, Plaintiff must establish that the defendant allegedly "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (citing *Calder v. Jones*, 465 U.S. 783 (1984)).  "Failing to sufficiently plead any one of these three elements is fatal to Plaintiff's attempt to show personal jurisdiction."  *Rupert v. Bond*, 68 F. Supp. 3d 1142, 1163 (N.D. Cal. 2014) (citing *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128-29 (9th. Cir. 2010)).  Here, the Court first addresses the second factor whether each Defendants' alleged misappropriation of trade secrets was expressly aimed at California.

/ / /

---

[9] *Calder v. Jones*, 465 U.S. 783 (1984).

### a.    Expressly Aiming as to IQVIA Holdings, Inc.

IQVIA Holdings argues that Plaintiffs have failed to show that any of the alleged acts giving rise to the litigation occurred in California or anywhere in the United States, and the only link between the facts and the forum is alleged injury to Plaintiffs, who are located in California.  IQVIA Holdings explains that the gravamen of the Complaint alleges that it misappropriated Plaintiffs' alleged trade secrets and confidential information for the purpose of providing PBM services "globally" yet, any action taken by the IQVIA Holdings, even if true, occurred outside California and in the Middle East. In response, Plaintiffs argue IQVIA Holdings expressly aimed its misappropriation of their trade secret knowing that it is located in California, it owned the PBM and related trade secrets, and IQVIA had substantial contacts with MedImpact in this forum.

To determine whether the defendant expressly aims at the forum state, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 290.  Thus, "mere injury to a forum resident is not a sufficient connection to the forum," nor is defendant's knowledge of plaintiff's "'strong forum connections' . . . combined" with the "foreseeable harm" the plaintiff suffered in the forum.  *Id.* at 289-90.

Prior to *Walden*, the Ninth Circuit held that a theory of "individualized targeting" was sufficient to satisfy the express aiming requirement.  *Washington Shoe Co. v. A-Z Sporting Goods, Inc.*, 704 F.3d 668, 675 (9th Cir. 2012) (quoting *Dole Foods Co.,* 303 F.3d at 1111) ("'express aiming' requirement is satisfied, and specific jurisdiction exists, 'when the defendant is alleged to have engaged in wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state.'").  However, the Supreme Court in *Walden* made clear that the court must look to the "defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a forum." *Axiom Foods,* 874 F.3d at 1070 (citing *Walden, 571* U.S. at 289).  In light of *Walden*, the Ninth Circuit explained that "[w]hile a theory of individualized targeting may remain

relevant to the minimum contacts inquiry, it will not, on its own, support the exercise of specific jurisdiction, absent compliance with what *Walden* requires." *Id.* at 1070-71. *Walden* made clear that courts "must look to the defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a forum." *Id.* at 1070.

"Two principles animate the 'defendant-focused' inquiry." *Axiom,* 874 F.3d at 1068 (citing *Walden,* 571 U.S. at 285). "First, the relationship between the nonresident defendant, the forum, and the litigation 'must arise out of contacts that the 'defendant himself' creates with the forum State.'" *Id.* "Second, the minimum contacts analysis examines 'the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" *Id.* "It follows that 'a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction.'" *Id.*

Plaintiffs' arguments on express aiming rest primarily on the "individualized targeting" theory of *Washington Shoe* that has been called into doubt by *Axiom.*[10]  Even though Plaintiffs argue that IQVIA Holdings had substantial contacts with MedImpact in California, the facts do not support their claim.  As to IQVIA, formerly IMS Health, Plaintiffs assert that communications with IMS Health[11] in 2015 create the contacts necessary to establish expressly aiming.  In 2015, IMS Health reached out to MedImpact in San Diego about purchasing Dimensions.  (Dkt. No. 67, Ps' Opp. at 19.)  According to

---

[10] For example, in their opposition, Plaintiffs argue "Defendants expressly aimed their misappropriation of MedImpact's trade secrets and other intentional torts at this forum, knowing MedImpact is headquartered here, knowing MedImpact owned the PBM and the related trade secrets, and having substantial contacts with MedImpact in this forum." (Dkt. No. 67, Ps' Opp. at 18.)  In conclusion, Plaintiffs assert that "IQVIA knew that MedImpact was located in California and directed its tortious conduct at MedImpact, an entity established and doing business in California, and suffering the resulting harm in California." (Dkt. No. 67, Ps' Opp. at 21.)  By itself, individualized targeting may not support the exercise of specific jurisdiction over a defendant.  *See Axiom Foods*, 874 F.3d at 1070-71.

[11] Defendants do not dispute that IMS Health was the predecessor of IQVIA Holdings and assumes the role of its successor IQVIA Holdings.

Dale Brown, President of MedImpact, in late 2015, while he was in San Diego, he had five to six telephone calls with IMS Health regarding its potential acquisition of Dimensions and sought consent from MedImpact for the acquisition. (Dkt. No. 67-5, Brown Decl. ¶ 14.) In addition, "IMS Health employees asked MedImpact employees due diligence type questions regarding the business, technology and finances of the JV." (*Id.*) In December 2015, Brown received a follow-up email from Carlos Santos, the Director of Business Development at IMS Health, regarding its acquisition of Dimensions and IMS Health's strategic intentions. (*Id.* ¶ 15.) Santos confirmed that IMS Health was interested in maintaining the JV. (*Id.*) Finally, Brown received another email later in connection with the acquisitions and post-acquisition regarding potential collaborations. (*Id.*)

First of all, "[b]oth this court and the courts of California have concluded that ordinarily 'use of the mails, telephone, or other international communications simply do not qualify as purposeful activity invoking the benefits and protection of the [forum] state.'" *Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991) (quoting *Peterson v. Kennedy*, 771 F.2d 1244, 1262 (9th Cir. 1985)).

Next, on the question of specific jurisdiction, the Court must look at Defendants' contacts as they relate to the challenged conduct giving rise to the misappropriation of trade secret causes of action. *See Goodyear Dunlop Tires Operations S.A.*, 564 U.S. at 919 (specific jurisdiction is limited to ruling on "issues deriving from, or connected with, the very controversy that establishes jurisdiction."); *Picot*, 780 F.3d at 1215 (challenged conduct had nothing to do with the forum itself). The Complaint provides facts about communications, conduct and activities between Dimensions and Plaintiffs from the inception of the NDA and JV Agreement. (Dkt. No. 1, Compl. ¶¶ 21-30.) The Complaint states that the MIA "realized a rapid success", (Dkt. No. 1, Compl. ¶ 27), and MedImpact and Dimensions had a "collaborative, productive relationship." (Dkt. No. 67, Ps' Opp. at 9.) The claim of misappropriation of trade secrets did not occur until IMS Health, IQVIA's predecessor, acquired Dimensions in February 2016. (*Id.*; Dkt. No. 1,

19cv1865-GPC(LL)

Compl. ¶ 31.)  In opposition, Plaintiffs do not challenge Defendants' argument that the conduct giving rise to the lawsuit did not occur until IMS Health, IQVIA's predecessor, purchased Dimensions in February 2016.  (Dkt. No. 59-1, Ds' Mot. at 9; Dkt. No. 1, Compl. ¶ 31.)  Plaintiffs improperly conflate the conduct before and after the acquisition to support personal jurisdiction.  However, any conduct, communications or activities, such as in-person meetings, emails or phone calls, between MIL and Dimensions prior to February 2016 are not relevant to the specific jurisdiction analysis.  Therefore, the pre-acquisition communications in 2015, attested to by Brown, in support of Plaintiffs' position, may potentially relate tangentially,[12] but do not relate directly to the challenged conduct of misappropriating trade secrets.  By themselves, they do not support the expressly aiming factor.[13]

The Complaint alleges that after the acquisition of Dimensions, IQVIA Holdings embarked on a scheme with Dimensions of misappropriating MedImpact's proprietary information, using that information to create a competing product, AIMS, and then targeted and stole MedImpact customers for its own benefit and undermined and destroyed the joint venture.  (Dkt. No. 1, Compl. ¶ 33.)  In describing how the misappropriation occurred by IQVIA Holdings, Plaintiffs explain that "MedImpact's trade secrets, confidential information, and know-how flowed from Dimensions into the parent companies which continue to use that information today."  (Dkt. No. 67, Ps' Opp. at 10 (citing (Dkt. No. 1, Compl. ¶ 44; Dkt. No. 67-4, Brown Decl. ¶¶ 28-34)).)  "IQVIA knew or should have known that the information provided to it by Dimensions, Dr. Ghosheh, and Mr. Sadana was taken from and belonged to MedImpact."  (Dkt. No. 1,

---

[12] Plaintiffs do not assert that Defendants had any ill intentions to misappropriate during these pre-acquisition communications.

[13] At the hearing, for the first time, Plaintiffs alleged that the pre-acquisition communications in late 2015 were part of a scheme to misappropriate their trade secrets and that IMS Health misrepresented its interest in maintaining the JV.  While the Court cannot rely on facts not presented in the Complaint or in Plaintiffs' opposition, it can consider them for purposes of whether Plaintiffs should be granted leave to amend the Complaint.

Compl. ¶ 75.)  Therefore, by the time IQVIA Holdings allegedly accessed MediImpact's trade secrets, they were already in the possession of Dimension.  Based on the allegations in the Complaint, the conduct to support the alleged misappropriation of trade secret occurred when Dimensions, an entity in the UAE, transferred Plaintiffs' trade secret and confidential information to its parent company, IQVIA Holdings, an entity with a principal place of business in North Carolina.  (*Id.* ¶¶ 44, 73, 75.)  The Complaint admits that Dimensions, not IQVIA Holdings, acquired MedImpact's trade secrets through the joint venture" and MedImpact's San Diego employees taught Dimensions about all aspects of the PBM.  (*Id.* ¶¶ 24, 40.)  However, Dimensions is not a named Defendant in the Complaint.  IQVIA Holdings obtained the trade secret from Dimensions and converted the trade secret for its own use to enter the PBM market abroad.  (*Id.* ¶¶ 32-37, 41-47.)  IQVIA Holdings knew the confidential information provided to it by Dimensions belonged to MedImpact and it encouraged Dimensions to share the information and IQVIA Holdings willingly accepted the information.  (*Id.* ¶ 75.)  These allegations do not present a prima facie case that IQVIA Holdings directed any conduct or created any meaningful contacts with California as it concerned the misappropriation of trade secrets.

Instead, the facts show that the alleged misappropriation by IQVIA Holdings was conducted outside of California such as in the countries of Ghana and Saudi Arabia.  (*See* Dkt. No. 67-4, Brown Decl. ¶¶ 28-34.)  Moreover, AIMS was a product created by Dimensions in 2015 by its employees located outside the United States.  (Dkt. No. 1, Comp. ¶ 32.)  Any conduct that Dimensions conspired with IQVIA to terminate the JV and seek to contract with the JV's customers occurred in the JV Territory, not California.  (*Id.* ¶¶ 33-37.)  The September 11, 2017 meeting concerning the termination of the JV as well as the meeting between Yousef Ghosheh and Grenfell occurred in London, not in California.  (*Id.*)

Finally, the Complaint alleges IQVIA Holdings has a location in San Diego California and employs people in this forum, provides services within the forum,

conducts business and enters into agreements within the forum and its actions caused injury to MedImpact in this forum.  (Dkt. No. 1, Compl. ¶ 62.)  Defendants present a disputed declaration stating that IQVIA Holdings Inc. is a Delaware corporation with principal places of business in North Carolina and Connecticut.  (Dkt. No. 59-2, Ashman Decl. ¶ 2.)  IQVIA Holdings is purely a holding company, and it does not conduct any substantive business operations.  (*Id.*)  Further, IQVIA Holdings Inc. does not have any offices or employees in California or anywhere else.  (*Id.*)  On disputed facts, the Court is required to resolve the facts in favor of the non-moving party, yet, even if IQVIA Holdings has a location in San Diego, Plaintiffs have failed to allege facts that its offices and employees in San Diego misappropriated MedImpact's trade secrets in San Diego.

Plaintiffs' citation to *Philipe Charriol* and *Fighter's Market* are distinguishable.  In *Philippe Charriol Int'l Ltd. v. A'lor Int'l Ltd.*, Case No. 13cv1257-MMA(JLB), 2014 WL 12284076, at *6 (S.D. Cal. May 2014), the district court found that the purposeful direction factor had been met where the record showed that the counterdefendants "traveled to California, and frequently contacted [counterclaimant's] personnel in California to conduct business via Skype videoconferencing, phone, email, and written communications. . . . Thus, unlike in *Walden,* [counterdefendants] have contacts with California beyond mere knowledge that [counterclaimant] has connections here."  *Id.* at *6.  For instance, the written correspondence to the counterclaimant in California involved solicitation of confidential information about its business and the counterdefendant made numerous visits, phone calls and email correspondence over 25 years.  *Id.* at *4.  The defendants' contacts in *Philippe Charriol* were more substantial and directed than in this case and the communications themselves were the method of how the misappropriation occurred.  Here, a representative of IQVIA Holdings never visited California, did not have extensive online communications or telephone or emails communications with MedImpact in California, and Plaintiffs have not pointed to any conduct of misappropriation through these pre-acquisition communications.  Therefore, *Philipe Charriol* is not supportive of Plaintiffs' position.

Moreover, in *Fighter's Market*, the court relied heavily on the now "outdated" "individualized targeting" theory of *Washington Shoe* and held that the Plaintiff satisfied the "expressly aimed" requirement based on a prima facie showing that "Defendant intentionally infringed Plaintiff's trademarks, knowing that the Plaintiff is a resident of California and that the impact of infringement would be felt in California." *Fighter's Market, Inc. v. Champion Courage LLC*, 207 F. Supp. 3d 1145, 1154 (S.D. Cal. 2016). Therefore, Plaintiffs' reliance on *Fighter's Market, Inc.* is misplaced. *See Kellytoy Worldwide, Inc. v. Jay at Play Int'l Hong Kong Ltd*., Case No. CV 19cv7831-AB(MRW), 2019 WL 8064196, at *4-5 (C.D. Cal. Dec. 5, 2019) (plaintiff relied on outdated test of "individualized targeting as held in *Washington Shoe* and *Fighter's Mkt.*) (citing *Caracal Enters. LLC v. Surani*, No. 16-cv-05073-RS, 2017 WL 446313, at *3 n.3 (N.D. Cal. Feb. 2, 2017 (observing that *Washington Shoe* and *Fighter's Mkt.* "have been cast into doubt by *Walden* and *Picot [v. Weston*, 780 F.3d 1206 (9th Cir. 2015)], which post-date *Washington Shoe* and require more than simply the plaintiff's residence in the forum state.") (internal citations omitted).

Instead, the Court finds other post-*Walden* and post-*Axiom* cases supportive of IQVIA Holdings' position. In *E*Healthline.com, Inc. v. Pharmaniaga Berhad*, No. 18cv1069-MCE-EFB, 2018 WL 5296291 (E.D. Cal. Oct. 23, 2018), the plaintiff alleged misappropriation of trade secrets and confidential information arising out of a Memorandum of Collaboration of a potential joint venture with the defendants, a Malaysian corporation and a Saudi Arabia privately owned investment company to develop a pharmaceutical facility in Saudi Arabia. *Id.* at *1. The parties entered into non-disclosure agreements where they agreed that any dispute resolution would be in Singapore, and the majority of communications occurred over the phone or teleconference or via email. *Id.* One defendant repeatedly declined the plaintiffs' request to meet in California and instead suggested meeting in London or Riyadh as more convenient. *Id.* Defendant Pharmaniaga agreed to one in-person meeting in California where it sent two employees to California for a weekend but no confidential information

was exchanged and no agreement was reached. *Id.* The parties also entered into a Memorandum of Collaboration in Germany providing for dispute resolution in London, which included confidentiality obligations. *Id*. at *2. The joint venture eventually failed to get established. *Id.* Later, the two defendants announced a new joint venture to potentially construct and operate a pharmaceutical facility in Saudi Arabia and excluded the plaintiff. *Id.* Eventually, the defendants did not build a pharmaceutical facility and no sales or revenues resulted. *Id.* The plaintiff filed suit alleging one cause of action for misappropriation of trade secrets and confidential information. *Id.* at *1.

As to specific jurisdiction, the court concluded, *inter alia*, that the expressly aiming factor was not met because the plaintiff reached out to the defendant in Malaysia, the defendant repeatedly declined to come to California for a meeting, and no confidential information was misappropriated at the one California meeting. *Id.* at *5. The court also noted there was no harm because the pharmaceutical facility in Saudi Arabia was never built. *Id.* The court rejected the plaintiff's argument that defendants "purposely directed their tortious action at California and engag[ed] in [misappropriation of confidential information] targeted at a plaintiff whom Pharmaniaga and Modern knew to be a resident of California" because "while it is clear that Pharmaniaga knew [the plaintiff] was a business in California, Plaintiff has not put forth sufficient information to show that Defendant [ ] expressly aimed their conduct related to its misappropriation of confidential information claim at California." *Id.* Similarly, in this case, Plaintiffs have not presented facts that IQVIA Holdings expressly aimed its misappropriation of trade secrets at California.

Also persuasive is the case of *Hempel v. Cydan Dev., Inc*., Case No. 18cv00008-MMD-CBC, 2018 WL 5777491 (D. Nev. Nov. 2, 2018), where the case was dismissed for lack of personal jurisdiction because the defendants' challenged conduct had nothing to do with Nevada as the challenged conduct centered on the plaintiffs' unilateral activity and activities outside of the state. *Id.* at *6. There, plaintiffs had developed proprietary information; the defendant reached out to the Nevada plaintiffs and entered into a

Confidentiality Agreement which was discussed at an in-person meeting at defendant's office in Massachusetts; and the agreement was signed electronically. *Id.* at *4. Defendants had no offices, no employees, no agents in Nevada and did not travel to Nevada to meet the plaintiffs. *Id.* Plaintiffs claimed that Nevada was the proper forum because substantial parts of the events giving rise to the claim occurred in Nevada, they resided and were headquartered in the district, and "the situs of the confidential material misappropriated by Defendants is with the [plaintiffs] who are domiciled in this [d]istrict." *Id.* at *3.

The *Hempel* court rejected the plaintiffs' claim observing that the complaint and the opposition did not allege that any misappropriation occurred in Nevada. *Id.* at *6. The plaintiffs argued that the court should focus on the fact that they had compiled and maintained the information in Nevada but the court rejected the invitation concluding that to focus on the fact that the plaintiffs "compiled, maintained, and shared the alleged misappropriated information with [the defendant] is surely not a defendant-focused examination and would again allow Plaintiffs' unilateral activity to drive the minimum contacts inquiry." *Id.* The court also keyed in on facts related to the challenged conduct and disregarded facts not related to the challenged conduct. *Id.* at *5 ("As an initial matter, Cydan's solicitation or initial contact via LinkedIn does not appear to itself be the challenged conduct, and the Confidentiality Agreement that ultimately resulted from such contact-given the joint venture did not materialize-was not executed in Nevada.").

Similarly, in this case, the thrust of Plaintiffs' argument is that IQVIA Holdings knew MedImpact resided in California, that MedImpact's trade secrets were in California and MedImpact suffered harm in California. (Dkt. No. 67, Ps' Opp at 18.) Such contacts do not qualify as expressly aiming conduct under *Walden*.

Accordingly, the Court concludes Plaintiffs have not demonstrated Defendant IQVIA Holdings expressly aimed its conduct to this forum.

///

///

### b.     Expressly Aiming as to Dr. Omar Ghosheh

Defendants argue that Plaintiffs' allegations as to Dr. Ghosheh are not relevant to the misappropriation claims as many allegations relate to conduct or activity that occurred prior to the acquisition of Dimensions in February 2016.  (Dkt. No. 1, Compl. ¶ 31.)  In response, Plaintiffs generally argue Dr. Ghosheh is subject to specific personal jurisdiction in California primarily because of his long-standing business relationship with MedImpact since the formation of the JV in 2011.  (Dkt. No. 1, Compl. ¶¶ 7, 25, 65; Dkt. No. 67-4, Brown Decl. ¶¶ 10-12.)  They also claim that Dr. Ghosheh obtained access to MedImpact's trade secrets through countless emails, phone calls and meetings with MedImpact employees in San Diego over many years.  (Dkt. No. 1, Compl. ¶¶ 22-26, 61, 65.)  However, Plaintiffs do not address or dispute Defendants' assertion, (Dkt. No. 59-1 at 9), that the conduct, communications or activities between MIL and Dimensions that occurred from the inception of their relationship through February 2016, do not give rise to the causes of action asserted in this case.

The Complaint avers, "[i]ndeed, after acquiring MedImpact's joint venture partner Dimensions, Defendant IQVIA, Dimensions, Dr. Ghosheh, and Mr. Sadana joined in a targeted scheme to compete against MIA and MedImpact, steal MIA customers, meet with regulators and governments around the world, and disclose and use MedImpact trade secrets to advance IQVIA's interests and their own interests globally."  (Dkt. No. 1, Compl. ¶ 4.)  Because of the trade secrets Dimensions acquired from MedImpact, it was able to create a competing product AIMS after its was acquired by IMS Health.  (*Id.* ¶ 32.)  MedImpact claims that "beginning in at least mid-2017, and continuing to date, IQVIA, with the assistance of Dimensions, Dr. Ghosheh and Mr. Sadana, misappropriated MedImpact's confidential and proprietary information and Trade Secrets and converted the same to its own use to enter the PBM market abroad."  (*Id.* ¶ 73.)  The challenged conduct giving rise to the misappropriation of trade secret claims are based on Dr. Ghosheh, who resided in Dubai, sharing and using MedImpact's trade secrets with

IQVIA defendants who are located outside of California. The acts that support the alleged misappropriation were not directed at this forum,

Plaintiffs point to the following facts to support the "expressly aiming" factor. First, Plaintiffs claim Dr. Ghosheh entered into a joint venture with MedImpact, a California based company; was a board member of the joint venture of which MedImpact is a shareholder; and breached his fiduciary duty to that shareholder. (Dkt. No. 67, Ps' Opp. at 20.) The initial formation of the joint venture in 2012 and being a board member do not relate to the challenged conduct; moreover, even if it was within the time period of the challenged conduct, these facts do not demonstrate expressly aimed conduct at California by Dr. Ghosheh. Next, Plaintiffs conclusorily claim that Dr. Ghosheh traveled to San Diego to meet with MedImpact employees "regarding the subject matter related to the subject matter of this litigation", (*id.*; Dkt. No. 1, Compl. ¶ 65) but fails to provide more details about the trip. In response, Dr. Ghosheh states that he visited San Diego once to meet with Medimpact in 2013. (Dkt. No. 59-5, Ghosheh Decl. ¶ 13.) The visit lasted two days and they discussed MedImpact's potential acquisition of Dimensions and no information was exchanged about the development of products and services for the JV. (*Id.*) Dr. Ghosheh admits he visited California one other time after 2013 that was entirely personal in nature and he did not meet with anyone from MedImpact or conduct any business in California. (*Id.* ¶ 14.) The one visit to California in 2013 did not concern facts to support a misappropriation claim.

Plaintiffs further claim Dr. Ghosheh obtained MedImpact's trade secrets from MedImpact employees in San Diego, sent mail addressed to MedImpact in San Diego, sent emails to MedImpact employees in San Diego, and conducted phone calls with MedImpact employees in San Diego. (Dkt. No. 67, Ps' Opp. at 20; Dkt. No. 1, Compl. ¶ 65; Dkt. No. 67-4, Brown Decl. ¶ 12.) Again, Plaintiffs do not specify when these contacts occurred. From what is before the Court, it appears that most of these communications occurring during the initial period of the JV Agreement and prior to the acquisition of Dimensions in February 2016.

19cv1865-GPC(LL)

As to the challenged conduct, the Complaint alleges, Dimensions, including, Dr. Ghosheh, with the help of IQVIA, including, Mr. Sadana, circumvented the contractual restrictions in the JV Agreement, the NDA and SLC by unlawfully disclosing and using MedImpact's Trade Secrets and offered IQVIA PBM opportunities in the Territory and around the globe." (*Id.* ¶ 40.) These allegations do not demonstrate that Dr. Ghosheh directed any challenged conduct to this forum. The September 2017 meeting where MedImpact met with representatives of IQVIA and Dimensions, including Dr. Ghosheh to discuss Dimensions' JV termination notice occurred in London, not San Diego. (Dkt. No. 1, Compl. ¶ 41; Dkt. No. 67-4, Brown Decl. ¶ 24.) All other allegations concern Dr. Ghosheh's partnering with companies in other countries to sell AIMS which occurred outside of California. (*Id.* ¶¶ 47, 54.) Further, Defendant Dr. Ghosheh is a resident of Dubai, United Arab Emirates. (Dkt. No. 59-5, Ghosheh Decl. ¶¶ 1, 2; Dkt. No. 67-4, Brown Decl. ¶ 11.)

Plaintiffs' generalized allegation that Dr. Ghosheh had a long-standing relationship with MedImpact through the joint venture and obtained trade secrets over the many years during the JV, without providing specific dates, does not provide support for specific jurisdiction over Ghosheh in this forum. Accordingly, Plaintiffs have failed to present a prima facie case that Dr. Ghosheh expressly aimed any misappropriation of trade secrets conduct at this forum. *See Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1144 (9th Cir. 2017) ("Any links to Arizona, which included Defendants' communications with Plaintiffs by telephone and email about the Tharaldson Litigation, occurred only because it happened to be where Plaintiffs resided."); *Professional's Choice Sports Medicine Prods., Inc. v. Hegeman*, No. 15-cv-2505-BAS(WVG), 2016 WL 1450704, at *4 (S.D. Cal. April 12, 2016) ("[A] plaintiff must point to contacts which demonstrate that the defendant '*expressly aimed* its tortious conduct at the forum.'").

### c.    Expressly Aiming as to Amit Sadana

Defendants argue that Plaintiffs fail to assert facts to connect Sadana with California and, instead, rely on vague allegations of emails and phone calls with

individuals in California. The key claim against Sadana, as an executive of IQVIA, is his involvement in securing a contract between Dimensions and Oman Insurance which occurred outside of California, (*see* Dkt. No. 1, Compl. ¶ 34). Plaintiffs respond generally that Sadana had a business relationship and numerous business dealings with MedImpact including serving as Chairman of the Board of the JV, breaching his fiduciary duty to MedImpact, spearheading a potential collaboration with MedImpact and sending emails and participating in phone calls with MedImpact in San Diego. (Dkt. No. 67, Ps' Opp. at 19-20 (citing Dkt. No. 1, Compl. ¶¶ 48, 61, 66; Dkt. No. 67-4, Brown Decl. ¶¶ 21-22).)

According to Plaintiffs, since at least early 2016, Sadana had a relationship with MedImpact during the acquisition discussions. (Dkt. No. 67-4, Brown Decl. ¶ 21.) After the acquisition, Sadana wanted to work with MedImpact to leverage PBM data in connection with Disease Management Programs. (*Id.*) Further, MedImpact sent and received many emails from Sadana as well as phone calls about the JV and collaborations. (*Id.*) Sadana also participated in telephonic board meetings with Brown who was in San Diego. (*Id.*) Defendant Sadana is a board member of MedImpact Arabia, and is a resident of Dubai, United Arab Emirates. (*Id.* ¶ 17.) These general allegations of Plaintiffs' contact with Sadana do not demonstrate any conduct connecting him to San Diego in a meaningful way as it relates to the misappropriation of trade secrets. *See Walden*, 571 U.S. at 290.

Similar to allegations concerning Dr. Ghosheh, Plaintiffs claim that IQVIA defendants, Dr. Ghosheh, Dimensions and Sadana joined in a targeted scheme to compete against MIA and MedImpact, to steal MIA customers, to meet with regulators and governments around the world, and to disclose and use MedImpact trade secrets to advance IQVIA's interests and their own interests globally. (Dkt. No. 1, Compl. ¶ 4.) "Dr. Ghosheh and Sadana . . . have actively participated in the scheme to acquire and use MedImpact's trade secrets and confidential information so that Dimensions and IQVIA can improperly compete against the joint venture and MedImpact." (*Id.* ¶ 7.) Defendants

Dr. Ghosheh and Sadana visited and specifically targeted MIA customers with the intent to steal them away from the joint venture by offering a competing PBM product. (*Id.*) Sadana is a resident of UAE and an employee of IQVIA, AG, a Swiss company with a branch in Dubai. (Dkt. No. 59-8, Sadana Decl. ¶ 1.) He has never been to California. (*Id.* ¶ 11.) Any challenged conduct occurred in the Middle East.

The thrust of the allegations against Sadana was his involvement in executing a contract between Oman Insurance and Dimensions outside the JV agreement in 2017. (Dkt. No. 1, Compl. ¶¶ 34, 43, 49.) Sadana circumvented the contractual restrictions in the JV Agreement, the NDA and SLC by unlawfully disclosing and using MedImpact's Trade Secrets and offered PBM opportunities in the Territory and around the globe. (*Id.* ¶ 40.) Finally, through the orchestrated efforts of Dr. Ghosheh and Sadana, Dimensions marketed its AIMS and related products and services over MIA's PBM platform to MIA's existing and prospective clients. (*Id.* ¶ 50.) Plaintiffs do not allege that Sadana's conduct was aimed at this forum concerning his involvement in securing a contract between Oman Insurance and Dimensions. Plaintiffs make a general reference to Sadana's contacts with MediImpact through phone calls or through emails but do not link them to the challenged conduct. (Dkt. No. 67-4, Brown Decl. ¶¶ 21, 22.) Accordingly, Plaintiffs have not demonstrated that Sadana expressly aimed his alleged conduct of misappropriating trade secrets with this forum.

Because Plaintiffs have not satisfied the expressly aiming element of the *Calder* test, the Court need not address any of the other prongs because "[f]ailing to sufficiently plead any one of these three elements [from *Calder*] is fatal to Plaintiff's attempt to show personal jurisdiction." *Rupert v. Bond,* 68 F. Supp. 3d 1142, 1163 (N.D. Cal. 2014) (citing *Brayton Purcell LLP*, 606 F.3d at 1128-29).

Finally, because Plaintiffs have failed show that Defendants purposefully availed themselves of the privilege of conducting activities in California, the Court need not address the second and third prongs of the specific jurisdiction analysis. *See Picot*, 780

F.3d at 1215 n. 2; *see also Kellytoy Worldwide, Inc. v. Jay at Play Int'l Hong Kong Ltd.*, Case No. CV 19cv7831-AB(MRS), 2019 WL 8064196, at *7 (C.D. Cal. Dec. 5, 2019).

In sum, the Court GRANTS Defendants' motion to dismiss for lack of personal jurisdiction.

## D. Leave to Amend

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" <u>DeSoto v. Yellow Freight Sys., Inc.</u>, 957 F.2d 655, 658 (9th Cir. 1992) (quoting <u>Schreiber Distrib. Co. v. Serv-Well Furniture Co.</u>, 806 F.2d 1393, 1401 (9th Cir. 1986)). In other words, where leave to amend would be futile, the Court may deny leave to amend. <u>See</u> <u>Desoto</u>, 957 F.2d at 658; <u>Schreiber</u>, 806 F.2d at 1401.

At the hearing, Plaintiffs raised additional facts concerning a scheme to misappropriate their trade secrets by IMS Health, predecessor to IQVIA Holdings, starting in late 2015 as well as raising other facts not raised in the Complaint or in their opposition. Because Plaintiffs may be able to plead facts to assert personal jurisdiction over Defendants on whether the misappropriation of trade secrets was expressly aimed at this forum, leave to amend would not be futile. Accordingly, the Court GRANTS Plaintiffs leave to file a first amended complaint.

## E. Jurisdictional Discovery

Alternatively, in the event the Court concludes it does not have personal jurisdiction over Defendants, Plaintiffs request the Court to grant them leave to conduct jurisdictional discovery. (Dkt. No. 67, Ps' Opp. at 26-27.) They argue that jurisdictional discovery is needed where IQVIA, a multi-national corporation, seeks to exploits its complicated corporate structure to avoid jurisdiction. Plaintiffs do not seek jurisdictional discovery as to facts surrounding Dr. Ghosheh and Sadana's involvement in the alleged misappropriation of MedImpact's trade secrets.

The district court has discretion to allow or deny jurisdictional discovery and any refusal to provide such discovery, "will not be reversed except upon the clearest showing that denial of discovery results in actual and substantial prejudice to the complaining litigant. Discovery may be appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Boschetto v. Hansing,* 539 F.3d 1011, 1020 (9th Cir. 2008) (quoting *Data Disc, Inc. v. Sys. Tech. Assocs.*, Inc., 557 F.2d 1280, 1285 n.1 (9th Cir. 1977)); *see also Harris Rutsky & Co. Ins. Services, Inc. v. Bell & Clements Ltd*., 328 F.3d 1122, 1135 (9th Cir. 2003) (holding that a district court abused its discretion in denying a motion for jurisdictional discovery regarding corporate alter ego liability). However, courts may deny a request for jurisdictional discovery "if it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction," *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977), or when the request is "based on little more than a hunch that it might yield jurisdictionally relevant facts," *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008).

"[W]here a plaintiff's claim of personal jurisdiction appears to be both attenuated and based on bare allegations in the face of specific denials made by the defendants, the Court need not permit even limited discovery." *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1160 (9th Cir. 2006) (quoting *Terracom v. Valley Nat. Bank*, 49 F.3d 555, 562 (9th Cir. 1995) (internal quotation marks omitted)). A party seeking jurisdictional discovery must present at least a "colorable basis" that jurisdiction exists. *Lang v. Morris*, 823 F. Supp. 2d 966, 979 (N.D. Cal. 2011) ("A plaintiff need only present a colorable basis for jurisdiction to obtain discovery, and a court abuses its discretion in denying discovery when it might well demonstrate jurisdictionally relevant facts.") (internal citation and quotation marks omitted).

Here, Plaintiffs do not allege that any of the IQVIA Defendants, whose corporate entity was created in November 2016 when QuintilesIMS was rebranded as IQVIA Holdings, had any contacts or directed any conduct related to the misappropriation of

trade secrets in California. Any discovery into the corporate structure of IQVIA Defendants will not assist the personal jurisdiction analysis because all of IQVIA Defendants' challenged actions, post November 2016, occurred outside of California. Because any jurisdictional discovery on the IQVIA corporate defendants would be futile, the Court DENIES Plaintiffs' request for jurisdictional discovery.

**F.     Federal Rule of Civil Procedure 12(b)(5) - Insufficient Service of Process**[14]

Defendants also argue that the Court should dismiss the case against Dr. Ghosheh and Sadana for insufficient service of process. Plaintiffs respond that Dr. Ghosheh and Sadana were properly served.

Rule 12(b)(5) allows a defendant to move to dismiss due to insufficient service of process. Fed. R. Civ. P. 12(b)(5). "A federal court is without personal jurisdiction over a defendant unless the defendant has been served in accordance with Rule 4. *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir. 1986) (citing *Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982)). "Rule 4 is a flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint." *Crowley v. Bannister*, 734 F.3d 967, 975 (9th Cir. 2013) (quoting *Benny*, 799 F.2d at 492). However, "[n]either actual notice, nor simply naming the person in the caption of the complaint, will subject defendants to personal jurisdiction if service was not made in substantial compliance with Rule 4." *Jackson*, 682 F.2d at 1347 (internal citations omitted).

Substantial compliance with service of process despite deficiencies requires that: "(a) the party that had to be served personally received actual notice, (b) the defendant would suffer no prejudice from the defect in service, (c) there is a justifiable excuse for the failure to serve properly, and (d) the plaintiff would be severely prejudiced if his

---

[14] Defendants move to dismiss IQVIA AG for insufficient service of process. Plaintiffs oppose arguing IQVIA AG was properly served under the Hague Convention. Defendants did not reply to Plaintiffs' argument. Accordingly, by failing to reply to Plaintiffs argument as to IQVIA AG, Defendants appear to have conceded to Plaintiffs' argument that IQVIA AG was properly served.

19cv1865-GPC(LL)

complaint were dismissed." *In re 701 Mariposa Project, LLC*, 514 B.R. 10, 17 (B.A.P. 9th Cir. 2014) (quoting *Whale v. United States*, 792 F.2d 951, 953 (9th Cir. 1986)).

As to serving an individual in a foreign country, Rule 4(f) provides,

(f) Serving an Individual in a Foreign Country. Unless federal law provides otherwise, an individual--other than a minor, an incompetent person, or a person whose waiver has been filed--may be served at a place not within any judicial district of the United States:
(1) by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents;
(2) if there is no internationally agreed means, or if an international agreement allows but does not specify other means, by a method that is reasonably calculated to give notice:
   **(A) as prescribed by the foreign country's law for service in that country in an action in its courts of general jurisdiction;**
   (B) as the foreign authority directs in response to a letter rogatory or letter of request; or
   (C) unless prohibited by the foreign country's law, by:
         (i) delivering a copy of the summons and of the complaint to the individual personally; or
         (ii) using any form of mail that the clerk addresses and sends to the individual and that requires a signed receipt; or
(3) by other means not prohibited by international agreement, as the court orders.

Fed. R. Civ. P. 4(f) (emphasis added). The UAE is not a party to the Hague Convention or any other treaty concerning service of process, *Color Switch LLC v. Fortafy Games DMCC*, Case No. 18cv1419-DAD-JLT, 2018 WL 2298401, at *3 (E.D. Cal. May 21, 2018) (United Arab Emirates is "not a party to The Hague Service Convention or any other treaty related to service of process"); therefore, Plaintiffs attempted to serve Dr. Ghosheh and Sadana by means as prescribed by UAE pursuant to "Cabinet Resolution No. (57) of 2018 Concerning the Executive Regulations of Federal Law No. (11) of 1992 on the Civil Procedure Law." (Dkt. No. 59-4, ElGazairly Decl., Ex. A at 40.)

Here, the process server delivered a copy of the summons and complaint on October 7, 2019 on Sadana by dropping it off with a "Ms. Anushka (Office Receptionist

at IQVIA)" at "11th Floor, Convention Tower, DWTC, Al Saada Street, Dubai, United Arab Emirates." (Dkt. No. 16.) On October 17, 2019, Plaintiffs' process server dropped off the summons and complaint on "Ms. Anushka (Person in charge at Dimensions Healthcare LLC)" at "Convention Tower, Happiness Street, 11th Floor, Dubai World Trade Center, 183246 Dubai, United Arab Emirates." (Dkt. No. 34.) It is to be noted that Dimensions and IQVIA AG both have the same address, (Dkt. No. 67-13, Jassim Decl. ¶ 5), and Ms. Anusha D'sa sits at the reception desk at the address of both Dimensions and IQVIA AG. (Dkt. No. 67-11, Farooq Decl. ¶ 5; Dkt. No. 67-13, Jassim Decl. ¶ 6.)

Defendants claim insufficient service of process because they do not employ a person named Ms. Anushska, the person identified in the proof of service. They do acknowledge that Anusha D'sa works as Sadana's personal assistant but is not an employee of Dimensions so she cannot accept service on behalf of Dr. Ghosheh. Further, they contend that the proof of service is defective as to Dr. Ghosheh because it failed to include the "name, capacity and surname of the service recipient, and his/her signature, stamp or fingerprint in acknowledgement of receipt of service, or establishing his/her refusal to receive the service and the underlying reason for such refusal." (Dkt. No. 59-4, ElGazairly Decl. ¶ 4.) As to Sadana, the proof of service is defective because it failed to include "the title, signature, seal or fingerprint" of the person who accepted service. (*Id.*) The Court concludes that despite these technical deficiencies, Plaintiffs substantially complied with service of process on Dr. Ghosheh and Sadana.

Both Dr. Ghosheh and Sadana received actual notice of the complaint as they have retained counsel and filed motions to dismiss. Defendants do not deny that Ms. Anusha D'sa received the summons and complaint for both Dr. Gosheh and Sadana. Defendants have not articulated any prejudice from the defect in service. Therefore, the Court concludes that Plaintiffs have substantially complied with service of process on Dr. Ghosheh and Sadana and DENIES Defendants' motion to dismiss. S*ee Henning v. Arya*, Case No. 14cv979-RFB-GWF, 2016 WL 4055641, at *4 (D. Nev. July 26, 2016)

(denying motion to dismiss for insufficient service of process because plaintiff substantially complied with UAE law even though process server, *inter alia*, did not obtain the signature, seal or fingerprint of person served as required under UAE law).

### Conclusion

Based on the above, the Court GRANTS Defendants' motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction over all Defendants with leave to amend. Plaintiffs shall file a first amended complaint within 14 days of the filed date of this order. The Court also DENIES Plaintiffs' request for jurisdictional discovery. The Court further DENIES Defendants' motion to dismiss for insufficient service of process. As such, the Court DENIES Defendants' motion to dismiss for failure to state a claim as MOOT.

IT IS SO ORDERED.

Dated: March 24, 2020

Hon. Gonzalo P. Curiel
United States District Judge