Randall E. Kay (SBN 149369)
Nicholas A. Hodges (SBN 307573)
Alyssa M. Moscrop (SBN 330310)
rekay@jonesday.com
nhodges@jonesday.com
amoscrop@jonesday.com
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA  92121.3134
Telephone:  +1.858.314.1200
Facsimile:   +1.844.345.3178

Jennifer D. Bennett(SBN 235196)
jennifer.bennett@dentons.com
DENTONS US LLP
One Market Plaza, Spear Tower, 24th Floor
San Francisco, California  94105
Telephone:  (415) 267-4000

Attorneys for Plaintiffs MedImpact Healthcare
Systems, Inc., MedImpact International, LLC and
MedImpact International Hong Kong, Ltd.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MEDIMPACT HEALTHCARE SYSTEMS, INC., a California corporation; MEDIMPACT INTERNATIONAL LLC, a California limited liability company; and MEDIMPACT INTERNATIONAL HONG KONG LTD.,  a Hong Kong company,<br><br>     Plaintiffs,<br><br>v.<br><br>IQVIA INC., a Connecticut corporation ; IQVIA Ltd., a UK company; IQVIA AG, a Swiss company;<br>OMAR GHOSHEH, individually; and AMIT SADANA, individually, and DOES 1-20.<br><br>     Defendants. | Case No. 3:19-cv-01865-GPC-LL<br><br>**FIRST AMENDED COMPLAINT FOR (1) BREACH OF FIDUCIARY DUTY; (2) INDUCING BREACH OF CONTRACT; (3) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (4) NEGLIGENT INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; (5) INTENTIONAL INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP; (6) UNFAIR COMPETITION; (7) CONSPIRACY; (8) MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA, 18 U.S.C. § 1836; (9) MISAPPROPRIATION OF TRADE SECRETS UNDER CAL. UNIFORM TRADE SECRETS ACT; AND (10) RICO ACT, 18 U.S.C. § 1962(c).**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs MedImpact Healthcare Systems, Inc., MedImpact International LLC, and MedImpact International HK Limited (together, "Plaintiffs" or "MedImpact"), file this First Amended Complaint ("Complaint") against Defendants IQVIA Inc., IQVIA Ltd., IQVIA AG (collectively referred to as "IQVIA" or the "IQVIA Defendants"), Omar Ghosheh ("Dr. Ghosheh") and Amit Sadana ("Mr. Sadana") as follows.  When used herein, "Defendants" refers collectively to the IQVIA Defendants, Dr. Ghosheh and Mr. Sadana.

## I.

## INTRODUCTION

1.      Each of the IQVIA Defendants are in the business of selling life sciences data including, to biotechnology and pharmaceutical companies.  This includes selling data to biopharma companies located in California and here in San Diego.  A pharmacy benefits management ("PBM") platform, like Plaintiffs' San Diego-based platform, determines on a claim-by-claim basis whether a pharmacy should dispense a prescription drug to the patient or whether the claim should be rejected.  The PBM platform thus, provides access to unparalleled data relating to prescription drug transactions.  It is no surprise that each of the IQVIA Defendants wanted access to this prescription level drug data processed by MedImpact's San Diego PBM platform.  That desire triggered Defendants' scheme for Defendant IQVIA AG to acquire MedImpact's joint venture partner Dimensions Healthcare LLC ("Dimensions").

2.      Beginning in late 2015, Defendants IQVIA Inc., IQVIA Ltd., IQVIA AG and Amit Sadana embarked on a scheme with Defendant Dr. Ghosheh and his company Dimensions, to acquire Dimensions under false pretenses and through deliberate misrepresentations to MedImpact, to compete unlawfully against MedImpact in the international PBM market, to interfere with MedImpact's customers and relationships, continually conceal what they were doing from

MedImpact, and gain access to the immense amount of valuable prescription data obtained from MedImpact's PBM platform that could be sold to pharmaceutical companies.  Once they succeeded and had what they needed, they deceitfully and prematurely terminated Dimensions' joint venture with MedImpact.

3.     After severing ties with MedImpact, Defendants proceeded to make PBM proposals to health authorities around the world without MedImpact, retain 100% of the revenue (rather than sharing with a JV partner), and significantly, sell the data to pharmaceutical companies—the IQVIA Defendants' primary clients and core business.  Indeed, the IQVIA Defendants have collectively made annually billions of dollars selling healthcare data to life sciences companies around the world including, to Novartis, Genentech, Amgen, and Gilead in California.  California has always played a significant role in their scheme.  The IQVIA Defendants were gaining access to a joint venture with a San Diego-based PBM company with immediate access to unprecedented, voluminous pharmaceutical data processed in San Diego and could sell that data back to California-based companies.

4.     As Alistair Grenfell, then IMS Health President for North Africa, Middle East, South Asia and Africa (and now President of Europe, Middle East, Africa, and South Asia of Defendant IQVIA Ltd.), stated, "This is a significant moment in our growth as a global leader in the healthcare technology industry; today we have gained a comprehensive understanding of the Middle East market from all angles and can now accelerate our expansion plans, offering world class systems and services to new customers across the region."  On information and belief, Alistair Grenfell recommended to the IMS Health board that IMS Health AG acquire Dimensions and that it use Dimensions to gain access to the vast amount of pharmaceutical data—obtained from MedImpact's PBM platform over several years—and to sell the data to pharmaceutical companies.  Indeed, the type of

FIRST AMENDED COMPLAINT

transaction-level pharmaceutical data MedImpact had in the region did not exist on that level anywhere else in the world and is highly desirable to any pharmaceutical company.

5.     Before the IQVIA Defendants became involved, the relationship between MedImpact and Dimensions began with what MedImpact now recognizes was misplaced trust.  Through decades of effort and the investment of hundreds of millions of dollars, MedImpact had become the largest privately-held PBM in the United States, serving approximately 50,000,000 lives domestically and employing more than 1,300 employees (the vast majority of whom are based in San Diego). Wanting to apply its experience and expertise abroad, MedImpact formed a joint venture with a UAE company, Dimensions, to expand into the Middle East's Gulf Region where no other PBMs were yet operating at that time, in 2011 to 2012.  The joint venture was MedImpact Arabia ("MIA").

6.     Desiring for the joint venture to succeed, MedImpact was an open book to its joint venture partner willingly sharing its closely guarded and proprietary trade secret information—subject to strict confidentiality agreements. Beginning in 2011, in person both in San Diego and in Dubai as well as through technological means (via e-mail and phone calls with MedImpact's San Diego employees), MedImpact's employees taught Dimensions and Defendant Dr. Ghosheh about all aspects of PBMs.  Together, MedImpact and Dimensions launched the first PBM in the region.  During its peak, MedImpact would process for MIA approximately 45,000 to 50,000 claims per day on its platform in San Diego, California.  The MIA joint venture sends tens of thousands of pharmaceutical claims per day to MedImpact's resident servers in San Diego. MedImpact's San Diego servers then adjudicate these claims and send the data back for use in the UAE.  This transactional data includes diagnoses codes, prescribed drugs, physician names, patient information and demographics, among a lot of

other valuable data, for tens of thousands of daily pharmaceutical transactions.  It is a repository of pharmaceutical data unlike any other in the world.

7.     Everything changed when IMS Health entered the picture with a scheme to acquire Dimensions.  IMS Health, with no previous PBM experience, was interested in the PBM business and importantly, in the data that comes from PBM that could be sold to pharmaceutical companies.  The acquisition brought with it a PBM platform acquired without enduring the laborious, time-consuming, and expensive process necessary to develop one on its own.  It also brought access to the immense and invaluable prescription data provided by PBM.

8.     Especially key is that Dimensions was developing AIMS using MedImpact's San Diego trade secrets, and through IQVIA's influence, Dimensions would willingly breach its agreement with MedImpact, divert the joint venture's customers and relationships, and steal MedImpact's trade secrets, confidential information and valuable pharmaceutical data for IQVIA's use.  For this scheme to work, however, IQVIA needed MedImpact's consent for the transaction. Beginning in at least December 2015, representatives from IMS Health (then IMS Health HQ Ltd. (now IQVIA Ltd.) and IMS Health AG (now IQVIA AG)) expressly reached out to MedImpact in San Diego for consent to the acquisition of Dimensions.  Defendants IQVIA Ltd. and IQVIA AG's employees, through multiple phone calls and email, contacted MedImpact in San Diego and repeatedly misrepresented that IMS Health was interested in maintaining the joint venture. Had MedImpact known IMS Health's true intent, MedImpact would not have consented to the acquisition of Dimensions and IQVIA Defendants would have not gained access to MedImpact's trade secrets or the pharmaceutical data.

9.     Almost overnight, after acquiring Dimensions, Defendants IQVIA Inc., IQVIA AG and IQVIA Ltd.—despite having no previous PBM experience or knowledge—transformed from being a non-participant in the PBM industry to

FIRST AMENDED COMPLAINT

making PBM proposals to clients and working with health agencies all around the world with Dimensions' assistance. They accomplished this while Dimensions was still MedImpact's joint venture partner and a shareholder in MIA.

10. By stealing MedImpact's trade secrets and engaging in the unlawful conduct described below, the IQVIA Defendants bypassed years of research and avoided development time and tens of millions of dollars of investment expense. In doing so, it caused damages to MedImpact in amounts that exceed tens of millions of dollars. MedImpact also alleges, on information and belief, that the IQVIA Defendants also obtained—through Dimensions—access to the immense repository of valuable patient pharmaceutical data processed on MedImpact's San Diego servers for MIA and has sold that data for profit to pharmaceutical companies including those in California, without MedImpact's consent and to MedImpact's detriment.

11. Defendants Dr. Ghosheh (co-founder of Dimensions) and Mr. Sadana (a senior level IQVIA executive) also act in the dual capacity as board members of MIA, of which MedImpact and Dimensions are shareholders. Instead of honoring their fiduciary duties and obligations as board members, both have actively participated in the scheme that Dimensions and IQVIA compete improperly against the joint venture and MedImpact and sell pharmaceutical data. MedImpact is informed and believes that Dr. Ghosheh and Mr. Sadana visited and specifically targeted MIA customers with the intent to steal them away from the joint venture by offering a competing PBM product. Dr. Ghosheh and Mr. Sadana successfully entered into contracts with MIA customers and prospective customers proposing products based on MedImpact's trade secrets, all while serving on the Board of MIA, in serious breach of the fiduciary duties they owed to the joint venture and MedImpact, and in breach of Dimensions' agreements with MedImpact. In so

FIRST AMENDED COMPLAINT

doing, Dr. Ghosheh and Mr. Sadana advanced not only IQVIA's improper interests but their own interests.

12.     This is a civil action for breach of fiduciary duties, inducing breach of contract, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, intentional interference with a contractual relationship, unfair competition, conspiracy, misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") and the California Uniform Trade Secrets Act ("CUTSA"), and for Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. § 1962(c) violations.

13.     MedImpact seeks damages for its injuries due to Defendants unlawful conduct, and a permanent injunction enjoining the Defendants from possessing, misappropriating and using MedImpact's confidential trade secret information and selling the pharmaceutical data.

## II.

## PARTIES

14.     Plaintiff MedImpact Healthcare Systems, Inc. ("MIHS") is, and at all relevant times herein was, a privately held California corporation with its principal place of business in the County of San Diego, State of California.  MIHS was founded in San Diego, California, in 1989 and provides pharmacy benefit management ("PBM") services to its clients.  MIHS is the largest privately held PBM provider in the United States, serving over 50 million members across 64,000 pharmacies.  MIHS currently employs close to 1,000 people in its San Diego headquarters and more than 1,300 employees overall.  MIHS partners with the nation's finest health plans, hospitals, self-funded employers, state and local governments, and universities, including the University of San Diego, to provide pharmacy benefit management services.  Over the course of 30 years, MIHS has invested hundreds of millions of dollars to develop its proprietary PBM platform.

FIRST AMENDED COMPLAINT

The PBM platform is hosted on servers in San Diego, California.  MIHS' San Diego-based PBM platform is used to support MedImpact's highly successful business in the United States and under license, is also currently used abroad by MIL and MI-HK.  MIHS' PBM platform and related trade secrets were developed by MedImpact employees in San Diego.  The MIHS PBM platform processes approximately 25,000 to 30,000 pharmaceutical transactions on behalf of the JV each day and transmits the data from San Diego, California to the UAE.

15.     Plaintiff MedImpact International LLC ("MIL"), is a limited liability company established and existing under the laws of California.  MIL is a wholly owned subsidiary of MIHS.  MIL commenced international business operations in 2011 and is active in the Middle East and Chinese markets, and is actively pursuing business opportunities in other geographies to expand its international presence.  MIL's principal place of business is in San Diego, California.  MIL's employees and officers work primarily from MedImpact's headquarters in San Diego, California.

16.     Plaintiff MedImpact International Hong Kong Ltd. ("MI-HK"), is a private Hong Kong corporation, and is a wholly owned subsidiary of MIL, which is a wholly owned subsidiary of MedImpact Healthcare Systems, Inc.  MI-HK's principal place of business is also in San Diego, California where MedImpact is headquartered.  MedImpact employees in San Diego support MI-HK's business strategies and initiatives.

17.     Non-party IQVIA Holdings, Inc. ("IQVIA Holdings") is a corporation organized under the laws of Delaware with its principal place of business in Durham, North Carolina.  Based on information and belief, IQVIA Holdings is a global provider of advanced analytics, technology solutions, healthcare data and contract research services to the life sciences industry to customers throughout the United States, including this judicial district, and that it maintains a physical presence and

FIRST AMENDED COMPLAINT

employs personnel in this judicial district.  Additionally, and based on information and belief, IQVIA Holdings has one of the largest collections of healthcare information in the world, which includes more than 600 million comprehensive, longitudinal, non-identified patient records spanning sales, prescription and promotional data, medical claims, electronic medical records, genomics, and social media.  Their growing data set contains over 30 petabytes of information sourced from more than 140,000 data suppliers and covering approximately one million data feeds globally.  Based on this data, IQVIA Holdings delivers information on over 85% of the world's pharmaceuticals.  Nearly all of the top 100 global pharmaceutical and biotechnology companies, measured by revenue, are clients, and many of these companies subscribe to reports and services in many countries.  On information and belief, IQVIA Holdings' subsidiaries sell pharmaceutical data to the largest pharmaceutical and biotechnology companies in California including, for example, to Amgen, Novartis, Genentech, and Gilead Sciences, and San Diego-based, Ionis Pharmaceuticals, ACADIA Pharmaceuticals and Retrophin.

18.    Defendant and co-conspirator IQVIA Inc., is a corporation organized under the laws of Delaware with its principal place of business in Danbury, Connecticut, and is a wholly-owned subsidiary of IQVIA.  IQVIA Inc. has a location at 10188 Telesis Ct. #400, San Diego, California 92121.  On information and belief, IQVIA Inc.'s San Diego office is involved in IQVIA's core business of providing data analytics and reports to the life sciences industry including, to California-based life sciences companies Amgen, Novartis, Genentech, and Gilead Sciences, and San Diego-based companies such as, Ionis Pharmaceuticals, ACADIA Pharmaceuticals and Retrophin.

19.    Defendant and co-conspirator IQVIA AG is a wholly-owned subsidiary of IQVIA Holdings, Inc., with its primary place of business in Switzerland and a branch in Dubai, UAE.  IQVIA AG's predecessor entity, IMS

FIRST AMENDED COMPLAINT

Health AG or IMS AG, acquired Dimensions and later changed its name to IQVIA AG.  On information and belief, IQVIA AG is involved in IQVIA's core business of providing data analytics and reports to the life sciences industry.

20.     Defendant and co-conspirator IQVIA Ltd. is a subsidiary of IQVIA Holdings, Inc., incorporated in England with its principal place of business in Reading, England.  IQVIA Ltd.'s predecessor IMS Health HQ Ltd. changed its name to IQVIA Solutions HQ Ltd. and then to IQVIA Ltd.  On information and belief, IQVIA Ltd. is involved in IQVIA's core business of providing data analytics and reports to the life sciences industry.

21.     During some of the time described in this complaint, the above-referenced IQVIA Defendants were members of the IMS Health corporate family. In or around October 2016, IMS Health merged with Quintiles creating QuintilesIMS. In or around November 2016, QuintilesIMS rebranded itself as IQVIA, and thus the IQVIA Defendants described above are now part of a corporate family broadly described as "IQVIA."

22.     Defendant and co-conspirator Dr. Omar Ghosheh ("Dr. Ghosheh"), an individual and a board member of MedImpact Arabia and co-founder of Dimensions, owed and breached his fiduciary obligations to MedImpact and is a resident of Dubai, United Arab Emirates.  On information and belief, Dr. Ghosheh recently resigned from Dimensions and the board.

23.     Defendant and co-conspirator Amit Sadana ("Mr. Sadana"), an individual and a board member of MedImpact Arabia, owed and breached his fiduciary obligations to MedImpact and is a resident of Dubai, United Arab Emirates.

24.     MedImpact, is informed and believes, and based thereon alleges that at all relevant times mentioned herein, each and every defendant was the agent, servant, employee, joint venturer, partner, subsidiary, and/or co-conspirator of each

other defendant, and that, in performing or omitting to perform the acts herein alleged, each was acting individually as well as through and in the foregoing alleged capacity and within the course and scope of such agency, employment, joint venture, partnership, subsidiary and/or conspiracy, and each other defendant ratified and affirmed the acts and omissions of the other Defendant.  MedImpact is further informed based on information and belief that each Defendant, in taking the actions alleged herein and/or ratifying the actions alleged herein, acted within the course and scope of such authority and, at the same time, for their personal financial and individual gain, as well as in the course and scope of such employment, agency and as an alter ego therein.  Additionally, Dr. Ghosheh acted at times distinctly from IQVIA or Dimensions to advance his own interests and those of the greater scheme.

25.     Whenever this Complaint refers to any actions of IQVIA, such allegations shall mean that the directors, officers, employees or agent of said entity did perform or authorize the alleged acts or actively engaged in the management, direction and control of such entity and were acting within the course and scope of their employment.  Whenever this Complaint refers to any actions of IMS Health ("IMS Health"), such allegations shall mean that the directors, officers, employees or agent of said entity performed or authorized the alleged acts or actively engaged in the management, direction and control of such entity and were acting within the course and scope of their employment.

26.     Whenever this Complaint refers to any actions of Dr. Ghosheh or Mr. Sadana individually, such allegations shall mean that Dr. Ghosheh and Mr. Sadana as directors, officers, employees or agents of said entity performed or authorized the alleged acts or actively engaged in the management, direction and control of such entity acting outside the scope their duties and obligations and in breach of their fiduciary obligations to the said entity for personal gain.

27.     Many facets and facts of the wrongdoing and conspiracy described

herein likely remain unknown, and the complete list of wrongdoers and co-conspirators likely extends beyond the entities and individuals identified here.  At present, Plaintiffs are ignorant of the true names and capacities of such individuals and entities and, therefore, sues them herein under the fictitious names Does 1-20.  Plaintiffs will amend to identify and state applicable claims, as appropriate, against additional entities and individuals as relevant information becomes available through investigation and discovery.

28.     Each of the co-conspirators referenced in this Complaint was an agent, conspirator, aider or abettor of one or more of the entity defendants.  The acts and omissions of each alleged co-conspirator were performed within the course and scope of that agency, conspiracy, aiding or abetting.  At all relevant times, the entity defendants were each acting with one or more of the co-conspirators pursuant to a common scheme, course of action, enterprise, or conspiracy.

29.     As used in this Complaint, the term "co-conspirators" refers collectively to all the named Defendants including the Doe defendants.

### III.

### GENERAL ALLEGATIONS

### A.     MedImpact's Aspirations to Expand PBM Services Globally.

30.     In or around 2010 to 2011, MIHS was interested in expanding its PBM platform globally, including into the Middle East's Gulf Region which at that time had no PBM providers.  MIHS formed MIL to expand its PBM services in the international market.  In or around 2011, MIL began discussions with Dimensions, both in San Diego and in Dubai.  MIL identified Dimensions as a possible joint venture partner because of its regulatory contacts and presence in the UAE.  At the time, Dimensions sold limited health IT software and integration products aimed primarily at pharmacy providers in the medical insurance market.  Dimensions did *not* have real-time online adjudication capabilities in the PBM market.

**B.**     **The Joint Venture Agreement.**

31.     On March 21, 2011, MIL and Dimensions began working together under a Non-Disclosure Agreement ("NDA"), pursuant to which Dimensions agreed to strictly maintain the confidentiality of MedImpact's confidential and proprietary trade secret information and not to use the information for any purpose other than the transaction contemplated in the NDA.  After the parties signed the NDA, MIL began sharing MedImpact's closely guarded proprietary and trade secret information with Dimensions.  Subsequently, on February 1, 2012, MIL and Dimensions entered into a Joint Venture Agreement ("JV Agreement"), under which they agreed to establish MedImpact Arabia ("MIA") to provide PBM services to the Gulf Region.  Defendant Dr. Ghosheh signed the JV Agreement knowing that MIHS and MIL had headquarters in San Diego, California.  The JV Agreement obligated Dimensions to maintain the confidentiality of "confidential and proprietary information or trade secrets" and "not utilize the Confidential information for any purpose other than as necessary to conduct the Business pursuant to this Contract (including as contemplated by the Services and License Contract)."  In other words, Dimensions agreed not to use or disclose MedImpact's confidential and trade secret information to anyone other than those with a need to know and who were bound by the terms of the JV Agreement.  On the same day, MIL and Dimensions entered into a service level agreement (the "SLC"), with similar confidentiality provisions.  The SLC also provided that Claims Data could solely be used by the JV for providing JV services.  Additionally, by entering into the JV Agreement, Dimensions agreed that any business opportunity that arose under the agreement within the Territory as defined in the agreement would strictly belong to the joint venture.  The Territory, as of the date of the JV Agreement, included members of the Gulf Co-operation Council, Jordan, Lebanon, and any other country the parties to the JV Agreement agreed in writing.  Dimensions knew

FIRST AMENDED COMPLAINT

and agreed to the terms of the NDA, JV Agreement, and SLC.  On January 1, 2014, with the consent of Dimensions, Plaintiff MIL assigned its rights and interest in the joint venture to Plaintiff MI-HK.

**(1)** **MedImpact's Contributions to the Joint Venture and the Joint Venture's Rapid Success.**

32.     MIHS spent decades developing its highly successful PBM platform in San Diego prior to the formation of the joint venture.  MIHS's PBM platform is supported on servers located in San Diego.  MIHS agreed to provide its San Diego platform to MIA for the exclusive use in the Territory in order to generate clients for MIA.  MIHS processes approximately 25,000 to 30,000 claims per day in San Diego, California on behalf of the JV.  MIHS spent 30 years and invested hundreds of millions of dollars in developing, refining, and collating all of the intellectual property in its PBM platform, including the business, financial, operational, technical and clinical know-how, and real time claims processing/adjudication know-how and capabilities, which were not present in the Territory prior to the creation of the joint venture.

33.     Following execution of the NDA, the JV Agreement, and SLC, through innumerable e-mail, phone calls and in person meetings/training, and through MIHS' MedAccess platform hosted on servers in San Diego, MedImpact's San Diego employees taught Dimensions, including, Defendant Dr. Ghosheh, about all aspects of PBM, including how to sell PBM services; how to price PBM services; how to contract for PBM services; how to implement PBM services; how to adjudicate claims; how to set up benefits and policies; details of clinical rules; how to develop the editing platform to customize MIL rules; the implementation process; user access testing technology to test claims; how to manage clients effectively; how to report value created to clients; how to use customer service portals in real time to support patients and pharmacists; how to provide online

FIRST AMENDED COMPLAINT

reporting capabilities to clients; and how to set up customer call centers at health plans to support PBM services.  It was through the JV, under the protection of confidentiality restrictions, Dimensions and Defendant Dr. Ghosheh gained access to MedImpact's trade secrets and know-how.

34.    After MedImpact and Dimensions entered into the NDA, they successfully launched their first PBM service in the Middle-East Gulf region that same year on or around October 1, 2011.  From 2011 through 2016, MIA demonstrated continued growth with increasing revenues and customers year-after-year.  Oman Insurance was MIA's largest customer, accounting for approximately 25% of the JV's revenue.  By late 2015, MIA had processed tens of millions of pharmaceutical claims in the Middle East from MIHS' PBM platform in San Diego.

**C.    IMS Health Schemes with and Acquires Dimensions.**

35.    In late 2015, MedImpact learned that IMS Health was interested in acquiring Dimensions.  Representatives from IQVIA AG and IQVIA Ltd. (then IMS Health AG and IMS Health HQ Ltd. respectively and referred to collectively as IMS Health), contacted MedImpact in San Diego, through approximately five to six phone calls with San Diego MedImpact employees and follow-up emails directed at MedImpact's San Diego employees, regarding IMS Health AG's acquisition of Dimensions, yet the true motives for the transaction were never disclosed.

36.    Specifically, IMS Health had directed several phone calls with MedImpact including, IMS Health employees[1] Carlos Santos (now with IQVIA Ltd.), Jordan Mitchell, James Salitan, Amit Sadana (now with IQVIA AG), Esther Horvath, and Celine Zeng relating to IMS Health AG's acquisition of Dimensions.  During these phone calls, IMS Health learned about the core business of the JV and

[1] Based on the way in which IMS Health refers to different IMS Health entities as IMS Health it is not possible based on publicly available information to better determine the specific IMS Health employers of each IMS Health employee.  To the extent the court finds it necessary for Plaintiffs to better identify the specific IMS Health and associated IQVIA entity associated with specific IMS Health employees, Plaintiffs respectfully request jurisdictional discovery on these topics.

FIRST AMENDED COMPLAINT

repeatedly misrepresented to MedImpact that the JV would not be impacted by the acquisition.

37.    IMS Health employees directed due diligence type related questions regarding the business, technology and finances of the JV to MedImpact executives in San Diego.  IMS Health understood through these conversations that MedImpact was a JV partner of Dimensions, was based in San Diego and provided its San Diego-based PBM to the JV to adjudicate pharmaceutical claims.  MedImpact representatives also made it clear to IMS Health executives that MedImpact does not sell pharmaceutical data.  IMS Health executives represented during the phone calls (and e-mail) with MedImpact that its acquisition of Dimensions would not affect the JV between MI-HK and Dimensions.  However, on information and belief, IMS Health already knew from their due diligence that Dimensions was developing AIMS, a competing PBM product based off MedImpact's trade secrets, yet IMS Health concealed this during the phone calls and emails with MedImpact.

38.    For example, on December 9, 2015, Carlos Santos, the Director of Business Development at IMS Health HQ Ltd. (now with IQVIA Ltd.), emailed Mr. Brown in San Diego, California about IMS Health's intentions to acquire Dimensions and memorializing an earlier meeting with Mr. Brown, hiding their true motives.  He also copied Defendants Dr. Ghosheh and Amit Sadana (now with IQVIA AG), and James Salitan, then General Counsel of IMS Health.  Mr. Santos wrote (emphasis added):

> Dale,
>
> It was very good to meet you today.
>
> As we discussed, I wanted to send you a follow up email to confirm in writing our interest in Dimensions Healthcare (DHC) and the confidential discussions we have had with them to date about acquiring a controlling interest in DHC. Given the relationship DHC has with Medimpact and our keenness to maintain the current Medimpact Arabia JV, **we wanted to**

- 16 -

FIRST AMENDED COMPLAINT

**formally make contact with both yourself and the appropriate representative from Medimpact International to discuss our strategic intentions**.

**We would also appreciate the opportunity to be able to ask some diligence questions and access certain specific financial information regarding the JV – ideally next week.** To this end and so that we can have the relevant assurances regarding our discussions, please find attached a mutual non-disclosure letter. I would be happy to sign a copy of the attached with each of Medimpact International and Medimpact Arabia JV or if easier we can have one NDA between the 3 companies – please let us know what suits you best / if you have any amendments. I am aware that both you and Dimensions will have a conversation with Medimpact International before sending the attached, so please feel free to send when you feel appropriate.

Many thanks for your assistance today. I look forward to catching up with you in due course.
Kind regards,

Carlos

39.     On December 15, 2015, Mr. Santos from IMS Health HQ Ltd. (now IQVIA Ltd.) sought more information from MedImpact in San Diego in order to assist in their acquisition of Dimensions.  Mr. Santos emailed Dale Brown of MedImpact, in San Diego, a list of due diligence questions that Mr. Santos wanted MedImpact to answer and copied Defendant Dr. Ghosheh, Defendant Amit Sadana, James Salitan, Celine Zeng and Jordan Mitchell all from IMS Health, Mr. Ghosheh from Dimensions and two auditors from Ernst and Young.  Specifically Mr. Santos wrote:

> Thanks Dale, I think that is a very good idea.
>
> In the interest of time, I attach the list of questions / information requests that we are proposing to ask of the JV from a financial perspective. This has been sent to Dimension's advisor already.
>
> I would be very happy to jump on a call with you today. If you wish to discuss the attached, KH and / or Richard form EY will join the call as well.

- 17 -

FIRST AMENDED COMPLAINT

Let me know if 5pm your time works for you

Thanks

CS

And, Mr. Santos attached to his email to Mr. Brown an excel spreadsheet with numerous information requests for MedImpact including, for example, a breakdown of monthly PBM sales per customer in including, number of members per month and the rates applied.

40.     Then, on December 21, 2015, under false pretenses to obtain MedImpact's consent to the transaction, Carlos Santos from IMS Health HQ Ltd. (now IQVIA Ltd.) reached out to MedImpact in San Diego, California, and copied IMS Health employees, Jordan Mitchell, James Salitan, Amit Sadana (now with IQVIA AG), Esther Horvath, Celine Zeng, and Anuradha Pai, and attached a change of control consent form for MedImpact to sign (emphasis added):

Dale,

As previously discussed, **please find attached the change of control consent we have drafted. As you will see the consent is very factual and based on the current JV agreement between Medimpact and Dimensions**. Please do let us know if you have any comments.

Separately, I wanted to raise a few points which are important for us to discuss with you pre the completion of our acquisition of Dimensions

1.     Changing the local service agent – The current agent is a Seller and thus to ensure appropriate independence post acquisition we would want this changed before completion. Ideally we would like to use CBD Consultancy.

2.     If the IP is still owned by MedImpact USA, adjustment of the JV agreement and the Services & License Contract as being in the names of separate MedImpact entities – again, in order to ensure contracts are correctly

FIRST AMENDED COMPLAINT

documented we want to adjust the JV agreement to reflect the correct parties and actual commercial position

       3.    Assignment of certain prescription benefits management contracts from the JV parties to the JV company – we have noted that certain management contracts have been countersigned by the JV parties rather than the JV itself – to ensure appropriate documentation of contracts we would like a commitment that these contracts will be reassigned in due course.

On the points above, Melissa will follow up shortly with a more detailed action request. Please let us know your thoughts. On points 1 and 2 we would like these actioned pre-completion if possible and with point 3, we would like a commitment now to make these changes which we can action post our acquisition of Dimensions.

Furthermore, once we have completed our acquisition, are in our integration stage and have established our relationship with Medimpact, we would also like to table the following points for discussion, predominantly to ensure greater clarity. Please let me know if you want any further details now.
       a.    Clarifying the change of control obligations
       b.    Providing a mechanism for the consequences of termination
As before, thank you very much for your assistance with these matters. **It is not our intention to change the overall operations of the JV at this time – our main intention is to ensure that matters are in order so that we can continue the current JV arrangement**.

Many thanks,
Carlos

    41.    Additionally, on December 27, 2015, Carlos Santos from IMS Health HQ Ltd. sent another email to Dale Brown in San Diego, California, writing:

Dale, Yousef,

Further to our earlier call, I am writing to confirm we are happy to proceed as per the action plan agreed on the call.
Namely we would like to receive written confirmation from Medimpact (Dale) that:
1.    There is no objection by Medimpact to change the local service agency and as such we can change the service agency post-completion, to be agreed at an appropriate Board meeting

FIRST AMENDED COMPLAINT

2.     There is no objection by Medimpact to adjust the JV agreement or the Services & License Contract post completion so as to ensure they reflect the correct and relevant Medimpact entities (discrepancy picked up during diligence)

If you could confirm the above that would satisfy our concerns at present; and we can discuss additional actions post-completion

Many thanks
Carlos

42.     During IMS Health's many and continuous contacts with MedImpact in San Diego, representatives from IMS Health (now Defendants IQVIA AG and IQVIA Ltd.) misrepresented to MedImpact's officers and employees in San Diego, California that this acquisition would not affect the JV and hid their true intent. With the understanding from IMS Health that IMS Health was interested in maintaining the JV, and wanting to be a cooperative and good JV partner, MedImpact agreed to IMS Health's (now IQVIA AG) acquisition of Dimensions. Specifically, Dimensions wanted to be acquired by MedImpact in 2013.  With the understanding and representations the JV would not be impacted, MedImpact did not prevent Dimensions from being acquired by IMS Health.

43.     Based on information and belief, pursuant to IMS Health and Dimensions' scheme to get MedImpact's approval, a consent letter, dated January 4, 2016, and signed by Defendant Dr. Ghosheh, was directed to MedImpact in San Diego, California with a deceitful confirmation the JV would not be changed.  The consent letter provided, in relevant part:

IMS AG, a limited liability company that is incorporated in Cham, Switzerland with company number CHE-106.920.201 ("IMS") intends to acquire a controlling stake in the capital of Dimensions Healthcare LLC.

We should be grateful if you would confirm to us that MedImpact Hong Kong has no objection to this change of control of Dimensions for the purpose of the MedImpact JV Agreement, the memorandum and articles of association of the JV Company (the "Memorandum & Articles of

- 20 -

FIRST AMENDED COMPLAINT

Association") and for all other purposes by countersigning the acknowledgement on the following page of this letter and returning a copy of the countersigned letter and acknowledgement to us.

**We confirm that we are not aware of any plans to change the business activities of Dimensions Healthcare LLC pursuant to the transaction above.**

44.     With IMS Health and Dimensions' representations, Mr. Brown signed the letter in San Diego, California and returned the consent letter on January 10, 2016.

45.     On January 11, 2016, IMS Health HQ Ltd.'s Mr. Santos sent a follow-up email to Mr. Brown in San Diego, California to organize a meeting or a conference call between IMS Health and MedImpact executives and copied Yousef Ghosheh, Defendant Dr. Ghosheh, Defendant Amit Sadana and Jordan Mitchell.

Dale,

Happy new year to you too!

Many thanks for sending this through. I gather Amit is still seeing if a meeting will be possible this week with yourself and Gery given his travel arrangements.
If it is not possible, we would be happy to organise a meeting later in the month or a conference call if appropriate.

Many thanks for your help
Kind regards
Carlos

46.     On January 14, 2016, Defendant Amit Sadana sent Mr. Brown and Gery Barry, executives from MedImpact, calendar invites for a meeting with IMS Health and MedImpact on January 19, 2016 to discuss the acquisition.  In none of the calls, emails or meetings with MedImpact did IMS Health reveal the true motives for the acquisition.

FIRST AMENDED COMPLAINT

47.    Then, on February 2016, after dishonestly obtaining consent from MedImpact and after having used MedImpact to succeed in the PBM market in the Middle-East Gulf region and having gained access to MedImpact's proprietary and trade secret information to develop AIMS, IMS Health AG (now IQVIA AG) bought Dimensions.  Through the acquisition, each IQVIA Defendant gained access to MedImpact's trade secrets and to an immense repository of unmatched pharmaceutical data.  MedImpact would not have consented to the transaction but for IMS Health's misrepresentations and without the transaction, none of the IQVIA Defendants would have gained access to MedImpact's San Diego-based trade secrets or the valuable pharmaceutical data.

48.    On information and belief, a significant motive for IMS Health AG purchasing Dimensions (and paying the price that it did) was to obtain the pharmaceutical data that IQVIA could then sell to pharmaceutical companies including, for IQVIA Inc. to sell the data to California-based companies.  At the time of the acquisition, MedImpact had processed tens of millions pharmaceutical transactions on its PBM platform in San Diego, California and sent the data per the JV to MIA.  MedImpact considers this data to be proprietary and does not sell this data to pharmaceutical companies.  Whereas, IQVIA has built a very successful model of selling data to pharmaceutical companies including those located in California.  IQVIA explained in its Annual Report, "[n]early all of the top 100 global pharmaceutical and biotechnology companies, measured by revenue, are IQVIA clients, and many of these companies subscribe to reports and services in many countries."  Many of the top global pharmaceutical and biotechnology companies are located in California and are IQVIA customers including, on information and belief, Amgen, Novartis, Genentech, and Gilead Sciences.

49.     Following IMS Health AG's acquisition of Dimensions in February of 2016, IMS Health executives continually contacted MedImpact in San Diego, California to manage and oversee the joint venture for the benefit of IMS Health.

50.     On February 19, 2016, Jordan Mitchell, Manager of Business Development at IMS Health, sent a calendar invite to Mr. Brown, Ryan Ingle, MedImpact's corporate controller, Ramona Kwok, MedImpact's accountant, and Kym Dinehart and Isai Castaneda Borja from MedImpact, all in San Diego, Mr. Santos and Mr. Tiwari from IMS Health and Mr. Ghosheh and Mr. Eskndrany from Dimensions to schedule a Finance Call.  The agenda included:

1.     Introduce new team members and highlight roles and responsibilities

2.     Discuss current JV processes, policies, and procedures.

3.     Discuss existing reporting practices of the JV to the parent companies.

4.     Discuss revenue recognition policies.

5.     Discuss opportunities for optimizing any of the current practices in the future.

51.     On March 15, 2016, Jordan Mitchell from IMS Health sent an email to Dale Brown and Ryan Ingle, Corporate Controller of MIHS in San Diego.  Carlos Santos and Aravinda Tiwari, of IMS Health and Yousef Ghosheh of Dimensions are copied on the email.  Jordan Mitchell, an IMS Health executive, proposes and attaches an addendum to the JV Agreement.  The addendum would "get[ the parties] to a position where the benefit of the JV is reflected as a revenue (and hence EBITDA) item within the parents accounts rather than as an equity (dividend) benefit."

52.     On March 29, 2016, Carlos Santos and Jordan Mitchell of IMS Health organized a call with Dale Brown, Kym Dinehart and Emebet Selassie from MedImpact in San Diego, California.  During the call, IMS Health and MedImpact discussed and agreed to the terms of the proposed addendum to the JV.  And, Mr.

Santos from IMS Health HQ Ltd. and Mr. Brown agreed that the JV would be responsible for accounting costs.  There were no attendees from Dimensions on the call.

53.     After the acquisition, IMS Health employees also contacted MedImpact in San Diego, California to work with MedImpact to leverage PBM data in connection with Disease Management Programs.  Pursuant to the proposed program, MedImpact would provide to IMS Health claims data from its PBM product which IMS Health would have then analyzed and used to generate reports that could be sold to pharmaceutical companies.  There were a number of email and a number of phone calls between IMS Health employee Lieu Dada and IMS Health AG employee Amit Sadana (now IQVIA AG) and Dale Brown in San Diego, California regarding the program.  Ultimately, MedImpact did not want the program did not move forward.

54.     In October 2016, IMS Health merged with Quintiles Transnational Holdings, Inc. creating QuintilesIMS.  In November 2016, QuintilesIMS rebranded itself as IQVIA Holdings, Inc. or IQVIA.

**(1)     IQVIA schemes with Dimensions to develop and market AIMS, a competing product to the PBM platform and ICM, steal customers and terminate the joint venture with the help of appointed members to MIA's Board of Directors.**

55.     Beginning in 2015 and continuing after IMS Health AG's acquisition of Dimensions, until at least late 2017, Dimensions developed its own competing PBM platform called Adjudication Insurance Management System ("AIMS") using and a similar product ICM, using MedImpact's trade secret and confidential information.

56.     Dimensions' website describes AIMS as:

   *"Adjudication Insurance Management System:*

- 24 -

FIRST AMENDED COMPLAINT

*Adjudication Insurance Management System (AIMS) is a platform for insurance companies and third party administrators (TPAs) that enables automated real-time adjudication for the vast majority of the healthcare authorizations and claims with advanced modules to administer its processing capabilities in relation to plans & products parameters such as benefits, groups members, networks and others aspects. AIMS offers as well e-authorization and e-claim management modules for those transactions that requires human intervention by the processers. AIMS has a transaction management & tracking module that enables users to real-time track transaction received and generated by AIMS. Moreover, AIMS has a dynamic reporting, dashboard and analytical module with a user-friendly interface to create standard and ad-hoc reports and dashboards. AIMS can be integrated with other products such as post office, providers' transaction managers, decision support systems and much more."*

57.     Following Dimensions' acquisition by IMS Health AG, Dimensions made its first AIMS and ICM sales.  After the acquisition, Defendants IQVIA Inc., IQVIA Ltd. and IQVIA AG systematically schemed with Dimensions to target and steal MedImpact customers, to undermine and ultimately destroy the joint venture for their own benefit.  Dimensions colluded with IQVIA AG to steal its first customer from MIA, closely collaborating with IQVIA AG on business development opportunities such as meeting with the joint venture's clients, including the largest customer Oman Insurance Company ("Oman Insurance"), preparing customer proposals using IMS Health (and later IQVIA) branded materials, and sharing opportunities and financial information related to the opportunities.  These acts were all completed in furtherance of the conspiracy between Dimensions, the IQVIA Defendants, Dr. Ghosheh, and Mr. Sadana.  Dr. Ghosheh and Mr. Sadana, by violating their fiduciary obligations to MIA as its directors, aided and abetted IQVIA by marketing Dimensions' competing products in competition against MIA's PBM platform to MIA's existing clients.

FIRST AMENDED COMPLAINT

58.     In further pursuit of the conspiracy, prior to terminating the JV, IQVIA AG and Dimensions succeeded in stealing the joint venture's largest client Oman Insurance by offering AIMS to replace MIA's PBM product.  Mr. Sadana, the Senior Vice President & GM, Africa, Middle East and South Asia (AMESA) at IQVIA AG (and the Chairman of the joint venture's Board of Directors) signed the contract between Oman Insurance and Dimensions.

59.     Then, contrary to IMS Health's representations to MedImpact in late 2015 and early 2016 about the joint venture, IQVIA instructed Dimensions to terminate the JV with MedImpact.  This happened only after Defendants schemed with Dimensions to develop and market AIMS and successfully stole the JV's largest customer.

60.     Thus, once Defendants had the confidence to cut its ties with MedImpact, Dimensions deceitfully terminated the JV.  In accord, about one month after signing a contract with Oman Insurance, on July 23, 2017, at IQVIA's instruction, Defendant Dr. Ghosheh signed a letter terminating the JV.  The termination letter was sent via FedEx to MedImpact's San Diego address 10181 Scripps Gateway Court, San Diego, California 92131, attention to Dale Brown. The same day, Dimensions' counsel Mr. Shanti sent an email to Dale Brown and Nancy Radtke, General Counsel of MIHS, attaching the termination letter. Defendant Amit Sadana from IQVIA AG and Defendant Dr. Ghosheh were also copied on the email.  The letter did not state the true reason for the termination of the joint venture, which was to allow the IQVIA Defendants to use MedImpact's proprietary data and to use MedImpact's trade secrets and customer lists to compete in the PBM market.

61.     Following the termination letter, in mid-September 2017, MedImpact representatives from San Diego met with representatives of IQVIA Ltd. (including Alistair Grenfell), IQVIA AG (including Amit Sadana) and Mr. Ghosheh to discuss

FIRST AMENDED COMPLAINT

termination.  At the time, Mr. Grenfell was President of North Europe Middle East and Africa (NEMEA) of IQVIA and, on information and belief, reported directly to the Chief Executive Officer of IQVIA.  Mr. Grenfell represented to MedImpact that Dimensions was not going to be a competitor to MedImpact in the PBM market. During the meeting, MedImpact specifically inquired about the renewal status of the contracts of certain clients and in particular MIA's largest customer Oman Insurance.  At this time, Dimensions was already approaching customers in the Territory to offer PBM services, had already won Oman Insurance and Dimensions was doing so using materials branded with the logo of the IQVIA Defendants. None of this was disclosed to MedImpact.

62.     A few weeks later, on or about September 28, 2017, Ahmed Al Tabbakh, the Head of Medical and Life Claims at Oman Insurance, told MedImpact it was using a product called AIMS to replace MIA's PBM platform.  In and around the same time, Mr. Dale Brown, confronted Mr. Sadana with this development. Mr. Sadana characterized AIMS as a "black box," misrepresenting AIMS to Mr. Brown and knowing about the contract between Dimensions and Oman Insurance replacing MIA's PBM.  Then, on October 1, 2017, Oman Insurance formally informed MIA and MIL that it was terminating its PBM Agreement with MIA.

63.     Oman Insurance's change from MIA's product to Dimensions' product was a direct result of IQVIA AG's conduct.  IQVIA AG and Dimensions had misappropriated MedImpact's Trade Secrets and targeted Oman Insurance with the express purpose of diverting MIA's business to IQVIA AG.  Once this was achieved, and as further demonstrated below, Dimensions was in a position to abandon the joint venture and continue the claims adjudication business with IQVIA, but without MI-HK's involvement.  In turn, Oman Insurance had no need for MedImpact's PBM and so terminated the agreement.

FIRST AMENDED COMPLAINT

64.     However, when confronted by MedImpact, Defendants continued to deny that they were doing anything wrong, insisted that AIMS was not doing PBM and that they were not competing with the JV.  Finally, in late 2017, Dale Brown and Mr. Roberts, a board member of MI-HK, had another phone call from San Diego confronting Dr. Ghosheh regarding Dimensions' AIMS.  During the call, Dr. Ghosheh continued to misrepresent AIMS and refused to provide technical information about AIMS.  During the call, Mr. Roberts asked Dr. Ghosheh if MedImpact could inspect AIMS to confirm whether or not it was doing PBM and Dr. Ghosheh refused an inspection.  AIMS was later found by a Tribunal to have been copied from MedImpact's Trade Secrets.

65.     Recently, MedImpact learned that around the time that Dimensions terminated the JV Agreement, IQVIA Ltd., IQVIA AG and Dimensions jointly set out to purposefully transition each of MIA's PBM clients to AIMS and Dimensions' other competing products.  Specifically, MedImpact learned in 2019 that in early September 2017, Dimensions' Mr. Yousef Ghosheh prepared a detailed analysis for IQVIA Ltd.'s senior management Mr. Alistair Grenfell, providing Mr. Grenfell with a customer-by-customer breakdown of each of MIA's clients, its pricing, contract status and summarizing which JV customers Dimensions and IQVIA hoped to switch away from MIA's PBM to AIMS and another Dimensions product, CDS, including, the likelihood that they would switch to one of Dimensions' products or stay with the JV.  According to their scheme, Defendants interfered with MIA's relationship with Oman Insurance, and interfered with MIA's other existing clients such as Vidal Health, ADNIC, MetLife, AXA, and Aafiya, and MIA's prospective business and economic relationships with Al Koot, GIG, and Warba.

**(2)**     **With Dimensions' Assistance, IQVIA discloses and uses MedImpact's proprietary trade secret information and sells pharmaceutical data from MedImpact's platform.**

66.     Prior to its acquisition of Dimensions, none of the IQVIA Defendants or their predecessors had claims adjudication capability.  But, with the help of Dimensions and appointed members to MIA's Board of Directors, namely Dr. Ghosheh and Mr. Sadana, IQVIA misappropriated MedImpact's confidential and proprietary trade secrets, which it then used to enter into the claims adjudication market including, by interfering with an existing contractual relationship between MIA and its existing clients, such as Oman Insurance.

67.     With Dimensions' assistance, MedImpact has learned IQVIA has also been responding to new proposals for PBM services from health authorities around the globe.  MedImpact learned that in 2018, Yousef Ghosheh traveled to Ghana with an IQVIA AG business development manager, Scott Princen, for payer providers and government.  Payers and Providers are target PBM customers.  On information and belief, IQVIA was a finalist for PBM business in Ghana.

68.     RX Health in Ghana has now developed what it calls on its website "RxClaim," "an electronic healthcare processing claim system that provides re-al time adjudication capabilities as well as speed and accuracy in processing claims." Rx CLAIM offers many of the same functionalities as a PBM system. "[R]eal time adjudication    capabilities,"    as    described    on    Rx    Health's    website http://rxhealthinfosystems.com/our-products/, run on software.  On its web-site, http://rxhealthinfosystems.com/clients/, RX Health itself makes the link with IQVIA AG (formerly IMS Health) by confirming that it is "proud to be an IMS Health partner of choice for their data and software technologies in Ghana and Nigeria."

69.     Based on information and belief, IQVIA AG, with the help of Dr. Ghosheh, has also partnered with Sehati in Saudi Arabia in connection with Saudi Heathen Insurance Bus ("SHIB"), a large national e-health project.  Sehati's mission as stated on its website is "to deliver the Saudi Health Insur-ance Bus (SHIB) Project and the Saudi e-Health Record (SeHE) Platform to the Saudi government.  Sehati

will build and operate the UniPlat, an innovative national e-Health program for digital transformation of all healthcare related services in the Kingdom for achieving full transparency in all healthcare trans-actions, increasing efficiency and reliability for healthcare providers and insur-ance companies, and ultimately providing the citizens and residents of Saudi Arabia with an enhanced healthcare experience." IQVIA is listed as a consor-tium member on the Sehati website (https://www.sehati.com.sa/).  Amongst other things, on information and belief, the health care platform IQVIA is de-veloping as part of SHIB will provide PBM services based on MedImpact's Trade Secrets and know-how.

70.    Based on information and belief, with Dr. Ghosheh's assistance, IQVIA has also offered a solution to implement Oman's national health insurance ex-change platform, the Mandatory Health Insurance System ("Dhamani").  CMA is the regulator for the insurance sector in the Sultanate.  In late February 2020, the award for Dhamani's RfPs was announced.  Specifically, in a press release regarding the announcement – https://www.omanobserver.om/cma-awards-contract-for-dhamani-health-insurance-platform – Infoline was named the Solutions Partner however, IQVIA was identified as the technology partner in the delivery of the platform.  Thus, on information and belief, working with Infoline, IQVIA will offer Dhamani a package of services with certain PBM re-lated features based on MedImpact's trade secrets and know-how.

71.    In a press release, Mohamed Ghazaly, Medical Insurance Expert and Direc-torate General of Insurance Supervision at the CMA (Capital Market Authori-ty), describes the Dhamani electronic exchange platform as the nerve center of the Unified Mandatory Health Insurance System.  Importantly, the electronic platform, Dr. Ghazaly further noted, will offer electronic validation and verifi-cation of insured parties, facilitate electronic claims exchange, enable e-authorization of medical services, e-prescriptions, e-payments, e-complaints and customer monitoring

services.  Thus, on information and belief, the con-tract IQVIA has won with Infoline will include electronic adjudication of pre-scription claims, which is a core component of PBM services, what MIA did and what MedImpact taught Dimensions to do under the JV Agreement through its Trade Secrets.

72.    Also, with Dimensions' assistance, IQVIA also has been able to market and sell to pharmaceutical companies including, those in California, pharmaceutical data obtained from MedImpact's platform.  As demonstrated in the graphic below, obtained from IQVIA's Middle East & Africa Pharmaceutical Market Insights, from October 2019, IQVIA touts and markets in its New IQVIA Initiatives Section, in a slide titled, "We have also developed a robust Patient level database for Dubai, providing critical insights at higher granularity" the pharmaceutical data obtained from MedImpact in San Diego, without MedImpact's consent.  For example, MedImpact alleges the data offered in their New and Standard Offerings boxes below is developed from MedImpact's pharmaceutical data processed by its San Diego PBM:



FIRST AMENDED COMPLAINT

**D.   Prior Arbitration Tribunal Found Dimensions Misappropriated MedImpact's Trade Secrets in Developing AIMS and ICM**

73.    After learning AIMS had replaced MIA's PBM at Oman Insurance in breach of the JV Agreement and SLC, MedImpact began an arbitration against IQVIA's subsidiary, Dimensions, in Dubai, UAE.  The tribunal determined, in part, that Dimensions breached the JV Agreement and SLC and copied MedImpact's trade secrets to develop AIMS and ICM platforms in breach of the JV Agreement. Particularly, the tribunal found it compelling that there were "exact replicas" of MedImpact's proprietary information in the AIMS platform, that "Dimensions set out to develop an independent business using the proprietary assets of MedImpact and MIA" and "[sought] to cover its tracks."  The tribunal entered a permanent injunction against Dimensions, and awarded damages to MIL and MI-HK for Dimensions' wrongful conduct.  The tribunal, however, had no jurisdiction over the IQVIA Defendants and could therefore not address IQVIA's wrongful conduct.

**E.   Dr. Ghosheh and Amit Sadana Breached Their Fiduciary Obligations and Duties of Loyalty to MedImpact, a Shareholder In MIA.**

74.    When MIL and Dimensions entered into the JV Agreement, they each owned fifty-percent (50%) interest in the joint venture, and under Section 7.1 of the JV Agreement, they each had the option to appoint three (3) members to MIA's Board of Directors.  Dimensions' and IQVIA's current appointees to MIA's Board of Directors include respectively, Defendants Dr. Ghosheh and Mr. Sadana, with Mr. Sadana being the Chairman.  Pursuant to Section 7.2(a), MIA's Board of Directors were responsible for directing "the overall management, supervision and control of the Business of the Company."  Furthermore, under Sections 4.1(a) and (b) of the JV Agreement, the principal purpose of forming the Company, *i.e.*, MIA, was "*to engage in the business of providing information technology consultative services* and *software* to companies and other entities undertaking activities related

to the healthcare sector in the Territory . . . (the 'Business')," and that "*[a]ny* Business opportunity in the Territory offered or made available to a Shareholder shall promptly be disclosed to the Company" (emphasis added).  Dr. Ghosheh and Mr. Sadana, as members of MIA's Board of Directors, breached their fiduciary obligations and duties of loyalty to MedImpact, a shareholder, and the joint venture by secretly creating opportunities for personal gain and diverting those opportunities to Dimensions and IQVIA, and by stealing the joint venture's existing clients.

75.     For example, in 2017, Dr. Ghosheh and Mr. Sadana engaged in an orchestrated effort and negotiated a contractual agreement between MIA's largest client Oman Insurance and Dimensions.  Mr. Sadana of IQVIA AG signed the contract with Oman Insurance.  Additionally, on information and belief, with the assistance of Dr. Ghosheh, IQVIA engaged in a concerted effort to sever MIA's contractual ties with its other clients such as Vidal Health, ADNIC, AXA, MetLife, and Al Koot, and interfered with MIA's prospective business relationships with Al Koot, GIG, and Warba.  In short, Dr. Ghosheh and Mr. Sadana acted outside the scope of their corporate responsibilities and in violation of their fiduciary obligations and duties of loyalty owed to MIA and conspired with IQVIA to damage the joint venture.

76.     Furthermore, through the orchestrated efforts of Dr. Ghosheh and Mr. Sadana, Dimensions marketed its AIMS and related products and services over MIA's PBM platform to MIA's existing and prospective clients.  Dr. Ghosheh and Mr. Sadana had fiduciary obligations to further MIA's Business opportunities in the Territory and not to compete with MIA.

## F.     IQVIA Defendants, Dr. Ghosheh And Mr. Sadana Cause Significant Damages To MedImpact.

77.     The loss of Oman Insurance and other client accounts and the decrease

FIRST AMENDED COMPLAINT

in pricing with others caused significant damage to MIHS, MIL and MI-HK.  MI-HK's revenue is predominantly from the JV.  MI-HK's revenue is ultimately passed through MIL, and consolidated in MIHS' financial statements.  MIHS has also invested revenue and San Diego-based resources, including, labor to support MI-HK.  Over the course of multi-year contracts with its clients, MedImpact stood to gain significant profits.  As a result of IQVIA's wrongful conduct and interference with existing contracts and prospective business opportunities, not to mention its unlawful use of MedImpact's Trade Secrets to gain new customers and opportunities, those existing and prospective clients have now been lost.  MI-HK consistently lost significant revenues from 2016 onwards and those revenues have continued to decline with IQVIA competing with MedImpact using MedImpact's confidential proprietary information.

78.     For example, solicitation of Oman Insurance by Dimensions and IQVIA was based upon MedImpact's Trade Secrets and know-how, including, the technology itself, pricing structure and preferences.

79.     Also, in July 2018, a then-client of the joint venture, ADNIC, confirmed to MedImpact that IQVIA, Dr. Ghosheh and Dimensions were circumventing the JV Agreement in an attempt to steal clients from the joint venture.  A representative of ADNIC asserted that IQVIA had approached ADNIC to sell them Dimensions' (and thus, not the joint venture's) PBM system.

80.     Dimensions conspired with IQVIA Ltd., IQVIA AG, IQVIA, Inc., Dr. Ghosheh and Mr. Sadana.  In furtherance of the conspiracy, Dimensions worked in collaboration with IQVIA Defendants, Dr. Ghosheh and Mr. Sadana to gain access to an immense repository of pharmaceutical data, compete against MIA's and MIHS' PBM platform, enter into the PBM market without MedImpact, and sell MedImpact's pharmaceutical data.

81.     Based on information and belief, MedImpact also alleges that

FIRST AMENDED COMPLAINT

Dimensions is providing each IQVIA Defendant with access to patient healthcare data processed by MedImpact in San Diego—by providing the IQVIA Defendants with the pharmaceutical data processed by MedImpact's San Diego servers on behalf of the JV and by providing the IQVIA Defendants with similar data obtained from AIMS and similar products developed using MedImpact's trade secrets.  A large proportion of IQVIA's business involves the selling of healthcare and pharmaceutical data to life sciences companies, so IQVIA stands to benefit from this information, however acquired.  On information and belief, the IQVIA Defendants are wrongfully selling this pharmaceutical data for profit, in furtherance of the conspiracy, without MedImpact's consent and to MedImpact's detriment. MedImpact does not sell its pharmaceutical data.  Thus, any implication that MIA or MedImpact is involved in the sale of healthcare data causes serious harm to MedImpact's reputation.

82.     The IQVIA Defendants, Dimensions, Dr. Ghosheh, and Mr. Sadana schemed to misappropriate MedImpact's Trade Secrets, to unfairly compete against MedImpact's PBM platform, and committed other wrongful acts alleged herein to otherwise injure MedImpact's status and reputation in the PBM industry.

83.     Defendants acted in concert by carrying out different parts of the wrongful acts asserted herein together and in cooperation and concert with one another.  For example, some Defendants were responsible for convincing MedImpact to consent to the acquisition of Dimensions, while some were directly copied or oversaw the copying of MedImpact's Trade Secrets shared with the JV, and others misrepresented the status of certain client accounts to both MedImpact and actual and current customers of the JV, while others were responsible to determining which of the JV customers would be prime for stealing from the joint venture, others were responsible for selling the competing products to JV customers, and others were responsible for selling pharmaceutical data.  Defendants

benefited from the acts of each other and managed, or could have managed, the acts of other Defendants. They either knew, should have known, or were willfully blind of, the wrongful acts of each other. The harmful consequences of the acts of Defendants were fully foreseeable by all Defendants. As a result, all Defendants are legally responsible for the wrongful acts of each of the Defendants described in detail below. These coordinated acts formed a RICO enterprise.

**IV.**

**JURISDICTION AND VENUE**

84.     This Court has specific jurisdiction over IQVIA Inc., IQVIA Ltd., IQVIA AG, Dr. Ghosheh and Mr. Sadana. Each Defendant has committed acts in California. Each defendant possesses the requisite "minimum contacts" with California—contacts that allowed the defendants to perpetuate and fulfill the very scheme at the center of this lawsuit. IQVIA Inc., IQVIA Ltd., IQVIA AG, Dr. Ghosheh and Mr. Sadana took steps in furtherance of their scheme in California. Together, they engaged in a scheme to (1) consistently reach out to and communicate with MedImpact representatives in San Diego, California in order to mislead MedImpact into agreeing to IMS Health's (now IQVIA AG's) acquisition of Dimensions; (2) through Dimensions, acquire MedImpact's trade secrets in San Diego, send hundreds of thousands of claims to be processed on MedImpact's San Diego servers, and misappropriate MedImpact's trade secrets; (3) place an executive—a willing participant in the scheme—on the board of the JV of which San Diego-based MedImpact is shareholder; (4) deceitfully terminate Dimensions' JV agreement with MedImpact via e-mail and mail sent to San Diego; (5) post-termination, continue to contact MedImpact executives in San Diego in order to conceal and further pursue this scheme; (6) sell pharmaceutical data processed by MedImpact in San Diego to pharmaceutical companies including, to companies in California, and earn generous revenues; and (7) target and exploit a California-

FIRST AMENDED COMPLAINT

based company, intentionally causing harm in the forum.

85.    Defendant Dr. Ghosheh has the requisite "minimum contacts" with California giving rise to the present action.  Dr. Ghosheh has had a long-standing business relationship—spanning almost ten years—with MedImpact in San Diego. As a co-founder of Dimensions, Dr. Ghosheh entered into the JV Agreement between Dimensions and San-Diego based MedImpact.  Dr. Ghosheh also elected to be a director of the JV, of which MedImpact is a San Diego shareholder.  Dr. Ghosheh participated in a number of board meetings and board calls with San Diego based board members.  During board meetings and calls of which Dr. Ghosheh participated, the business and finances of the JV were discussed including, customers, pricing, and technology.  Through these contacts with the forum Dr. Ghosheh learned the valuable information used to execute the scheme.

86.    From 2011 through the present, Dr. Ghosheh gained access to MedImpact's trade secrets and know-how through intentional, calculated contact with MedImpact employees and MedImpact servers in San Diego.  As an example, in early April 2011, Dr. Ghosheh engaged in email conversations with San Diego executive Dale Brown about "Plan Design/Payer Implementations."  Through this contact with the forum, Dr. Ghosheh learned how to implement MedImpact's standard Implementation Questionnaire into a template suitable for Abu Dhabi payers.  Dr. Ghosheh also participated in consistent phone calls with MedImpact's San Diego employees whereby Dr. Ghosheh gained access to MedImpact's trade secrets and PBM platform.  Even more importantly, on information and belief, Dr. Ghosheh had direct access to MedImpact's trade secrets via MedImpact's MedAccess platform, which is hosted on secure servers in San Diego, California.

87.    In March 2013, Dr. Ghosheh traveled to MedImpact in San Diego, California to meet with MedImpact executives.  Dr. Ghosheh met with MedImpact executives to discuss not only MedImpact's potential acquisition of Dimensions,

FIRST AMENDED COMPLAINT

but also to discuss JV business.  During his March visit, Dr. Ghosheh met with Dale Brown and Gery Barry to discuss the JV and attended MedImpact's annual customer appreciation event.  During his visit and at the customer event, Dr. Ghosheh met with JV clients, teammates and members of the technical team.

88.     In late 2015, as described in paragraphs 38-46, Dr. Ghosheh reached out to MedImpact in San Diego, California to discuss and assist with IMS Health's proposed acquisition of Dimensions and seek their consent.  In January 2016, Dr. Ghosheh signed the dishonest consent letter sent to MedImpact's Dale Brown in San Diego, California, seeking MI-HK's consent for IMS Health's purchase of Dimensions.  On April, 26, 2016, Dr. Ghosheh sent an email to Dale Brown in San Diego notifying MedImpact that Defendant Amit Sadana would be chairman of the board of the JV.

89.     Then, on July 23, 2017, Dr. Ghosheh again intentionally reached out to MedImpact in San Diego, California to wrongfully and deceitfully terminate the JV. Conveniently for Defendants, this termination was pursued abruptly after IMS Health acquired Dimensions, after Dimensions misappropriated MedImpact's trade secrets and developed competing products, such as AIMS, and after Dimensions and IQVIA AG stole the JV's largest customer.  None of this was revealed in the letter.  Dr. Ghosheh's termination letter was sent via email to Mr. Brown and MedImpact's General Counsel, Nancy Radtke, and also via FedEx courier delivery to Mr. Brown and MedImpact in San Diego.  The letter states in relevant part:

> We are writing to inform you that, effective as of the date of this letter, Dimensions Healthcare LLC (hereinafter referred to as "*Dimensions*") is hereby providing you with 12 months' written notice of termination of the Joint Venture Contract executed between Dimensions and MedImpact International, LLC (which subsequently assigned the agreement to MedImpact International HK Limited; hereinafter referred to as "*MedImpact*") executed in February 2012.

After sending the termination letter to MedImpact in July 2017, Dr. Ghosheh

- 38 -

FIRST AMENDED COMPLAINT

continued to reach out to MedImpact in California by actively participating in a number of phone calls, virtual meetings and board meetings with MedImpact's San Diego executives.  Dr. Ghosheh engaged in this contact with MedImpact in California in order to intentionally conceal the very basis on which the JV was terminated—to allow the IQVIA Defendants to misappropriate MedImpact's trade secrets and sell its pharmaceutical claims data.  For example, during a JV board meeting in Dubai on September 12, 2017 where MedImpact director James Gollaher participated from San Diego, Dr. Ghosheh misrepresented that the IQVIA Defendants were not going to offer PBM services in the territory.  Further, during a discussion about the renewal status of the JV's largest customer, Oman Insurance, Dr. Ghosheh withheld the fact that Dimensions and IQVIA AG had already signed an agreement with Oman Insurance for AIMS to replace the JV's PBM.  Then in late 2017, Dr. Ghosheh again concealed the ongoing scheme by withholding information about the nature of Dimensions' AIMS product, this time during a phone call with MI-HK board member Mr. Roberts.  During the call, Dr. Ghosheh refused to provide technical information about AIMS to Mr. Roberts—who was communicating from San Diego—and refused an inspection of the product that was developed from MedImpact trade secrets.  Dr. Ghosheh reached out to MedImpact in California via phone, and email, and in-person visits for the purpose of acquiring MedImpact's trade secrets and to conceal and perpetuate this scheme, causing injury to MedImpact in California.

90.    Defendant IQVIA AG (formerly IMS Health AG) has the requisite "minimum contacts" with California giving rise to the present action.  IQVIA AG (and its predecessor IMS Health AG) has had a long-standing business relationship—spanning four years—with MedImpact in San Diego.  Beginning in late 2015, numerous executives from IMS Health AG reached out to MedImpact in San Diego to discuss its potential acquisition of Dimensions.  As detailed in

FIRST AMENDED COMPLAINT

paragraphs 35-48, through a series of intentional and continuous phone calls and email with MedImpact employees in San Diego, under false pretenses, IMS Health AG obtained MedImpact's consent to Dimensions' acquisition.

91.    IQVIA AG effectively became MedImpact's JV partner after acquiring Dimensions, and in this role, consistently reached out to MedImpact in the forum. It was through IQVIA AG's deliberate contact with California, as described below, that allowed IQVIA AG to manipulate MedImpact representatives and pave the way to misappropriate MedImpact's trade secrets, steal its customers, and sell its pharmaceutical data.  As described in paragraphs 49-54, IQVIA AG representatives contacted MedImpact representatives in San Diego to manage the joint venture for the benefit of IQVIA AG, including to discuss proposals for an addendum to the JV Agreement.  IMS Health AG employees also contacted MedImpact representatives in San Diego to discuss JV business through a number of conference calls—a series of intentional, repeated contacts—at a minimum on June 17, 2016, July 11 and 18, 2016, and August 22, 2016.  IMS Health AG also contacted MedImpact in San Diego  via its board nomination of Amit Sadana, through the numerous board meetings and calls with board members in California.

92.    IMS Health AG (now IQVIA AG) employees also continued to reached out to MedImpact in San Diego, California to leverage the PBM data in connection with Disease Management Programs.  Lieu Dada and Amit Sadana specifically, both from IMS Health AG (now IQVIA AG), physically entered the forum via email and phone calls to MedImpact representatives in San Diego. MedImpact ultimately determined it did not want the program to go forward.

93.    IQVIA AG further reached out to California when it gained access to MedImpact's San Diego-developed trade secrets and San Diego-processed pharmaceutical data.  Without having contacted MedImpact representatives in San Diego, and without having misrepresented the very reason IQVIA AG sought to

FIRST AMENDED COMPLAINT

acquire Dimensions, IQVIA AG could not have fulfilled its scheme to compete in the PBM market and steal customers from MedImpact.  In accordance with this scheme, on June 2017, Amit Sadana of IQVIA AG signed a contract with the JV's largest customer, Oman Insurance, to offer AIMS as a replacement for MIA's PBM.  On information and belief, once IQVIA AG and Dimensions succeeded in switching the JV's customer, IQVIA AG coerced Dimensions to terminate the JV with MedImpact via letter and email to MedImpact in San Diego.  IQVIA AG senior executive Amit Sadana was included on the termination email sent to MedImpact in San Diego.

94.     Following the termination letter, IQVIA AG executives, including Mr. Sadana, participated in a number of phone calls, meetings and board meetings with MedImpact's San Diego executives regarding the termination and Dimensions' AIMS product.  As described in paragraphs 61-65, IQVIA AG executive Mr. Sadana reached out to Mr. Brown in San Diego, California via e-mail to set up the September 11, 2017 meeting in London between MedImpact executives and IQVIA Ltd. senior executive Mr. Grenfell.  Mr. Sadana then coordinated with Mr. Brown regarding the agenda for that face-to-face meeting.  At the subsequent September 12, 2017 board meeting, the JV directors discussed the renewal status of the JV's largest customer, Oman Insurance.  IQVIA AG's Mr. Sadana intentionally withheld from MedImpact that Dimensions and IQVIA AG had already signed an agreement with Oman Insurance for AIMS, developed from MedImpact's trade secrets, to replace the JV's PBM.  Additionally, in late September/October 2017, IQVIA AG senior executive Mr. Sadana communicated with Mr. Brown about AIMS in a phone call.  During that call, Mr. Sadana described AIMS both as a "dumb platform," with no software that Oman Insurance could set-up and customize on their own system, and also as distinct from PBM.

FIRST AMENDED COMPLAINT

95.     IQVIA AG reached out to MedImpact in California to acquire MedImpact's consent to Dimension's acquisition by deceit, and to continuously misrepresent the AIMS platform and IQVIA AG's strategic plans to misappropriate MedImpact's San Diego trade secrets and sell pharmaceutical data processed on MedImpact's San Diego servers.  On information and belief, IQVIA AG has received for sale and has sold the pharmaceutical claims data that was processed on MedImpact's San Diego servers.  Given that all of these contacts were directed at Plaintiffs in California, not by happenstance, it is clear that California was the focal point of the contacts.

96.     Defendant Mr. Sadana has the requisite "minimum contacts" with California giving rise to the present action.  Mr. Sadana has had a long-standing business relationship—spanning four years—with MedImpact in San Diego. Beginning in late 2015, Mr. Sadana was involved in intentional and direct acquisition discussions with MedImpact in San Diego, as described in paragraphs 35-48.  Following IMS Health AG's acquisition of Dimensions, in April 2016, Amit Sadana was appointed as the chairman of the JV, of which California-based MedImpact is a shareholder.  Shortly thereafter, as alleged above, Mr. Sadana was consistently engaged with California through a number of conference calls to MedImpact San Diego executives discuss JV business, at a minimum, on June 17, 2016, July 11 and 18, 2016, and August 22, 2016.  From 2016 to the present, Mr. Sadana sent numerous emails to the MedImpact board members in San Diego in his role as Chairman of the Board.  Mr. Sadana also participated in numerous board meetings with MedImpact's San Diego-based board members, some of whom attended board meetings by phone from San Diego, California.  In addition, Mr. Sadana participated in numerous board calls with board members who were sitting in San Diego, California including, at least on August 22, 2016, and October 26, 2016.  During board meetings, the business and finances of the JV were discussed

FIRST AMENDED COMPLAINT

including, customers, pricing, and technology.  Through these contacts with the forum Mr. Sadana learned the valuable information used to execute the scheme. Mr. Sadana misappropriated MedImpact's trade secrets that he knew were developed in this forum.  Mr. Sadana was included in the email communication to MedImpact in San Diego, terminating the JV.  Following the termination letter, Mr. Sadana physically entered the state by sending emails, making a number of phone calls, and participating in several meetings and board meetings with MedImpact's San Diego executives regarding the termination of the JV.  Defendant Mr. Sadana himself created this contact with California.

97.     As described in paragraph 94, through an August 10, 2017, email sent to Mr. Brown in San Diego, California and Defendant Dr. Ghosheh, Mr. Sadana set up the face-to-face September 11, 2017 meeting in London between MedImpact executives and IQVIA Ltd. senior executive Mr. Grenfell.  Mr. Sadana sent an email to and also had a phone call with Mr. Brown in San Diego, California to discuss the agenda for the London meeting.  Then, at the September 12, 2017 board meeting, Mr. Sadana failed to reveal to MedImpact that he had signed an agreement with Oman Insurance for AIMS, developed from MedImpact's trade secrets, to replace the JV's PBM.  Additionally, in late September/October 2017, Mr. Sadana communicated with Mr. Brown about AIMS over a phone call.  During that call, Mr. Sadana described AIMS both as a "dumb platform," with no software that Oman Insurance could set-up and customize on their own system, and also as distinct from PBM.

98.     Mr. Sadana reached out to MedImpact in California to conceal the true nature behind the Dimensions acquisition, to continuously misrepresent IQVIA AG's AIMS platform and strategic plans to misappropriate MedImpact's San Diego trade secrets, and perpetuated the conspiracy alleged herein, causing injury to MedImpact in California.

FIRST AMENDED COMPLAINT

99.   Defendant IQVIA Ltd. has the requisite "minimum contacts" with California giving rise to the present action.   IQVIA Ltd. (and its predecessor IMS Health HQ Ltd.) has had a long-standing business relationship—spanning four years—with MedImpact in San Diego.  Beginning in late 2015, executives from IQVIA Ltd., including, Carlos Santos, deliberately and repeatedly reached out to MedImpact in San Diego regarding its potential acquisition of Dimensions.  In fact, IQVIA Ltd. drove the acquisition decision.  On information and belief, IQVIA Ltd.'s senior executive Mr. Grenfell recommended the Dimensions acquisition to the IMS Health board.

100.   As detailed in paragraphs 35-48, through a series of phone calls and email with MedImpact employees in San Diego, under false pretenses, IQVIA Ltd. physically entered the forum to obtain MedImpact's consent for IMS Health AG's acquisition of Dimensions.  For example, on December 9, 2015, Carlos Santos emailed Mr. Brown of MedImpact to express interest in acquiring Dimensions.  In mid-December 2015, Santos emailed Brown again to schedule a call on December 16, 2015.  Then, on December 21, 2015, in an email to Brown in San Diego, Santos concealed the true intention behind the acquisition of Dimensions.  Although Santos stated, "[i]t is not our intention to change the overall operations of the JV at this time – our main intention is to ensure that matters are in order so that we can continue the current JV arrangement,"  MedImpact alleges this to be untrue, given that IQVIA ultimately terminated the JV after stealing the JV's largest customer.  IQVIA Ltd.'s other contacts with San Diego, to name a few, include an email on December 27, 2015, a finance call between IMS Health and MedImpact on February 22, 2016, and a conference call regarding changes to the JV first addendum on March 29, 2016.  These contacts are not random, fortuitous, or attenuated.  Nor are these contacts based on the unilateral activity of the Plaintiffs.  Instead, IQVIA Ltd. intentionally created these repeated contacts in order to further

FIRST AMENDED COMPLAINT

the scheme of wrongdoing described herein.

101.   Following IMS Health's acquisition of Dimensions, IQVIA Ltd. continued to have numerous contacts with MedImpact San Diego executives giving rise to this lawsuit.  As described in paragraphs 49-52, following acquisition, IQVIA Ltd. executives directed communications towards MedImpact in San Diego to manage the joint venture for the benefit of IMS Health including, proposals relating to an addendum to the JV Agreement.  For example, in an email chain spanning from mid to late March 2016, and a phone call during the same time frame, IMS Health employees—including Mr. Santos (now of IQVIA Ltd.)— reached out to MedImpact in San Diego to address specific changes to the JV addendum.  Throughout, IMS Health employees sent revised copies of the addendum for MedImpact employees in San Diego to review and implement.

102.   Additionally, on September 11, 2107, IQVIA Ltd. senior executive Alistair Grenfell met with Mr. Brown, Mr. Roberts and Mr. Howe in London, England.  Mr. Grenfell misrepresented to MedImpact's San Diego executives that IQVIA's subsidiary was not interested in entering the PBM market and competing against MedImpact.  On information and belief, around the same time, Mr. Grenfell received a detailed customer-by-customer analysis from Mr. Ghosheh regarding each of the JV's customers, the pricing, contract status and the likelihood they would switch to one of Dimensions' competing products.

103.   IQVIA Ltd. reached out to MedImpact in California and maintained communication with MedImpact representatives in the forum in order to perpetuate its scheme to steal MedImpact's trade secrets, divert its customers, interfere with its business, and sell its pharmaceutical data.  On information and belief, IQVIA Ltd. has received for sale the pharmaceutical claims data that was processed on MedImpact's San Diego servers.  IQVIA Ltd.'s contact with the forum was

FIRST AMENDED COMPLAINT

deliberate and deceitful and without it, IQVIA Ltd. could not have pursued this conspiracy.

104.    Defendant IQVIA Inc. has the requisite "minimum" contacts with California giving rise the present action.  IQVIA Inc. has offices and employees in California, including an office at 10188 Telesis Ct. #400, San Diego, California 92121.  On information and belief, IQVIA Inc., a US-based IQVIA subsidiary, is also in possession of MedImpact's trade secrets and confidential information through Dimensions given Dimensions' AIMS and ICM products are marketed on IQVIA branded materials.  On information and belief, because the core business of IQVIA involves selling claims data to pharmaceutical companies, and because IQVIA Inc. employees are primarily engaged in sales and certain other client-facing activities relating to the core business of the company in this forum, IQVIA Inc. is selling the pharmaceutical data to pharmaceutical companies in California— pharmaceutical data which was processed by and received from MedImpact's PBM servers in San Diego.  IQVIA Inc. therefore contacted and is presently contacting the forum in order to sell data wrongfully acquired from MedImpact, causing injury to MedImpact in San Diego.

105.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, complete diversity exists between the Plaintiffs and all Defendants and the amount in controversy exceeds $75,000.00.  Additionally, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiffs allege a claim under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 and 18 U.S.C. § 1962(c) (RICO).  Separate and apart from this Court's diversity jurisdiction for Plaintiffs' state law claims, this Court also has subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 and the doctrines of ancillary and pendent jurisdiction.

106.    Venue is proper in this district under 28 U.S.C. § 1391, because a

substantial part of the acts and the injuries arising from the trade secret misappropriation, unfair competition and interference with economic relationships complained of herein have occurred and are occurring in this judicial district, and because the intellectual property that is subject of the action is situated here.

## V.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Breach of Fiduciary Duties and Duty of Loyalties

### Against Dr. Ghosheh and Mr. Sadana

107.   MedImpact hereby incorporates by this reference paragraphs 1 through 106, inclusive, as if set forth fully herein.

108.   Plaintiffs' claim for breach of fiduciary duties and duty of loyalties stands separate and independently from Plaintiffs' claims of trade secret misappropriation pled below, and is not based on the same nucleus of facts as the trade secret claims, as explained herein.

109.   Both Dr. Ghosheh and Mr. Sadana owed fiduciary obligations and duties of loyalty to MIA in their capacities as Board of Directors of MIA, and owed fiduciary obligations and duties of loyalty to MedImpact as its shareholder.  Dr. Ghosheh and Mr. Sadana were bound by their fiduciary obligations and duties of undivided loyalty to act in the best interests of MIA and MedImpact.  Furthermore, Dr. Ghosheh and Mr. Sadana were obligated by the JV Agreement such that "*[a]ny* Business opportunity in the Territory offered or made available to a Shareholder shall promptly be disclosed to the Company." (emphasis added).

110.   Dr. Ghosheh and Mr. Sadana breached their fiduciary obligations and duties of loyalty to the JV and MedImpact by secretly creating opportunities for personal gain and diverting those opportunities to Dimensions and IQVIA, including concealing the purpose behind IMS Health's acquisition of Dimensions,

FIRST AMENDED COMPLAINT

misrepresenting the AIMS platform as not PBM, stealing the JV's existing clients, and assisting IQVIA in selling the pharmaceutical data MedImpact processed for the JV.

111.   Dr. Ghosheh and Mr. Sadana's breach of their fiduciary obligations and duties of undivided loyalty to MIA and MedImpact, by acting adversely to the interests of MIA and MedImpact, was a substantial factor in causing significant harm to MedImpact.

112.   As a proximate and legal result of Dr. Ghosheh's and Mr. Sadana's breach of their fiduciary duties and duties of undivided loyalty, MedImpact has suffered significant damage in an amount to be proven at trial.  While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that it has lost in excess of millions of dollars in contractual damages.  Additionally, because Dr. Ghosheh and Mr. Sadana acted with malice, MedImpact also seeks exemplary and/or punitive damages.

## SECOND CAUSE OF ACTION

### Inducing Breach of Contract Against IQVIA

113.   MedImpact hereby incorporates by this reference paragraphs 1 through 112, inclusive, as if set forth fully herein.

114.   Plaintiffs' claim for inducing breach of contract stands separate and independently from Plaintiffs' claims of trade secret misappropriation pled below, and is not based on the same nucleus of facts as the trade secret claims, as explained herein.

115.   As alleged in paragraph 31, a valid, binding, and enforceable JV Agreement, SLC, and NDA existed between MIL/MI-HK and Dimensions.  The JV Agreement obligated Dimensions to act in the best interest of the joint venture, such that, "[a]ny Business opportunity in the Territory offered or made available to a Shareholder shall promptly be disclosed" to the joint venture.  The SLC also

FIRST AMENDED COMPLAINT

required that the JV may "use Claims Data solely for the purpose of providing the Services." IQVIA knew of the existence of the JV Agreement, SLC, and NDA between MIL/MI-HK and Dimensions.

116.   IQVIA intentionally induced Dimensions to breach its obligations under the JV Agreement, SLC, and NDA in order to steal MIA's existing clients and provide pharmaceutical data to IQVIA for sale to pharmaceutical companies. Dimensions did in fact breach its obligations under the JV Agreement, SLC, and NDA.

117.   Dimensions breach was caused by IQVIA's wrongful and unjustified conduct in soliciting Dimensions, Dr. Ghosheh and Mr. Sadana to interfere with MIA's customers and divert their business away from MIA and consequently, MIL and MIHS, and IQVIA's soliciting Dimensions to provide IQVIA with MIA's Claims Data.

118.   As a result of IQVIA's unlawful acts and Dimension's resulting breach, MI-HK (as a shareholder in MIA), MIL and MIHS (as the parent), suffered significant damages.

## THIRD CAUSE OF ACTION

### Intentional Interference with Prospective Economic Relations Against IQVIA

119.   MedImpact hereby incorporates by this reference paragraphs 1 through 118, inclusive, as if set forth fully herein.

120.   Plaintiffs' claim for intentional interference with prospective economic relations stands separate and independently from Plaintiffs' claims of trade secret misappropriation pled below, and is not based on the same nucleus of facts as the trade secret claims, as explained herein.

121.   MedImpact is informed and believes, and based thereon alleges, that IQVIA interfered with MedImpact's economic and ongoing business relationship with Dimensions.  As alleged in paragraphs 31-34, an economic and ongoing

- 49 -

FIRST AMENDED COMPLAINT

business relationship existed between MI-HK and Dimensions under the JV Agreement forming MIA.  This economic and ongoing business relationship contained existing and probable future economic benefits or advantages to MI-HK (as a shareholder in MIA), MIL and MIHS (as the parent).  IQVIA knew of this ongoing economic and business relationship between MI-HK and Dimensions.

122.   As alleged in paragraphs 59-60, the IQVIA Defendants used their position and influence as parent companies of Dimensions to wrongfully terminate the JV Agreement between MI-HK and Dimensions, and consequently disrupt the relationship and divert its economic benefits.  MedImpact is informed and believes, and based thereon alleges, that IQVIA solicited and encouraged MIA board members Dr. Ghosheh and Mr. Sadana to breach the terms of the JV Agreement, the NDA and the SLC.  The JV Agreement was in fact, wrongfully terminated on July 23, 2017.  MedImpact has been damaged as a proximate result of IQVIA's intentional interference with the JV Agreement and SLC.

123.   MedImpact is informed and believes, and based thereon alleges, that IQVIA also interfered with MedImpact's economic relationships with existing and potential customers.  For example, as alleged in paragraphs 31-34, an economic and ongoing business relationship existed between MIA, of which MedImpact is a JV partner, and its largest customer Oman Insurance.  This economic and ongoing business relationship contained existing and probable future economic benefits or advantages to MI-HK, as a shareholder in MIA, and MIL and MIHS, as the parent.

124.   IQVIA knew of this ongoing economic and business relationship between MIA and its customers including, Oman Insurance.  MedImpact is informed and believes, as alleged in paragraphs 65, 75, 77-80, that IQVIA solicited Dimensions, Dr. Ghosheh and Mr. Sadana to interfere with MIA's customers and divert their business away from MIA and consequently MedImpact.

125.   Oman Insurance did in fact terminate its relationship with MIA in late

FIRST AMENDED COMPLAINT

September 2017, lured by Dimensions' AIMS platform and as a result of IQVIA's intentional interference.  In addition, as alleged in paragraphs 65 and 75, other customers with which MIA maintained an ongoing economic and business relationship either terminated their relationships with MIA or altered their relationships with MIA by decreasing pricing.  Consequently, MedImpact has been damaged by IQVIA's intentional interference with MIA's existing and potential customers.

126.   While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that it has lost in excess of millions of dollars in contractual benefits as a result of defendants' wrongful conduct that MedImpact stood to gain through the JV, its relationship with Oman Insurance, and other existing and potential customers.

127.   MedImpact is informed and believes, and based thereon alleges, that Defendants' wrongful acts will continue to cause injury to MedImpact and that such injury will continue unless enjoined and restrained by this Court.

128.   MedImpact is informed and believes, and based thereon alleges, that the acts of Defendants alleged herein were willful, oppressive, fraudulent, despicable and in conscious disregard of the rights of MedImpact and the resulting harm to MedImpact.  Defendants are liable for punitive and exemplary damages in amount to be established according to proof at time of trial.

## FOURTH CAUSE OF ACTION

**Negligent Interference with Prospective Economic Relations Against IQVIA**

129.   MedImpact hereby incorporates by this reference paragraphs 1 through 123, and 125-127, inclusive, as if set forth fully herein.

130.   Plaintiffs' claim for negligent interference with prospective economic relations stands separate and independently from Plaintiffs' claims of trade secret

FIRST AMENDED COMPLAINT

misappropriation pled below, and is not based on the same nucleus of facts as the trade secret claims, as explained herein.

131.   As set forth above, an economic and ongoing business relationship existed between MI-HK and Dimensions under the JV Agreement, containing an existing and probable future economic benefit or advantage to MI-HK, as a shareholder in MIA, and MIL and MIHS, as the parent.

132.   Additionally, economic and ongoing business relationships existed and presently exist between MIA and its customers containing an existing and probable future economic benefit or advantage to MI-HK, as a shareholder in MIA, and MIL and MIHS, as the parent.

133.   The IQVIA Defendants knew of the ongoing economic and business relationship between MI-HK and Dimensions and MIA and its customers.  IQVIA also aware or should have been aware that if they did not act with due care, their actions would interfere with these relationships and cause Plaintiffs to lose in whole or in part the probable future economic benefit or advantage of the relationship. Thus, it was foreseeable that IQVIA would cause harm to Plaintiffs by stealing its customers and competing against its PBM platform.

134.   MedImpact is informed and believes, and based thereon alleges, that defendants were negligent in that they solicited Dimensions, Dr. Ghosheh and Mr. Sadana to interfere with MIA's customers and divert their business away from MIA and consequently compete against MedImpact.

135.   Because Defendants interfered with and disrupted the economic relationships between MI-HK and Dimensions as well as MIA and its customers, and as a proximate result of Defendants' acts as alleged herein, MedImpact has suffered damages and will continue to suffer damages consisting of the loss of customers and revenues in an amount to be proven at trial, unless Defendants are enjoined.

FIRST AMENDED COMPLAINT

136.   While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that it has lost in excess of millions of dollars in contractual benefits as a result of Defendants' wrongful conduct that MedImpact stood to gain through the joint venture as well as its relationship with Oman Insurance and other actual and potential customers.

## FIFTH CAUSE OF ACTION

**Intentional Interference With A Contractual Relationship Against IQVIA**

137.   MedImpact hereby incorporates by this reference paragraphs 1 through 136, inclusive, as if set forth fully herein.

138.   Plaintiffs' claim for intentional interference with a contractual relationship stands separate and independently from Plaintiffs' claims of trade secret misappropriation pled below, and is not based on the same nucleus of facts as the trade secret claims, as explained herein.

139.   As set forth above, MIL and Dimensions entered into a binding JV Agreement offering economic benefit or advantage to MedImpact.  MIL's interest and rights in the JV Agreement were assigned to MI-HK.

140.   IQVIA knew of the existence of the JV Agreement, SLC, and of the economic and business relationships between MIL/MIHK and Dimensions.

141.   By coercing Dimensions to terminate the joint venture and soliciting the assistance of Dr. Ghosheh and Mr. Sadana, IQVIA intentionally engaged in a pattern of conduct that prevented or hindered the performance of the contract. Consequently, the JV Agreement was wrongfully terminated on July 23, 2017.

142.   MI-HK, as a shareholder in MIA, and MIL and MIHS, as the parent, have suffered significant damages as a proximate result of IQVIA's interference with and disruption of the contracts between MIL/MI-HK and Dimensions.  In addition, Plaintiffs will continue to suffer damages due to loss of customers and revenues, in an amount to be proven at trial, unless Defendants are enjoined.

143.   While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that it has lost in excess of millions of dollars in contractual benefits as a result of Defendants' wrongful conduct that MI-HK stood to gain through the joint venture as well as its relationship with Oman Insurance and other actual and potential customers. Additionally, because IQVIA's acts were committed with malice, MedImpact also seeks exemplary and/or punitive damages.

## SIXTH CAUSE OF ACTION

### Unfair Competition – Cal. Bus. & Prof. Code § 17200, et seq.
### Against IQVIA

144.   MedImpact hereby incorporates by this reference paragraphs 1 through 143, inclusive, as if set forth fully herein.

145.   Plaintiffs' claim for unfair competition stands separate and independently from Plaintiffs' claims of trade secret misappropriation pled below, and is not based on the same nucleus of facts as the trade secret claims, as explained herein.

146.   California Business & Professions Code §17200 prohibits acts of unfair competition, which means and includes any "unlawful, unfair or fraudulent business act or practice."

147.   On information and belief, each IQVIA Defendant violated Cal. Bus. & Prof. Code §17200 by engaging in "unlawful" business acts or practices by, inter alia, engaging in a scheme to acquire Dimensions and terminate the joint venture in order to steal the joint venture's customers and to sell pharmaceutical data without MedImpact's permission.  This conduct constitutes a series of unlawful business acts or practices because the conduct violates the common law of California.  In particular, and as described more fully in the causes of action above, this conduct constitutes the following violations of California law: inducing breach of contract,

FIRST AMENDED COMPLAINT

intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and intentional interference with a contractual relationship.

148. The IQVIA Defendants also violated Cal. Bus. & Prof. Code §17200 because their conduct violates Cal. Civ. Code §§1572 (actual fraud), 1573 (constructive fraud), 1709 and 1710 (deceit). On information and belief, MedImpact relied on the following misrepresentations and omissions made by the IQVIA Defendants in furtherance of the fraudulent scheme. These facts establish that the IQVIA Defendants violated the statutes listed in this paragraph.

a. On December 9, 2015, Carlos Santos emailed Dale Brown of MedImpact to express interest in acquiring Dimensions. Carlos Santos worked for IMS Health HQ Ltd., an entity that is now IQVIA Ltd. Dr. Ghosheh and Mr. Sadana were copied on the email, along with James Salitan. Mr. Sadana worked for IMS Health AG, an entity that is now IQVIA AG. Mr. Salitan worked for an IMS Health entity whose current identity is unknown. This communication withheld critical information about the true motives of the transaction. On information and belief, those motives included obtaining MedImpact's proprietary data for IMS Health's data business and obtaining access to the joint venture's customers for the creation of a PBM business. Over the following weeks, the same parties engaged in follow-up emails and phone calls, yet the true motives for the transaction were never disclosed.

b. On December 21, 2015 Carlos Santos of IMS Health HQ Ltd. (now IQVIA Ltd.) sent Dale Brown an email discussing the potential acquisition of Dimensions. Santos wrote: "It is not our intention to change the overall operations of the JV at this time – our main intention is to ensure that matters are in order so that we can continue the current JV arrangement." On information and belief, this was a misrepresentation.

FIRST AMENDED COMPLAINT

c.     A consent letter, dated January 4, 2016, and signed by Dr. Ghosheh, was emailed to Dale Brown.  It stated: "We confirm that we are not aware of any plans to change the business activities of Dimensions Healthcare LLC pursuant to the transaction described above [referring to the acquisition of Dimensions by IMS Health]."  On information and belief, this was a misrepresentation, and it was written by individuals at IMS Health (now at unknown IQVIA entities), although it was signed by Dr. Ghosheh.

d.     IMS Health AG completed its acquisition of Dimensions in February 2016.  On March 15, 2016, Jordan Mitchell of IMS Health (now an entity unknown) emailed Dale Brown and Ryan Ingle of MedImpact to propose an amendment to the Joint Venture's Services and License Contract.  Between March 15, 2016 and March 30, 2016, Carlos Santos of IMS Health HQ Ltd. (now IQVIA Ltd.) and Jordan Mitchell of IMS Health (now an entity unknown) negotiated the amendment, via phone calls and emails, with Dale Brown, Ryan Ingle, and Kym Dinehart of MedImpact.  Dr. Ghosheh signed the amendment.  On information and belief, employees of Dimensions and IMS Health shared a timeline for the development of AIMS three months later.  On information and belief, Dr. Ghosheh, Dimensions, and IMS Health knew about the plan for AIMS.  But during the negotiations of the amendment to the Services and License Contract, the plan for AIMS was not disclosed, nor were the true motives for the acquisition of Dimensions disclosed.

e.     After the IMS Health AG acquisition of Dimensions, Mr. Sadana of IMS Health AG (now IQVIA AG) was named a director of the joint venture.  In April 2016, he was named chairman of the board of the joint venture. In his role on the board, Mr. Sadana had numerous communications via email and telephone in 2016 with executives of MedImpact.  For example, on April 28, 2016, Mr. Sadana sent an email to Dale Brown and Gary Barry of MedImpact regarding a

FIRST AMENDED COMPLAINT

board meeting scheduled for the next day.  On July 18, 2016, Mr. Sadana participated in a conference call with Dale Brown and Queenie Liu of MedImpact. And on August 22, 2016, Mr. Sadana participated in a conference call with Dale Brown and Gery Barry of MedImpact.  On information and belief, Mr. Sadana knew that Dimensions and IMS Health were planning to approach customers in the Territory using IMS Health branded materials and not including Dimensions in the proposed transactions.  Yet despite his repeated contacts with MedImpact, Mr. Sadana never disclosed these plans to MedImpact.  In other words, material information was fraudulently omitted from every communication from Mr. Sadana during this time period, including the specific communications discussed in this paragraph.

f.      On July 23, 2017, Dr. Ghosheh sent a letter to MedImpact providing notice of the termination of the joint venture.  The letter was sent to San Diego, California, physically via Federal Express, and electronically via email.  The letter did not state the true reason for the termination of the joint venture, which was to allow the IQVIA Defendants to sell the joint venture's pharmaceutical data and access to the joint venture's customers for the creation of a PBM business.  As discussed above, on information and belief, IQVIA Inc. has sold the pharmaceutical data and IQVIA AG and IQVIA Ltd. have unlawfully competed with MedImpact by stealing customers and setting up a competing PBM business.

g.      On July 26, 2017, Dale Brown met with Dr. Ghosheh.  At the meeting, Dr. Ghosheh said the decision to terminate the joint venture was made by Alistair Grenfell of QuintilesIMS (now of IQVIA Ltd.).  Dr. Ghosheh also said that Mr. Grenfell was the manager of Mr. Sadana (now of IQVIA AG).  Neither Mr. Grenfell nor Mr. Sadana ever disclosed the pending termination, nor did they disclose the true reason for the termination.

FIRST AMENDED COMPLAINT

h.     On September 11, 2017, Messrs Howe, Brown and Roberts of MedImpact, met with Alistair Grenfell (now of IQVIA Ltd.) and Yousef Ghosheh, of Dimensions, in London regarding the termination of the joint venture.  Mr. Grenfell misrepresented that Dimensions was not going to compete in the PBM market.  At this time, Dimensions was already reaching out to customers in the Territory to offer PBM services, and Dimensions was doing so using materials branded with the logo of the IQVIA Defendants.

i.     On September 12, 2017, there was a board meeting of the joint venture.  Dr. Ghosheh told the board that Dimensions was not going to offer PBM services.  And, Mr. Sadana (now of IQVIA AG) stated that the joint venture was not working for the IQVIA Defendants.  At this time, Dimensions was already approaching customers in the Territory to offer PBM services, and Dimensions was doing so using materials branded with the logo of the IQVIA Defendants.

149.   Plaintiffs reserve the right to allege other violations of law which constitute other unlawful business acts and practices.  Such conduct is ongoing and continues to this date.

150.   MIHS, MIL, and MI-HK have each suffered injuries-in-fact and have lost money or property in California as a direct and proximate result of the pattern of wrongful conduct engaged in by the Defendants.  MIHS, MIL, and MI-HK suffered the following injuries, and more, in California because of the wrongful conduct described herein.  These injuries are ongoing.

a.     MI-HK's revenue is predominantly from the joint venture.  MI-HK's revenue is ultimately passed through MIL, and consolidated in MIHS's financial statements.  MIHS, MIL, and MI-HK consistently lost significant revenues from 2016 onwards and those revenues have continued to decline because of the wrongful actions described herein.  These revenues would have been realized in California.

FIRST AMENDED COMPLAINT

b.      MIHS invested revenue and San Diego-based resources, including labor, to support MI-HK.  MIHS expected a return on these investments, and the wrongful actions described herein have destroyed the expected return.

c.      MIHS continues to use San Diego-based resources to support MI-HK.  These expenditures affect MIHS's profits and losses in California.  The Defendants' wrongful actions have negatively impacted MIHS's profits.

d.      MIHS, MIL, and MI-HK each abided by the provision in the Joint Venture Agreement precluding competition in the Territory outside of the joint venture.  Each of the three plaintiff entities therefore lost revenue that would have been realized in California by refraining from competing in the Territory.

e.      MIHS, MIL, and MI-HK each face price erosion anywhere they compete with the Defendants.  This price erosion results in lost revenue that would have been realized in California.

f.      MIHS, MIL, and MI-HK all have their principal places of business in San Diego, California.  MIL's employees and officers work primarily from MedImpact's headquarters in San Diego, California.  MIHS's employees in San Diego support MI-HK's business strategies and initiatives.  MIHS, MIL, and MI-HK therefore suffer injuries to their businesses in San Diego.

151.   MedImpact seeks injunctive relief to stop IQVIA from unfairly soliciting MedImpact's current and potential customers and to stop IQVIA from using MedImpact's data without permission.  MedImpact also seeks restitution for all money and property lost as a result of the wrongful activities of the IQVIA Defendants.

## SEVENTH CAUSE OF ACTION

### Civil Conspiracy Against All Defendants

152.   MedImpact hereby incorporates by this reference paragraphs 1 through 151, inclusive, as if set forth fully herein.

153.   Plaintiffs' claim for civil conspiracy stands separate and independently from Plaintiffs' claims of trade secret misappropriation pled below, and is not based on the same nucleus of facts as the trade secret claims, as explained herein.

154.   The IQVIA Defendants, Dimensions, Dr. Ghosheh, and Mr. Sadana knowingly and willfully conspired and agreed among themselves to acquire Dimensions, gain access to an immense repository of pharmaceutical data, to develop and sell ICM and AIMS, compete against MIA's and MIHS' PBM platform, enter into the PBM market without MedImpact, and sell the pharmaceutical data obtained from MedImpact's PBM.

155.   The IQVIA Defendants, Dimensions, Dr. Ghosheh, and Mr. Sadana committed the wrongful acts herein alleged pursuant to, and in furtherance of, the conspiracy and above-alleged agreement.

156.   As alleged in paragraphs 35-83, the IQVIA Defendants, Dimensions, Dr. Ghosheh, and Mr. Sadana furthered the conspiracy by intentionally concealing the reason behind IQVIA's acquisition of Dimensions, misrepresenting IQVIA's intent to maintain the JV thereby obtaining MedImpact's consent to the acquisition by deceit, building a competing PBM platform in order to steal customers from the MIA, and selling the pharmaceutical data obtained from MedImpact's PBM.

157.   As a proximate result of the wrongful acts herein alleged, Plaintiffs have suffered and will continue to suffer significant damage in an amount to be proven at trial.  The Defendants are jointly and severally liable to MedImpact, and MedImpact is entitled to punitive damages against the defendants.

## EIGHTH CAUSE OF ACTION

## Misappropriation of Trade Secrets Under the Defend Trade Secrets Act
## (18 U.S.C. § 1836, et seq.) Against All Defendants

158.   MedImpact hereby incorporates by this reference paragraphs 1 through 106, inclusive, as if set forth fully herein.

159.   MedImpact owns and possesses Trade Secrets.

160.   Defendants used and are using the MedImpact Trade Secrets to develop and offer PBM services.  To perpetrate a scheme to steal MedImpact's proprietary trade secret information and customers, IQVIA Ltd.'s senior level employees such as Alistair Grenfell, and certain members of the Board of Directors of MIA, in particular, Dr. Ghosheh and Mr. Sadana, were also involved.

161.   In connection with teaching MedImpact's processes to Defendant Dr. Ghosheh and Dimensions, from 2011 through the present, Dr. Ghosheh and Dimensions acquired MedImpact's Trade Secrets.  MedImpact entrusted Dr. Ghosheh and Dimensions with access to MedImpact's Trade Secrets, including, how to on-board clients including, documents that identify all of the information that must be collected from clients on the front end to build out the PBM services including all options and decisions that must be made by (or with) the client in order to structure the benefit design and coverage rules, as identified for example, in MedImpact's implementation questionnaires; information and documents that outline and define features and options of the pharmacy benefit plan and provide granular details on the standard benefit designs, clinical and utilization management protocols on an element-by-element basis, including descriptions of each element and decisions for the client to make with regard to benefits, as identified for example, in MedImpact's benefit templates; detailed listing and structure of data elements/fields as identified in the file type formats/layouts, including, how to structure that information into the system, how to build a system based off that information; the user interface modules within the MedAccess tool that provides specific processes and information in the PBM process, and; adjudication logic, including, the rules and edits used to adjudicate claims and the order in which the rules and edits are applied (the "Trade Secrets"[2]).  Dimensions used its status as a

[2] As this Complaint is filed publicly, MedImpact cannot state the particulars of the trade secrets herein.  The trade secret information will be identified with greater

joint venture partner of MedImpact to gain access to MedImpact's Trade Secrets and Defendants gained improper access to MedImpact's Trade Secrets through Dimensions.

162.   In summary, MedImpact gave Dimensions access to its Trade Secrets including, but not limited to, (1) the information and documents Dimensions needed so that Dimensions could provide PBM products and services to MIA's customers; (2) the information and documents needed to translate the information received from the client into data elements in a database that can be used by the system; and (3) MedImpact's proprietary adjudication logic and rules used to adjudicate claims, including, how to process a claim, what rules apply, in what order to apply the rules, what outputs are generated and how to communicate that back to the pharmacy (*e.g.*, through MedAccess and other technical documentation).  MedImpact contributed its PBM engine along with interfaces for insurance payers to manage and monitor clinical and financial plan data and customer service support software, along with its wealth of business, technological and business experience that it developed over decades.  In addition, MedImpact also brought to the joint venture its MedImpact brand and reputation in the marketplace, which was a significant contribution given MedImpact's long history in this industry in the United States.

163.   Based on MedImpact's contribution of its PBM platform to the joint venture's business operations, MIA realized a rapid success in securing many clients, such as Oman Insurance, Vidal Health, AXA, Nextcare, Pentacare, Aafiya, Metlife, Alico MSH, Dubai Insurance, Aetna, Al Buhaira Insurance Company, etc. Out of its many clients, Oman Insurance was MIA's largest customer, accounting for approximately 25% of MIA's revenues.

164.   MedImpact takes extraordinary steps to protect its trade secret and

particularity in discovery and pursuant to a court protective order to protect the disclosure.

FIRST AMENDED COMPLAINT

proprietary information.  MedImpact maintains the secrecy of its Trade Secrets by executing confidentiality agreements with all employees, independent contractors, and all other parties provided with MedImpact's Trade Secrets including, all payers, etc.  In addition, MedImpact uses technologically sophisticated firewalls, private networks, and other technical mechanisms to ensure the security and proprietary nature of this information.  MedImpact's Trade Secrets are password protected on company computers.  MedImpact also requires its employees, independent contractors, and all other parties to use badges and other security mechanisms to control access to MedImpact's facility in San Diego.  MedImpact also marks confidential information as "confidential" for example, on its implementation questionnaires, file formats, and other documentation containing MedImpact confidential information and Trade Secrets.  MedImpact also provides various levels and controls access of its employees to its Trade Secrets depending on their need to know.  MedImpact regularly instructs and repeatedly reminds its employees of the highly sensitive nature of its proprietary information and Trade Secrets, which needs to be protected from disclosure to third parties at all times.  As a privately held company, MedImpact has less mandatory disclosure obligations to, for instance, shareholders and regulators, allowing MedImpact greater control over its Trade Secrets.  Additionally, because MedImpact receives and stores confidential patient healthcare data, MedImpact has maintained its HIPAA compliance for decades and has invested significant resources protecting and securing patient information and data.

165.   The NDA, JV Agreement and the SLC between MedImpact and Dimensions all included confidentiality provisions that required Dimensions to maintain the confidentiality of MedImpact's proprietary information and Trade Secrets and to not disclose the information to third parties.

166.   MedImpact's Trade Secrets provide it a competitive advantage, and MedImpact derives economic value from the its Trade Secrets.

167.   MedImpact has developed its Trade Secrets over decades and at great expense.  MedImpact's Trade Secrets enable it to be the largest private PBM in the United States and provide MedImpact a competitive advantage.  MedImpact's Trade Secrets have substantial independent economic value.  By stealing MedImpact's Trade Secrets, and by engaging in the unlawful conduct described below, Defendants have avoided years of their own research and development time and tens of millions of dollars of investment expense, causing damages to MedImpact in amounts that exceed tens of millions of dollars.

168.   MedImpact's Trade Secrets relate to products and services used, sold, and ordered in, or intended to be used, sold, and/or ordered in, interstate and foreign commerce.  Specifically, MedImpact's Trade Secret information concerning its PBM solution is used by customers throughout the United States.

169.   MedImpact has expended hundreds of millions of dollars and a significant amount of time and other resources in developing its Trade Secrets.  In addition, MedImpact goes to great lengths to protect the secrecy of this information by executing confidentiality agreements with all employees, independent contractors, and all other parties provided with MedImpact's confidential information, maintaining firewalls, private networks, and other technical mechanisms to ensure the security of MedImpact's confidential information, labeling certain written communications as confidential, employing passwords and several other security mechanisms to protect MedImpact's confidential information. For example, MedImpact requires employees to read employee handbooks governing the treatment of confidential and trade secret information; to attend training on the protection of confidential and trade secret information; and for departing employees, to return all documents and MedImpact computers or devices,

and MedImpact then terminates the access of those departing employees to all computers and systems.  MedImpact also has controlled access doors throughout its facilities.  Further, MedImpact has computer access restrictions on computers themselves, but also MedImpact databases and tools, such as MedAccess.

170.   MedImpact shares its confidential information and Trade Secrets only on a need-to-know basis with its employees and certain customers and partners subject to strict confidentiality agreements with an express obligation to protect confidentiality.  It is MedImpact's practice to require any third party including, payers, with access to MedImpact's confidential and trade secret information to sign a MedImpact NDA prior to disclosure of MedImpact's confidential information and Trade Secrets.

171.   MedImpact's Trade Secrets derive independent economic value from not being generally known to and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.  MedImpact's Trade Secrets are of great value to MedImpact and would give any competitor of MedImpact an unfair competitive advantage.

172.   Specifically, MedImpact's Trade secrets are of great value to MedImpact and such information would give any competitor, who improperly acquired such information, an unfair competitive advantage by: (1) not expending the time and resources to develop the trade secret and confidential and proprietary information as MedImpact has done; (2) more quickly developing products and technologies to unfairly compete with MedImpact in order to diminish MedImpact's head start and to create an unfair head start for the competitor; and (3) other improper advantages.

173.   Defendants IQVIA Inc., IQVIA Ltd., IQVIA AG, Amit Sadana and Omar Ghosheh misappropriated MedImpact's Trade Secrets by their improper

- 65 -

FIRST AMENDED COMPLAINT

acquisition, use and disclosure of MedImpact's Trade Secrets for their own benefit including in the development of AIMS and ICM, and other named products for the pharmacy benefits management ("PBM") services market.

174.  In violation of MedImpact's rights, the IQVIA Defendants willfully misappropriated MedImpact's confidential and proprietary information and converted the same to their own use in entering the PBM market.

175.  Defendants engaged in acts in furtherance of their misappropriation in California and in the United States.  Defendants' solicitation of MedImpact, numerous contacts with MedImpact in California, and communications with MedImpact representatives in California all constitute acts in furtherance of trade secret misappropriation in California and in the United States under the Defend Trade Secrets Act.  These acts include:

a.      Dr. Ghosheh's communications with MedImpact's employees to learn about MedImpact's trade secrets from May 11, 2016 forward.

b.      On July 23, 2017, Defendant Dr. Ghosheh signed a letter terminating the JV that he sent via FedEx to MedImpact's San Diego address 10181 Scripps Gateway Court, San Diego, California 92131, attention to Dale Brown. The same day, Dimensions' counsel Mr. Shanti sent an email to Dale Brown and Nancy Radtke, General Counsel of MIHS, attaching the termination letter. Defendant Amit Sadana from IMS Health and Defendant Dr. Ghosheh were also copied on the email.

c.      Dr. Ghosheh's late 2017 call with Mr. Roberts misrepresenting AIMS' capabilities to Mr. Roberts, a board member of MI-HK, and Dale Brown. During the call, Mr. Roberts asked Dr. Ghosheh if MedImpact could inspect AIMS to confirm whether it was doing PBM or not.  During the call, Dr. Ghosheh refused to provide technical information about AIMS and refused an inspection.  AIMS was later found by a Tribunal to be copied improperly from MedImpact's Trade Secrets.

FIRST AMENDED COMPLAINT

176.   On information and belief, by receiving, improperly using, and further disclosing the foregoing Trade Secrets, IQVIA misappropriated MedImpact's Trade Secrets in violation of 18 U.S.C. § 1836, et seq.

177.   Upon information and belief, Dimensions, Dr. Ghosheh, and Mr. Sadana solicited and collected MedImpact's Trade Secret information, and used the information as part of a scheme with IQVIA to misappropriate such Trade Secrets to get AIMS up and running and develop competing PBM products in order to compete with and steal MedImpact's business.  Further, upon information and belief, IQVIA acquired, has used and continues to use MedImpact's Trade Secrets, knowing that it was misappropriated and obtained through deceitful means.  Such misappropriation permitted Dimensions and Dr. Ghosheh to develop competing products, and to do so in substantially shorter time and with substantially less investment than could have been accomplished without misappropriation of such Trade Secrets.

178.   MedImpact is informed and believes, and based thereon alleges, that IQVIA knew or should have known that the information provided to it by Dimensions, Dr. Ghosheh, and Mr. Sadana was taken from and owned by MedImpact.  MedImpact is further informed and believes, and based thereon alleges, that IQVIA encouraged Dimensions, Dr. Ghosheh, and Mr. Sadana to do so and willingly accepted information from them that it did not otherwise have, and solicited Dimensions, Dr. Ghosheh, and Mr. Sadana for the information knowing that it came from MedImpact.  MedImpact is further informed and believes, and on that basis alleges, that IQVIA unreasonably performed insufficient due diligence to ensure that Dimensions did not share confidential MedImpact information with IQVIA and actually encouraged Dimensions, Dr. Ghosheh, and Mr. Sadana to misappropriate MedImpact information for IQVIA's benefit.

FIRST AMENDED COMPLAINT

179.   IQVIA is, on information and belief, still in possession of MedImpact's Trade Secrets, and, on information and belief, is able to access and use this information.

180.   Defendants' misappropriation of MedImpact's Trade Secrets has been intentional, knowing, willful, malicious, fraudulent, and oppressive.

181.   If Defendants' conduct is not remedied, they will continue to misappropriate, disclose, and use MedImpact's Trade Secrets for their own benefit and to MedImpact's detriment.

182.   Because MedImpact's remedy at law is inadequate, MedImpact seeks, in addition to damages, preliminary and permanent injunctive relief to recover and protect its Trade Secrets and other legitimate business interests.  Moreover, Defendants' intentional, willful, and malicious conduct indicates that injunctive or other equitable relief will be inadequate to prevent Defendants' future misconduct. Therefore, MedImpact further seeks an order under 18 U.S.C. § 1836(b)(2) for the seizure of any and all of MedImpact's Trade Secrets and confidential or proprietary information in the possession, custody, or control of any Defendant in order to recover and protect MedImpact's Trade Secrets and other legitimate business interests.

183.   As the direct and proximate result of Defendants' conduct, MedImpact has suffered and will continue to suffer irreparable injury and significant damages, in an amount to be proven at trial.

184.   MedImpact has been damaged by all of the foregoing, and is also entitled to an award of exemplary damages and attorneys' fees.

FIRST AMENDED COMPLAINT

### NINTH CAUSE OF ACTION

### Misappropriation of Trade Secrets Under

### California Uniform Trade Secrets Act ("CUTSA")

### Against All Defendants

185.   MedImpact hereby incorporates by this reference paragraphs 1-106 and 158-184, inclusive, as if set forth fully herein.

186.   At all times relevant herein, MedImpact was in possession of its Trade Secrets as defined by California Civil Code section 3426.1(d).  This information has independent economic value in that it enables MedImpact to offer and provide PBM services customized to the unique needs and circumstances of its customers and has made MedImpact the largest private PBM provider in the United States. The information is not generally known to the public or to the managed pharmacy benefits industry, and derives independent economic value from not being known to the general public or to the relevant industry.

187.   MedImpact has expended hundreds of millions of dollars over decades and other resources in developing its Trade Secrets, know-how and proprietary information.  In addition, MedImpact goes to great lengths to protect the secrecy of this information by executing confidentiality agreements with all employees, independent contractors, payers, and all other parties provided with MedImpact's Trade Secrets and confidential information, maintaining sophisticated firewalls, private networks, and other technical mechanisms to ensure the security of MedImpact's confidential information, labeling certain written communications as confidential, employing passwords and several other security mechanisms to protect MedImpact's confidential information.  For example, MedImpact requires employees to read employee handbooks governing the treatment of confidential and trade secret information; to attend training on the protection of confidential and trade secret information; and for departing employees, to return all documents and

MedImpact computers or devices, and MedImpact then terminates the access of those departing employees to all computers and systems.  MedImpact also has controlled access doors throughout its facilities.  Further, MedImpact has computer access restrictions on computers themselves, but also MedImpact databases and tools, such as MedAccess.

188.   MedImpact shares its confidential information and Trade Secrets only on a need-to-know basis with its employees and certain customers and partners subject to strict confidentiality agreements with an express obligation to protect confidentiality.  It is MedImpact's practice to require any third party including, payers, with access to MedImpact's confidential information and Trade Secrets to sign a MedImpact non-disclosure agreement ("NDA") prior to disclosure.

189.   MedImpact is informed and believes, and based thereon alleges, that beginning in at least mid-2017, and continuing to date, IQVIA, with the assistance of Dimensions, Dr. Ghosheh and Mr. Sadana, misappropriated MedImpact's confidential and proprietary information and Trade Secrets and converted the same to its own use to enter the PBM market abroad.

190.   Additionally, and based on information and belief, by improperly receiving, issuing, and further disclosing the foregoing trade secret material, IQVIA misappropriated MedImpact's Trade Secrets in violation of California Civil Code §§ 3426.1(b) and 3426.3.

191.   MIHS, MIL, and MI-HK each suffered concrete domestic injuries to their businesses and property in California as a direct and causal result of Defendants' misappropriation of Plaintiffs' Trade Secrets.

192.   MI-HK's revenue is predominantly from the joint venture.  MI-HK's revenue is ultimately passed through MIL, and consolidated in MIHS's financial statements.  MIHS, MIL, and MI-HK consistently lost significant revenues from

FIRST AMENDED COMPLAINT

2016 onwards and those revenues have continued to decline because of Defendants' misappropriation of Plaintiffs' Trade Secrets.

193.   MIHS, MIL and MI-HK each individually invested resources to develop innovations constituting the MedImpact Trade Secrets.

194.   MIHS, MIL, and MI-HK all have their principal places of business in San Diego, California.  MIL's employees and officers work primarily from MedImpact's headquarters in San Diego, California.  MIHS's employees in San Diego support MI-HK's business strategies and initiatives.  MIHS, MIL, and MI-HK therefore suffer harm to their businesses in San Diego as a result of Defendants' misappropriation.

195.   MedImpact is informed and believes, and based thereon alleges, that IQVIA knew or should have known that the Trade Secrets improperly disclosed to them by Dimensions, Dr. Ghosheh, and Mr. Sadana were taken from and belonged to MedImpact.  MedImpact is further informed and believes, and based thereon alleges, that IQVIA encouraged Dimensions to do so and willingly accepted information from Dimensions, Dr. Ghosheh, and Mr. Sadana that it did not otherwise have, and solicited Dimensions, Dr. Ghosheh, and Mr. Sadana for information knowing that it came from MedImpact.  MedImpact is further informed and believes, and on that basis alleges, that IQVIA performed no due diligence to ensure that Dimensions did not share confidential MedImpact information with IQVIA and actually encouraged Dimensions and Dr. Ghosheh to misappropriate MedImpact information for the benefit of IQVIA.

196.   As a proximate result of Defendants' acts as alleged herein, MedImpact has suffered damages, and will continue to suffer damages, unless Defendants are enjoined from using the confidential trade secret information they misappropriated and ordered to immediately return said information, and unless MedImpact obtains actual damages consisting of the loss of customers and

revenues.  While the exact amount of damages will be proven at trial, MedImpact is informed and believes, and based thereon alleges, that the value of the actual and potential customer contracts and associated revenues lost though Defendants' wrongful conduct exceeds tens of millions of dollars.  Alternatively, and at a minimum, MedImpact is entitled to a reasonable royalty for Defendants' wrongful misappropriation and use of MedImpact's Trade Secrets, in an amount to be proven at trial.

197.   Defendants, in engaging in the aforementioned acts, are guilty of malice and oppression in that they deliberately intended to harm MedImpact's business and improve their own by misappropriation and acted in conscious disregard of MedImpact's rights.  Defendants' conduct therefore warrants the assessment of punitive damages in an amount appropriate to punish Defendant and deter others from engaging in similar conduct.

198.   Defendants' wrongful conduct in misappropriating MedImpact's Trade Secrets, confidential customer and competitive business information and disclosing and utilizing said information will continue unless and until enjoined and restrained by order of this Court.  Without such Court intervention, Defendants' conduct in misappropriating MedImpact's proprietary information will cause great and irreparable injury to MedImpact's business, in that MedImpact has lost and will continue to lose existing and potential customers.

199.   MedImpact has no adequate remedy at law for the injuries currently being suffered in that Defendant will continue to wrongfully solicit MedImpact's existing and potential clientele and customers and utilize information that was wrongfully misappropriated from MedImpact, including but not limited to trade secrets, know-how, confidential and proprietary technical information and know-how and customer information that is not generally available to the public at large. MedImpact is entitled to a temporary, preliminary and permanent injunction against

Defendants as prayed herein.

200.   MedImpact is informed and believes, and on that basis alleges, that Defendants' conduct was, and is, malicious, fraudulent, deliberate and willful. MedImpact is therefore entitled to recover from Defendants exemplary damages in the amount of twice the total damages or reasonable royalty awarded, pursuant to California Civil Code §3426.3.

201.   MedImpact is also entitled to an award of attorneys' fees pursuant to California Civil Code § 3426.4.

**TENTH CAUSE OF ACTION**

**Racketeer Influenced And Corrupt Organizations Act, 18 U.S.C. § 1962(c) Against All Defendants**

202.   MedImpact hereby incorporates by this reference paragraphs 1 through 201, inclusive, as if set forth fully herein.  MedImpact also incorporates by this reference the Racketeer Influenced and Corrupt Organizations Act ("RICO") statement filed in the above captioned case as docket entry number 3.

203.   The IQVIA Defendants, Dimensions, Dr. Ghosheh, and Mr. Sadana qualify as "persons" under 18 U.S.C. § 1961(3).

204.   The IQVIA Defendants, Dimensions, Dr. Ghosheh, and Mr. Sadana are members of an associated-in-fact "enterprise" under 18 U.S.C. § 1961(4) (the "IQVIA RICO Enterprise").  Throughout its existence, the IQVIA RICO Enterprise engaged in, and its activities affected, interstate commerce because it involved commercial activities across state lines.

205.   Each member of the IQVIA RICO Enterprise is separate and distinct from the Enterprise.

206.   As described more fully below, the IQVIA Defendants, Dimensions, Dr. Ghosheh, and Mr. Sadana each participated, directly or indirectly, in the

conduct of the affairs of the IQVIA RICO Enterprise because each had some part in directing those affairs.

207.   As described more fully below, the IQVIA RICO Enterprise engaged in a pattern of racketeering activity under 18 U.S.C. § 1961(5).

208.   As described more fully below, the IQVIA Defendants, Dimensions, Dr. Ghosheh, and Mr. Sadana each violated 18 U.S.C. § 1962(c).

209.   As described more fully below, by violating 18 U.S.C. § 1962(c), the IQVIA RICO Enterprise caused concrete financial losses to the business and property of MIHS, MIL, and MI-HK.  Accordingly, MIHS, MIL, and MI-HK are "person[s] injured in his or her business or property" by reason of the Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

210.   The IQVIA Defendants, Dimensions, Dr. Ghosheh, and Mr. Sadana each engaged in, as well as aided and abetted, numerous predicate acts that constitute both a pattern of racketeering activity as well participation, directly or indirectly, in the conduct of the affairs of the IQVIA RICO Enterprise.  For example:

a.     Each member of the RICO Enterprise engaged in trade secret misappropriation in violation of the federal Defend Trade Secrets Act, as described above at paragraphs 1-112 and 158-183.  Such trade secret misappropriation is a RICO predicate.  18 U.S.C. § 1961(1) (citing 18 U.S.C. § 1832, "relating to . . . theft of trade secrets").

b.     Each member of the RICO Enterprise engaged in mail and wire fraud, both of which are RICO predicates.  18 U.S.C. § 1961(1) (citing 18 U.S.C. §§ 1341, 1343).  MedImpact relied, to its detriment, on each of the misrepresentations and omissions listed in the subsections of this paragraph below. The Defendants knowingly and intentionally made these misrepresentations and omissions.  The Defendants either knew or recklessly disregarded that these were

material misrepresentations and omissions.  The Defendants knew and intended that MedImpact would rely on these misrepresentations and omissions.

i.      On December 9, 2015, Carlos Santos emailed Dale Brown of MedImpact to express interest in acquiring Dimensions.  Carlos Santos worked for an IMS Health entity, IMS Health HQ Ltd., that is now IQVIA Ltd.  Dr. Ghosheh and Mr. Sadana were copied on the email, along with James Salitan.  Mr. Sadana worked for an IMS Health entity, IMS Health AG, that is now IQVIA AG.  Salitan worked for an IMS Health entity whose current identity is unknown.  This communication withheld critical information about the true motives of the transaction.  On information and belief, those motives included obtaining MedImpact's proprietary data for IMS Health's data business and obtaining MedImpact's trade secrets for a PBM business.  Over the following weeks, the same parties engaged in follow-up emails and phone calls, yet the true motives for the transaction were never disclosed.

ii.      On December 21, 2015 Carlos Santos of IMS Health HQ Ltd. (now IQVIA Ltd.) sent Dale Brown an email discussing the potential acquisition of Dimensions.  Santos wrote: "It is not our intention to change the overall operations of the JV at this time – our main intention is to ensure that matters are in order so that we can continue the current JV arrangement."  On information and belief, this was a misrepresentation.

iii.      A consent letter, dated January 4, 2016, and signed by Dr. Ghosheh, was emailed to Dale Brown.  It stated: "We confirm that we are not aware of any plans to change the business activities of Dimensions Healthcare LLC pursuant to the transaction described above [referring to the acquisition of Dimensions by IMS Health]."  On information and belief, this was a misrepresentation, and it was written by individuals at IMS Health (now at unknown IQVIA entities), although it was signed by Dr. Ghosheh.

FIRST AMENDED COMPLAINT

iv.    IMS Health AG completed its acquisition of Dimensions in February 2016.  On March 15, 2016, Jordan Mitchell of IMS Health (now an entity unknown) emailed Dale Brown and Ryan Ingle of MedImpact to propose an amendment to the Joint Venture's Services and License Contract.  Between March 15, 2016 and March 30, 2016, Carlos Santos of IMS Health HQ Ltd. (now IQVIA Ltd.) and Jordan Mitchell of IMS Health (now an entity unknown) negotiated the amendment, via phone calls and emails, with Dale Brown, Ryan Ingle, and Kym Dinehart of MedImpact.  Dr. Ghosheh signed the amendment.  On information and belief, employees of Dimensions and IMS Health shared a timeline for the development of AIMS three months later.  On information and belief, Dr. Ghosheh, Dimensions, and IMS Health knew about the plan for AIMS.  But during the negotiations of the amendment to the Services and License Contract, the plan for AIMS was not disclosed, nor were the true motives for the acquisition of Dimensions disclosed.

v.    After the IMS Health AG acquisition of Dimensions, Mr. Sadana of IMS Health AG (now IQVIA AG) was named a director of the joint venture.  In April 2016, he was named chairman of the board of the joint venture. In his role on the board, Mr. Sadana had numerous communications via email and telephone in 2016 with executives of MedImpact.  For example, on April 28, 2016, Mr. Sadana sent an email to Dale Brown and Gary Barry of MedImpact regarding a board meeting scheduled for the next day.  On July 18, 2016, Mr. Sadana participated in a conference call with Dale Brown and Queenie Liu of MedImpact. And on August 22, 2016, Mr. Sadana participated in a conference call with Dale Brown and Gery Barry of MedImpact.  On information and belief, Mr. Sadana knew that Dimensions and IMS Health were developing AIMS using MedImpact's trade secrets and planning to approach customers in the Territory using IMS Health branded materials and not including Dimensions in the proposed transactions.  Yet

FIRST AMENDED COMPLAINT

despite his repeated contacts with MedImpact, Mr. Sadana never disclosed these plans to MedImpact.  In other words, material information was fraudulently omitted from every communication from Mr. Sadana during this time period, including the specific communications discussed in this paragraph.

vi.    On July 23, 2017, Dr. Ghosheh sent a letter to MedImpact providing notice of the termination of the joint venture.  The letter was sent to San Diego, California, physically via Federal Express, and electronically via email.  The letter did not state the true reason for the termination of the joint venture, which was to allow the IQVIA Defendants to use MedImpact's proprietary data and to use MedImpact's trade secrets and customer lists to compete in the PBM market.  As discussed above, on information and belief, IQVIA Inc. has sold MedImpact's proprietary data, and IQVIA AG and IQVIA Ltd. have engaged in the theft and use of MedImpact's trade secrets.

vii.    On July 26, 2017, Dale Brown met with Dr. Ghosheh.  At the meeting, Dr. Ghosheh said the decision to terminate the joint venture was made by Alistair Grenfell (now of IQVIA Ltd.).  Dr. Ghosheh also said that Mr. Grenfell was the manager of Mr. Sadana (now of IQVIA AG).  Neither Mr. Grenfell nor Mr. Sadana ever disclosed the pending termination, nor did they disclose the true reason for the termination.

viii.    At the July 26, 2017 meeting, Dr. Ghosheh told Dale Brown that Dimensions would not build a PBM nor partner with another PBM to provide PBM services after termination.  But at this time Dimensions was already reaching out to customers in the Territory to offer PBM services, and Dimensions was doing so using materials branded with the logo of the IQVIA Defendants.

ix.    On September 11, 2017, Messrs Howe, Brown and Roberts of MedImpact met with Alistair Grenfell (now of IQVIA Ltd.) and Yousef Ghosheh, of Dimensions in London regarding the termination of the joint venture.

FIRST AMENDED COMPLAINT

Mr. Grenfell misrepresented that Dimensions was not going to compete in the PBM market.  At this time Dimensions was already reaching out to customers in the Territory to offer PBM services, and Dimensions was doing so using materials branded with the logo of the IQVIA Defendants.

x.      On September 12, 2017, there was a board meeting of the joint venture.  Dr. Ghosheh told the board that Dimensions was not going to offer PBM services.  And, Mr. Sadana (now of IQVIA AG) stated that the joint venture was not working for the IQVIA Defendants.  At this time, Dimensions was already approaching customers in the Territory to offer PBM services, and Dimensions was doing so using materials branded with the logo of the IQVIA Defendants.

xi.      On December 14, 2017, Mr. Roberts of MedImpact, held a telephone conversation with Dr. Ghosheh regarding Dimensions' AIMS PBM product.  Despite Mr. Roberts direct requests, Dr. Ghosheh refused to allow an inspection of AIMS so that MedImpact could confirm AIMS was not a PBM and was not developed using MedImpact trade secrets and instead actively concealed these facts during the call.

xii.      In addition to these misrepresentations and omissions, all of the Defendants, during the course of multi-year business relationships, sent numerous other communications to each of the Plaintiffs, in the United States, by wire and mail in furtherance of the scheme to defraud MIHS, MIL, and MI-HK.

211.   As is evidenced by the pattern of racketeering activity described above, the members of the IQVIA RICO Enterprise are associated together for a common purpose.  That purpose is to unlawfully obtain MedImpact's proprietary data, trade secrets, and customer lists and to unlawfully compete with MedImpact and interfere with MedImpact's current and prospective economic relations.  It is also clear from this pattern of racketeering activity that the IQVIA RICO Enterprise has an ongoing organization with an ascertainable structure, and it functions as a

continuing unit with separate roles and responsibilities.  There is a clear relationship among the members of the enterprise.  The enterprise has sufficient longevity to permit its members to pursue the enterprise's purpose.

212.   Each member of the IQVIA RICO Enterprise benefited from the common purpose of the scheme to steal MedImpact's trade secrets, proprietary data, and customers.

213.   Defendants' conduct in furtherance of this scheme was intentional.

214.   MIHS, MIL, and MI-HK each suffered concrete domestic injuries to their businesses and property as a direct and proximate result of the pattern of racketeering activity engaged in by the IQVIA RICO Enterprise.  MIHS, MIL, and MI-HK suffered the following injuries, and more, because of the misappropriation of trade secrets, described above, and because MIHS, MIL, and MI-HK relied on the fraudulent misrepresentations and omissions, also described above.

a.    MI-HK's revenue is predominantly from the joint venture.  MI-HK's revenue is ultimately passed through MIL, and consolidated in MIHS's financial statements.  MIHS, MIL, and MI-HK consistently lost significant revenues from 2016 onwards and those revenues have continued to decline because of the actions of the IQVIA RICO Enterprise.  These revenues would have been realized in California.

b.    MIHS invested money and San Diego-based resources, including labor, to support MI-HK.  MIHS expected a return on these investments, and the actions of the IQVIA RICO Enterprise has destroyed the expected return.

c.    MIHS continues to use San Diego-based resources to support MI-HK.  These expenditures affect MIHS's California profits and losses.  The IQVIA RICO Enterprise has negatively impacted MIHS's California profits.

d.    MIHS, MIL, and MI-HK each abided by the provision in the Joint Venture Agreement precluding competition in the Territory outside of the

FIRST AMENDED COMPLAINT

joint venture.  Each of the three plaintiff entities therefore lost revenue by refraining from competing in the Territory.

e.  MIHS, MIL, and MI-HK each face price erosion anywhere they compete with IQVIA and Dimensions.  This price erosion has caused all three Plaintiffs to lose revenue that would have been realized in California.

f.  MIHS, MIL, and MI-HK all have their principal places of business in San Diego, California.  MIL's employees and officers work primarily from MedImpact's headquarters in San Diego, California.  MIHS's and MIL's employees in San Diego support MI-HK's business strategies and initiatives. MIHS, MIL, and MI-HK therefore suffer harm to their businesses in San Diego.

215.  Under the provisions of 18 U.S.C. § 1964(c), MedImpact is entitled to bring this action and to recover its treble damages, the costs of bringing this suit and reasonable attorneys' fees.

216.  Each Defendant is accordingly liable to MedImpact for three times MedImpact's actual damages as proved at trial plus interest and attorneys' fees.

## VI.

## **DEMAND FOR JURY TRIAL**

217.  Plaintiffs respectfully request a jury trial in this action on all issues so triable.

## VII.

## **PRAYER FOR RELIEF**

Based on the foregoing, MedImpact demands judgment against Defendants and hold them jointly and severally liable, as follows:

1.  Judgment in Plaintiffs' favor and against Defendants on all causes of action alleged herein;

2.  A preliminary and permanent injunction to enjoin Defendants, their agents, servants, employees, attorneys, successors and assigns, and all persons,

FIRST AMENDED COMPLAINT

firms, and corporations acting in concert with them, from further misappropriation or unauthorized use of MedImpact's Trade Secrets;

3.      Order Defendants to pay MedImpact compensatory damages based on competent and admissible evidence at trial with interest at the highest rate allowable by law;

4.      Order Defendants to pay MedImpact consequential and actual damages or disgorgement of Defendants' profits unjustly obtained based on competent and admissible evidence at trial with interest at the highest rate allowable by law;

5.      Order Defendants to pay MedImpact punitive damages, including, but not limited to double damages for its intentional misappropriation of MedImpact's Trade Secrets;

6.      Order Defendants to pay MedImpact reasonable attorneys' fees and allowable court costs and expenses; and

7.      Order all other such relief to MedImpact under law and equity as the Court deems just and proper.

Dated:  April 7, 2020                    DENTONS US LLP


                                          By:  *s/ Jennifer D. Bennett*
                                              JENNIFER D. BENNETT
                                          Attorneys for Plaintiffs
                                          Email: jennifer.bennett@dentons.com

FIRST AMENDED COMPLAINT

1

**CERTIFICATE OF SERVICE**

2    I, Jennifer D. Bennett, hereby declare:

3    I am a partner at Dentons US LLP in San Francisco, California.  I am over

4    the age of eighteen years and not a party to the within action.  My business

5    address is Dentons US LLP, One Market Plaza, Spear Tower, 24th Floor, San

6    Francisco, California 94105.

7    On April 7, 2020, I caused a true copy of the following documents entitled:

8
9    **FIRST AMENDED COMPLAINT FOR (1) BREACH OF**
     **FIDUCIARY DUTY; (2) INDUCING BREACH OF**
10   **CONTRACT; (3) INTENTIONAL INTERFERENCE WITH**
     **PROSPECTIVE ECONOMIC ADVANTAGE; (4) NEGLIGENT**
11   **INTERFERENCE WITH PROSPECTIVE ECONOMIC**
     **ADVANTAGE; (5) INTENTIONAL INTERFERENCE WITH A**
12   **CONTRACTUAL RELATIONSHIP; (6) UNFAIR**
     **COMPETITION; (7) CONSPIRACY; (8)**
13   **MISAPPROPRIATION OF TRADE SECRETS UNDER DTSA,**
     **18 U.S.C. § 1836; (9) MISAPPROPRIATION OF TRADE**
14   **SECRETS UNDER CAL. UNIFORM TRADE SECRETS ACT;**
15   **AND (10) RICO ACT, 18 U.S.C. § 1962(c)**

16

17   to be served using the CM/ECF System, upon all counsel of record registered to

18   receive electronic filings

19   I declare under penalty of perjury under the laws of the United States of

20   America that the foregoing is true and correct, and that this declaration was

21   executed on April 7, 2020, at San Francisco, California.

22

23                                    *s/ Jennifer D. Bennett*
                                      Jennifer D. Bennett
24

25

26

27

28

- 82 -

FIRST AMENDED COMPLAINT