1
2
3
4
5
6
7
8
9          UNITED STATES DISTRICT COURT

10         SOUTHERN DISTRICT OF CALIFORNIA

11

| | |
|---|---|
| 12  MEDIMPACT HEALTHCARE SYSTEMS, INC., a California corporation, MEDIMPACT INTERNATINAL LLC, a California limited liability company, MEDIMPACT INTERNATIONAL HONG KONG LTD., a Hong Kong company,<br><br>Plaintiff,<br><br>v.<br><br>IQVIA INC., a Connecticut corporation; IQIA Ltd., a UK company; IQVIA AG, a Swiss company, OMAR GHOSHEH, individually, and AMIT SADANA, individually,<br><br>Defendant. | Case No.:  19cv1865-GPC(LL)<br><br>**ORDER**<br><br>**1) DENYING DEFENDANTS' MOTION TO DIMSISS FOR LACK OF PERSONAL JURISDICTION**<br><br>**2) GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DIMSISS FOR FAILURE TO STATE A CLAIM**<br><br>**[Dkt. Nos. 106, 107.]** |

24
25        Before the Court is Defendants' motion to dismiss the first amended complaint
26  under Federal Rule of Civil Procedure ("Rule") 12(b)(2) for lack of personal jurisdiction
27  and Rule 12(b)(6) for failure to state a claim.  (Dkt. Nos. 106, 107.)  Oppositions were
28  filed by Plaintiffs as well as replies by Defendants.  (Dkt. Nos. 110, 111, 115, 116.)

Based on the reasoning below, the Court DENIES Defendants' motion to dismiss for lack of personal jurisdiction and GRANTS in part and DENIES in part Defendants' motion to dismiss for failure to state a claim.

### Procedural Background

On September 26, 2019, Plaintiffs Medimpact Healthcare Systems, Inc. ("MHSI"), Medimpact International LLC ("MIL"), and MedImpact International Hong Kong Ltd. ("MI-HK") (collectively "Plaintiffs" or "MedImpact") filed a Complaint against Defendants IQVIA Holdings, Inc. ("IQVIA Holdings"), IQVIA Inc., IQVIA AG, Omar Ghosheh ("Dr. Ghosheh") and Amit Sadana ("Sadana") (collectively "Defendants") alleging twelve causes of action for misappropriation of trade secrets under state and federal law and other claims.  (Dkt. No. 1, Compl.)  On March 24, 2020, the Court granted Defendants' motion to dismiss for lack of personal jurisdiction with leave to amend.[1]  (Dkt. No. 91.)  On April 7, 2020, Plaintiffs filed the operative first amended complaint ("FAC").  (Dkt. No. 93.)  The FAC alleges ten causes of action for 1) breach of fiduciary duty; 2) inducing breach of contract; 3) intentional interference with prospective economic advantage; 4) negligent interference with prospective economic advantage; 5) intentional interference with a contractual relationship; 6) unfair competition; 7) conspiracy; 8) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; 9) misappropriation of trade secrets under California Uniform Trade Secrets Act ("CUTSA"); and 10) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).  (*Id.*)  The named Defendants are IQVIA Inc., IQVIA Ltd., IQVIA AG, Dr. Ghosheh and Sadana. (*Id.*)

---

[1] In that order, the Court also denied Plaintiffs' request for jurisdictional discovery, denied Defendants' motion to dismiss for insufficient service of process, and denied Defendants' motion to dismiss for failure to state a claim as moot.  (Dkt. No. 91.)

**Factual Background**

**A.    Joint Venture Between MedImpact and Dimensions**

Plaintiff MHSI was founded in San Diego, California, in 1989, and provides pharmacy benefit management ("PBM") services to its clients.  (*Id.* ¶ 14.)  It is the largest privately held PBM provider in the United States with over 50 million members across 64,000 pharmacies.  (*Id.*)  It partners with the nation's finest health plans, hospitals, self-funded employers, state and local governments, and universities, including the University of San Diego, to provide PBM services.  (*Id.*)  It has spent more than 30 years and invested hundreds of millions of dollars developing its proprietary PBM platform.  (*Id.*)

Plaintiff MIL is a wholly owned subsidiary of MedImpact and established and existing under the laws of California and began international business operations in 2011 and is active in the Middle East and Chinese markets.  (*Id.* ¶ 15.)  MI-HK is a private Hong Kong corporation, and is a wholly owned subsidiary of MIL, which is a wholly owned subsidiary of MHSI.  (*Id.* ¶ 16.)  MI-HK's principal place of business is in San Diego and MedImpact employees in San Diego support MI-HK's business.  (*Id.*)

Seeking to build up its PBM platform globally, from around 2010 to 2011, MHSI formed MIL to expand its PBM services internationally, including the Middle East's Gulf Region which had no PBM providers at the time.  (*Id.* ¶ 30.)  Around 2011, MIL began discussions with Dimensions to establish a joint venture due to its regulatory contacts and presence in the United Arab Emirates ("UAE").  (*Id.*)  At the time, Dimensions sold limited health IT software and integration products aimed primarily at pharmacy providers in the medical insurance market and did not have real-time online adjudication capabilities in the PBM market.  (*Id.* ¶ 30.)  Dimensions Healthcare LLC ("Dimensions") is a United Arab Emirates company headquartered in Dubai.  (Dkt. No. 106-4, Ghosheh Decl. ¶ 2.)  Defendant Dr. Ghosheh is a co-founder of Dimensions and has been employed with Dimensions until his recent retirement on March 31, 2020.  (*Id.* ¶ 2.)  Ghosheh is resident of Dubai, UAE and is also a board member of MedImpact Arabia.  (Dkt. No. 93, FAC ¶ 22.)

On March 21, 2011, MIL and Dimensions began working together under a Non-Disclosure Agreement ("NDA") where Dimensions agreed to strictly maintain the confidentiality of MedImpact's confidential and proprietary trade secret information and not to use such information for any purpose other than the transaction contemplated in the NDA. (*Id.* ¶ 31.) Under the NDA, MIL began sharing MedImpact's closely guarded proprietary and trade secret information with Dimensions. (*Id.*) Subsequently, on February 1, 2012, MIL and Dimensions entered into a Joint Venture Agreement ("JV Agreement"), under which they agreed to establish MedImpact Arabia ("MIA") to provide PBM services to the Gulf Region. (*Id.*) The JV Agreement required Dimensions to maintain the confidentiality of "confidential and proprietary information or trade secrets" and "not utilize the Confidential information for any purpose other than as necessary to conduct the Business pursuant to this Contract (including as contemplated by the Services and License Contract)." (*Id.*) On the same day, MIL and Dimensions also entered into a service level agreement (the "SLC") with similar confidentiality provisions. (*Id.*) The SLC also stated that Claims Data could solely be used by the JV for providing JV services. (*Id.*) By entering into the JV Agreement, Dimensions agreed that any business opportunity that arose under the agreement within the Territory would strictly belong to the joint venture. (*Id.*) The Territory, at the time, included members of the Gulf Co-operation Council, Jordan, Lebanon, and any other country the parties to the JV Agreement agreed in writing. (*Id.*) On January 1, 2014, with the consent of Dimensions, Plaintiff MIL assigned its rights and interest in the joint venture to Plaintiff MI-HK. (*Id.*)

MHSI spent decades developing its PBM platform in San Diego and is supported on servers in San Diego. (*Id.* ¶ 32.) It processed about 25,000 to 30,000 claims per day in San Diego on behalf of the JV. (*Id.*) After the execution of the NDA, the JV Agreement, and SLC, through e-mails, phone calls and in person meetings/training, and

through MHSI's MedAccess[2] platform hosted on servers in San Diego, MedImpact's San Diego employees taught Dimensions, including Dr. Ghosheh, about all aspects of the PBM. (*Id.* ¶ 33.) It was through the JV, under the protection of the confidentiality restrictions, that Dimensions and Dr. Ghosheh gained access to MedImpact's trade secrets. (*Id.*) MedImpact and Dimensions successfully launched their first PBM in the Middle-East Gulf region around October 1, 2011, and from 2011 through 2016, MIA had continued growth with increasing revenues and customers every year. (*Id.* ¶ 34.) Oman Insurance was MIA's largest customer accounting for about 25% of the JV's revenue. (*Id.*) By late 2015, MIA had processed tens of millions of pharmaceutical claims in the Middle East from MedImpact's PBM platform in San Diego. (*Id.*)

**B.    Defendants' Acquisition of Dimensions**

In late 2015, representatives from IQVIA AG (then IMS Health AG) and IQVIA Ltd. (then IMS Health HQ Ltd.) (collectively "IMS Health") contacted MedImpact in San Diego about five to six time by telephone and follow up emails regarding IMS Health AG's interest in acquiring Dimensions but the true motives for the acquisition were never disclosed. (*Id.* ¶ 35.) In late 2015, IMS Health employees Carlos Santos ("Santos") (now with IQVIA Ltd.) Jordan Mitchell, James Salitan, Defendant Sadana (now with IQVIA AG), Esther Horvath and Celine Zeng initiated several phone calls with MedImpact concerning IMS Health AG's acquisition of Dimensions and during these conversations, IMS Health learned about the JV business and repeatedly mispresented to MedImpact that the JV would not be impacted by the acquisition. (*Id.* ¶¶ 35, 36.) IMS Health directed due diligence type questions about the business, technology and finances of the JV to MedImpact's executives in San Diego. (*Id.* ¶ 37.) From these conversations, IMS Health understood that MedImpact was a JV partner with Dimensions, was based in San Diego and provided its San Diego based PBM to the JV to adjudicate pharmaceutical

---

[2] No party has described what MedAccess is.

claims.  (*Id.*)  Representatives of MedImpact explicitly told IMS Health executives that MedImpact did not sell pharmaceutical data.  (*Id.*)  Through conducting its own diligence, IMS Health, on information and belief, knew that Dimensions was developing AIMS, a competing PBM product based off of MedImpact's trade secrets but this information was kept concealed during the phone calls and emails with MedImpact.  (*Id.*)

For example, on December 9, 2015, Santos (now with IQVIA Ltd) emailed Dale Brown, ("Brown") President of MedImpact in San Diego, memorializing an earlier meeting about IMS Health's strategic intentions to acquire Dimensions and Defendant Dr. Ghosheh and Defendant Sadana (now with IQVIA AG), and James Salitan, General Counsel of IMS Health, were copied on the email.  (*Id.* ¶ 38.)  The email sought the opportunity to ask due diligence questions and access to "certain specific financial information regarding the JV."  (*Id.*)  On December 15, 2015, Santos sought more information from MedImpact in San Diego by providing a list of due diligence questions and copied Defendant Dr. Ghosheh, of Dimensions, Defendant Sadana, James Salitan, Celine Zeng and Jordan Mitchell.  (*Id.* 39.)  On December 21, 2015, under false pretenses, Santos reached out to MedImpact and copied Jordan Mitchell, James Salitan, Defendant Sadana, Esther Horvath, Celine Zeng and Anuradha Pai and attached a change of control consent form.  (*Id.* ¶ 40.)  On December 27, 2015, Santos sent another email to Brown with follow up questions.  (*Id.* ¶ 41.)  The numerous contacts by IMS Health (now Defendants IQVIA AG and IQVIA Ltd) were filled with misrepresentations to MedImpact's officers and employees in San Diego that the acquisition of Dimensions would not affect the JV and hid their true intent.  (*Id.* ¶ 42.)  Relying on IMS Health's representations that the JV would not be impacted, MedImpact agreed to the acquisition.  (*Id.*)

A consent letter, dated January 4, 2016, signed by Defendant Dr. Ghosheh was directed to MedImpact in San Diego with a confirmation that the JV would not be altered.  (*Id.* ¶ 43.)  On January 11, 2016, IMS Health HQ Ltd. sent a follow up email to Brown to organize a conference call between IMS Health and MedImpact executives and copied

Yousef Ghosheh,[3] Defendant Dr. Ghosheh, Defendant Sadana and Jordan Mitchell.  (*Id.* ¶ 45.)  On January 14, 2016, Defendant Sadana sent calendar invites, via email, to executives of MedImpact for a meeting with IMS Health and MedImpact on January 19, 2016 to discuss the acquisition.  (*Id.* ¶ 46.)

In February 2016, after dishonestly obtaining consent from MedImpact, after having used MedImpact to succeed in the PBM market in the Middle-East Gulf region, after having gained access to MedImpact's proprietary and trade secret information to develop AIMS, IMS Health AG (now IQVIA AG) acquired Dimensions.  (*Id.* ¶ 47.)  Through the acquisition, each IQVIA Defendant gained access to MedImpact's trade secrets and large repository of unmatched pharmaceutical data.  (*Id.*)  On information and belief, one of the main motives for IMS Health AG purchasing Dimensions was to obtain the pharmaceutical data and then sell it to pharmaceutical companies, including California-based companies.  (*Id.* ¶ 48.)  At time of acquisition, MedImpact had processed tens of millions of pharmaceutical transactions on its PBM platform in San Diego and sent the data to MIA.  (*Id.*)  According to MedImpact, the pharmaceutical data is proprietary and it does not sell the data to pharmaceutical companies.  (*Id.*)  In contrast, IQVIA, as part of its model, sells data to pharmaceutical companies.  (*Id.*)  Even after the acquisition, IMS Health executives continued to reach out to MedImpact in San Diego to manage and oversee the joint venture though emails and calendar invites for conference calls in February and March 2016.  (*Id.* ¶¶ 49-53.)

In October 2016, IMS Health merged with Quintiles Transnational Holdings, Inc. creating QuintilesIMS.  (*Id.* ¶ 54.)  In November 2016, QuintilesIMS rebranded itself as IQVIA Holdings, Inc.  (*Id.*)  Defendant IQVIA, Inc., is a corporation organized under the laws of Delaware with its principal place of business in Danbury, Connecticut, and is a wholly-owned subsidiary of IQVIA Holdings.  (*Id.* ¶ 18.)  Defendant IQVIA, Inc. has a

---

[3] Yousef Ghosheh is distinct from Defendant Dr. Omar Ghosheh.

location in San Diego, California.  (*Id.* ¶ 14.)  Defendant IQVIA AG is a wholly-owned subsidiary of IQVIA Holdings, with its primary place of business in Switzerland and a branch in Dubai, UAE.  (*Id.* ¶ 19.)  IQVIA AG's predecessor entity was IMS Health AG or IMS AG.  (*Id.*)  IQVIA Ltd. is a subsidiary of IQVIA Holdings, incorporated in England with its principal place of business in Reading, England.  (*Id.* ¶ 20.)  IQVIA Ltd.'s predecessor was IMS Health HQ Ltd.  (*Id.*)

## C.    Development of AIMS

Beginning in 2015 and continuing until at least to late 2017, Dimensions "developed its own competing PBM platform called Adjudication Insurance Management System ("AIMS") using and a (*sic*) similar product ICM, using MedImpact's trade secret and confidential information."  (*Id.* ¶ 55.)  AIMS is described as a "platform for insurance companies and third party administrators (TPAs) that enables automated real-time adjudication for the vast majority of the healthcare authorizations and claims with advanced modules to administer its processing capabilities in relation to plans & products parameters such as benefits, groups, members, networks and other aspects."  (*Id*. ¶ 56.)  After IMS Health AG acquired Dimensions, Dimensions made its first AIMS and ICM sales.  (*Id.* ¶ 57.)

Plaintiffs allege that Defendants systematically schemed to target and steal MedImpact's customers and undermined and ultimately destroyed the joint venture for their benefit.  (*Id.*)  Prior to terminating the JV, IQVIA AG and Dimensions successfully stole the JV's largest client, Oman Insurance, by offering AIMS to replace the PBM product in June 2017.  (*Id.* ¶¶ 58, 93.)  Dr. Ghosheh and Sadana violated their fiduciary obligation to MIA.  (*Id.* ¶ 57.)  Sadana, who was the Senior Vice President & General Manager, Africa, Middle East and South Asia at IQVIA AG as well as Chairman of the JV's Board of Directors, was a signatory to the contract between Oman Insurance and Dimensions.  (*Id.* ¶ 58.)  Sadana has been employed by IQVIA AG for over 7 years and is a member of the board of directors of Dimensions and was appointed chairman of the

8

board of MIA after Dimensions' acquisition in February 2016.  (Dkt. No. 115-1, Sadana Decl. ¶ 2.)

Once Defendants successfully developed and marketed AIMS and stole the JV's largest customer, Dimensions terminated the JV.  (Dkt. No. 93, FAC ¶¶ 59, 60.)  A month after signing the contract with Oman Insurance, on July 23, 2017, at IQVIA's instruction, Dr. Ghosheh signed a letter terminating the JV and mailed it to Brown in San Diego.  (*Id.* ¶ 60.)  On the same day, Dimensions' counsel sent an email with the termination letter attached to Brown and General Counsel of MedImpact.  (*Id.*)  Sadana and Dr. Ghosheh were both copied on the email.  (*Id.*)

In mid-September 2017, MedImpact representatives met with representatives of IQVIA Ltd. (including Alistair Grenfell a senior management executive), IQVIA AG (including Sadana) and Yousef Ghosheh to discuss the termination.  (*Id.* ¶ 61.)  At the meeting, Grenfell represented that IQVIA's subsidiary, Dimensions, was not going to be a competitor to MedImpact in the PBM market even though MedImpact specifically asked about the renewal status of certain clients, including Oman Insurance.  (*Id.*)

On September 28, 2017, the Head of Medical and Life Claims at Oman Insurance told MedImpact that it was using AIMS to replace MIA's PBM platform.  (*Id.* ¶ 62.)  Around the same time, when Brown confronted Sadana about this, he responded that AIMS was a "black box", misrepresenting AIMS and knowing that a contract had already been signed with Oman Insurance and Dimensions.  (*Id.*)  On October 1, 2017, Oman notified MIA and MIL that it was terminating its PBM agreement with MIA.  (*Id.*)

Plaintiffs allege that Oman's termination of the PBM agreement was a direct result of IQVIA AG's conduct of misappropriating MedImpact's trade secrets with Dimensions for the purpose of diverting MIA's business to itself.  (*Id.* ¶ 63.)  Yet, when MedImpact confronted Defendants, they denied any wrongdoing insisting that AIMS was not doing PBM and they were not competing with the JV.  (*Id.* ¶ 64.)

In late 2017, Brown and Mr. Roberts, a board member of MI-HK, confronted Dr. Ghosheh about AIMS and he continued to mispresent AIMS and refused to provide

technical information about it and refused their request to inspect it.  (*Id.*)  An arbitration Tribunal found that AIMS had been copied from MedImpact's trade secrets.  (*Id.*)

In September 2017, Mr. Yousef Ghosheh prepared a detailed analysis with a customer-by-customer breakdown of each of MIA's clients, its pricing, contract status and summarizing which JV customers Dimensions and IQVIA hoped to take away that was prepared for Grenfell.  (*Id.* ¶ 65.)  Plaintiffs claim that Defendants interfered with MIA's other existing clients such as Vidal Health, ADNIC, Metlife, AXA, and Aafiya, and MIA's prospective business and economic relationships with Al Koot, GIG and Warba.  (*Id.* ¶ 65.)  Further, the FAC claims that Defendants have responded to new proposals for PBM services in Ghana and Saudi Arabia.  (*Id.* ¶¶ 67-71.)

In addition, with Dimensions' assistance, IQVIA has also marketed and sold pharmaceutical data obtained from MedImpact's platform to pharmaceutical companies in California.  (*Id.* ¶ 72.)  IQVIA has touted its "robust Patient level database for Dubai" which is pharmaceutical data obtained from MedImpact in San Diego without its consent.  (*Id.*)

MedImpact instituted arbitration proceedings against Dimensions in Dubai, UAE. The Tribunal determined, in part, that Dimensions breached the JV Agreement and the SLC and copied MedImpact's trade secrets to develop AIMS and ICM platforms which was in breach of the JV Agreement.  (*Id.* ¶ 73.)  The Tribunal entered a permanent injunction against Dimensions and awarded damages to MIL and Mi-HK for its conduct, but it had no jurisdiction over the IQVIA Defendants.  (*Id.*)  As a result of Defendants' conduct, Plaintiffs have suffered significant damages due to lost revenues from the loss of customers and injured MedImpact's status and reputation in the PBM industry.  (*Id.* ¶¶ 77, 82.)

## Discussion

**A.    Legal Standard on Federal Rule of Civil Procedure 12(b)(2)**

"When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction."  *In re Western States*

*Wholesale Natural Gas Antitrust Litig. v. Oneok, Inc.,* 715 F.3d 716, 741 (9th Cir. 2013). If the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make "a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Bryton Purcell LLP v. Recordon & Recordon*, 575 F.3d 981, 985 (9th Cir. 2009). On a prima facie case, the court considers uncontroverted allegations in the complaint as true and the court resolves all contested facts in favor of the non-moving party.[4] *In re Western States Wholesale Nat. Gas Antitrust Litig*., 715 F.3d 716, 741 (9th Cir. 2013); *AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996) (same). At the same time, however, the plaintiff cannot establish jurisdiction by alleging bare jurisdictionally-triggering facts without providing some evidence of their existence. *Amba Mktg. Sys., Inc. v. Jobar Int'l, Inc.,* 551 F.2d 784, 787 (9th Cir. 1977).

"Where, as here, no federal statute authorizes personal jurisdiction, the district court applies the law of the state in which the court sits." *Marvix Photo, Inc. v. Brand Techs., Inc.,* 647 F.3d 1218, 1223 (9th Cir. 2011) (citations omitted). California's long-arm statute is "coextensive with the outer limits of due process under the state and federal constitutions, as those limits have been defined by the United States Supreme Court." *Republic Int'l Corp. v. Amco Eng'rs, Inc.,* 516 F.2d 161, 167 (9th Cir. 1976) (quoting *Threlkeld v. Tucker,* 496 F.2d 1101, 1103 (9th Cir. 1974)). As such, the Court need only consider the requirements of due process. Due process requires that nonresident defendants have "minimum contact" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Personal jurisdiction can be either "general" or "specific." *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-16 (1984). The FAC alleges specific jurisdiction over all Defendants. (Dkt. No. 93, FAC ¶ 84.) "Personal jurisdiction must exist for each claim asserted against a

---

[4] Defendants' argument that on contested facts the court must "ignore FAC allegations contradicted by such evidence" is not legally supported. (Dkt. No. 106-1 at 14.)

defendant." *Action Embroidery Corp. v. Atl. Embroidery, Inc.,* 368 F.3d 1174, 1180 (9th Cir. 2004).

**B.   Specific Jurisdiction**

Specific jurisdiction exists when a case "aris[es] out of or relate[s] to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A.,* 466 U.S. at 414 n. 8.  The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant "focuses on 'the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* 571 U.S. 277, 284 (2014).  Specific jurisdiction is limited to ruling on "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S, 915, 919 (2011) (citation omitted).  "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the States." *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1771, 1781 (2017).  A court must look "to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. Therefore, "mere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290.  Rather, "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Id.*   Specifically, a court may exercise specific jurisdiction over a defendant only where "the defendant's suit-related conduct" "create a substantial connection with the forum [s]tate." *Williams v. Yamaha Motor Co. Ltd*., 851 F.3d 1015, 1022-23 (9th Cir. 2017) (quoting *Walden*, 571 U.S. at 284-85).

The Ninth Circuit conducts a three-prong test to determine whether a non-resident defendant is subject to specific personal jurisdiction,

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or

relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir. 2004) (citing *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)). "The plaintiff bears the burden of satisfying the first two prongs of the test." *Id.* If the plaintiff meets that burden, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

On the first prong, the Court applies the purposeful direction analysis for claims sounding in tort and the purposeful availment analysis for claims sounding in contract. *Id.* Here, although Plaintiffs bring both contract and tort claims, the case as a whole sounds in tort. *See e.g., Snowy Village USA, Inc. v. Kim*, Case No. 8:18-cv-01100-JLS-DFM  2018 WL 11026378 (C.D. Cal. Sept. 13, 2018) (even though the plaintiff brings both contract and tort claims, the case as a whole sounds in contract). Moreover, the parties both apply the tort based purposeful direction analysis in this case.

## C.    Purposeful Direction

Under the first prong, the Ninth Circuit applies the purposeful direction test enunciated in *Calder v. Jones*, 465 U.S. 783 (1984). *Schwarzenegger,* 374 F.3d at 802-03; *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017). Under the three-part *Calder* "effects" test to evaluate purposeful direction, Plaintiff must establish that the defendant allegedly "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (citing *Calder*, 465 U.S. at 783).

Defendants appear to challenge only Plaintiffs' ability to show the second factor that each Defendant expressly aimed conduct at the forum state. On the second factor, to determine whether the defendant expressly aimed conduct at the forum state, "[t]he

proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden,* 571 U.S. at 290.  Thus, "mere injury to a forum resident is not a sufficient connection to the forum," nor is defendant's knowledge of plaintiff's "'strong forum connections' . . . combined" with the "foreseeable harm" the plaintiff suffered in the forum.  *Id.* at 289-90.  The Supreme Court in *Walden* made clear that the court must look to the "defendant's 'own contacts' with the forum, not to the defendant's knowledge of a plaintiff's connections to a forum." *Axiom Foods*, 874 F.3d at 1070 (citing *Walden*, 571 U.S. at 289).  "Two principles animate the 'defendant-focused' inquiry." *Axiom,* 874 F.3d at 1068 (citing Walden, 571 U.S. at 285).  "First, the relationship between the nonresident defendant, the forum, and the litigation 'must arise out of contacts that the 'defendant himself' creates with the forum State.'" *Id.*  "Second, the minimum contacts analysis examines 'the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.'" *Id.*  "It follows that 'a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction.'" *Id.*

## 1.    Expressly Aiming as to IQVIA Ltd.

Defendants argue that IQVIA Ltd., a UK-based company, is not subject to personal jurisdiction in California because the allegations against IQVIA Ltd. is limited to five email communications regarding the acquisition of Dimensions, (FAC ¶¶ 36-46), which the Court already rejected in its prior order, IQVIA Ltd. hosting a meeting in London in September 2017 to discuss Dimensions' decision to terminate the JV, (FAC ¶¶ 97, 102), which the Court also rejected in its prior order, and IQVIA Ltd. allegedly received Plaintiffs' claims data stolen from servers in California, (FAC ¶ 103), which is a claim barred by issue preclusion.  (Dkt. No. 106-1 at 16-17[5].)

---

[5] Page numbers are based on the CM/ECF pagination.

Plaintiffs respond that IQVIA Ltd. expressly aimed its conduct at the forum when it initiated contact with MedImpact representatives in California to obtain its consent to Dimensions' acquisition, and played a key role in driving the acquisition decision for the purpose of gaining access to and eventually stealing MedImpact's trade secrets and JV customers, selling data and then terminating the JV, (FAC ¶¶ 99-103).  (Dkt. No. 110 at 21-22.)

The Court, in its prior order, granted dismissal on specific jurisdiction as to IQVIA Holdings because the facts alleged did not link any conduct of Defendant's conduct concerning trade secret misappropriation with the email communications in December 2015 and January 2016.  (Dkt. No. 91 at 15-16.)  It noted that these email communications may be tangentially related to the challenged conduct of misappropriating trade secrets but because there were no allegations of any "ill intentions to misappropriate during these pre-acquisition communications," the Court concluded they did not relate directly to the challenged conduct.[6]  (Dkt. No. 91 at 16.)  In addition, at the motion hearing, Plaintiffs raised facts, that were not alleged in the complaint, that these pre-acquisition communications in late 2015 were part of a scheme to misappropriate their trade secrets. The Court concluded it could not consider these new allegations and granted Plaintiffs leave to file a FAC.  (*Id.* n. 13, *id.* at 27.)

In the FAC, Plaintiffs have added numerous additional facts to support personal jurisdiction over Defendants and have corrected the deficiencies the Court noted in its order.  (*Compare* Dkt. No. 1, Compl, (50 pages) *with* Dkt. No. 93, FAC (82 pages).)  The FAC continues to allege that IQVIA Ltd. communicated with MedImpact in California by telephone, email and at a conference, however, now, the FAC alleges the contents of these communications which assert facts to support a scheme of alleged misappropriation

---

[6] Specifically, the Court noted in its prior order that a representative of IQVIA Holdings never visited California, did not have extensive online communications or telephone or emails communications with MedImpact in California, and Plaintiffs did not point to any conduct of misappropriation through these pre-acquisition communications.  (Dkt. No. 91 at 18.)

of trade secret[7] as well as facts to support claims for inducing breach of contract, intentional interference with contractual relationship[8] and intentional interference with prospective economic advantage.[9]  (Dkt. No. 110 at 25.)

In *Cisco*, the plaintiff was a major supplier of set-top boxes in India and used the Viper17LN chip ("Viper chip") in the power supply units of its set-top boxes.  *Cisco Sys. Inc. v. STMicroelectronics Inc.,* No. 5:14cv3236-RMW, 2015 WL 5138556, at *1 (N.D. Cal. Sept. 1, 2015).  The Viper chip was manufactured in Europe and Asia by subsidiaries of the defendant.  *Id.*  The Viper chips were defective causing the set-top boxes to shut down, and Cisco sought assistance from the defendants.  Despite their assistance, the Viper chip continued to fail.  The complaint alleged negligence, negligent and intentional misrepresentations, negligent and intentional interference with prospective economic advantage, and intentional interference with existing contractual relations.  *Id.* at *1. The plaintiff also claimed a group of employees from the subsidiaries, including ST Micro–Italy, acted in a civil conspiracy to deny, conceal information, and defraud Cisco regarding the nature, scope, and extent of the Viper chip issue.  *Id.* at *2.  ST Micro–Italy, an Italian corporation with a principal place of business in Cantania, Italy, moved to dismiss for lack of personal jurisdiction.  *Id.*  The court denied the motion to dismiss concluding that the "expressly aiming" prong was met

---

[7] Under the DTSA, a plaintiff must allege that: "(1) the plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3) the defendant's actions damaged the plaintiff."  *Alta Devices, Inc. v. LG Elecs, Inc*., 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018).

[8] A claim for inducing breach of contract and intentional interference with contractual relations requires a plaintiff to plead: (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3) intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the relationship; and (5) resulting damage. *Pac. Gas & Elec. Co. v. Bear Stearns & Co*., 50 Cal. 3d 1118, 1126 (1990);

[9] An intentional interference with prospective economic relationship claim requires a party to show "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  *CRST Van Expedited, Inc. v. Werner Enters., Inc*. 479 F.3d 1099, 1108 (9th Cir. 2007)

where the defendants' oral and written communications with Cisco's San Diego personnel contained false and misleading statements regarding defects in the Viper chips. *Id.* at \*4.  In addition, the defendants were aware at the time that at least some of the Cisco employees with whom they were communicating were based in California.  *Id.*

Similarly, in this case, the FAC alleges that the email and telephone communications by IQVIA AG and IQVIA Ltd. (then IMS Health AG and IMS Health HQ Ltd. (collectively "IMS Health"), starting in late 2015 and early 2016 to MedImpact in San Diego was for the purpose of obtaining Plaintiffs' consent to IMS Health's (now IQVIA AG's) acquisition of Dimensions.  (Dkt. No. 93, FAC ¶¶ 35-37.)  However, Plaintiffs claim that IMS Health did not reveal the true reasons behind the acquisition, which were to acquire Dimensions in order to access the prescription level drug data processed by Plaintiffs' PBM platform and to compete unlawfully against MedImpact in the international PBM market by interfering with MedImpact's customers and relationships using AIMS.  (*Id.* ¶¶ 1, 2.)  During these pre-acquisition communications starting in late 2015, IMS Health sought detailed financial, technological and business information about the JV and, through its due diligence, learned that Dimensions was developing AIMS, a competing PBM product based on MedImpact's trade secrets.  (*Id.* ¶¶ 35-37.)  Throughout these communication, IMS Health repeatedly misrepresented that the JV would not be affected.  (*Id.* ¶¶ 37, 40, 42, 43.)

Based on these facts, the Court concludes that Plaintiffs have presented a prima facie showing that IQVIA Ltd. expressly aimed their conduct at California as it relates to the claims for misappropriation of trade secrets, inducing breach of contract, intentional interference with prospective economic advantage and intentional interference with contractual relationship.  *See Cisco Sys. Inc.,* 2015 WL 5138556, at \*4  (denying dismissal for lack of personal jurisdiction based solely on communications that formed the basis of the causes of action against the defendant); *see also Microsoft Corp. v. Mountain West Computers, Inc*., No. C14–1772RSM, 2015 WL 4479490, at \*7 (W.D. Wash. July 22, 2015) (court exercised personal jurisdiction over the defendant in part

because Utah-based defendant "affirmatively contacted Microsoft" in Washington "through internet contact with its servers and by telephone").  Because the Court concludes that a prima facie case of "expressly aiming" has been met as to IQVIA Ltd. based on the pre-acquisition communications, the Court need not address whether the meeting hosted by IQVIA Ltd. in London in September 2017 and IQVIA Ltd. allegedly received Plaintiffs' claims data stolen from servers in California satisfy the "expressly aiming" factor.

### 2.    Expressly Aiming as to IQVIA AG

Defendants argue that the alleged facts to support that IQVIA AG had sufficient contacts with California are not sufficient as the Court already considered and rejected many of the same allegations.  (Dkt. No. 106-1 at 22-23.)  Plaintiffs submit that IQVIA AG, through phone, email and mail communications, expressly aimed its conduct at the forum when it: (1) affirmatively contacted MedImpact to obtain consent for its acquisition of Dimensions, (2) repeated misrepresentations that it had no intent to end the JV, (3) engaged in JV business while stealing JV customers and trade secrets, (4) sold JV data, (5) blatantly lied about the AIMS platform and (6) played a key role in terminating the JV, through the phone, email and mail, (FAC ¶¶ 90-95).  (Dkt. No. 110 at 21.)

In addition to the facts that support jurisdiction against IQVIA Ltd., as those are also alleged against IQVIA AG, the FAC also alleges that after the acquisition of Dimensions, IQVIA AG essentially became MedImpact's JV partner and constantly reached out to MedImpact to manage the JV through numerous calls and emails.  (Dkt. No. 93, FAC ¶¶ 49-54, 91.)  IQVIA AG also reached out to MedImpact to leverage PBM data in connection with the Disease Management Programs which it ultimate decided against.  (*Id.* ¶ 92.)  IQVIA AG further aimed its conduct to California when it gained access to MedImpact's San Diego developed trade secrets and processed pharmaceutical data and ultimately fulfilled its scheme when Sadana of IQVIA AG contracted with Oman Insurance to offer AIMS as a replacement of MIA's PBM.  (*Id.* ¶ 93.)  IQVIA AG coerced Dimensions to terminate the JV with MedImpact through a letter and email to

MedImpact.  (*Id.*)  After the termination, IQVIA AG executives were involved in numerous phone calls, meetings and board meetings with MedImpact executives and when asked about the renewal status of the JV's largest customer, Sadana intentionally withheld information that IQVIA AG had already signed an agreement with Oman Insurance using MedImpact's trade secrets.  (*Id*. ¶ 94.)

As with IQVIA Ltd., the Court concludes that the "expressly aiming" factor is easily met with IQVIA AG as it was involved in even more conduct directed at California than IQVIA Ltd.

### 3.    Expressly Aiming as to IQVIA Inc.

Defendants next assert that the claim that IQVIA Defendants obtained and resold claims data in California is not only false but should be barred by issue preclusion because the Tribunal in the Dubai arbitration ruled that claim was without merit. Plaintiffs challenge Defendants argument contending that IQVIA Inc. has offices and employees in California and "expressly aimed its conduct at the forum by selling and continuing to sell pharmaceutical data processed by MedImpact on San Diego servers to pharmaceutical companies in California. FAC ¶ 104".  (Dkt. No. 110 at 22.)  Plaintiffs further dispute the issue prelusion argument as not only flawed but also premature.  (*Id.* at 29-30.)

First, the parties present disputed issues of fact as to how the claims data was sent between MedImpact and Dimensions.  (*See* Dkt. No. 110-1, Brown Decl. ¶¶ 6-9 with Dkt. No. 118-16, Ghosheh Decl. ¶¶ 5-8. (UNDER SEAL).)  Moreover, based on the summary briefing, it is not clear whether issue preclusion applies.  In light of the disputed facts, the Court resolves the contested facts in favor of the non-moving party on a Rule 12(b)(2) motion.  Accordingly, the Court concludes that the "expressly aiming" factor has been met as to IQVIA Inc.

### 4.    Expressly Aiming as to Dr. Omar Ghosheh

Defendants argue that the expressly aiming arguments as to Dr. Ghosheh are stale and do not cure the jurisdictional flaw the Court identified in its prior order.  (Dkt. No.

106-1 at 25-26.)  Plaintiffs respond that Dr. Ghosheh communicated with MedImpact for years by phone and email and accessed MedAccess on San Diego servers to acquire MedImpact's trade secrets, (FAC ¶¶ 85-86).  (Dkt. No. 110 at 22.)  Dr. Ghosheh also aimed his conduct at the forum by sending dishonest mail and emails to the forum including the consent and termination letters that were directed to MedImpact in San Diego.  (*Id.*)

In its prior order, the Court found that Plaintiffs did not provide specific facts and failed to link Dr. Ghosheh's suit-related conduct with the forum.  (Dkt. No. 91 at 22-24.)  However, the FAC now alleges specific facts to support suit-related conduct by Dr. Ghosheh directed at the forum.  For ten years, through Dr. Ghosheh and MedImpact's long-standing business relationship through the JV and Dr. Ghosheh's role as director of the JV, Dr. Ghosheh learned valuable information about MedImpact's trade secrets through numerous communications with MedImpact's employees in San Diego.  (Dkt. No. 93, FAC ¶¶ 85-86.)  The FAC alleges that Dr. Ghosheh's improper conduct began in late 2015 when he reached out to MedImpact to discuss IMS Health's proposed acquisition of Dimensions.  (*Id.* ¶ 88.)  In January 2016, he signed a consent letter, purporting to hide the true reasons to acquire Dimensions, which was sent to Brown for his signature.  (*Id.* ¶ 88.)  On July 23, 2017, Dr. Ghosheh reached out to Medimpact to fraudulently terminate the JV as he intended to allow IQVIA Defendants to misappropriate MedImpact's trade secrets and sell its pharmaceutical claims data.  (*Id.* ¶¶ 89, 90.)  On September 12, 2017, during a board meeting, Dr. Ghosheh misrepresented that the IQVIA Defendants were not going to offer PBM services in the territory, but during discussion of the renewal status of Oman Insurance, Dr. Ghosheh omitted the fact that Dimensions and IQVIA AG had already signed an agreement with Oman Insurance for AIMS to replace the PBM.  (*Id.* ¶ 90.)  Finally, when MedImpact asked Dr. Ghosheh about providing technical information about AIMS, he refused.  (*Id.*)

The Court finds that these facts present a prima facie showing that Dr. Ghosheh expressly aimed his conduct at the forum as these communications relate to the claims of

20

1   breach of fiduciary duty as well as it relates to the claims for misappropriation of trade
2   secrets, inducing breach of contract, intentional interference with prospective economic
3   advantage and intentional interference with contractual relationship.  *See ScaleMP, Inc. v.*
4   *TidalScale, Inc*., Case No. 18-cv-04716-EDL,  2019 WL 7877939, at *12-13 (N.D. Cal.
5   Mar. 6, 2019) ("expressly aiming" factor satisfied even though original acquisition of
6   information obtained during a telephonic call was not a wrongful act, since it qualified as
7   the crucial contact with the forum because it was the moment when the defendant
8   acquired the information that was later allegedly misappropriated).

9          **5.      Expressly Aiming as to Amit Sadana**

10         Defendants argue that Plaintiffs repeat jurisdictional allegations against Sadana
11   that have been rejected and add an allegation that Sadana attended JV board meetings that
12   does not support jurisdiction because he attended them from the UAE.  (Dkt. No. 106-1 at
13   26-27.)  Plaintiffs oppose arguing that Sadana expressly aimed his conduct at the forum
14   when he communicated with MedImpact in California under false pretenses to secure the
15   acquisition of Dimensions, and continuously contacted California by phone, email, and
16   telephonic board meetings in his position as Chairman of the JV, in contacts where he
17   learned information about the JV and hid the ongoing scheme.  (Dkt. No. 110 at 23.)

18         The FAC claims that Sadana had a four-year relationship with MedImpact and
19   beginning in late 2015, he was involved in procuring the acquisition of Dimensions.
20   Then in April 2016, he was appointed Chairman of the JV and since then has been
21   consistent engaged with California through conferences calls to attend JV board meetings
22   to engage in numerous board calls with board members sitting in San Diego,  and sent
23   numerous emails to board members in San Diego in his role as Chairman.  (Dkt. No. 93,
24   FAC ¶ 96.)  During these communications, the JV's business and finance were discussed
25   and through these communications, he learned valuable information used to execute the
26   scheme.  (*Id.*)  He was involved in termination of the JV including making numerous
27   phone calls and attending several meetings and board meetings concerning the
28   termination.  (*Id.*)  At the September 12, 2017 board meeting in London, Sadana failed to

inform MedImpact that he had already signed an agreement with Oman Insurance for AIMS which was developed using MedImpact's trade secrets.  (*Id.* ¶ 97.)  Later, in late September/October 2017, Sadana explained that AIMS was a "dumb platform" with no software that Oman Insurance could set-up and customize on its own system and is distinct from PBM.  (*Id.*)  All these communications were conducted in order to conceal the scheme to misappropriate MedImpact's trade secrets and conceal the true intentions behind acquiring Dimensions.  (*Id.*)

While most of the communications occurred while he was in the UAE, such contacts have been found sufficient to satisfy the "expressly aiming" factor so long as the communications formed the basis of the causes of action against Defendants.  *See Cisco*, 2015 WL 5138559, at *5.  These new facts sufficiently link Sadana's conduct with the claims in this case, and Plaintiffs have set out a prima facie showing that Sadana expressing aimed conduct towards California.

## D.  Exercise of Jurisdiction Must be Reasonable

Defendants further argue that if the Court were to find that there was suit-based conduct purposely directed towards California, the Court should decline to exercise jurisdiction because it would be unreasonable.  Plaintiffs oppose.

On the third prong for purposeful direction, the burden shifts to Defendants "to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802.  The Court looks to seven factors to determine whether exercising personal jurisdiction over Defendants is reasonable.  They are:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

19cv1865-GPC(LL)

*Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007) (*quoting CE Distrib., LLC v. New Sensor Corp.*, 380 F.3d 1107, 1112 (9th Cir. 2004)).  Defendants, as foreign defendants, bear a heavy burden to prove a "'compelling case' of unreasonableness to defeat jurisdiction."  *Dole Food Co.*, 303 F.3d at 1117 (indicating there is strong presumption of reasonableness).

First, the Court concludes that because Defendants have purposefully directed their activities in this forum causing injury here, they have injected themselves into this forum.  *See Advanced Skin & Hair, Inc. v. Bancroft,* 858 F.Supp.2d 1084, 1091 (C.D. Cal. 2012) ("Because Defendant purposefully availed herself on California . . . the Court finds that Defendant purposefully interjected herself in California, supporting a finding of reasonableness.") (citing *Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc.,* 1 F.3d 848, 852 (9th Cir. 1993) (this factor "parallels the question of minimum contacts" in determining the reasonableness of exercising specific jurisdiction); and *Roth v. Garcia Marquez,* 942 F.2d 617, 623 (9th Cir. 1991) ("In light of the first prong of purposeful availment, analysis of this first factor in the third prong would be redundant")).

Second, according to Defendants, their burden would be substantial in California where four defendants are non-U.S. defendants and reside in the UAE, the UK or Switzerland which is also the location of the relevant documents and witnesses.  To have those witnesses travel across the world would be expensive and highly disruptive to their ongoing business activities.  Plaintiffs respond that the modern advances in communications and transportation have reduced the burden of litigating in another country.  Moreover, IQVIA entities are part of a billion-dollar global conglomerate and have the resources to litigate in California.  "[W]ith the advances in transportation and telecommunications and the increasing interstate practice of law, any burden is substantially less than in days past."  *CE Distrib.*, 380 F.3d at 1112.  Despite technological advances, this factor nonetheless will always favor the defendants.  *See Dole Food* Co., 303 F.3d at 1117 (by their very nature, the factors of burden on defendants and sovereignty conflict are likely to favor foreign defendants every time

personal jurisdiction in the United States is considered.)  Therefore, this factor slightly favors Defendants.

Third, Defendants argue that haling them, except sham Defendant IQVIA, Inc., into California would conflict with important sovereign interests summarily stating that "foreign nation presents a higher sovereignty barrier than another state within the United States" citing *FDIC v. British-American Ins. Co., Ltd*. 828 F.2d 1439, 1444 (9th Cir. 1987).  By itself, Defendants' summary proposition does not explain which sovereignty has a conflict with jurisdiction in this Court.  In fact, as Defendants admit, four Defendants reside in the UAE, the UK and/or Switzerland and they have failed to demonstrate how these separate sovereignties have a conflict with jurisdiction in California.  This factor favors Plaintiffs.

Fourth, Defendants claim the issue of whether California has a significant interest in the litigation is neutral because there has been no purposeful activity directed to California.  Plaintiffs contend that California has a strong interest in litigation that involves residents who are tortiously injured by out-of-state defendants.  The Court sides with Plaintiffs as Defendants have purposefully directed their activities in this forum knowing they would cause injury to Plaintiffs; therefore, California has an interest in adjudicating this case.  *See Sinatra v. National Enquirer, Inc*., 854 F.2d 1191, 1200 (9th Cir. 1988) ("California maintains a strong interest in providing an effective means of redress for its residents [who are] tortiously injured").  This factor supports Plaintiffs.

Fifth, Defendants claim that it would be inefficient to try this case in California as none of their witnesses or documents are in California.  In response, Plaintiffs argue that their relevant operations are in San Diego as well as the intellectual property at issue and the pharmaceutical data processed by MedImpact that is allegedly being sold by IQVIA Defendants to companies in California.  Moreover, any witnesses can be deposed on a virtual platform and electronic access to documents reduces the inefficiency of physical documents and in person depositions.  The Court agrees that with today's modern technological advances, and also in light of COVID-19, where parties have been forced

1   to litigate in a remote, virtual manner, it would not be inefficient to litigate the case in
2   California.  Thus, this factor is neutral.

3          Sixth, Defendants claim that Plaintiffs' choice of forum is of little importance to
4   the reasonableness inquiry and they have already demonstrated a willingness to litigate
5   the same subject matter in Dubai as demonstrated by the arbitration.  In contrast,
6   Plaintiffs claim that they have a significant interest in protecting their intellectual
7   property in California.  Moreover, the proceeding in Dubai was an arbitration pursuant to
8   an arbitration agreement, not litigation and the proceeding was against a different
9   defendant.  While a plaintiff's convenience is not of paramount importance, *Dole Food*
10  *Co.,* 303 F.3d at 1106, it is a listed factor and cannot be disregarded.  Accordingly, this
11  factor slightly favors Plaintiffs.

12         Seventh, Defendants argue that Plaintiffs have not met their burden to demonstrate
13  an alternative forum does not exist and they cannot because an alternative forum exists
14  in the courts of Dubai.  (Dkt. No. 106-1 at 30.)  Plaintiffs contend that Dubai is not an
15  adequate alternative forum because Dubai cannot adjudicate U.S. law claims and
16  because Defendants are residents in the UAE, the UK and Switzerland and it is not clear
17  whether Dubai would have jurisdiction over all Defendants.  On the final factor, the
18  "plaintiff bears the burden of proving the unavailability of an alternative forum."  *Core-*
19  *Vent Corp. v. Nobel Indust. AB*, 11 F.3d 1482, 1490 (9th Cir. 1993); *Bauman v.*
20  *DaimlerChrysler Corp*. 644 F.3d 909 (9th Cir. 2011) (citation omitted) ("The plaintiff
21  'bears the burden of proving the unavailability of an alternative forum,' although as
22  mentioned earlier, the overall burden with respect to reasonableness lies with the
23  defendants.").  Here, this factor supports Defendants as Plaintiffs makes summary
24  arguments about the lack of an alternative forum without demonstrating that their
25  "claims cannot be effectively remedied" in Dubai.  *See Core-Vent*, 11 F.3d at 1490
26  (noting that, to meet its burden of proving the unavailability of an alternative forum, a
27  plaintiff must show that its "claims cannot be effectively remedied there.").

28

19cv1865-GPC(LL)

1    Considering all the factors in light of the Defendants' burden of presenting a

2    "compelling case." the Court concludes that the exercise of jurisdiction over Defendants

3    in California is reasonable.

4    Accordingly, under the purposeful direction analysis, the Court concludes it has

5    specific personal jurisdiction over all Defendants and the Court DENIES Defendants'

6    motion to dismiss for lack of personal jurisdiction.

7    **E.    Legal Standard as to Federal Rule of Civil Procedure 12(b)(6)**

8    Federal Rule of Civil Procedure ("Rule") 12(b)(6) permits dismissal for "failure to

9    state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).  Dismissal

10   under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or

11   sufficient facts to support a cognizable legal theory.  *See Balistreri v. Pacifica Police*

12   *Dep't.,* 901 F.2d 696, 699 (9th Cir. 1990).  Under Federal Rule of Civil Procedure

13   8(a)(2), the plaintiff is required only to set forth a "short and plain statement of the claim

14   showing that the pleader is entitled to relief," and "give the defendant fair notice of what

15   the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,*

16   550 U.S. 544, 555 (2007).

17   A complaint may survive a motion to dismiss only if, taking all well-pleaded

18   factual allegations as true, it contains enough facts to "state a claim to relief that is

19   plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly*,

20   550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual

21   content that allows the court to draw the reasonable inference that the defendant is liable

22   for the misconduct alleged." *Id.*  "Threadbare recitals of the elements of a cause of

23   action, supported by mere conclusory statements, do not suffice." *Id.*  "In sum, for a

24   complaint to survive a motion to dismiss, the non-conclusory factual content, and

25   reasonable inferences from that content, must be plausibly suggestive of a claim entitling

26   the plaintiff to relief." *Moss v. U.S. Secret Serv.,* 572 F.3d 962, 969 (9th Cir. 2009)

27   (quotations omitted).  In reviewing a Rule 12(b)(6) motion, the Court accepts as true all

28

1  facts alleged in the complaint, and draws all reasonable inferences in favor of the

2  plaintiff.  *al-Kidd v. Ashcroft*, 580 F.3d 949, 956 (9th Cir. 2009).

3  **F.     Defend Trade Secrets Act**

4      **1.     Defendants IQVIA Ltd., IQVIA AG, Dr. Ghosheh and Sadana**

5      Defendants move to dismiss the DTSA claim against IQVIA Ltd., IQVIA AG, Dr.

6  Ghosheh and Sadana because they did not commit a domestic act in furtherance of the

7  alleged trade secret misappropriation because the misappropriation occurred outside the

8  United States years after Plaintiffs voluntarily disclosed their trade secrets to Dimensions.

9  (Dkt. No. 107-1 at 14-17.)  Plaintiffs respond that the DTSA applies to extraterritorial

10  conduct by IQVIA Ltd, IQVIA AG, Dr. Ghosheh and Sadana and they committed acts in

11  furtherance of the offense in the United States.  (Dkt. No. 111 at 11-15.)

12      The DTSA applies to the acquisition, disclosure and use of trade secrets.  *See* 18

13  U.S.C. §§ 1839(5)(A) & (B).[10]  Under the DTSA, a plaintiff must allege that: "(1) the

14  plaintiff owned a trade secret; (2) the defendant misappropriated the trade secret; and (3)

15  the defendant's actions damaged the plaintiff."  *Alta Devices, Inc. v. LG Elecs, Inc*., 343

16  F. Supp. 3d 868, 877 (N.D. Cal. 2018) (citations omitted).  A trade secret

17  misappropriation claim can be brought under the DTSA "if the trade secret is related to a

18  product or service used in, or intended for use in, interstate or foreign commerce." 18

19  U.S.C. § 1836(b)(1).  The DTSA also applies to conduct occurring outside the United

20  States if (1) "the offender is a . . . organization organized under the laws of the United

21  States or a State" or (2) "an act in furtherance of the offense was committed in the United

22  States." 18 U.S.C. § 1837(1-2).

23      "[A]n act in furtherance of the offense" is not defined under the DTSA and district

24  courts look to the common law as it is regularly used in federal conspiracy law.  *Luminati*

---

[10] The DTSA defines "misappropriation" as (a) "acquisition of a trade secret" by a person who knows or should know the secret was improperly acquired or (b) "disclosure or use of a trade secret of another without express or implied consent . . . ." 18 U.S.C. § 1839(5)(A) & (B).

*Networks Ltd. v. BIScience Inc*., CIVIL ACTION NO. 2:18-CV-00483-JRG, 2019 WL 2084426, at *9 (E.D. Tex. May 13, 2019) ("Court looks to the established common law meaning of "in furtherance of" when interpreting the extraterritoriality provision of the DTSA."); *Motorola Solutions, Inc. v. Hytera Commc'n Corp. Ltd*., 436 F. Supp. 3d 1150, 11165 (N.D. Ill. 2020) (relying on *Luminati* analysis).  Relying on *Yates v. United States*, 354 U.S. 298, 334 (1957), the district court, in *Luminati,* explained that "*Yates* makes clear that the act in furtherance of the offense of trade secret misappropriation need not be the offense itself or any element of the offense, but it must 'manifest that the [offense] is at work' and is not simply 'a project in the minds of the' offenders or a 'fully completed operation.'  Put another way, an act that occurs before the operation is underway or after it is fully completed is not an act 'in furtherance of' the offense." *Luminati*, 2019 WL 2084426 at *10.

Defendants narrowly focus their argument on the act of misappropriation; however, an "act in furtherance of the offense" includes misappropriated conduct that is "at work."  *See id*.  However, the FAC alleges "acts in furtherance of the offense" of trade secret misappropriation that began with Defendants' communications with MedImpact located in California.  These acts include (1) Dr. Ghosheh communicating with MedImpact employees to learn about MedImpact's trade secrets; (2) Dr. Ghosheh accessing MedAccess which is hosted on San Diego servers from May 11, 2016 until the JV's termination in July 2017; (3) following the JV termination, Dr. Ghosheh, Sadana, IQVIA Ltd. and IQVIA AG continuing to communicate with MedImpact in California through numerous phone calls, virtual meetings and board meetings without disclosing the real reasons for the termination; (4) Dr. Ghosheh sending the July 23, 2017 letter to MedImpact in San Diego terminating the JV without revealing the true reasons; (5) Dr. Ghosheh's call to Mr. Roberts, a board member of MI-HK, and Brown, misrepresenting AIMS' capabilities and when asked if they could be provided with technical information or inspect AIMS, and (6) Dr. Ghosheh refusing an inspection and attempting to hide the fact that he used Plaintiffs' trade secrets.  (Dkt. No. 93, FAC ¶¶ 33, 175(a)-(c).)   Further,

28

in June, July and August 2016, IQVIA AG's predecessor and Sadana allegedly reached out to MedImpact to discuss JV business during which they learned valuable information. (*Id.* ¶ 91.)  It was during these communications that the trade secret misappropriation was "at work" by keeping MedImpact in the dark while Defendants executed their trade secret misappropriation.  These allegations are sufficient to draw a reasonable inference that acts in furtherance of the misappropriation, whether by acquisition, use or disclosure, were committed in the United States.  Defendants reliance on *ProV Int'l, Inc. v Lucca,* No. 8:19cv978-T-23AAS, 2019 WL 5578880 (M.D. Fla. Oct. 29, 2019) is inapposite as there, the court found there were no facts alleged connecting the defendant's attendance at the trade show with the alleged misappropriation of the plaintiffs' trade secrets.

Accordingly, the Court DENIES Defendants' motion to dismiss the DTSA as to Defendants IQVIA Ltd., IQVIA AG, Dr. Ghosheh and Sadana.

## 2.    Defendant IQVIA, Inc.

Defendants argue that the allegations against Defendant IQVIA, Inc. fail to assert a misappropriation act to support a DTSA claim because selling Plaintiffs' confidential claims data is not a trade secret.  (Dkt. No. 107-1 at 17.)  Contrary to Defendants' argument, Plaintiffs maintain that the FAC pleads allegations of misappropriation against IQVIA Inc.  (Dkt. No. 111 at 16-17.)

While Defendants point to paragraphs in the FAC that alleges that IQVIA Inc. was responsible for misappropriating claims data and reselling them, the FAC also includes allegations that IQVIA Inc. was also involved in the misappropriation of Plaintiffs' trade secrets concerning the PBM platform.  (*See* Dkt. No. 93, FAC ¶¶ 66, 160, 173-175.)  Accordingly, the Court DENIES Defendants' motion to dismiss the DTSA claim as to Defendant IQVIA, Inc.

## G.    CUTSA Preemption

Defendants argue that claims 2-7 are preempted by CUTSA because they are based on the same nucleus of facts as the misappropriation of trade secrets claims.  Plaintiffs

1    disagree and contend that claims 2-7 do not rely on the same nucleus of facts as the
2    misappropriation of trade secrets.

3           CUTSA was enacted with the California's legislative intent to occupy the entire
4    field of misappropriation of trade secrets as it has "comprehensive structure and breadth."
5    *K.C. Multimedia, Inc. v. Bank of America Tech. & Operations, Inc*., 171 Cal. App. 4th
6    939, 954-956, 957 (2009).  Misappropriation means improper acquisition, or non-
7    consensual disclosure or use of another's trade secret.  Cal. Civ. Code § 3426.1(b).  Due
8    to the broad scope of CUTSA, it preempts any common law claim that derives from the
9    same nucleus of facts as trade secret misappropriation.  *K.C. Multimedia, Inc.,* 171 Cal.
10   App. 4th. at 954, 962; *see also* Cal. Civ. Code § 3426.7.  Section 3426.7(b) provides for
11   three exemptions from the scope of preemption and include: "(1) contractual remedies,
12   whether or not based upon misappropriation of a trade secret, (2) other civil remedies that
13   are not based upon misappropriation of a trade secret, or (3) criminal remedies . . . ."  Cal.
14   Civ. Code § 3426.7(b).  In this case, the parties dispute whether claims 2-7 arise from the
15   "same nucleus of facts as trade secret misappropriation."  *K.C. Multimedia, Inc*., 171 Cal.
16   App. 4th at 962.

17          "The preemption inquiry for those causes of action not specifically exempted by §
18   3426.7(b) focuses on whether other claims are no more than a restatement of the same
19   operative facts supporting trade secret misappropriation. If there is no material distinction
20   between the wrongdoing alleged in a CUTSA claim and that alleged in a different claim,
21   the CUTSA preempts the other claim."  *Convolve, Inc. v. Compaq Comp. Corp*., No. 00
22   CV 5141(GBD), 2006 WL 839022, at *6 (S.D.N.Y. Mar. 31, 2006) (applying California
23   law); s*ee also PQ Labs, Inc. v. Yang Qi,* No. C12–450, 2012 WL 2061527, at *5 (N.D.
24   Cal. June 7, 2012) (same).  To survive preemption, the claims must "allege wrongdoing
25   that is materially distinct from the wrongdoing alleged in a CUTSA claim."  *SunPower
26   Corp. v. SolarCity Corp.,* No. 12-CV-00694-LHK, 2012 WL 6160472, at *9 (N.D. Cal.
27   Dec. 11, 2012).  For example, if an interference with prospective economic advantage
28   claim is based on the same nucleus of facts as a CUTSA trade secret misappropriation

claim, then the claim is preempted by CUTSA.  *Axis Imex, Inc. v. Sunset Bay Rattan, Inc.,* No. C 08-3931 RS, 2009 WL 55178, at *5 (N.D. Cal. Jan. 7, 2009) (CUTSA preemption applies when, after the facts relating to trade secrets are removed, there are not enough facts for the claim to survive).  A "determination of whether a claim is based on trade secret misappropriation is largely factual."  *K.C. Multimedia, Inc.*, 171 Cal. App. 4th at 954.  Moreover, CUTSA preemption is interpreted broadly, *id.* at 957 (rejecting appellant's narrow interpretation of CUTSA preemption), and the court focuses on "the actual gravamen of [the] complaint, *id.* at 959.

In this case, the CUTSA claim is based on allegations that beginning in at least mid-2017 until now, IQVIA along with Dimensions, Dr. Ghosheh and Sadana misappropriated MedImpact's confidential and proprietary information and trade secrets and utilized them to enter the PBM market internationally.  (Dkt. No. 93, FAC ¶ 189.)  The CUTSA claim alleges wrongful misappropriation of "MedImpact's Trade Secrets, confidential customer and competitive information" as well as "trade secrets, know-how, confidential and proprietary technical information and know-how and customer information."  (*Id.* ¶¶ 198, 199.)   IQVIA knew or should have known that the trade secrets improperly disclosed to them by Dimensions, Dr. Ghosheh and Mr. Sadana were taken from and belonged to MedImpact, that IQVIA encouraged Dimensions to do so and accepted such information and solicited them for information which they knew came from MedImpact.  (*Id.* ¶ 195.)  Medimpact lost significant revenue from 2016 onwards and those revenues have continued to decline because of Defendants' misappropriation of trade secrets.  (*Id.* ¶ 192.)

> **1.   Second Cause of Action – Inducing Breach of Contract as to IQVIA; and Fifth Cause of Action – Intentional Interference with Contractual Relationship as to IQVIA**

To prevail under either a claim for inducing breach of contract and intentional interference with contractual relations, a plaintiff must plead: (1) a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of this contract; (3)

intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the relationship; and (5) resulting damage. *Pac. Gas & Elec. Co. v. Bear Stearns & Co*., 50 Cal. 3d 1118, 1126 (1990); *see also Epitech, Inc. v. Cooper Wiring Devices, Inc*., Case No.: 3:11-CV-1693 JM (WVG), 2013 WL 12095586, *2 (S.D. Cal. Mar. 20, 2013) (inducing breach of contract and intentional interference with contractual relations involve similar showings).

In *KC Multimedia*, the court concluded that the tortious interference with contractual relations was preempted where the appellant claimed that the appellees "engaged in intentional acts designed to induce a breach or disruption of plaintiff's contractual relationship" with appellant's former employee by "helping" and "encouraging" him "to misappropriate trade secrets and then by luring the former employee to become an employee of the appellee. *Id.* at 960-61. Appellant further alleged that its "contractual relationship with [the former employee] was disrupted and breached because [the former employee] misappropriated . . . trade secrets and accepted employment with [the appellees]." *Id.* at 961.

In *Western Air Charter*, the district court held that the intentional interference with contractual relations was preempted because without the misappropriation of trade secret, there would be no claim. *Western Air Charter, Inc. v. Schembari*, Case No.: CV 17-00420-AB (KSx), 2017 WL 10638759, at *3 (C.D. Cal. Oct. 6, 2017). While Plaintiffs alluded to other allegations to support its claim, the court noted that the "intentional act" designed to induce breach of contract necessary to support a claim for intentional interference with contractual relations was the affirmative act misappropriation of trade secrets, not the defendant's acts of setting up a competing business. *Id.* Therefore, without the trade secret misappropriation facts, the plaintiff could not establish "the third element of a claim for intentional interference with contractual relations." *Id.*

Here, Plaintiffs have attempted to carefully draft the FAC to avoid CUTSA preemption by avoiding using the words "trade secret misappropriation" or facts relating to that claim. However, a careful review of the allegations to support both claims reveals

that they rely on the same nucleus of facts as the trade secret misappropriation.  As to inducing breach of contract, the FAC alleges that IQVIA intentionally induced Dimensions to breach its obligations under the JV Agreement, the SLC and NDA "in order to steal MIA's existing clients and provide pharmaceutical data to IQVIA for sale to pharmaceutical companies."  (Dkt. No. 93, FAC ¶ 116.)  The facts underlying the "intentional act" of inducing breach or interference rely on Defendants developing and using AIMS, a competing PBM product which was developed using Plaintiffs' PBM trade secrets.  As alleged, once AIMS was created and a contract with Oman Insurance was executed, IQVIA Defendants induced Dimensions to terminate the JV and to compete against Plaintiffs in the international market.  Additionally, the inducing breach of contract claim alleges the intentional act of unlawfully obtaining pharmaceutical data and selling them to pharmaceutical companies in California.  *(Id.*)  While the parties do not address whether CUTSA preemption applies to confidential information, caselaw appears to support this proposition.  *See Mattel, Inc. v. MGA Entm't, Inc*., 782 F. Supp. 2d 911, 987 (C.D. Cal. 2011) ("UTSA supersedes claims based on the misappropriation of confidential information, whether or not that information meets the statutory definition of a trade secret"); *SunPower*, 2012 WL 6160472, at *5 ("If the basis of the alleged property right is in essence that the information is that it is 'not . . . generally known to the public,' then the claim is sufficiently close to a trade secret claim that it should be superseded notwithstanding the fact that the information fails to meet the definition of a trade secret."); *but see Amron Intern. Diving Supply, Inc. v. Hydrolinx Diving Commc'n, Inc*., No. 11–CV–1890, 2011 WL 5025178, at *10 (S.D. Cal. 2011) (common law causes of action were not preempted because they were based on different "allegations" than the plaintiff's trade secrets claim).  In litigating this claim, the facts supporting the misappropriation of trade secrets will necessarily be used to demonstrate the claim of inducing breach of contract.

Similarly, on the claim for intentional interference with a contractual relationship, the FAC alleges that IQVIA engaged in a "pattern of conduct" of coercing Dimensions to

terminate the JV Agreement with the aid of Dr. Ghosheh and Sadana which ultimately led to the termination of the JV on July 23, 2017.  (Dkt. No. 93, FAC ¶ 141.)  Further, as to damages, Plaintiffs claim that it lost millions of dollars in contractual benefits including its relationship with Oman Insurance and other actual and potential customers. (*Id.* ¶ 143.)  While the FAC is purposefully devoid of any facts to support the "pattern of conduct" leading to the termination of the JV, the allegations concerning damages reveal that the "pattern of conduct" relates to the misappropriation of trade secrets.  The loss of Oman Insurance was due to IQVIA offering its competing AIMS product using Plaintiffs' trade secrets.  The interference was only possible by IQVIA's development and use of AIMS that precipitated the termination of the JV and to lure Plaintiffs' clients to contract with IQVIA.  Therefore, this claim shares the same nucleus of facts with the claim for misappropriation of trade secrets.  The FAC lacks any other factual basis for an inducement of a breach or interference with the JV Agreement by IQVIA and without the alleged trade secret misappropriation, there would be no such claim.  *See Western Air Charter, Inc.*, 2017 WL 10638759, at *3 (without the trade secret misappropriation facts, the plaintiff could not establish "the third element of a claim for intentional interference with contractual relations.").  Plaintiffs do not point to other facts, apart from misappropriating trade secrets, that would support the intentional acts or "pattern of conduct" to support these causes of action.  *See id.* (although not persuasive the plaintiffs alleged their intentional interference of contract was based on additional allegations besides misappropriation of trade secret).   Therefore, the Court concludes that inducing breach of contract and intentional interference with contractual relationship are preempted by CUTSA as they are "based on the same nucleus of facts as trade secret misappropriation."  *See K.C. Multimedia, Inc.,* 171 Cal. App. 4th at 958, 962 (holding that claims for breach of confidence, interference with contract, and unfair competition were all preempted by CUTSA).  The Court GRANTS Defendants' motion to dismiss the second and fifth causes of action.

/ / /

2.      **Third Cause of Action – Intentional Interference with Prospective Economic Relations as to IQVIA; Fourth Cause of Action – Negligent Interference with Prospective Economic Relations as to IQVIA**

Defendants move to dismiss the third and fourth causes of action arguing that these claims are premised on facts that support a misappropriation of trade secret claim and the necessary element to allege an independent wrongful conduct is the misappropriation of trade secrets.  (Dkt. No. 107-1 at 19-20.)  Plaintiffs argue that they have alleged an independent unlawful conduct distinct from trade secret misappropriation which include breach of fiduciary duty and conspiracy.  (Dkt. No. 111 at 19-20.)

Under California law, an intentional interference with prospective economic relationship claim requires a party to show "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant."  *CRST Van Expedited, Inc. v. Werner Enters., Inc.* 479 F.3d 1099, 1108 (9th Cir. 2007) (citing *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)).  A plaintiff alleging interference with a prospective relationship is also required "to allege an act that is wrongful independent of the interference itself."  *Id.*  "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard."  *Korea Supply*, 29 Cal. 4th at 1159.

On this claim, the FAC alleges that IQVIA Defendants, using its influence as parent companies of Dimensions, wrongfully terminated an ongoing business relationship, the JV Agreement, on July 23, 2017, between MI-HK and Dimensions, and diverted its economic benefit to IQVIA.  (Dkt. No. 93, FAC ¶ 122.)  On information and belief, the FAC avers that IQVIA solicited and encouraged MIA board members to breach the terms of the JV Agreement, the NDA and the SLC.  (*Id.*)  The FAC further

alleges that IQVIA interfered with MedImpact's relationship with existing and potential customers, including Oman Insurance. (*Id.* ¶ 123.)   IQVIA successfully lured Oman Insurance in September 2017 to Dimensions' competing AIMS platform. (*Id.* ¶ 125.) Additionally, other MIA customers terminated their relationships with Plaintiffs or altered their relationships by decreasing pricing. (*Id.*)  The FAC provides detailed allegations as to Defendants' scheme with Dimensions to steal the JV's clients and terminate the JV by offering AIMS to replace Plaintiffs' PBM. (*Id.* ¶¶ 57, 58, 59.) Plaintiffs claim that the termination letter sent by Dr. Ghosheh did not state the true reasons for the termination which was "to allow the IQVIA Defendants to use MedImpact's proprietary data and to use MedImpact's trade secrets and customer lists to compete in the PBM market." (*Id.* ¶ 60.)   Here, where the "gravamen of the wrongful conduct" is the misappropriation of a trade secret, CUTSA preemption applies.  *See K.C. Multimedia, Inc.*, 171 Cal. App. 4th at 961.

In response to Defendants' argument that the only independent unlawful conduct is the misappropriation of trade secret and confidential information, Plaintiffs maintain that the third and fourth claims are also based on the unlawful acts of breach of fiduciary duty and conspiracy.  However, conspiracy is not a cause of action but requires an underlying wrongful act, *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (1994) (a civil conspiracy is activated by the commission of an underlying wrongful act), which Plaintiffs do not identify or explain.  In addition, the breach of fiduciary duty only applies to Dr. Ghosheh and Sadana, (Dkt. No. 93, FAC ¶¶ 108-12), not IQVIA Defendants.  Because this claim is alleged against IQVIA Defendants, Plaintiffs' argument fails.

The intentional interference with prospective economic advantage alleges two separate interferences.  First, IQVIA Defendants, as parent companies, influenced Dimensions to terminate the JV Agreement between MI-HK and Dimensions causing disruption of the relationship and diversion of its economic benefits. (Dkt. No. 93, FAC ¶ 122.)  Second, IQVIA Defendants interfered with Plaintiffs' economic relationship with

existing and potential customers, including its largest customer, Oman Insurance.  (*Id.* ¶ 123.)

Similar to the facts to support the second and fifth counts, the nucleus of facts to support IQVIA's interference with the JV is based on the same nucleus of facts as trade secret misappropriation and is preempted.  As to the second interference concerning disrupting the relationships with Plaintiffs' clients, the Court similarly concludes that the facts to support this claim is also intertwined with the trade secret misappropriation claim.  The FAC points to the loss of Oman Insurance as a customer as it was "lured by Dimensions' AIMS platform" and loss of existing and potential customers or altered relationships with current customers due to decreased pricing.  (*Id.* ¶¶ 125-26.)  In fact, the FAC specifically alleges "solicitation of Oman Insurance by Dimensions and IQVIA was based upon MedImpact's Trade Secrets and know-how, including, the technology itself, pricing structure and preferences."  (*Id.* ¶ 78.)  Similarly, the harm suffered under CUTSA also consists of revenue due to the loss of customers and potential customer contacts.  (*Id.* ¶ 196.)  Moreover, the only way Defendants were able to interfere with Plaintiffs' customer relationships was through the misappropriation of trade secrets.  *See Rovince Int'l Corp. v. Preston,* No. CV 13–3527 CAS (PJWx), 2013 WL 5539430, *5 (C.D. Cal. Oct. 7, 2013) (intentional inference with prospective business relationships claim displaced where the only wrongful conduct alleged by the FAC was misappropriation of trade secrets).

In addition, on the fourth claim for negligent interference with prospective economic relations, Defendants argue because of the absence of a "special relationship" between any IQVIA entity and Plaintiffs giving rise to a duty of care, the claim fails.  (Dkt. No. 107-1 at 20.)  Plaintiffs respond that they do not need to plead a duty of care and Defendants have been on clear notice of their claims for negligent interference with prospective economic advantage.  (Dkt. No. 111 at 22-23.)

Notwithstanding the issue of whether the FAC has sufficiently alleged a duty of care, the facts underlying the fourth claim for negligent interference with prospective

1   economic advantage claim that IQVIA Defendants interfered with JV Agreement
2   between MI-HK and Dimensions, and interfered with the relationships with Plaintiffs'
3   customers are the same as the third claim, and are necessarily preempted.  (*See* Dkt. No.
4   93, FAC ¶¶ 132-34.)  Accordingly, the Court GRANTS Defendants' motion to dismiss
5   the third and fourth claims.

6   ### 3.      Unfair Competition as to IQVIA

7          California's Unfair Competition Law prohibits any "unlawful, unfair or fraudulent
8   business act or practice." Cal. Bus. & Prof. Code § 17200.  "Each of these three
9   adjectives [unlawful, unfair or fraudulent] captures a separate and distinct theory of
10  liability."  *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation
11  marks omitted).  The UCL's coverage is broad, sweeping and embracing of anything that
12  can be properly called a business practice and at the same time forbidden by law.  *Cel–*
13  *Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

14         Here, the FAC alleges a violation of the unlawful prong of the UCL.  (Dkt. No. 93,
15  FAC ¶¶ 144-151.)  Under the "unlawful" prong, the UCL incorporates other laws and
16  treats violations of those laws as unlawful business practices independently actionable
17  under state law.  *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th
18  Cir. 2000) (citing *Cel–Tech Comms., Inc.*, 20 Cal. 4th at 180). Violation of almost any
19  federal, state or local law may serve as the basis for an "unlawful" UCL claim.  *Saunders*
20  *v. Superior Ct.*, 27 Cal. App. 4th 832, 838-39 (1994). "To state a cause of action based on
21  an unlawful business act or practice under the UCL, a plaintiff must allege facts sufficient
22  to show a violation of some underlying law."  *Prakashpalan v. Engstrom, Lipscomb and*
23  *Lack*, 223 Cal. App. 4th 1105, 1133 (2014) ("unlawful practices are practices 'forbidden
24  by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory or court-
25  made.'").  A claim under the UCL is displaced when it "relies on the same facts as the
26  misappropriation claim."  *K.C. Multimedia*, 171 Cal. App. 4th at 961; *see also Digital*
27  *Envoy, Inc. v. Google, Inc.,* 370 F. Supp. 2d 1025, 1035 (N.D. Cal. 2005) (unfair
28  competition and unjust enrichment claims were preempted).

Here, the UCL claim is based on the underlying causes of action for inducing breach of contract, intentional interference with prospective economic advantage, negligent interference with prospective economic advantage, and intentional interference with a contractual relationship, (Dkt. No. 93, FAC ¶ 147), that the Court has held to be preempted by CUTSA.  Therefore, those "unlawful acts" are also necessarily preempted by CUTSA.  *See K.C. Multimedia*, 171 Cal. App. 4th at 961.

Additionally, Plaintiffs claim that IQVIA Defendants also committed actual and constructive fraud pursuant to California Civil Code sections 1572, 1573 and deceit pursuant to California Civil Code sections 1709, 1710.  (Dkt. No. 93, FAC ¶ 148.)  The FAC alleges unlawful business acts or practices by "engaging in a scheme to acquire Dimensions and terminate the joint venture in order to steal the joint venture's customers and to sell pharmaceutical data without MedImpact's permission."  (*Id.* ¶ 147.)  These fraud claims are also based on the same allegations to support the claims for trade secret misappropriation and are therefore preempted.  (*See* Dkt. No. 93, FAC ¶¶ 148(a)-(i).)  Therefore, the Court GRANTS Defendants' motion to dismiss the UCL cause of action.

**4.     Seventh Cause of Action – Conspiracy as to all Defendants**

Defendants submit that the conspiracy claim is similarly intertwined with the alleged misappropriation of trade secret claim and theft of claims data.  (Dkt. No. 107-1 at 23.)  Plaintiffs argue that their conspiracy claim is based on Defendants' collusion to steal the JV customers which involved breaches of fiduciary duty and efforts to secure clients without MedImpact knowing.

Under California law, "[t]o state a cause of action for conspiracy, the complaint must allege (1) the formation and operation of the conspiracy, (2) the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or acts."  *Cellular Plus, Inc. v. Superior Ct.*, 14 Cal. App. 4th 1224 1236 (1993).

On the conspiracy count, the FAC alleges all Defendants conspired and agreed among themselves to "acquire Dimensions, gain access to an immense repository of pharmaceutical data, to develop and sell ICM and AIMS, compete against MIA's and

MHSI's PBM platform, enter into the PBM market without MedImpact, and sell the pharmaceutical data obtained from MedImpact's PBM."  (Dkt. No. 93, FAC ¶ 154.)  This conspiracy was furthered by *inter alia*, "building a competing PBM platform in order to steal customers from the MIA, and selling the pharmaceutical data obtained from MedImpact's PBM."  (*Id.* ¶ 156.)  These allegations support a claim for trade secret misappropriation which underlies the wrongful conduct for the conspiracy count as to IQVIA Defendants, and the Court GRANTS Defendants' motion to dismiss on the conspiracy claim as to IQVIA Defendants.

However, Plaintiffs' argument that the wrongful conduct involved breaches of fiduciary duty concern only Defendants Dr. Ghosheh and Sadana, as they both owed a fiduciary duty to MedImpact, as shareholder of MIA.  (Dkt. No. 111 at 21.)  To the extent Defendants did not move to dismiss the breach of fiduciary claim based on CUTSA preemption and there are facts alleged as to breach of fiduciary duty that could plausibly form an independent basis for a claim based on taking actions adverse to the interests of MIA, (Dkt. No. 93, FAC ¶¶ 110-11), the Court DENIES Defendants' motion to dismiss as to Dr. Ghosheh and Sadana on the conspiracy claim.  *See Ali v. Fasteners for Retail, Inc.*, 544 F. Supp. 2d 1064, 1070 (E.D. Cal. 2008) (where "facts can form an independent nucleus for a breach of fiduciary duty claim . . ., a CUTSA preemption finding is premature.").

## H.    Breach of Fiduciary Duty

Next, Defendants submit that Plaintiffs, or more specifically MI-HK, as the shareholder in MIA, lack standing to pursue a direct action, (Dkt. No. 107-1 at 25), while Plaintiffs claim that a direct shareholder action is proper, (Dkt. No. 111 at 23).

Corporate directors and officers owe a fiduciary duty to the corporation and its shareholders.  *Berg & Berg Enters., LLC v. Boyle*, 178 Cal. App. 4th 1020, 1037 (2009).  Shareholders may bring either "a *direct* action filed by the shareholder individually (or on behalf of a *class* of shareholders to which he or she belongs) for injury to his or her interest as a *shareholder*," or a "*derivative* action filed *on behalf of the corporation* for

*injury to the corporation* for which it has failed or refused to sue." *Schuster v. Gardner*, 127 Cal. App. 4th 305, 311 (2005) (emphasis in original) (citation omitted).

"An action is derivative if 'the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance of distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent the dissipation of its assets.'" *Id.* at 313. "An individual cause of action exists only if damages to the shareholders were not incidental to damages to the corporation." *Id.* "To determine whether shareholder claims are direct or derivative, [the court] must examine both who suffered the harm alleged—the shareholders or the corporation—and who would receive the benefit of any remedy." *Indiana Elec. Workers Pension Trust Fund, IBEW v. Dunn*, 352 Fed. App'x 157 (9th Cir. 2009) (unpublished).

Here, the FAC alleges that MI-HK and Dimensions are the two shareholders in the JV. (Dkt. No. 93, FAC ¶ 11.) The FAC alleges harm specifically to Plaintiffs and not to Dimensions. For example, IQVIA's acquisition of Plaintiffs' pharmaceutical claims data through Dimensions and subsequent sale to pharmaceutical companies in California alleges injuries suffered by Plaintiffs and not Dimensions. (*Id.* ¶¶ 10, 17, 110.) As Plaintiffs explain, MedImpact suffered injuries that were separate from the joint venture as it was the only shareholder kept in the dark about Defendants' fraudulent scheme and their injuries are separate and distinct. The Court concludes that Plaintiffs have sufficiently alleged facts to support a direct-action suit by MI-HK. Accordingly, the Court DENIES Defendants' motion to dismiss the breach of fiduciary duty cause of action.

## I.  Tenth Cause of Action - RICO

Defendants argue that the tenth cause of action fails to state a RICO claim because Plaintiffs have failed to allege facts sufficient to plead two or more predicate acts that caused the RICO injuries and failed to allege they have statutory standing to bring a RICO claim by failing to allege injuries that are "domestic" and "concrete." In contravention, Plaintiffs argues they have sufficiently pled numerous "predicate acts" and

1    established the required causal link between the RICO actions and the harm suffered by

2    Plaintiffs and they alleged injuries that are "domestic" and "concrete."

3         **1.    Predicate Acts**

4         The FAC asserts a claim of RICO conspiracy under 18 U.S.C. § 1962(d) for

5    violation of 18 U.S.C. 1962(c)[11].  (Dkt. No. 93, FAC ¶¶ 202-16.)

6         To state a claim under § 1962(c), a plaintiff must allege (1) conduct, (2) of an

7    enterprise, (3) through a pattern, (4) of racketeering activity (known as "predicate acts"),

8    (5) causing injury to the plaintiff's "business or property" by the conduct constituting the

9    violation.  *Living Designs, Inc. v. E.I. Dupont de Numours & Co.*, 431 F.3d 353, 361 (9th

10   Cir. 2005).  Under this section, the conduct must be the proximate cause of harm.

11   *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496-97 (1985).  Section 1962(d) makes

12   it "unlawful for any person to conspire to violate" § 1962(c).  18 U.S.C. § 1962(d).

13   Because the RICO claim sounds in fraud, Federal Rule of Civil Procedure 9(b) applies

14   and requires fraud to be pled with particularity.  *See* Fed. R. Civ. P. 9(b).  The allegations

15   of fraud must be "specific enough to give defendants notice of the particular misconduct

16   so that they can defend against the charge."  *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d

17   1097, 1106 (9th Cir. 2003) (internal quotation marks omitted).  This requires the plaintiff

18   to identify "the who, what, when, where, and how" of the alleged misconduct.  *Id.*

19        A "pattern of racketing" requires at least two acts of racketeering activity.  18

20   U.S.C. § 1961(5).  Predicate acts of racketeering activity mail fraud, 18 U.S.C. § 1341,

21   wire fraud, 18 U.S.C. § 1343, and theft of trade secrets, 18 U.S.C. §§ 1831, 1832.  *See* 18

22   U.S.C. § 1961(1).

---

[11] "(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  18 U.S.C. § 1962(c).

The FAC alleges two types of RICO predicates: 1) trade secret misappropriation under the DTSA and 2) mail and wire fraud.  (Dkt. No. 93, FAC ¶¶ 210(a)-(b).)  It pleads eleven particularized and separate material misrepresentations or omissions.  (*Id.*)

The parties do not dispute that a claim under trade secret misappropriation constitutes a predicate act but disagree on whether Plaintiffs have sufficiently alleged the second predicate act of mail or wire fraud.

A mail or wire fraud violation contains three elements: "(A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud." *Eclectic Props. East, LLC v. Marcus & Millichap Co*., 751 F.3d 990, 997 (9th Cir. 2014).  The gravamen of the offense is the scheme to defraud, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element," *Schmuck v. United States*, 489 U.S. 705, 712 (1989) (citation and internal quotation marks omitted), even if the mailing itself "contain[s] no false information." *Id.* at 715.

Defendants argue that the alleged affirmative misrepresentations were all objectively honest on their face and any suggestion of omissions fail because the FAC has failed to allege there was a duty to disclose any omitted information to support a RICO fraud scheme.  Second, Defendants aver that, even if the two alleged acts of mail or wire fraud survive, the FAC still fails to establish that any such act caused the injury Plaintiffs allege they suffered.  In response, Plaintiffs argue that Defendants' assertion that the affirmative misrepresentations were "objectively honest" is not appropriate on a motion to dismiss.  Next, on the alleged omissions, they assert that the FAC alleges that Dr. Ghosheh and Sadana had fiduciary duties to MedImpact and IQVIA Defendants by having exclusive knowledge of material facts not known to Plaintiffs, they had a duty to disclose those facts they actively concealed.  Finally, they claim the FAC sufficiently alleges proximate causation under RICO.

43

1    The Court agrees with Plaintiffs that Defendants' argument disputing the merits of

2 the affirmative misrepresentations is not appropriate on a motion to dismiss and not a

3 basis to dismiss the claim.

4    As to whether a duty to disclose must be alleged concerning the alleged omissions,

5 Defendants are correct that a RICO wire fraud claim based on an omission requires the

6 existence of an independent duty to disclose.[12]  *See United States v. Shields*, 844 F.3d

7 819, 822 (9th Cir. 2016) (concluding "that it was error to not instruct the jury that it must

8 find a relationship creating a duty to disclose before it could conclude that a material non-

9 disclosure supports a wire fraud charge.").  Relying on the broad definition of a duty to

10 disclose in *United States v. Milovanovic*, 678 F.3d 713, 722-24 (9th Cir. 2002), in

11 *Shields*, the Ninth Circuit  explained that "a relationship creating a duty to disclose may

12 be a formal fiduciary relationship, or an 'informal,' 'trusting relationship in which one

13 party acts for the benefit of another and induces the trusting party to relax the care and

14 vigilance which it would ordinarily exercise.'"  *Id.* (citing *In re Monnig's Dep't Stores,*

15 *Inc. v. Azad Oriental Rugs, Inc*., 929 F.2d 197, 201 (5th Cir. 1991) ("Confidential

16 relationships arise not only from technical fiduciary relationships, but also from

17 partnerships, joint ventures, and other informal relationships."); *United States v. Pappert,*

18 112 F.3d 1073, 1080 (10th Cir. 1997) ("[T]here is not a bright line between formal or

19 informal fiduciary relationships, and run-of-the-mill commercial relationships . . . .

20 [Courts] must carefully distinguish between those arms-length commercial relationships

21 where trust is created by the defendant's personality or the victim's credulity, and

22 relationships in which the victim's trust is based on defendant's position in the

23 transaction.")); *see also Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics,*

24 *Inc*., 818 F.2d 1466, 1472 (9th Cir. 1987) (alleged omissions cannot serve as the basis for

25 a federal claim of mail or wire fraud "[a]bsent an independent duty, such as a fiduciary

26

27

28 _____

[12] Plaintiffs rely on California law to analyze a duty to disclose but does not provide legal support that a
state law duty to disclose may be applied to a federal RICO claim.

1    duty or an explicit statutory duty.")  "Where there is a duty to disclose, an elaborate

2    coverup, a violation of a fiduciary duty, or the omission is accompanied by affirmative

3    misrepresentations, an omission can support a claim of mail or wire fraud."  *Brown v.*

4    *LaSalle Northwest Nat. Bank*, 820 F. Supp. 1078, 1081 (N.D. Ill. 1993).

5         Here, the FAC sufficiently alleges a duty to disclose based on the omission

6    allegations on the assertion that Dr. Ghosheh and Sadana, as board members of MIA, had

7    a fiduciary duty to MIA and owed fiduciary obligations to MedImpact as its shareholder.

8    (Dkt. No. 93, FAC ¶ 109.)  As to IQVIA Defendants, the FAC alleges an informal

9    trusting relationship between them and Plaintiffs whereby Defendants reached out to

10   Plaintiffs concerning the acquisition of Dimensions and lured them into believing that

11   IMS Health was interested in preserving the JV and therefore, MedImpact, relying on

12   these misleading assurances, succumbed and agreed to the acquisition.  (*Id.* ¶¶ 35-42.)

13   *See Shields*, 844 F.3d at 822 ("informal, trusting relationship in which one party acts for

14   the benefit of another and induces the trusting party to relax the care and vigilance which

15   it would ordinarily exercise").  Therefore, Plaintiffs have plausibly alleged two predicate

16   acts of racketeering activity.

17        Finally, as to causation, Defendants claim the FAC fails to establish that any such

18   act caused the injury Plaintiffs allege they suffered because the decreased revenues could

19   have been caused by other reasons such as a downtown in the market, a new unrelated

20   competitor or other factors.  Plaintiffs respond that their injuries were proximately caused

21   by Defendants' RICO conduct.

22        RICO provides civil remedies to a person injured "by reason of" the RICO

23   violation, 18 U.S.C. § 1964(c), which demands that the defendant's violation be a "but

24   for" causation and proximate cause of the injury to the plaintiff.  *See Holmes v. Sec.*

25   *Investor Protection Corp.*, 503 U.S. 258, 268 (1992) (RICO violation requires a

26   "showing that the defendant's violation not only was a 'but for' cause of his injury, but

27   was the proximate cause as well.").  "[T]he proximate-cause requirement generally bars

28   suits for alleged harm that is 'too remote' from the defendant's unlawful conduct."

1  *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 133 (2014).  Thus,

2  it "demand[s] . . . some direct relation between the injury asserted and the injurious

3  conduct alleged."  *Holmes*, 503 U.S. at 268; *Painters and Allied Trades District Council*

4  *82 Health Care Fund v. Takeda Pharms. Co*., 943 F.3d 1243, (9th Cir. 2019) (to establish

5  causation for purposes of RICO, a plaintiff must allege "some direct relation between the

6  injury asserted and the injurious conduct alleged.").

7       Here, the misappropriation of trade secret and the alleged mail and wire fraud

8  claims allege a direct injury to Plaintiff's revenue.  The FAC alleges that due to the RICO

9  enterprise of stealing Plaintiffs' trade secrets, Plaintiffs lost revenue by losing clients and

10  caused price erosion.  (Dkt. No. 93, FAC ¶¶ 214(a), (e).)  Specific clients they lost were

11  Oman Insurance as well as Vidal Health, ADNIC, MetLife, AXA and Aafiya.  (*Id.* ¶ 65.)

12  These are sufficient allegations to demonstrate the but for and proximate causation

13  between the conduct and alleged injury necessary to allege RICO injury.  Thus, the Court

14  DENIES Defendants' motion to dismiss on the failure to sufficiently allege predicate acts

15  and proximate causation.

16       **2.    RICO Statutory Standing**

17       First, Defendants argue that the Plaintiffs have failed to allege a concrete injury

18  through their allegations of (1) lost revenue from the JV passed through MIA to MIL and

19  ultimately consolidated in MHSI financial statements; (2) distribution of MHSI's

20  expected return on its investment of money and San Diego based resources, such as labor

21  to support MI-HK; (3) the negative impact on MHSI's profits resulting from its continued

22  use of resources to support MI-HK; (4) lost revenue due to Plaintiffs' compliance with

23  the JV Agreement precluding them from competing in the Territory; and (5) price erosion

24  wherever they compete with IQVIA and Dimensions, (FAC ¶¶ 214(a)-(f).)  (Dkt. No.

25  107-1 at 25-28.)   Plaintiffs respond that the RICO enterprise caused them to lose money

26  by interfering with their business relationships and by committing fraud and

27  misappropriating trade secrets.  (Dkt. No. 111 at 25-28.)

28

1    Civil RICO "creates a private civil cause of action that allows '[a]ny person injured

2 in his business or property by reason of a violation of section 1962' to sue in federal

3 district court and recover treble damages, costs, and attorney's fees." *RJR Nabisco, Inc.*

4 *v. European Cnty.*, 136 S. Ct. 2090, 2097 (2016) (quoting 18 U.S.C. § 1964(c)).  To

5 allege civil RICO standing under 18 U.S.C. § 1964(c), a "plaintiff must show: (1) that his

6 alleged harm qualifies as injury to his business or property; and (2) that his harm was 'by

7 reason of' the RICO violation." *Canyon Cnty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 972

8 (9th Cir. 2008) (citation omitted).  "[T]he plaintiff only has standing if, and can only

9 recover to the extent that, he has been injured in his business or property by the conduct

10 constituting the violation." *Sedima,* 473 U.S. at 496.  "Without a harm to a specific

11 business or property interest-a categorical inquiry typically determined by reference to

12 state law-there is no injury to business or property within the meaning of RICO." *Diaz v.*

13 *Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc).  In *Diaz*, the Ninth Circuit "held that

14 an injury is compensable under RICO if the injury constitutes "harm to a specific

15 business or property interest" and if the alleged business or property interest is cognizable

16 under state law. *Attia v. Google LLC*, Case No. 17-cv-06037-BLF, 2018 WL 2971049, at

17 *13 (N.D. Cal. June 13, 2018) (citing *Diaz*, 420 F.3d at 900).

18    In *Attia,* the district court concluded that both factors of *Diaz* were met.  First, the

19 claim for trade secret misappropriation alleged that Plaintiffs suffered an injury to

20 business or property recognized by state law.  *Id.* at *13.  Second, Plaintiffs alleged that

21 they were entirely barred from using their trade secrets after Google allowed them to be

22 published by the PTO in 2012.  *Id.* at *14; *but see Mattel, Inc. v. MGA Entm't, Inc*., 782

23 F. Supp. 2d 911, 1019 (C.D. Cal. 2011) (no concrete financial loss based solely on

24 plaintiff's loss of exclusive control over its confidential trade secrets).

25    In *Mattel*, district court rejected the plaintiff's arguments contending "(1) the loss

26 of exclusive use of confidential materials is per se concrete financial injury; (2) Mattel's

27 lost exclusive use of confidential materials resulted in lost market share and lost profits;

28 and (3) Mattel's lost exclusive use of confidential materials resulted in lost opportunity."

1    *Id.* at 1020.  As to lost market share and profits, the court concluded that there was no

2    causal link between the loss calculations and the injury to Mattel's property interest.

3    However, the court noted that financial loss could be established if there was evidence

4    about specific contracts, relationships, or sales that were negatively impacted by the

5    alleged misappropriation of Mattel's trade secrets.  *Id.*

6         Here, the Court agrees with Defendants that the alleged injury suffered in

7    paragraph 214 of the FAC are conclusory and do not connect the RICO enterprise with a

8    concrete injury.  However, allegations in the FAC do support RICO standing.  First,

9    "California recognizes a property interest in the confidentiality and exclusive use of trade

10   secret information"; therefore, Plaintiffs' allegation of trade secret misappropriation

11   resulted in loss of business or property.  *Mattel, Inc.*, 782 F. Supp. 2d at 1019.  As to a

12   specific injury, the FAC alleges specific contracts lost due to the trade secret

13   misappropriation with Oman Insurance as well as Vidal Health, ADNIC, MetLife, AXA

14   and Aafiya.  (Dkt. No. 93, FAC ¶¶ 58, 65.)   These are sufficient to demonstrate a

15   concrete financial loss.

16         Next, Defendants claim that Plaintiffs lack standing because they cannot allege a

17   domestic injury because any injury would be based on harm to MI-HK, a non-U.S.

18   subsidiary, who would have suffered as a result of its membership in the JV.  Disputing

19   Plaintiffs' argument that MI-HK suffered harm in the U.S. because it has its principal

20   place of business in San Diego, CA, Defendants note that the California Secretary of

21   State's records show that MI-HK is not registered to do business in California.  (Dkt. No.

22   107-1 at 27-28.)  Plaintiffs challenges Defendants' argument that a corporate entity

23   suffers economic harm in its principal place of business, relying on *Korea Trade Ins.*

24   *Corp. v. ActiveON, Inc*., Case No.: 17-CV-0811-WQH-MDD,  2018 WL 1281800, at *4

25   (S.D. Cal. Mar. 9, 2018), and Defendants point to no legal authority about the

26   significance of MI-HK not being registered to do business in California.  (Dkt. No. 111 at

27   25-26.)

28

In *RJR Nabisco, Inc*, 136 S. Ct. at 2099, the Court held that RICO's substantive prohibitions apply to conduct in foreign countries but the injury must have been suffered domestically as RICO does not allow for recovery for foreign injuries. *Id.* at 2111. One district court examined how courts since *RJR Nabisco* have interpreted "domestic injury", noting that many courts have found that the location of the plaintiff alleging the injury was relevant to the injury allegedly suffered by the plaintiff. *Korea Trade Ins. Co.*, 2018 WL 1281800, at *4 (collecting cases).

"Although a single rule has not yet emerged, there is 'a general consensus among the courts that . . . the location of a RICO injury depends on where the plaintiff 'suffered the injury'—not where the injurious conduct took place." *Unigestion Holdings, S.A. v. UPM Tech., Inc*., 412 F. Supp. 3d 1273, 1291 (D. Or. Sept. 3, 2019) (quoting *Humphrey v. GlaxoSmithKline PLC*, 905 F.3d 694, 702 (3d Cir. 2018)). The Seventh Circuit has held that, for intangible injuries, the place of injury for a corporation is its principal place of business. *Armada (Singapore) PTE Ltd. v. Amcol Int'l Corp*., 885 F.3d 1090, 1094–95 (7th Cir. 2018), while the Third Circuit applies a multi-factor test, *Humphrey*, 905 F.3d at 707 ("consideration of multiple factors . . .[such as] where the injury itself arose; the location of the plaintiff's residence or principal place of business; where any alleged services were provided; where the plaintiff received or expected to receive the benefits associated with providing such services; where any relevant business agreements were entered into and the laws binding such agreements; and the location of the activities giving rise to the underlying dispute.").

In this case, the Court need not determine which rule to apply as under either test, it is clear MI-HK, as a wholly owned subsidiary of MHSI, suffered injury in California which is in clear contrast to the facts in *Humphrey* and *Armada*. In *Humphrey*, it was clear that the injuries were suffered in China as "Plaintiffs lived in China; had their principal place of business in China; provided services in China (albeit to some American companies – but even they were operating in China); entered the Consultancy Agreement in China and agreed to have Chinese law govern it; met with Defendants' representatives

only in China; and themselves indicated on the civil cover sheet that the underlying incident arose in China. . . . Plaintiffs have not alleged that they possess offices, assets, or any other property in the United States." *Humphrey*, 905 F.3d at 707.  In *Armada*, the Seventh Circuit held that because the plaintiff's principal place of business is in Singapore, the harm was suffered there.  *Armada*, 885 F.3d at 1095.

MI-HK has a principal place of business in California, and the employees of MedImpact in San Diego support MI-HK's business.  (Dkt. No. 93, FAC ¶ 16.)  MHSI used San Diego-based resources to invest and support MI-HK in the joint venture.  (*Id.* 214(b), (c).)  As such, due to the RICO enterprise, Plaintiffs have suffered lost revenue that would have been realized in California.  (*Id.* ¶¶ 214(a).)  Accordingly, Plaintiffs have alleged a domestic injury.

The precedents cited by Defendants are inapposite as the plaintiff had no connection or injuries suffered in the United States.  In *Uthe Tech. Corp. v. Allen*, No. C 95-02377 WHA, 2016 WL 4492580, at *2 (N.D. Cal. Aug. 26, 2016), the court concluded there was no injury in the United States to Plaintiff where the business in question, its wholly-owned subsidiary, was in Singapore and the only injury was the diminution in the value of Uthe's one hundred percent stake in Uthe Singapore. Moreover in *Gusevs v. AS Citadele Banka*, Case No. 2:16-cv-03793-SVW-FFM, 2016 WL 9086931, at *7 (C.D. Cal. Sept. 8, 2016), the court concluded the complaint did not allege a domestic injury because the alleged injuries included losses on the lines of credit they obtained from a Latvian company, secured by property in Latvia and guaranteed by a resident of Latvia.  *Id.*  Moreover, even though one of the Plaintiff entities claims to have a principal place of business in the United States, the entity had no connection to the transactions or conduct alleged in the complaint.  *Id.*  Therefore, the court concluded that none of the injuries in question to businesses or properties appear to have occurred within the United States.  *Id.* at *8.

Accordingly, the Court DENIES Defendants' motion to dismiss the RICO cause of action.

50

**J.     Leave to Amend**

Where a motion to dismiss is granted, "leave to amend should be granted 'unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency.'" *DeSoto v. Yellow Freight Sys., Inc.,* 957 F.2d 655, 658 (9th Cir. 1992) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture* <u>Co.</u>, 806 F.2d 1393, 1401 (9th Cir. 1986)).  In other words, where leave to amend would be futile, the Court may deny leave to amend.  *See Desoto*, 957 F.2d at 658; *Schreiber,* 806 F.2d at 1401.

In their opposition, Plaintiffs request leave to amend if the Court granted dismissal of any claims noting that the first motion to dismiss under Rule 12(b)(6) was not addressed by the Court as it was denied as moot.  While the Court did not address the first motion to dismiss, Plaintiffs had the benefit of Defendants' arguments in that motion.  It is obvious that the FAC was amended in view of these arguments, particularly concerning CUTSA preemption.  The original complaint alleged that "[a]ll aspects of this case ultimately lead back to trade secrets and other valuable assets owned and protected in California, a deliberate scheme to target and exploit a California company, and damages suffered in California", (Dkt. No. 1, Compl. ¶ 61), and all the common law claims included facts addressing improper use of MedImpact's trade secrets and confidential information, (*id.* ¶¶ 102, 110, 115. 116, 120, 123, 125).  In response to arguments raised in Defendants' motion to dismiss, the FAC was drafted specifically to avoid CUTSA preemption.  For example, the FAC deleted paragraph 61 and added to each common law claim the following sentence: "Plaintiffs' claim for [common law claim] stands separate and independently from Plaintiffs' claims of trade secret misappropriation pled below, and is not based on the same nucleus of facts as the trade secret claims, as explained herein", (*id.* ¶¶ 114, 120, 130, 138, 145, 153), and removed any reference to "trade secrets" or "confidential information" from the common law claims.  Because Plaintiffs were given an opportunity to address CUTSA preemption in the FAC, the Court concludes it would be futile to grant them leave to amend.

Accordingly, the Court DENIES Plaintiffs' request for leave to file a second amended complaint.

**Conclusion**

Based on the above, the Court DENIES Defendants' motion to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction, and GRANTS in part and DENIES in part Defendants' motion to dismiss for failure to state a claim without leave to amend. Specifically, the Court GRANTS Defendants' motion to dismiss the second cause of action for inducing breach of contract, third cause of action for intentional interference with prospective economic advantage, fourth cause of action for negligent interference with prospective economic advantage, fifth cause of action for intentional interference with a contractual relationship, and sixth cause of action for unfair competition.  The Court also GRANTS Defendants' motion to dismiss the seventh cause of action for conspiracy as to IQVIA Defendants and DENIES it as to Defendants Dr. Ghosheh and Sadana.   Finally, the Court DENIES Defendants' motion to dismiss the first cause of action for breach of fiduciary duty, eighth cause of action for misappropriation of trade secret under DTSA, the ninth cause of action for misappropriation of trade secrets under CUTCA and tenth cause of action for RICO violations.

IT IS SO ORDERED.

Dated:  August 27, 2020

Hon. Gonzalo P. Curiel
United States District Judge

19cv1865-GPC(LL)