1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9             SOUTHERN DISTRICT OF CALIFORNIA

10

11  MEDIMPACT HEALTHCARE                    Case No.:  19cv1865-GPC(DEB)
    SYSTEMS, INC., a California corporation,
12  MEDIMPACT INTERNATIONAL LLC,            **ORDER GRANTING IN PART AND**
    a California limited liability company,  **DENYING IN PART DEFENDANTS'**
13  MEDIMPACT INTERNATIONAL                  **OMNIBUS MOTION FOR**
    HONG KONG LTD., a Hong Kong             **SUMMARY JUDGMENT**
14  company,
                                            [REDACTED - ORIGINAL]
15                                          **[FILED UNDER SEAL]**
                                Plaintiffs,
16
    v.                                      **[Dkt. No. 453.]**
17
18  IQVIA INC., a Delaware corporation,
    IQVIA LTD., a United Kingdom
19  company; IQVIA AG, a Swiss company,
    OMAR GHOSHEH, individually, and
20  AMIT SADANA, individually,
21
                                Defendants.
22

23

24        Before the Court is Defendants' omnibus motion for summary judgment.  (Dkt.

25  No. 453.)  Plaintiffs filed an opposition and Defendants replied.  (Dkt. Nos. 472, 530.)  A

26  hearing was held on June 17, 2022 and July 15, 2022.  (Dkt. Nos. 567, 590.)  Based on a

27  careful review of the briefs, the voluminous supporting record, the applicable law, and

28

hearing oral argument, the Court GRANTS in part and DENIES in part Defendants' motion for summary judgment.

## Procedural Background

On September 26, 2019, Plaintiffs Medimpact Healthcare Systems, Inc. ("MHSI"), Medimpact International LLC ("MIL"), and MedImpact International Hong Kong Ltd. ("MI-HK") (collectively "Plaintiffs" or "MedImpact") filed a Complaint against Defendants IQVIA Holdings, Inc., IQVIA Inc., IQVIA AG, Omar Ghosheh ("Dr. Ghosheh") and Amit Sadana ("Mr. Sadana") alleging twelve causes of action arising out of misappropriation of their trade secrets under federal and state law as well as other related claims. (Dkt. No. 1, Compl.) On March 24, 2020, the Court granted Defendants' motion to dismiss for lack of personal jurisdiction with leave to amend. (Dkt. No. 91.) On April 7, 2020, Plaintiffs filed the operative first amended complaint ("FAC"). (Dkt. No. 93.) The FAC alleges ten causes of action against Defendants IQVIA Ltd., IQVIA Inc., IQVIA AG ("IQVIA Defendants"), Dr. Ghosheh and Mr. Sadana (collectively "Defendants") for 1) breach of fiduciary duty; 2) inducing breach of contract; 3) intentional interference with prospective economic advantage; 4) negligent interference with prospective economic advantage; 5) intentional interference with a contractual relationship; 6) unfair competition; 7) conspiracy; 8) misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836; 9) misappropriation of trade secrets under California Uniform Trade Secrets Act ("CUTSA"), Cal. Civil Code § 3426.1(b); and 10) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). (*Id.*)

On August 27, 2020, the Court denied Defendants' motion to dismiss for lack of personal jurisdiction and granted in part and denied in part the motion to dismiss for failure to state a claim. (Dkt. No. 130.) After the court's ruling, the remaining claims are the first cause of action for breach of fiduciary duty and seventh cause of action for conspiracy against Dr. Ghosheh and Mr. Sadana, and eighth cause of action for misappropriation of trade secrets under the DTSA, ninth cause of action for

misappropriation of trade secrets under CUTSA, and tenth cause of action for RICO violations against all Defendants.  (Dkt. No. 130.)

Both parties then separately filed summary judgment motions on issue and/or claim preclusion based on a judgment in a prior arbitration with the Dubai International Financial Centre-London Court of International Arbitration ("DIFC-LCIA").  First, on March 2, 2021, Defendants sought partial summary judgment on issue and claim preclusion which the Court denied because they failed to demonstrate privity between Dimensions Healthcare LLC ("Dimensions"), a party to the Arbitration, and each IQVIA Defendant.  (Dkt. No 195.)  On May 14, 2021, the Court, on reconsideration, found that Defendants demonstrated privity but only as to Defendants IQVIA AG and IQVIA Inc., and not as to Defendants IQVIA Ltd., Dr. Ghosheh and Mr. Sadana.  (Dkt. No. 222.)  On August 19, 2021, the Court then denied Defendants IQVIA AG and IQVIA Inc.'s renewed motion for partial summary judgment on claim and issue preclusion for the "alleged theft and re-sale of Plaintiffs' pharmaceutical benefits management ("PBM") claims data" and "for already adjudicated customer account-based damages for the alleged misappropriation of Plaintiffs' PBM trade secrets."  (Dkt. No. 294 at 8.[1])

Subsequently, on March 10, 2022, Plaintiffs sought partial summary judgment on issue preclusion that "1) MedImpact's trade secrets used to build AIMS[2] are protectible; and 2) AIMS uses Plaintiffs' misappropriated trade secrets" as to IQVIA AG and IQVIA Inc, which the Court granted.[3]  (Dkt. No. 432 at 25.)  On June 24, 2022, the Court denied Defendants' motion for reconsideration of the March 10, 2022 order on issue preclusion.  (Dkt. No. 569.)  Now pending is Defendants' omnibus motion for summary judgment on the merits of the remaining causes of action in the FAC which is fully briefed.  (Dkt. Nos. 453, 472, 530.)

---

[1] Page numbers are based on the CM/ECF pagination.
[2] Adjudication Insurance Management System
[3] In that order, the Court also denied Plaintiffs' motion for partial summary judgment that IQVIA AG misappropriated Plaintiffs' trade secrets by providing AIMS to NUPCO-Wasfaty.  (Dkt. No. 432 at 26.)

**Factual Background**

Plaintiff MHSI provides services to health plans, third party administrators, self-funded employers and governments.  (Dkt. No. 510, Bennett Decl., Ex. 1, Partial Final Award on Liability ("Partial Final Award") ¶ 69 (UNDER SEAL).)  Its PBM platform "allows patients and dispensing pharmacies to obtain insurance approvals for prescribed medicines.  The PBM platform connects physicians, pharmacists and insurance payers to allow payers more efficiently to provide pharmacy benefits and care to patients. . . [and] provides online real-time insurance coverage giving approvals or denials for prescribed medicines based on proprietary clinical algorithms, complicated plan design rules and member eligibility. This provides time and cost efficiency, plus enhanced operational efficacy, for the healthcare sector." (*Id.* (UNDER SEAL).)  Plaintiff MIL is in the business of providing tailored PBM solutions, including informatics, to healthcare providers, insurers, employers and government.  (*Id.* ¶ 68 (UNDER SEAL).)

Non-party "Dimensions is a leading provider in the Middle East of healthcare software, information analytics and related services, and end-to-end technology solutions that help payers, providers, and regulators automate and optimize the way they interact with each other.  Dimensions has broad capabilities across all types of claims and authorizations (not restricted to pharmacy) and works with thousands of healthcare providers and payers in the Middle East." (*Id.* ¶ 70 (UNDER SEAL).)

On February 1, 2012, Dimensions and MIL entered into a Joint Venture Agreement ("JVA") creating MedImpact Arabia Limited ("MIA"), a Cayman corporation.  (Dkt. No. 545, Ds' Reply to SSUF, Nos. 85, 215; Dkt. No. 510-2, Bennett Decl., Ex. 13, JVA.)  On June 28, 2013, MIL assigned its rights and interest in the JVA to Plaintiff MI-HK.  (Dkt. No. 545, Ds' Reply to SSUF, No. 83.)

Plaintiff MIL is incorporated in California and Plaintiff MI-HK is incorporated in Hong Kong.  (*Id.*, Nos. 87, 88.)  Mr. Dale Brown ("Mr. Brown") was the Senior Vice President of MIL based in San Diego and was also the General Manager of the Joint Venture ("JV") in the United Arab Emirates ("UAE").  (*Id.*, No. 94.)

1    Defendant Dr. Ghosheh was a co-founder of Dimensions and became a board

2    member of the JV in 2012.  (*Id.*, No. 216.)  In early February 2016, Defendant IQVIA

3    AG acquired Dimensions.  (*Id*., No. 92.)  Defendant IQVIA AG is a Swiss company and

4    wholly owned by IQVIA Inc.  (*Id.*, No. 90.)  Defendant IQVIA Ltd. is a U.K. company

5    and wholly owned by IQVIA Inc.  (*Id.*, No. 89.)  Defendant Mr. Sadana is the General

6    Manager for Africa, Middle East and South Asia for IQVIA AG and has worked for

7    IQVIA AG and its predecessor in Dubai since around 2013.  (*Id.*, No. 191.)  After the

8    acquisition of Dimensions by IQVIA AG in February 2016, Mr. Sadana became a board

9    member for Dimensions and Chairman of the MIA.  (*Id.*, No. 192.)

10    In June 2017, Dr. Ghosheh and Mr. Sadana signed a contract to provide

11    Dimensions' AIMS to Oman Insurance.  (*Id.*, SSUF No. 237.)  On July 23, 2017, Mr.

12    Brown, while in San Diego, received a letter from Dr. Ghosheh providing notice that

13    Dimensions was terminating the JV without providing a reason.  (*Id*., SSUF, No. 239.)

14    On September 11, 2017, MedImpact representatives Dale Brown, Aaron Roberts, and

15    Steve Howe met with Alistair Grenfell, of IQVIA Ltd., and Yousef Ghosheh, of

16    Dimensions, in London regarding the termination of the JV.  (*Id.*, SSUF, No. 243.)  A JV

17    board meeting in Dubai was held the next day on September 12, 2017 where Mr. Sadana

18    and Dr. Ghosheh attended.  (*Id.,* SSUF, No. 245.)  It was not until October 2017 that

19    MedImpact learned about Dimensions' AIMS and that Defendants were using it to

20    replace the MIA's PBM platform.  ((Dkt. No. 472-2, Brown Decl. ¶ 19; Dkt. No. 510,

21    Bennett Decl., Ex. 1, Partial Final Award ¶ 84 (UNDER SEAL).)

22    According to Plaintiffs, beginning in 2015 and at least to late 2017, Dimensions

23    secretly developed its AIMS, a competing platform similar to MedImpact's PBM, using

24    Medimpact's trade secret and confidential information.  They claim that IQVIA AG and

25    Dimensions stole a number of joint venture clients by offering AIMS to replace the PBM

26    platform.  Once Defendants successfully developed and sold AIMS, Dimensions

27    terminated the JVA on July 23, 2017.

28    */ / /*

**A.      International Arbitration in Dubai**

Due to Dimensions' conduct in developing AIMS, a misappropriated product, and selling it to the joint venture clients in violation of the JVA and related Services and License Contract ("SLC"), on January 23, 2018, Plaintiffs MIL and MI-HK filed claims in arbitration against Dimensions with the Dubai International Financial Centre-London Court of International Arbitration ("DIFC-LCIA") seeking relief against Dimensions for a number of breaches of the JVA and SLC and misappropriation of trade secret under U.S., English and UAE Law.  (Dkt. No. 491-8, Swedlow Decl., Ex. 14, Partial Final Award (UNDER SEAL).)  On April 16, 2019, the Arbitral Tribunal issued a Partial Final Award on Liability in favor of MIL and MI-HK.  (*Id.* (UNDER SEAL).)  On July 24, 2019, the Arbitrator issued a Final Award on damages.  (*Id.*, Ex. 15, Final Award (UNDER SEAL).)  He ordered a permanent injunction and ordered Dimensions to pay MIL and MI-HK ██████████ in damages, $██████████ for legal costs and AED ██████████ in Arbitration costs.  (*Id.*, Final Award ¶ 107 (UNDER SEAL).)  On April 20, 2021, pursuant to the parties' joint motion for entry of judgment, this Court confirmed the international arbitration award pursuant to 9 U.S.C. § 207 and final judgment was entered.  (Case No. 21cv193-GPC(DEB), Dkt. No. 22.)

**Discussion**

**A.      Legal Standard on Motion for Summary Judgment**

Federal Rule of Civil Procedure ("Rule") 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact. *Celotex Corp.,* 477 U.S. at 323. The moving party can satisfy its burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324. If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law. *Id.* at 325. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party." *Fontana v. Haskin,* 262 F.3d 871, 876 (9th Cir. 2001). The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact. *Anderson*, 477 U.S. at 255.

**B.    Preclusion on DTSA and CUTSA Causes of Action**

Defendants posit that the DTSA and CUTSA claims are barred by (1) claim preclusion because the prior arbitration and current case arise out of the same transactional nucleus of facts and (2) issue preclusion because the same avoided costs theory of damages were raised in both cases, and were actually and necessarily decided in the arbitration. (Dkt. No. 453-1 at 25-27.)

The doctrines of claim and issue preclusion preclude parties from raising matters that they had a full and fair opportunity to litigate and protect against "the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions." *Taylor v. Sturgell,* 553 U.S. 880, 892 (2008) (quoting *Montana v. United States*, 440 U.S. 147, 153-54 (1979)). Under claim preclusion, a final judgment bars "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). In contrast, issue preclusion prevents "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim." *Id.* (quoting *New Hampshire*, 532 U.S. at 748-49).

In other words, "[c]laim preclusion precludes relitigation of claims that were raised or should have been raised in earlier litigation" while "[i]ssue preclusion . . . forecloses relitigation of factual or legal issues that have been actually and necessarily decided in earlier litigation." *San Remo Hotel, L.P. v. S.F. City & Cnty.*, 364 F.3d 1088, 1094 (9th Cir. 2004). The party asserting preclusion "must carry the burden of establishing all necessary elements." *Taylor*, 553 U.S. at 907 (2008) (quoting 18 Wright & Miller, Federal Practice and Procedure § 4405, at 83 (2d ed. 2002)).

### 1.    Claim Preclusion as to DTSA and CUTSA

"[C]laim preclusion prevents parties from raising issues that could have been raised and decided in a prior action—even if they were not actually litigated. If a later suit advances the same claim as an earlier suit between the same parties, the earlier suit's judgment 'prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'" *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1595-96 (2020) (quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979)). The claim preclusion factors are "(1) an identity of claims, (2) a final judgment

on the merits, and (3) privity between parties." *V.V.V. & Sons Edible Oils Ltd. v. Meenakshi Overseas, LLC,* 946 F.3d 542, 545 (9th Cir. 2019) (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1077 (9th Cir. 2003) (internal quotation marks omitted)).

The elements of a misappropriation claim under the DTSA requires the plaintiff to prove "(1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Global Holdings, Inc*., 978 F.3d 653, 657-58 (9th Cir. 2020) (citing 18 U.S.C. § 1839(5)).   An analysis on CUTSA is "substantially similar" to the DTSA.  *Id.* at 657; *compare* 18 U.S.C. § 1839(5), *with* Cal. Civ. Code § 3426.1(b); *see also Deerpoint Grp., Inc. v. Agrigenix, LLC*, 345 F. Supp. 3d 1207, 1228 (E.D. Cal. 2018) (interpreting "DTSA claims consistently with its CUTSA claims").

In assessing whether there is an "identity of claims", the Ninth Circuit directs courts to look at four factors which are not to be applied mechanistically:

> (1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions.

*Mpoyo v. Litton Electro-Optical Sys*., 430 F.3d 985, 987 (9th Cir. 2005) (citation omitted).  While all four factors are considered, "[r]eliance on the transactional nucleus element is especially appropriate because the element is 'outcome determinative.'" *ProShipLine Inc. v. Aspen Infrastructures LTD*, 609 F.3d 960, 968 (9th Cir. 2010) (quoting *Mpoyo,* 430 F.3d at 988).  "Whether two events are part of the same transaction or series depends on whether they are related to the same set of facts and whether they could conveniently be tried together." *Media Rights Techs., Inc. v. Microsoft Corp*. 922 F.3d 1014, 1027 (9th Cir. 2019) (quoting *Western Sys., Inc. v. Ulloa*, 958 F.2d 864, 871

(9th Cir. 1992) and citing Restatement (Second) of Judgments § 24 (1982) ("What factual grouping constitutes a 'transaction', and what groupings constitute a 'series', are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.")).  "If the harm[s] arose at the same time, then there was no reason why the plaintiff could not have brought [both] claim[s] in the first action. The plaintiff simply could have added a claim to the complaint." *Id.* (quoting *Howard*, 871 F.3d at 1039).  In contrast, "'[i]f the harm[s] arose from different facts,' then a party is not obligated to bring both claims on pain [sic] of preclusion." *Id.*  As the United States Supreme Court recently confirmed "[s]uits involve the same claim (or cause of action) when they aris[e] from the same transaction, or involve a 'common nucleus of operative facts.'" *Lucky Brand Dungarees, Inc.*, 140 S. Ct. at 1595.  Where two claims are grounded in different conduct, different subject and different times, they do not share a "common nucleus of operative facts." *Id.*

Here, Defendants contend that Plaintiffs' trade secret claims are barred because the claims in the prior arbitration and this case arise out of the same transactional nucleus of facts and produced an arbitral ruling which denied Plaintiffs any recovery of damages. (Dkt. No. 453-1 at 26.)  According to Defendants, the issues the Court already ruled on that "MedImpact's trade secrets used to build AIMS are protectible" and "AIMS uses Plaintiffs' misappropriated trade secrets," involve the same transactional nucleus of facts as the Arbitration.  (*Id.* at 26-27.)  Further because the Arbitrator considered and rejected the same "avoided costs" damages theory that Plaintiffs seek in the case, the DTSA and CUTSA claims are barred.  (*Id.*)  Plaintiffs respond that because Defendants have engaged in continuing misappropriating conduct after the Arbitration, the cases do not arise out of the same transactional nucleus of facts, and claim preclusion does not apply. (Dkt. No. 472 at 18.)  Additionally, Plaintiffs maintain that a jurisdictional exception applies that bars claim preclusion in this case.  (*Id.* at 20.)

The parties do not dispute there has been a final judgment on the merits and the Court determined there was privity between Dimensions and Defendants IQVIA AG and IQVIA Inc.  As it relates to "avoided costs", the issue in dispute is whether there is an "identity of claims" in this case and in the Arbitration on the avoided costs theory of damages.[4]

Defendants assert that the DTSA and CUTSA claims are barred because they arise out of the same transactional nucleus of facts as the Statutory IP Claim[5] in the Arbitration because Plaintiffs sought the same "avoided costs" theory of damages, relying on the same expert as in this case.  (Dkt. No. 453-1 at 26.)  True, the alleged trade secret and misappropriation based on AIMS in both cases arise from the same transactional nucleus of facts, yet Defendants fail to account for the alleged misappropriating conduct after the Arbitration award which is distinct from conduct pre-Arbitration.

During the Arbitration, MIL sought damages caused by the Dimensions' misappropriation based on an "avoided costs" theory.  (Dkt. No. 491-8, Swedlow Decl., Ex. 14, Partial Final Award ¶ 90(d).)  According to MIL, "[t]hese avoided costs can come in the form of savings in research and development (R&D) costs.  Dimensions has been unjustly enriched by the amount of R&D expense it was able to avoid."  (Dkt. No. 491-7, Swedlow Decl., Ex. 13 at 38-39 (UNDER SEAL).)  In support, MIL relied on the witness statement of Mr. Vasudeva Bobba, Vice President of Application Development and

---

[4] The Court observes that a separate issue preclusion question exists as to whether the PBM platform in the instant case is essentially the same as the AIMS platform that was found to have misappropriated Plaintiffs' trade secrets. *Cf., Hallco v. Foster*, 256 F.3d 1290, 1295-96 (Fed. Cir. 2001) (in patent litigation, earlier judgment operated to bar a challenge to validity of patent claims at issue if accused device was essentially the same as the previous device admitted to infringe); *TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882-84 (Fed. Cir. 2011) (in patent contempt proceedings, inquiry focuses on whether there exists colorable differences between the newly accused product and the adjudged infringing product). This order does not decide this question which remains undecided.

[5] The Arbitration Tribunal referred to the claims for breaches of Articles 10.1 and 11.1 of the JVA and Article 9.2 of the SLC as the "Contractual IP Claim" and the misappropriation of MedImpact's intellectual property rights under U.S., English and UAE law as the "Statutory IP Claim."  (Dkt. No. 491-8, Swedlow Decl., Ex. 14, Partial Final Award ¶¶ 97(2)(iii) & (iv) (UNDER SEAL).)

19cv1865-GPC(DEB)

former Director of IT and International at MedImpact, dated January 12, 2019, concerning the calculations of the avoided costs theory.  (*Id.* at 38 (UNDER SEAL).)  Defendants argue that similarly, in this case, Plaintiffs' damages expert James E. Malackowski relied on the same calculations presented in Mr. Vasudeva Bobba's witness statement and estimated that the amount to create a PBM in the UAE without Plaintiffs' trade secrets to support unjust enrichment was in the range of ████████ ████.  (Dkt. No. 491-23, Swedlow Decl., Ex. 29 at 85 (UNDER SEAL).)

The Arbitrator ruled in favor of MIL and MI-HK on the Contractual IP Claims and awarded damages and imposed an injunction barring Dimensions "from selling, offering for sale, using, disclosing or transferring, . . . AIMS . . . ."  (Dkt. No. 491-9, Swedlow Decl., Ex. 15, Final Award at 38-39 (UNDER SEAL).)  On the Statutory IP Claims, because Dimensions was left without an asset, "which it ought to pay for", the Arbitrator concluded that it would not meet the justice of the case and denied recovery on the additional form of damages of "avoided costs."  (Dkt. No. 491-9, Swedlow Decl., Ex. 14, Partial Final Award ¶ 179 (UNDER SEAL).)

On the other hand, in this case, Plaintiffs seek unjust enrichment based on Defendants' continued misappropriation of Plaintiffs' trade secrets in violation of the injunction imposed by the Arbitrator.[6]  (Dkt. No. 472 at 17-18.)  Therefore, because the instant claims concern conduct after the arbitration, they could not have been asserted at the arbitration because the facts were not yet in existence.  In *Lawlor*, the United States Supreme Court held, in a case involving res judicata or claim preclusion, that even though both cases concerned "the same course of 'wrongful conduct'", the continued wrongful conduct may give rise to more than one cause of action.  *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955) (no bar "whether the defendants' conduct be

---

[6] In fact, Defendants, in prior briefing, agreed that post-Arbitration conduct and IQVIA's acquisition of Dimensions had not been previously litigated.  (Dkt. No. 271 at 2.)  The Court agreed and ruled that issue and claim preclusion could not apply to separate conduct of IQVIA Defendants that involved post-arbitration actions.  (Dkt. No. 294 at 13.)

regarded as a series of individual torts or as one continuing tort."); 18 Charles Alan Wright et al., Federal Practice & Procedure § 4409 (3d ed. 2018) ("A substantially single course of activity may continue through the life of a first suit and beyond. The basic claim-preclusion result is clear: a new claim or cause of action is created as the conduct continues."); *Media Rights Techs*., 922 F.3d at 1021-22.

Because Plaintiffs' claims concern continuing post-arbitration misconduct, these are new claims with new injuries grounded in different conduct and different times. *See* Restatement (Second) of Judgments § 24 cmt. b ("Among the factors relevant to a determination whether the facts are so woven together as to constitute a single claim are their relatedness in time, space, origin, or motivation, and whether, taken together, they form a convenient unit for trial purposes"); *Howard v. City of Coos Bay*, 871 F.3d 1032, 1040 (9th Cir. 2017) ("Howard's retaliation claims in this suit arose from events that occurred after she filed her complaint in *Howard I*, and they are not barred by claim preclusion."); *Frank v. United Airlines, Inc*., 216 F.3d 845, 851 (9th Cir. 2000) ("A claim arising after the date of an earlier judgment is not barred, even if it arises out of a continuing course of conduct that provided the basis for the earlier claim."); *TechnoMarine SA v. Giftports*, Inc., 758 F.3d 493, 502 (2d Cir. 2014) ("TechnoMarine's trademark infringement claim is not barred by claim preclusion because Giftports allegedly committed new instances of trademark infringement after the settlement, so that the present claim, to the extent based on the new acts of infringement, was not and could not have been litigated in the earlier proceeding.").  Because Defendants' alleged continued misappropriation of trade secrets could not have been presented to the arbitrator, the claims are not barred by claim preclusion.

In view of the ongoing nature of the alleged misappropriation, unjust enrichment may still a viable theory of damages under the DTSA and CUTSA for post-arbitration

conduct and the Court DENIES Defendants' motion for summary judgment on the DTSA and CUTSA causes of action based on claim preclusion.[7]

### 2.    Issue Preclusion

Defendants also argue that even if claim preclusion does not apply, issue preclusion bars the avoided costs theory because it was actually and necessarily decided in the arbitration and is identical to the avoided costs theory in this case.  (Dkt. No. 453-1 at 27.)  Plaintiffs argue that the Tribunal did not necessarily decide the avoided costs theory and the issues are not identical.  (Dkt. No. 472 at 21-22.)

Issue preclusion prevents "'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment,' even if the issue recurs in the context of a different claim."  *Taylor*, 553 U.S. at 892 (quoting *New Hampshire*, 532 U.S. at 748-49).  On the issue of whether a question, issue or fact was "actually litigated", the Ninth Circuit articulated four conditions that must be met: "'(1) the issue at stake was identical in both proceedings; (2) the issue was actually litigated and decided in the prior proceedings; (3) there was a full and fair opportunity to litigate the issue; and (4) the issue was necessary to decide the merits.'"  *Janjua v. Neufeld*, 933 F.3d 1061, 1065 (9th Cir. 2019) (quoting *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012), *as amended* (May 3, 2012)).  "[A]n issue is actually litigated when an issue is raised, contested, and submitted for determination."  *Id*. at 1066 (citing Restatement (Second) of Judgments § 27, cmt. (d) (1982) ("When an issue is properly raised, by the pleadings or otherwise, and is submitted for determination and is determined, the issue is actually litigated. . . .").

---

[7] In opposition, Plaintiffs argue that even during the arbitration, the Tribunal was not presented with evidence concerning projects for ▮▮▮▮▮▮▮▮, a fact disputed by Defendants.  (Dkt. No. 545, Ds' Reply to SSUF, No. 259 (UNDER SEAL).)  Since these claims were not raised or addressed in the prior arbitration, these projects are also not subject to preclusion.

Here, the Court agrees with Defendants that the avoided costs theory of damages to support the Statutory IP Claims was actually litigated and decided by the Arbitrator. (*See* Dkt. No. 491-8, Swedlow Decl., Ex. 14, Partial Final Award ¶ 179 (UNDER SEAL).) The remaining question is whether the damage issues and supporting facts are the same in the instant case as those decided by the arbitrator. The Court finds the issues at stake are not identical in both proceedings. The Arbitrator denied an "avoided costs" award of damages because they would not "meet the justice of the case". MIL and MI-HK were denied an additional remedy on the Statutory IP Claim because the injunction required Dimensions and any Affiliate[8] as defined in the JVA,[9] to cease selling, offering for sale, using, disclosing or transferring AIMS so that Dimensions was left without an asset to pay for and MIL and MI-HK were awarded $██████ in damages. In contrast, in this case, Plaintiffs allege that Defendants have ignored the injunction by their continued use of AIMS, and have essentially held onto and improperly used Plaintiffs' trade secrets throughout the time following the arbitration award. Because the issues at stake in both proceedings are not identical, the Court DENIES Defendants' motion for summary judgment on the avoided costs theory of damages based on issue preclusion.

## C.   Claims Data Allegation

Defendants next move for judgment on the claims data allegations arguing that they lawfully had access to the claims data from the Dubai Health Authority ("DHA"), the owner of the claims data, a year before it acquired Dimensions. (Dkt. No. 453-1 at 29.) Second, they contend that the requested $██████ damages assessed by Plaintiffs' expert Mr. Malackowski is flawed. (*Id.* at 29-30.) Plaintiffs oppose arguing the claims data, themselves, are not trade secrets, but use of the claims data generated

---

[8] The Final Injunction also directed Dimensions to "immediately inform IQVIA, Inc., IQVIA Holdings, Inc. and IQVIA AG, and all subsidiaries of Dimensions of the orders contained in this injunction." (Dkt. No. 491-9, Swedlow Decl., Ex. 15, Final Award, App'x at 38 (UNDER SEAL).)

[9] Under the JVA, affiliate is defined, in relevant part, as "in the case of any other Person, a Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with, the Person specified." (Dkt. No. 510-2, Bennett Decl., Ex. 13, JVA 1.4 at 223.)

using MedImpact's PBM technology, a trade secret, constitute trade secret misappropriation.  (Dkt. No. 472 at 24-25.)  Plaintiffs maintain that Defendants violated the trade secret statutes by selling claims data generated by their PBM technology when Dimensions and IQVIA entered into the Collaborative Agreement whereby IQVIA would purchase "de-identified" data from Dimensions and then sold it.  (*Id.* at 25.)  Further, Plaintiffs argue that the DHA, as a non-owner of the trade secrets, does not have authority to provide consent for the use of MedImpact's trade secrets and it does not matter if Dimensions sent the data to the DHA before providing it to IQVIA.  (*Id.* at 25.)

On May 3, 2012, the ███████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████. (Dkt. No. 491-37, Swedlow Decl., Ex. 43[10] at 504 (UNDER SEAL).)  The eClaimLink software created the Dubai Health Post Office, a centralized health data exchange system in Dubai.  (Dkt. No. 453-5, Swedlow Decl., Ex. 2.)  During the pending litigation, on November 15, 2021, the DHA emailed Dimensions stating:

_____

[10] Plaintiffs filed an objection to Exhibits 43-46, 59-60 and 66-98 of Swedlow's declaration for lack of authentication under Federal Rule of Evidence 901 and 902. (Dkt. No. 472-2.)  In reply, Defendants argue they have sufficiently authenticated the exhibits. (Dkt. No. 545 at 118-19 (UNDER SEAL).)  However, in the abundance of caution, Defendants submit the declarations of Dr. Omar Ghosheh, Harvey Ashman, and Farah Shaikh to further authenticate each of the exhibits.  (Dkt. No. 545 at 130-41.)  Accordingly, because Defendants have now authenticated these exhibits, the Court overrules Plaintiffs' objections to the exhibits identified in Swedlow's declaration.

███████████████████████████████ e owner of all of the data generated by the Dimensions' solutions.

(Dkt. No. 491-38, Swedlow Decl., Ex. 44 (UNDER SEAL).)  In addition, the renewal of the license agreement, the Contract Annex, provides that the intellectual property rights include ███████████████████████████████████ ██████████████████████ belong to the DHA.  (Dkt. No. 491-39, Swedlow Decl., Ex. 45 at 8 (UNDER SEAL).)

In discovery, MedImpact stated " ████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████████." (Dkt. No. 491-28, Swedlow Decl., Ex. 34 at 37-38 (UNDER SEAL).)  MedImpact understood ██████████████████████████████████ ███████████████████████████████████████.  (*Id.* at 38 (UNDER SEAL).)  The ███████████████████████ ███████████████████████████████████████." (*Id.* (UNDER SEAL).)  At his deposition, Mr. Dale Brown, former President of MI-HK, MHSI, and Senior Vice President and former director of MIL,[11] acknowledged █████████ ███████████████████████████████████████ ████████████████████████████████████ Dkt. No. 491-15, Swedlow Decl., Ex. 21, Brown Depo. at 48:18-49:13 (UNDER SEAL).)

On February 4, 2015, a year before the acquisition of Dimensions by IQVIA, ███████████████████████████████████████ ███████████████████████████████████████

_____

[11] (Dkt. No. 472-7, Brown Decl. ¶ 1.)

1   ██████████.[12]  (Dkt. No. 491-40, Swedlow Decl., Ex. 46 (UNDER SEAL); Dkt. No.

2   545, Ds' Reply SSUF, Nos. 118, 273 (UNDER SEAL).)  According to this Agreement,

3   ████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████

5   ██████  (Dkt. No. 491-40, Swedlow Decl., Ex. 46, Collaboration Agreement ¶ 11 at 10

6   (UNDER SEAL).)

7           Plaintiffs argue that despite the DHA's authority, Dimensions did not have the

8   authority to enter into the ██████████████████████████████████████

9   ██████████████████████████████  (Dkt. No. 472 at 25.)  According

10  to the JVA, dated February 1, 2012, the parties agreed that "████████████████

11  ████████████████████  ████████  ████████████████

12  ████████████████████████████████████████████████████████

13  ████████████████████████████████████████████

14  ██████████████████████."  (Dkt. No. 510-2, Bennett Decl., Ex. 13,

15  JVA ¶ 7.3.1 at 231 (UNDER SEAL).)  Plaintiffs maintain that the ██████████

16  ██████████ was an illegal contract because it was contrary to the DTSA and CUTSA.

17  (*Id.*)  However, Plaintiffs' reliance on *VIA Techs., Inc. v. ASUS Computer Int'l*,

18  14cv3586, 2015 WL 3809382, at *4 (N.D. Cal. June 18, 2015) does not support their

19  position.  In that case, the district court concluded that the plaintiffs had stated a claim

20  under CUTSA because "marketing goods that embody the trade secret constitutes use of

21  the trade secret."  *Id.*  In this case, Plaintiffs allege use of non-protectable claims data

22  generated from a trade secret, and not that the trade secret, itself, was embedded in a

23  product that was subsequently sold.  As Plaintiffs argue, misappropriation of trade secret

---

[12] "De-identified data is patient-level data with the patient's personal identifying information removed."
(Dkt. No. 472-7, Brown Decl. ¶ 27.)

[13] "**Service Providers** means together MIL and Dimensions and 'Service Provider' shall mean either
one of them."  (Dkt. No. 510-2, Bennett Decl., Ex. 13, JVA ¶ 1.1 at 228 (UNDER SEAL).)

19cv1865-GPC(DEB)

involves "use" of the trade secrets, not use of non-protectable data generated from a trade secret.

To the extent Plaintiffs seek misappropriation of trade secrets concerning the claims data, Defendants reply that because Plaintiffs did not take measures to protect their claims data trade secret, a claim for trade secret misappropriation fails.  The Court agrees.

Trade secret misappropriation requires that the plaintiff possess a trade secret.  *See InteliClear, LLC*, 978 F.3d at 657-58 (citing 18 U.S.C. § 1839(5).)  "[T]rade secret" is defined as "all forms and types of financial, business, scientific, technical, economic, or engineering information . . .  [that] (A) *the owner thereof has taken reasonable measures to keep such information secret*; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (emphasis added).

A plaintiff bringing a misappropriation of trade secrets claim must show "a substantial element of secrecy . . . so that, except by the use of improper means, there would be difficulty in acquiring the information." *Walker v. Univ. Books, Inc*., 602 F.2d 859, 865 n.2 (9th Cir. 1979).  "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." *Ruckelshaus v. Monsanto Co*., 467 U.S. 986, 1002 (1984); *see HiRel Connectors, Inc. v. United States*, No. CV01-11069 DSF VBKX, 2006 WL 3618011, at *8 (C.D. Cal. Jan. 25, 2006) ("[a]ny information given from HiRel to Hughes that was not subject to a confidentiality agreement is not information that HiRel can claim as a trade secret.")).  Similarly, under California law, misappropriation cannot occur if someone "discloses his trade secret to others who are under no obligation to protect the confidentiality of the information." *Altavion, Inc. v. Konica Minolta Sys. Lab., Inc*., 226 Cal. App. 4th 26, 57 (2014).

Here, Mr. Brown acknowledged that per UAE's governmental regulations,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████.  (Dkt. No. 545, Swedlow Decl., Ex. 101, Brown Depo.

at 28:25-29:12; 30:21-33:10 (UNDER SEAL).)  He further testified that ████████

████████████████████████████████████████████████████████████

██████████████████████████████████ (*Id.* at 33:17-25 (UNDER

SEAL).)  Accordingly, Plaintiffs have failed to create a genuine issue of material fact that

they possessed a trade secret by taking reasonable measures to keep the claims data

secret.  Thus, the Court GRANTS Defendants' motion for summary judgment on the

claims data allegations.  Because the only claims against IQVIA Inc. are the claims data

allegations, (Dkt. No. 453-1 at 11; Dkt. No. 472 at 28), and these allegations have been

dismissed, the Court also DISMISSES IQVIA Inc. as a defendant.

**D.    Specific Personal Jurisdiction**

Defendants move for summary judgment that the Court lacks specific personal

jurisdiction over Dr. Ghosheh and Mr. Sadana.[14]  (Dkt. No. 453-1 at 40-48.)  Plaintiffs

respond that the Court has specific personal jurisdiction over the individual defendants.

(Dkt. No. 472 at 26-33.)

At summary judgment, the plaintiff bears the full burden of proving personal

jurisdiction exists by preponderance of the evidence, as if the case had gone to trial.

*Haisten v. Grass Valley Med. Reimbursement Fund, Ltd*., 784 F.2d 1392, 1396 & n. 1

(9th Cir. 1986).  On summary judgment, the Court must view the evidence "in the light

most favorable to the party opposing the motion", in this case, Plaintiffs, and "may find

personal jurisdiction only if no genuine issue of material fact remains that [the plaintiff]

has established personal jurisdiction by a preponderance of the evidence." *Stewart Title*

---

[14] Defendants also move for summary judgment for lack of specific personal jurisdiction over IQVIA Inc. but the Court has dismissed it as a defendant because no claims against it remain.

*of Nevada, Inc. v. Haenisch*, No. 206CV–00966PMP–RJJ, 2006 WL 3717419, at *3 (D. Nev. Dec. 14, 2006) (citing *Haisten*, 784 F.2d at 1396 & n. 1); *see Data Disc, Inc. v. Sys. Tech. Assoc's, Inc.*, 557 F.2d 11280, 1285 n.2 (9th Cir, 1977) ("Of course, at any time when the plaintiff avoids a preliminary motion to dismiss by making a prima facie showing of jurisdictional facts, he must still prove the jurisdictional facts at trial by a preponderance of the evidence.").

Specific jurisdiction exists when a case "aris[es] out of or relate[s] to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8 (1984). The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant "focuses on 'the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore,* 571 U.S. 277, 284 (2014). Specific jurisdiction is limited to ruling on "issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S, 915, 919 (2011) (citation omitted). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the States." *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1771, 1781 (2017). A court must look "to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. Therefore, "mere injury to a forum resident is not a sufficient connection to the forum." *Id.* at 290. Rather, "an injury is jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." *Id.* Specifically, a court may exercise specific jurisdiction over a defendant only where "the defendant's suit-related conduct" "create a substantial connection with the forum [s]tate." *Williams v. Yamaha Motor Co. Ltd*., 851 F.3d 1015, 1022-23 (9th Cir. 2017) (quoting *Walden*, 571 U.S. at 284-85).

The Ninth Circuit conducts a three-prong test to determine whether a non-resident defendant is subject to specific personal jurisdiction,

(1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 802 (9th Cir. 2004) (citing *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)).  "The plaintiff bears the burden of satisfying the first two prongs of the test."  *Id.*  If the plaintiff meets that burden, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable."  *Id.* (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-78 (1985)).

On the first prong, the parties apply the purposeful direction analysis which is used for claims sounding in tort.  (*See* Dkt. No. 453-1 at 41; Dkt. No. 472 at 30.)

## 1. Purposeful Direction

Under the first prong, the Ninth Circuit applies the purposeful direction test enunciated in *Calder v. Jones*, 465 U.S. 783 (1984).  *Schwarzenegger,* 374 F.3d at 802-03; *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017).  Under the three-part *Calder* "effects" test to evaluate purposeful direction, Plaintiff must establish that the defendant allegedly "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (citing *Calder*, 465 U.S. at 783).  Defendants challenge the second "expressly aimed" factor.  (Dkt. No. 453-1 at 41-46.)

### a. Expressly Aiming as to Dr. Ghosheh

Defendants argue that Plaintiffs cannot show that Dr. Ghosheh "expressly aimed" his conduct at California for three reasons.  (Dkt. No. 453-1 at 42-44.)  First, they argue

that Dr. Ghosheh's participation in a foreign JV doing business in the Middle East cannot create personal jurisdiction.  (*Id.* at 42.)  Second, they assert that it is undisputed that Dr. Ghosheh did not access servers that were located in California.  (*Id.* at 42-43.)  Third, Defendants maintain that communications through emails and conference calls with individuals who were based in California regarding the termination of the JV do not support expressly aiming factor.  (*Id.* at 43.)  Plaintiffs respond that the Court, in a prior motion to dismiss order, recognized that Dr. Ghosheh expressly aimed his contact at this forum.  (Dkt. No. 472 at 28-29.)

The second *Calder* prong asks whether the defendant's allegedly tortious action was "expressly aimed at the forum."  *Picot v. Weston,* 780 F.3d 1206, 1214 (9th Cir. 2015) (quoting *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1129 (9th Cir. 2010)).  A court's analysis "depends, to a significant degree, on the specific type of tort or other wrongful conduct at issue."  *Id.* (quoting *Schwarzenegger*, 374 F.3d at 807).  "The proper question," the Supreme Court held, "is not where the plaintiff experienced a particular injury or the effect but whether the defendant's conduct connects him to the forum in a meaningful way."  *Walden*, 571 U.S. at 290.  Moreover, personal jurisdiction may flow from a single contact with the forum state if the claim "arise[s] out of that particular purposeful contact of the defendant with the forum state."  *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987); *McGee v. Int'l Life Ins. Co*., 355 U.S. 220, 223 (1957) (a single contact may support jurisdiction if the cause of action arises out of that particular purposeful contact of the defendant with the forum state).

The Court addresses Defendants' third argument as it is dispositive of the question whether Dr. Ghosheh expressly aimed suit related conduct at California.  The question is whether Dr. Ghosheh's email or conference call communications with individuals in California involve suit-related conduct of misappropriating MedImpact's trade secrets and breaching his fiduciary duty.  *See Picot,* 780 F.3d at 1214 ("In this case, Picot alleges intentional interference with a contract, so we must ask whether Weston expressly aimed such interference at California.")

1       In *Walden*, the Supreme Court left open the question whether a defendant's online

2   activity constitutes "contacts."  *Walden*, 571 U.S. at 1125 n. 9 ("In any event, this case

3   does not present the very different questions whether and how a defendant's virtual

4   'presence' and conduct translate into 'contacts' with a particular State. . . .We leave

5   questions about virtual contacts for another day.").  While sending a single email or a

6   series of emails, by itself, does not amount to purposeful availment, *Rupert v. Bond*, 68 F.

7   Supp. 3d 1142, 1168 (N.D. Cal. 2014), "[c]ourts that have interpreted *Walden* in the

8   context of virtual contacts have generally found personal jurisdiction over defendants

9   who conduct interactive online activities with forum residents or direct business to the

10  forum state."  *D.light Design, Inc. v. Boxin Solar Co., Ltd.*, Case No. 13-cv-05988-EMC,

11  2015 WL 7731781, at *2 (N.D. Cal. Dec. 1, 2015) (citing *In re Capacitors Antitrust*

12  *Litig.*, No. 14-CV-03264-JD, 2015 WL 3638551, at *3 (N.D. Cal. June 11, 2015) (finding

13  personal jurisdiction where defendant shipped products into the forum) and *LiveCareer*

14  *Ltd. v. Su Jia Techs. Ltd*., No. 14-CV-03336-JST, 2015 WL 1448505, at *4 (N.D. Cal.

15  Mar. 31, 2015) (finding personal jurisdiction where defendant maintained an interactive

16  commercial website used by forum state residents that also contained specific instructions

17  for forum state users)); *see also Atkins v. Calypso Systems, Inc*., 14cv02706-PHX-NVW,

18  2015 WL 5856881, at *6-7 (D. Ariz., Oct. 8, 2015) (specific personal jurisdiction found

19  where the defendant knowingly called and emailed a person in Arizona, and those

20  communications caused injury); *Alexis v. Rogers*, Case No.: 15cv691-CAB-BLM, 2016

21  WL 11707630, at *9 (S.D. Cal. Feb. 26, 2016) (denying motion to dismiss for lack of

22  personal jurisdiction in employment case where out of state defendants employed the

23  plaintiff, a California resident).  The Court had also previously relied on *Cisco Systems*,

24  *Inc. v. STMicroelectronics Inc*., 14cv03236-RMW, 2015 WL 5138556, at *4 (N.D. Cal.

25  Sept. 1, 2015), where personal jurisdiction was sufficiently alleged when the defendant's

26  employees sent numerous emails and reports to, and had regular telephone calls with the

27  plaintiff's California-based employees that contained false and misleading statements and

28

the defendant's employees were aware that the plaintiff's employees were based in California.  (*See* Dkt. No. 130 at 16.)

In the motion to dismiss order, the Court concluded that Plaintiffs made a prima facie showing that Dr. Ghosheh expressly aimed his conduct at the forum because his email and mail communications related to claims of the alleged misappropriation and breaches of his fiduciary duty.  (Id. at 20-21.)  That ruling, relying on the allegations in the FAC, has no impact on the instant motion for summary judgment.

At summary judgment, the Court now looks at the evidence presented.  Dr. Ghosheh is a co-founder of Dimensions and worked in Dubai until his retirement on March 31, 2020.  (Dkt. No. 453-8, Swedlow Decl., Ex. 5, Dr. Ghosheh Decl. ¶ 2 (UNDER SEAL).)  He visited San Diego once for business in 2013 to discuss the potential acquisition of Dimensions by MedImpact, not IQVIA.  (*Id.* ¶ 13.)  The visit lasted two days and he states that no information about the development of products and services for the JV was exchanged or discussed during this meeting.  (Dkt. No. 453-8 Swedlow Decl., Ex. 5, Dr. Ghosheh Decl. ¶ 13.)  In response, Plaintiffs present a competing declaration of Mr. Brown stating that on that visit, Dr. Ghosheh met with MedImpact executives to discuss not only a potential acquisition of Dimensions by MedImpact but also JV business.  (Dkt. No. 472-7, Brown Decl. ¶ 10.)  Dr. Ghosheh also attended an annual appreciation event and introduced himself as a MedImpact JV partner and met with JV clients such as ███████████████████ teammates and members of the technical team.  (*Id.*)  These competing facts do not create a genuine issue of fact that Dr. Ghosheh engaged in any suit-related conduct during his 2013 visit. Engaging in general JV business does not support Plaintiffs' argument that Dr. Ghosheh was involved in any misappropriating conduct.  Therefore, Dr. Ghosheh did not expressly aim any allegedly tortious conduct on this visit to California.

Dr. Ghosheh attended JV board meetings in Dubai as required by the JVA even though some individuals dialed-in from San Diego.  (Dkt. No. 491-4, Swedlow Decl., Ex. 10, Dr. Ghosheh Decl. ¶ 4 (UNDER SEAL); Dkt. No. 491-35, Swedlow Decl., Ex. 41 at

15 ("Board meetings shall be held at the Company's branch office in Abu Dhabi or such other address in the UAE or elsewhere as decided by the Board.") (UNDER SEAL).)  In response, Mr. Brown states that even though the JVA stated that board meetings would be held in the UAE, certain MedImpact board members participated from San Diego. (Dkt. No. 472-2, Brown Decl. ¶¶ 7, 12, 18.)  Merely knowing that certain participants attended board meetings telephonically from San Diego does not amount to expressly aiming.  There are no facts showing that Dr. Ghosheh initiated these telephonic board meeting calls.

Mr. Brown further declares that in late 2015, Dr. Ghosheh affirmatively reached out to him in San Diego, ████████████████████████████████████████ ████████████████████ (Dkt. No. 472-7, Brown Decl. ¶ 11.)  While Defendants reply that this statement provides no detail to establish consistent communications giving rise to Plaintiffs' claims, (Dkt. No. 530 at 14), "personal jurisdiction may flow from a single contact" as long as the claim arises out of that particular contact.  *See Lake*, 817 F.2d at 1421.  Here, the Court concludes that this statement supports specific personal jurisdiction as the alleged scheme by IQVIA Defendants includes their acquisition of Dimensions in February 2016.

Next, the parties dispute whether the January 4, 2016 consent letter signed by Dr. Ghosheh and Mr. Brown ████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████.", (Dkt. No. 510-2, Bennett Decl., Ex. 28 at 336 (UNDER SEAL)), supports the expressly aiming factor.  (*Compare* Dkt. No. 453-1 at 19 *with* Dkt. No. 472 at 29.)  The consent letter was directed to MI-HK's address in Hong Kong and Mr. Brown signed it on behalf of MI-HK.  But Plaintiffs present no facts that Mr. Brown received the email or letter while in San Diego.  Moreover, the consent letter was emailed to Mr. Brown by an Administrative/HR Officer, (Dkt. No. 510-2, Bennett Decl., Ex. 27 at

334 (UNDER SEAL)), not by Dr. Ghosheh.  Thus, the consent letter does not support Plaintiffs' position that Dr. Ghosheh reached out to Mr. Brown in San Diego.

Finally, on July 23, 2017, Dr. Ghosheh sent a letter to Mr. Brown addressed to San Diego providing notice of the termination of the JV agreement.  (Dkt. No. 510-3, Bennett Decl., Ex. 33 at 10; *id.*, Ex. 34 at 12 (UNDER SEAL).)  This letter supports the expressly aimed factor by Dr. Ghosheh because the alleged scheme included termination of the JVA once AIMS was fully developed.[15]  Therefore, the Court finds that Dr. Ghosheh's July 23, 2017 termination letter directed to Mr. Brown in San Diego supports the expressly aimed factor.

Accordingly, the Court concludes that Plaintiffs have presented evidence that Dr. Ghosheh expressly aimed his conduct at California.

### b.    Expressly Aiming as to Mr. Sadana

Defendants next aver that Mr. Sadana's involvement in the JV, by itself, is insufficient to give rise to personal jurisdiction because the JV's business was outside the United States, and the JV participants were foreign corporations and the board meetings took place in Dubai.  (Dkt. No. 472-1 at 45.)  They also argue that any communications Mr. Sadana had were primarily with MI-HK, a Hong Kong entity located in Dubai, Amaan, and Hong Kong.  (*Id.* at 46.)  Further, they contend that Mr. Sadana did not communicate with anyone about terminating the JV and was merely carbon copied ("cc'd") on correspondence.  (*Id.*)  Finally, none of the client contracts Mr. Sadana signed had any relationship with California as they were all in the Middle East.  (*Id.*)  In

---

[15] The scheme is demonstrated by the following facts.  After the termination notice of the JVA, on September 11, 2017, Mr. Brown, Mr. Grenfell, of IQVIA Ltd. and Yousef Ghosheh of Dimensions met in London to discuss termination of the JV and Mr. Grenfell represented that Dimensions was not going to compete with MedImpact in the PBM market.  (Dkt. No. 472-7, Brown Decl. ¶ 17; Dkt. No. 545, Ds' Reply to SSUF, No. 109.)  On the next day, September 12, 2017, a JV board meeting was held in Dubai with Mr. Brown, as well as other MedImpact representatives, Mr. Sadana, Yousef Ghosheh and Dr. Ghosheh.  (Dkt. No. 472-7, Brown Decl. ¶ 18.)  When discussing the renewal status of the JV's largest customer, Oman Insurance, Dimensions and IQVIA withheld the fact they had already signed a license agreement with Oman Insurance for AIMS on June 29, 2017.  (*Id.*; Dkt. No. 510-3, Bennett Decl., Ex. 31 at 2 (UNDER SEAL).)

1   response, Plaintiffs rely on the Court's ruling on personal jurisdiction at the motion to

2   dismiss stage.  (Dkt. No. 472 at 30-31.)

3          On the motion to dismiss, the Court concluded that in his role as Chairman of the

4   JV since April 2016, Mr. Sadana consistently engaged with California through

5   conference calls with board members sitting in San Diego, sending emails to board

6   members in San Diego and attending board meetings where San Diego-based board

7   members participated by phone.  (Dkt. No. 130 at 21 (citing Dkt. No. 93, FAC ¶ 96).)

8   The FAC alleged that it was during these communications that Mr. Sadana learned

9   valuable information which he used to execute the scheme.  (*Id.*)  He was also involved in

10  termination of the JV by making numerous phone calls and attending several board

11  meetings concerning it.  (*Id.*)

12         At summary judgment, the Court has carefully reviewed the evidence provided by

13  both parties and concludes that Plaintiffs have not presented a genuine issue of material

14  fact that Mr. Sadana's communications with MedImpact employees or MIA board

15  members in San Diego concern Plaintiffs' claims for misappropriation and breach of

16  fiduciary duty.

17         Mr. Sadana is a resident of Dubai and is the General Manager for Africa, Middle

18  East and South Asia for IQVIA AG and has worked with IQVIA AG since 2013.  (Dkt.

19  No. 93, FAC ¶ 23; Dkt. No. 491-11, Swedlow Decl., Ex. 17, Mr. Sadana Depo. at 12:19-

20  24 (UNDER SEAL).)  After IQVIA AG acquired Dimensions in February 2016, he

21  served as a board member for Dimensions and as Chairman of MIA and never attended

22  any board meetings in California.  (Dkt. No. 545**,** Ds' Reply SSUF, Nos. 192, 193

23  (UNDER SEAL).)

24         In response, Plaintiffs assert that Mr. Sadana often communicated with MedImpact

25  employees located in San Diego citing to emails sent by Mr. Sadana to Mr. Brown.  (Dkt.

26  No. 472 at 30 (citing Ds' Reply SSUF, No. 236.)  A careful review of these emails

27  reveals that no substantive content was communicated but merely addressed

28  scheduling/rescheduling board meetings.  (*See* Dkt. No. 510-5, Brown Decl., Ex. 6 at 15

(February 5, 2018 email from Mr. Sadana to Mr. Brown and others regarding business topics and postponement of a board meeting scheduled for November, 29, 2017); Dkt. No. 510-2, Bennett Decl., Ex. 29 at 339 (August 17, 2017 email from Mr. Sadana to Mr. Brown and others about rescheduling a meeting); Dkt. No. 510-2, Bennett Decl., Ex. 30 at 341 (April 24, 2016 email from Mr. Sadana to Mr. Brown about scheduling a meeting on April 27, 2016 at the Hyatt Regency Creekside near Dubai Healthcare City)).  These emails do not show that Mr. Sadana expressly aimed any suit-related conduct towards California.

Plaintiffs also provide the declaration of Mr. Brown to support specific personal jurisdiction over Mr. Sadana.  (Dkt. No. 472-7, Brown Decl. ¶¶ 11, 12, 21.)  However, the declaration does not provide sufficient details that Mr. Sadana expressly aimed any suit related conduct to California.  Instead, Mr. Brown makes general statements that Mr. Sadana sent numerous emails and participated in numerous board meetings with San Diego based board members in his role as Chairman of the Board where business and finances were discussed.  (*Id.* ¶ 12.)  Mr. Brown does not provide specific dates, and whether Mr. Sadana's emails or communications at board meetings or in emails relate to suit-related conduct.

Further, Mr. Brown states that when he learned that Mr. Sadana lied to him about the nature of AIMS and IQVIA's sale of AIMS to Oman Insurance, Mr. Brown "participated in a phone call with Mr. Sadana from San Diego." (*Id.* ¶ 21.)  It was in that phone call that Mr. Sadana lied and said AIMS was a "dumb platform" with no software and it was not a PBM.  (*Id.*)  However, Mr. Brown does not state that Mr. Sadana initiated the phone call, and thus, that phone call does not support the expressly aiming factor.

As to Mr. Sadana's role in the JV termination, Mr. Brown generally states that "Mr. Sadana contacted me and other MedImpact personnel in San Diego to discuss the JV termination.  Mr. Sadana contacted me by email, and also by phone, to set up a meeting to discuss the JV termination.  Mr. Sadana and I discussed the agenda for an

upcoming meeting in London.  The meeting in London was set up to discuss the JV termination." (*Id.* ¶ 16.)  As the person privy to the communications with Mr. Sadana, Mr. Brown fails to provide specifics as to the content of these communications and only provides general statements.  Because Mr. Brown's general statement is the only evidence to support Mr. Sadana's expressly aimed conduct to this forum, the Court concludes that Plaintiffs have not shown, by a preponderance of the evidence, that Mr. Sadana is subject to specific personal jurisdiction.  *See Haisten*, 784 F.2d at 1396 n. 1; *Stoliarov v. Marshmello Creative, LLC*, Case No. CV 19-3934 PSG (JPRx)2021 WL 1781870, *2 (C.D. Cal. Apr. 7, 2021) ("When defending against a summary judgment motion for lack of personal jurisdiction, Plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence").

Finally, Plaintiffs cite to a number of documents in the record but they concern the "scheme" between Dimensions and Defendants and are not relevant to whether Mr. Sadana "expressly aimed" his conduct towards this forum.  (*See* Dkt. No. 472 at 30-32 (citing Ds' Reply to SSUF, Nos. 224, 237, 238, 241, 242).)

Accordingly, the Court GRANTS Defendants' motion for summary judgment and dismisses Mr. Sadana as a defendant for lack of specific personal jurisdiction.

## 2.    Exercise of Jurisdiction Must be Reasonable

Defendants further argue that the exercise of jurisdiction over Dr. Ghosheh does not comport with fair play and substantial justice. (Dkt. No. 453-1 at 47.)  Plaintiffs oppose. (Dkt. No. 472 at 31.)

On the third prong for purposeful direction, the burden shifts to Defendants "to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802.  The Court looks to seven factors to determine whether exercising personal jurisdiction over Defendants is reasonable.  They are:

> (1) the extent of the defendants' purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendants' state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial

resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Menken v. Emm*, 503 F.3d 1050, 1058 (9th Cir. 2007) (*quoting CE Distrib., LLC v. New Sensor Corp*., 380 F.3d 1107, 1112 (9th Cir. 2004)).  Dr. Ghosheh, as a foreign defendant, bears a heavy burden to prove a "'compelling case' of unreasonableness to defeat jurisdiction."  *See Dole Food Co*., 303 F.3d at 1117 (indicating there is strong presumption of reasonableness).

The first factor favors Plaintiffs because Dr. Ghosheh has purposefully directed his activities in this forum causing injury here; thus, he has injected himself into this forum. *See Advanced Skin & Hair, Inc. v. Bancroft,* 858 F.Supp.2d 1084, 1091 (C.D. Cal. 2012) ("Because Defendant purposefully availed herself on California . . . the Court finds that Defendant purposefully interjected herself in California, supporting a finding of reasonableness.") (citing *Amoco Egypt Oil Co. v. Leonis Nav. Co., Inc.,* 1 F.3d 848, 852 (9th Cir. 1993) (this factor "parallels the question of minimum contacts" in determining the reasonableness of exercising specific jurisdiction); and *Roth v. Garcia Marquez,* 942 F.2d 617, 623 (9th Cir. 1991) ("In light of the first prong of purposeful availment, analysis of this first factor in the third prong would be redundant")).

Second, Defendants argue that there will be a burden on Dr. Ghosheh, an individual who does not have the same monetary resources as IQVIA Defendants.  (Dkt. No. 453-1 at 47.)  Further, Dr. Ghosheh states travel to California would be disruptive of his ability to perform his job for Dimensions because he nor Dimensions conducts any business in or travels to California.[16]  (Dkt. No. 453-8, Swedlow Decl., Ex. 5, Dr. Ghosheh Decl. ¶ 17.)  Plaintiffs respond and the Court agrees that cost and

---

[16] The Court observes that the record reflects that Dr. Ghosheh retired on March 31, 2020.  (Dkt. No. 491-2, Swedlow Decl., Ex. 8, Ghosheh Decl. ¶ 2 (UNDER SEAL); *but see* Dkt. No. 198-2, Shanti Decl. ¶ 24 (stating Dr. Ghosheh retired in December 2019.)  Therefore, arguments that travel to California would be disruptive to his job at Dimensions are no longer valid.

inconvenience of travel should not be give much weight if minimum contacts have been established.  *See Asahi Metal Indus. Co. v. Superior Ct., of Cal. Solana Cnty.*, 480 U.S. 102, 114 (1987) ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."); *Angel Prods. Worldwide, Inc. v. Airstage by Effeckt-Technik, GmbH*, 426 F. Supp. 3d 630, 635 (D. Nev. 2019) ("Undoubtedly, travelling to a foreign jurisdiction with a different language and legal system is more burdensome than litigating in a familiar jurisdiction.  Nonetheless, this is to be expected when conducting international commercial business.").  However, this factor nonetheless will always favor the defendants.  *See Dole Food Co.*, 303 F.3d at 1117 (by their very nature, the factors of burden on defendants and sovereignty conflict are likely to favor foreign defendants every time personal jurisdiction in the United States is considered.) Therefore, this factor slightly favors Defendants.

Third, Defendants argue that California law has a strong policy favoring enforcement of choice of law provisions and the JVA provides that the English laws apply.  (Dkt. No. 453-1 at 48.)  Moreover, they claim that the Cayman Islands has a clear interest in resolving disputes over a joint venture organized under its laws.  (*Id.*) Plaintiffs respond that none of the defendants were parties to the JVA and none are brought under English law.  (Dkt. No. 472 at 32.)  The Court agrees with Plaintiffs that there is no choice of law issue in this case.  Further, Defendants have not identified the extent of any "conflict with the sovereignty of the defendants' state."  Thus, the third factor favors Plaintiffs.

Fourth, Defendants maintain that the alleged tortious conduct does not involve California because Dr. Ghosheh did not interject himself into the forum where the Dimensions' JV partner was MI-HK, a Hong Kong company, clients who were allegedly stolen are located outside the U.S. and all the board meetings occurred outside the U.S. (Dkt. No. 453-1 at 47-48.)  Plaintiffs disagree because the evidence show that Dr. Ghosheh directed his conduct at California.  (Dkt. No. 472 at 32.)  Because the Court

found that Dr. Ghosheh purposefully directed his activities in this forum, it follows that California has an interest in adjudicating this case. *See Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1200 (9th Cir. 1988) ("California maintains a strong interest in providing an effective means of redress for its residents [who are] tortiously injured"). This factor supports Plaintiffs.

On the fifth and sixth factors, Defendants acknowledge and appear to submit to the Court's conclusion at the pleading stage that the fifth factor is neutral and the sixth factor slightly favors Plaintiffs. (Dkt. No. 453-1 at 48.)

Seventh, Defendants argue that Plaintiffs still have not met their burden to demonstrate an alternative forum does not exist. (Dkt. No. 453-1 at 47.) Plaintiffs contend that the Dubai courts rarely hear claims brought under United States statutes and rarely assert jurisdiction over non-resident defendants. (Dkt. No. 472 at 32.) Defendants do not provide a reply on this factor.

Plaintiffs rely on DLA Piper's website describing jurisdiction of the UAE courts stating that while they recognize choice of law provisions in contracts, in practice they are reluctant to apply foreign law based on public policy and even if a party demonstrates a particular choice of law applies, the courts might still ignore the application of foreign law. (Dkt. No. 472-4, Bennett Decl., Ex. 5 at 296-97.) Reliance on this website is not challenged by Defendants. In addition, Article 21 of the Federal Law No. 11/1992 on the Civil Procedures Law applicable to the UAE provides for the jurisdiction "against the foreigner who has no residence or domicile in the state" in certain limited circumstances. (Dkt. No. 472-4, Bennett Decl., Ex. 6 at 302.) One of the circumstances is if any of the defendant is a domicile or residence in the state. (*Id.*) In this case, Dr. Ghosheh is a resident of the UAE; therefore, jurisdiction may be possible in the UAE. Nonetheless, because of the likelihood the UAE courts will not apply United States statutes, Plaintiffs have shown that their "claims cannot be effectively remedied there." *See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1490 (9th Cir.

1   1993) (the "plaintiff bears the burden of proving the unavailability of an alternative

2   forum."). This factor favors Plaintiffs.

3        Considering all the factors and in light of Defendants' failure to demonstrate a

4   "compelling case," the Court concludes that the exercise of jurisdiction over Dr.

5   Ghosheh in California is reasonable. Thus, the Court concludes it has specific personal

6   jurisdiction over Dr. Ghosheh and the Court DENIES Defendants' motion to dismiss for

7   lack of personal jurisdiction.

8   **E.**     **Misappropriation of Trade Secrets under DTSA and CUTSA**

9        Defendants move for summary judgment on the DTSA and CUTSA causes of

10  action as to Defendants IQVIA Ltd., Dr. Ghosheh and Mr. Sadana.[17] They argue that

11  even though the Court ruled on issue preclusion as it concerns IQVIA Inc. and IQVIA

12  AG that trade secrets raised in the Arbitration are protectible and were misappropriated,

13  those rulings do not apply to these three Defendants. Further, despite the Court's ruling

14  on issue preclusion, they argue that ruling did not resolve which trade secrets are

15  protectible. (Dkt. No. 453-1 at 56.) Plaintiffs oppose. (Dkt. No. 472 at 36-50.)

16      **1.**     **IQVIA Ltd.**

17       Defendants argue the misappropriation of trade secret claims against IQVIA Ltd.

18  should be dismissed because there is no evidence to support a claim because it was not a

19  signatory to any contracts.[18] (Dkt. No. 453-1 at 59.) Plaintiffs respond that IQVIA Ltd,

20  through Alistar Grenfell, an employee of IQVIA Ltd, misappropriated trade secrets by

21  marketing and selling AIMS and EMS. (Dkt. No. 472 at 50-51 (citing Ds' Reply to

22  SSUF, Nos. 283-89.).)

23

24  _____

25  [17] As discussed in the prior section, Mr. Sadana has been dismissed for lack of personal jurisdiction.

26  Therefore, two defendants, IQVIA Ltd. and Dr. Ghosheh, remain that are not subject to the Court's ruling on issue preclusion.

27  [18] Defendants also argue IQVIA Ltd. was only party to a single claims data at issue which is not a trade

28  secret; however, the Court has already granted summary judgment on the claims data claim. Therefore, their argument on claims data is moot.

Alistar Grenfell is an employee of IQVIA Ltd. and is the IQVIA President of Europe, the Middle East, Africa, and South Asia.  (Dkt. No. 545, Ds' Reply to SSUF, Nos. 283, 284 (UNDER SEAL).)  A careful review of the evidence provided by Plaintiffs shows that Mr. Grenfell was carbon copied on an email that discussed MIA's PBM product, the roles of MI-HK and Dimensions, and Dimensions' new real-time adjudication engine called AIMS.  (Dkt. No. 510-2, Bennett Decl., Ex. 15 at 236 (email dated Jan. 19, 2016 from Carlos Santos to Ron Bruehlman (UNDER SEAL).)  Mr. Grenfell received an email from Yousef Ghosheh on September 6, 2017, a day before the meeting with MedImpact, to discuss the termination of the JV and presented ███████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████. (Dkt. No. 510-13, Bennett Decl., Ex. 36 at 17 (UNDER SEAL).)  The PowerPoint presentation sent to Mr. Grenfell showed the number of clients and revenue that were expected to move to AIMS and CDS.  (*Id.,* Bennett Decl., Ex. 37 at 19-20 (UNDER SEAL).)  Yet, these emails do not demonstrate any misappropriating conduct by Mr. Grenfell in marketing and selling AIMS.

Next, Plaintiffs assert that Mr. Grenfell oversaw the ████████████████ which included EMS.  However, the submitted evidence does not show that Mr. Grenfell oversaw the project or that he even approved it.  He was only carbon copied on the email that included a "Health Insurance Platform" proposal for ████████████████ █████  (Dkt. No. 510-4, Bennett Decl., Ex. 70 at 100; *id.*, Ex. 71 at 115 (UNDER SEAL).)  At his deposition, Mr. Grenfell testified that he understood very little about the ████████████████.  (Dkt. No. 545, Swedlow Reply Decl., Ex. 105, Grenfell Depo. at 215:15-21 (UNDER SEAL).)

Finally, Plaintiffs allege that Mr. Grenfell was the "executive leader" of the ██████ project where IQVIA Ltd. offered ████████████however, the Power Point presentation slide, in support, states "Executive Leadership Commitment to CCHI" and names a few individuals, including Alistar Grenfell.  (Dkt. No. 510-4, Bennett Decl., Ex. 72 at 122

(UNDER SEAL).)  Mr. Grenfell testified that one cannot "be on an executive leadership commitment.  I think you can demonstrate executive leadership commitment.  I could have been on an executive leadership committee, if there was one.  So, to answer your question, quite often, I'm rolled out in my position as the president of the region to talk in general terms to prospective clients about our commitments to essential projects, so that's part of my role. So that absolutely rings a bell, yes." (Dkt. No. 545, Swedlow Reply Decl., Ex. 105, Grenfell Depo. at 205:20-206:5 (UNDER SEAL).)   He further explained that clients, particularly in the Middle East, want senior management commitment to a project so a team will ask Mr. Grenfell "to come in and reaffirm IQVIA's commitment to a particular project." (*Id*. at 207:8-21 (UNDER SEAL).)  Based on the evidence presented, Plaintiffs have not raised a genuine issue of material fact that IQVIA Ltd., through Mr. Grenfell, misappropriated any trade secrets.  Therefore, the Court GRANTS Defendants' motion for summary judgment and dismisses Defendant IQVIA Ltd.

## 2.   Dr. Ghosheh

The only remaining defendant, not subject to the Court's issue preclusion on two elements of trade secret misappropriation, is Dr. Ghosheh.  In the prior order on issue and claim preclusion, the Court concluded that Defendants had not demonstrated privity between Dimensions and Dr. Ghosheh because they did not provide relevant legal authority to support a substantial legal relationship based on the fact that he controlled the affairs of Dimensions.  (Dkt. No. 222 at 7.)  Defendants relied on *In re Gottheiner,* 703 F.2d 1136, 1139-40 (9th Cir. 1983) where the Ninth Circuit held that privity was established in that case where a party "owns most or all of the shares in a corporation and controls the affairs of the corporation."  Because Defendants did not show that Dr. Ghosheh had any ownership interest in Dimensions, the Court concluded that privity had not been established.  (*Id.* n. 4.)

Recognizing that the purpose behind issue and claim preclusion is to conserve judicial resources and avoid the possibility of inconsistent rulings, *see Taylor* 553 U.S. at 892, and because a court may, *sua sponte*, raise preclusion where the parties have been

36

provided an opportunity to address the issue[19], *Headwaters Inc. v. United States Forest Serv.*, 399 F.3d 1047, 1054-55 (9th Cir. 2005) (citation omitted), the Court, *sua sponte*, reconsiders its prior ruling on privity between Dimensions and its co-founder and former CEO, Dr. Ghosheh.  (*See* Dkt. Nos. 198, 209, 214.)

In *Taylor,* the Court rejected the "virtual representation"[20] theory of privity that the lower court relied on and held that privity must be based on one of six recognized exceptions to the rule against nonparty preclusion.  *Taylor,* 533 U.S. at 893.  One exception is demonstrating a pre-existing "substantive legal relationship[s]" between the person to be bound and a party to the judgment.  *Id.*  However, the Court recognized that "[a]lthough references to 'virtual representation' have proliferated in the lower courts, our decision is unlikely to occasion any great shift in actual practice.  Many opinions use the term 'virtual representation' in reaching results at least arguably defensible on established grounds . . . . In these cases, dropping the 'virtual representation' label would lead to clearer analysis with little, if any, change in outcomes."  *Taylor,* 533 U.S. at 904 (internal citations omitted).  Therefore, Ninth Circuit caselaw that references "virtual representation" is not necessarily overruled by *Taylor.*

Under Ninth Circuit law, "[e]ven when the parties are not identical, privity may exist if 'there is 'substantial identity' between parties, that is, when there is sufficient commonality of interest.'"  *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003) (quoting *In re Gottheiner*, 703 F.2d 1136, 1140 (9th Cir. 1983)).  Relevant to this case, in *Pedrina*, the Ninth Circuit held that corporate officers not named in a prior action were in privity with corporate

---

[19] Even though the parties had previously briefed this issue, at the motion hearing, the Court provided the parties an opportunity to file a supplemental brief on privity as to Dr. Ghosheh.  Both parties filed a notice indicating they do not oppose the Court's tentative ruling at the hering that privity exists between Dr. Ghosheh and Dimensions.  (Dkt. Nos. 592, 594, 595.)

[20] "This Circuit has held that when two parties are so closely aligned in interest that one is the virtual representative of the other, a claim by or against one will serve to bar the same claim by or against the other."  *Nordhorn v. Ladish Co., Inc*., 39 F.3d 1402, 1405 (9th Cir. 1993).

entity defendant in prior action because corporate officers were being "accused of participating in the same criminal wrongdoing with which the corporation was charged previously" and the alleged actions against them were done in their official capacities. *Pedrina v. Chun*, 97 F.3d 1296, 1302 (9th Cir. 1996); *see also In re Chiquita Brands Int'l, Inc. Alien Tort Statute and Shareholder Derivative Litig.*, CASE NO. 08-MD-01916-KAM, Case No. 10-CIV-60573, Case No. 17-CIV-80535, 2018 WL 11251118, at *4 (S.D. Fla. Aug. 13, 2018) (*same*).

Here, Dr. Ghosheh was the co-founder of Dimensions in 2008 and the General Manager/CEO of Dimensions until his retirement in March 2020. (Dkt. No. 198-2, Shanti Decl. ¶¶ 22, 24; Dkt. No. 453-8, Swedlow Decl., Ex. 5, Dr. Ghosheh Decl. ¶¶ 1, 2; Dkt. No. 491-2, Swedlow Decl., Ex. 8, Dr. Ghosheh Decl. ¶ 2 (UNDER SEAL).)  As General Manager, he managed the day-to-day operations of Dimensions. (Dkt. No. 198-2, Shanti Decl. ¶ 25.)  After IQVIA AG acquired Dimensions, he was one of four board members of Dimensions until his retirement. (*Id.* ¶ 27.)  Dr. Ghosheh states he is intimately familiar with "Dimensions' operations, including the office and employee locations, document management systems, and the types of products and services offered by Dimensions." (Dkt. No. 491-2, Swedlow Decl., Ex. 5, Dr. Ghosheh Decl. ¶ 3 (UNDER SEAL).)  He also developed and implemented business strategy, identified and secured new business opportunities, strengthened ties with customers, hired and evaluated personnel, optimized and managed the entire business and complied with IQVIA's policies, local laws and regulations. (Dkt. No. 198-2, Shanti Decl. ¶ 26.)

In the prior Arbitration, Dimensions was a named defendant defending against claims of breach of contract of the JVA and SLC as well as misappropriation of trade secrets.  In this case, Dr. Ghosheh is a named defendant also defending against the same misappropriation of trade secret claims in his official capacity.  For instance, Heather Bates, Plaintiffs' expert, states the trade secrets in the prior arbitration are the same as in this case. (Dkt. No. 491-21, Swedlow, Decl., Ex. 27, Bates Expert Report ¶ 28 (UNDER SEAL).)  Therefore, the Court concludes that privity exists between Dimensions and Dr.

Ghosheh and the Court's rulings on issue and claim preclusions apply to him. Accordingly, the Court DENIES Defendants' motion for summary judgment on the issue of trade secret identification, whether they are trade secrets and misappropriation of those trade secrets.

Defendants, relying on their *Daubert* motions as to James Malackowski ("Mr. Malackowski") and Vasevuda Bobba ("Mr. Bobba"), lastly argue that the trade secret misappropriation claims fail for lack of damages because Plaintiffs have not set forth competent evidence of trade secret damages. (Dkt. No. 453-1 at 58-59.) Plaintiffs contend that their experts' opinions are admissible and further even if their opinions are excluded, they can still prove their damages.[21] (Dkt. No. 472 at 47.)

Because the Court conditionally denies Defendants' motion to exclude the expert opinions of Mr. Malackowski and Mr. Bobba, the Court DENIES Defendants' motion for summary judgment the DTSA and CUTSA for failure to demonstrate damages.

**F.      Breach of Fiduciary Duty as to Dr. Ghosheh**

Defendants argue that the breach of fiduciary duty claim is preempted by CUTSA, and even if not, it fails as a matter of law for lack of damages. (Dkt. No. 453-1 at 49, 52.) In response, Plaintiffs, for the first time, rely on Cayman law and maintain that CUTSA preemption is not applicable, and even if it did apply, preemption does not apply to the CDS claims, a competing claim, not a misappropriated claim. (Dkt. No. 472 at 33-34.) In reply, Defendants argue that Plaintiffs have waived the application of Cayman law at this late stage because they relied on California law at the motion to dismiss stage and their expert, Mr. Malackowski, relies on California law. (Dkt. No. 530 at 21-22.)

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Mazza v. Am. Honda Motor Co*., 666

---

[21] MedImpact also seeks injunctive relief under the DTSA and CUTSA. (Dkt. No. 472 at 48 n.16; Dkt. No. 93, SAC at p. 80.) The DTSA and CUTSA provide for injunctive relief. *See* 18 U.S.C. § 1836(b)(3)(A); Cal. Civ. Code § 3426.2. Therefore, even if Plaintiffs' experts are excluded on damages, MedImpact may seek injunctive relief as a remedy.

F.3d 581, 589 (9th Cir. 2012) (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir.), *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001)); *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1005 (9th Cir. 2001) ("In a diversity case, federal courts apply the substantive law of the forum in which the court is located, including the forum's choice of law rules.").

California has adopted and codified the "internal affairs doctrine," which requires a court to apply the law of the state of incorporation to those matters concerning the internal affairs of a corporation. *State Farm Mut. Auto. Ins. Co. v. Superior Ct.*, 114 Cal. App. 4th 434, 442 (2003); *Vaughn v. LJ Int'l, Inc.*, 174 Cal. App. 4th 213, 223 (2009): Cal. Corp. Code § 2116 ("The directors of a foreign corporation transacting intrastate business are liable to the corporation, its shareholders, creditors, receiver, liquidator or trustee in bankruptcy for the making of unauthorized dividends, purchase of shares or distribution of assets or false certificates, reports or public notices or other violation of official duty according to any applicable laws of the state or place of incorporation or organization, whether committed or done in this state or elsewhere."). "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands."[22] *Lidow v. Superior Ct*., 206 Cal. App. 4th 351, 358-59 (2012) (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) (internal quotation marks omitted)).

---

[22] Matters that typically fall under the internal affairs doctrine and "which involve primarily a corporation's relationship to its shareholders include steps taken in the course of the original incorporation, the election or appointment of directors and officers, the ad/option of by-laws, the issuance of corporate shares, preemptive rights, the holding of directors' and shareholders' meetings, methods of voting including any requirement for cumulative voting, shareholders' rights to examine corporate records, charter and by-law amendments, mergers, consolidations and reorganizations and the reclassification of shares." *Lidow*, 206 Cal. 4th at 359.

California recognizes a limited exception to the internal affairs doctrine "where, with respect to the particular issue, some other state has a more significant relationship . . . to the parties and the transaction[.]" *Id.* at 359 (quoting Restatement 2d Conflicts of Laws, § 309).  In *Lidow*, after reviewing precedent on the application of this "exception", the court of appeals commented "that courts are less apt to apply the internal affairs doctrine when vital statewide interests are at stake, such as maintaining the integrity of California security markets and protecting its citizens from harmful conduct. . . [and] when less vital state interests are at stake (e.g., whether a foreign corporation headquartered in another state pays promised dividends to its shareholders, or whether the shareholder of a foreign corporation must fulfill certain procedural requirements set before bringing a derivative suit), courts are more apt to apply the internal affairs doctrine." *Id.* at 362 (declining to apply internal affairs because wrongful termination in violation of public policy concerns conduct beyond corporate governance and implicate California's vital state interest in protecting its residents from harmful conduct such as retaliation and wrongful termination).

The California Supreme Court has suggested and the Ninth Circuit has applied the internal affairs doctrine, the state of the law of incorporation, to breach of fiduciary duty claims.  In *Nedlloyd*, even though the California Supreme Court found that the choice-of-law provision applied to the plaintiff's breach of fiduciary duty claim, it also noted that it would reach the same conclusion based on the internal affairs doctrine.  *Nedlloyd Lines B.V. v. Superior Ct*., 3 Cal. 4th 459, 471 (1992) ("even in the absence of a choice-of-law clause, Hong Kong's overriding interest in the internal affairs of corporations domiciled there would in most cases require application of its law.").  The Ninth Circuit has stated, "[c]laims involving 'internal affairs' of corporations, such as the breach of fiduciary duties, are subject to the laws of the state of incorporation." *Davis & Cox v. Summa Corp*., 751 F.2d 1507, 1527 (9th Cir. 1985) *superseded on other grounds as stated in Mattel, Inc. v. MGA Entm't, Inc.,* 705 F.3d 1108, 1110 (9th Cir. 2013); *see also In re Verisign, Inc., Derivative Litig*., 531 F. Supp. 2d 1173, 1215 (N.D. Cal. 2007) (claims

41

related to internal affairs of a corporation include "claims for breach of fiduciary duty, accounting, unjust enrichment, rescission, constructive fraud, corporate waste, breach of contract, gross mismanagement, and restitution"); *Voss v. Sutardja*, No. 14-01581-LHK, 2015 WL 349444, at *9 (N.D. Cal. Jan. 26, 2015) (in a case concerning breach of fiduciary duty claim and others, applying Bermuda law and rejecting the plaintiff's argument that an exception to internal affairs doctrine should apply simply because of the company's extensive contacts with California); *Booth v. Strategic Realty Trust, Inc.*, No. 13-04921-JST, 2014 WL 3749759, at *8 (N.D. Cal. July 29, 2014) (applying Maryland law to a breach of fiduciary duty claim based on the internal affairs doctrine); *Vaughn,* 174 Cal. App. 4th at 223-25 n. 5 (applying internal affairs doctrine to breach of fiduciary duty claim).

While California case law and Ninth Circuit precedent support the application of the internal affairs doctrine to a claim for breach of a fiduciary duty, if a claim implicates a broader public interest that California has a vital interest in protecting, then the doctrine does not apply.  *See Kaul v. Mentor Graphics Corp*., No. 16-CV-02496-BLF, 2016 WL 6249024, at *9 (N.D. Cal. Oct. 26, 2016), *aff'd*, 730 Fed. App'x 437 (9th Cir. 2018) (holding that the law of the state where a company is incorporated should apply to breach of fiduciary duties unless there is no choice-of-law clause in the agreement and it is an unusual case where a different state has a more significant relationship to the parties and corporation).

Here, MIA was a Cayman corporation when it was formed in 2012, (Dkt. No. 545, Ds' Reply to SSUF, No. 215); therefore, under California's conflict of law principles, Cayman law applies to the breach of fiduciary claim against Dr. Ghosheh unless a limited exception applies.

In response to Defendants' preemption argument, Plaintiffs simply responds that CUTSA preemption is inapplicable because Cayman law applies.  In reply, Defendants argue that Plaintiff has waived the application of Cayman law because Plaintiffs relied on California law at the motion to dismiss stage, and their damages expert relies on

California law in his report.  (Dkt. No. 530 at 21-22.)  However, Defendants have not provided legal authority that California's conflict of law principles can be waived; instead, they rely on cases addressing waiver under choice of law analysis.[23]  (*See* Dkt. No. 530 at 22 (citing *Consortium Info. Servs., Inc. v. Credit Data Servs., Inc*., 149 Fed. App'x 575, 576 (9th Cir. Aug. 1, 2005) (choice of law issue where failure to plead a defense under Florida law until summary judgment waived application of Florida's defense); *Ellison Framing, Inc. v. Zurich American Ins. Co*., 805 F. Supp. 2d 1006, 1011 n. 1 (E.D. Cal. Apr. 4, 2011) (choice of law provision in agreement waived); *Skinner v. DeLaurentiis*, 2004 WL 316962, at *4 (Ct. App. Feb. 20, 2004) (unpublished) (choice of law issue)).

Here, neither party engages in any analysis required to resolve the applicability of the internal affairs doctrine and which law ultimately applies on this claim.  Because the issue of whether Cayman or California law applies to the breach of fiduciary claim has not been resolved, the Court DENIES Defendants' motion for summary judgment on the breach of fiduciary duty cause of action.

## G.   Civil Conspiracy as to Dr. Ghosheh

Defendants move for summary judgment on the civil conspiracy claim premised on the breach of fiduciary duty arguing CUTSA preemption applies and for failing to demonstrate damages.  (Dkt. No. 453-1 at 53.)  Plaintiffs respond that preemption is not warranted on the fiduciary duty claim based on CDS, which is not a misappropriated product.  (Dkt. No. 472 at 36.)  Defendants did not reply.  (*See* Dkt. No. 530.)

"Conspiracy is not a cause of action, but a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the

---

[23] Choice of law refers to a contractual provision stating what law governs the parties' relationship while conflict of law refers to "the principles and rules courts must use to determine which laws apply to litigants' claims when the parties each argue that different jurisdictions' laws apply and those jurisdictions' laws are materially different"  *Jergens, Inc. v. 5th Axis, Inc.,* Case No.: 20-CV-2377-CAB-BLM, 2021 WL 1139417, at *2 n.1, *3 (S.D. Cal. Mar. 25, 2021) ("the Court is obligated to follow conflict of laws rules promulgated by California state courts.").

immediate tortfeasors a common plan or design in its perpetration." *Applied Equipment Corp. v. Litton Saudi Arabia Ltd*., 7 Cal. 4th 503, 510-11 (1994).  "The elements of a civil conspiracy are (1) the formation of a group of two or more persons who agreed to a common plan or design to commit a tortious act; (2) a wrongful act committed pursuant to the agreement; and (3) resulting damages."  *City of Industry v. Fillmore*, 198 Cal. App. 4th 191, 212 (2011) (quoting *Applied Equipment Corp. v. Litton Saudi Arabia Ltd*., 7 Cal. 4th 503, 510–11 (1994)).

Defendants move for summary judgment solely on preemption and lack of damages premised on the breach of fiduciary duty claim.  Because the Court denies summary judgment on the breach of fiduciary duty claim because the conflict of law issue has not been resolved, the Court also DENIES Defendants' motion for summary judgment on the civil conspiracy cause of action.

## H.    RICO as to Remaining Defendants IQVIA Ltd., IQVIA AG and Dr. Ghosheh

Section 1962(c) of RICO provides that "[i]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c).  In order to prove civil RICO under 18 U.S.C. § 1962(c), four elements must be shown: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's business or property."  *United Bhd. of Carpenters & Joiners of Am. v. Bldg. & Const. Trades Dep't, AFL–CIO* ("UBC"), 770 F.3d 834, 838 (9th Cir. 2014) (citation and internal quotation marks omitted).  "RICO is to be read broadly."  *Sedima, S.P.R.L. v. Imrex Co*., 473 U.S. 479, 497 (1985) (footnote omitted).

Defendants move for summary judgment arguing that 1) there was no distinct RICO enterprise, 2) the alleged predicate acts fail, and 3) there was no pattern of racketeering.  (Dkt. No. 453-1 at 30-40.)  Plaintiffs oppose.  (Dkt. No. 472 at 50-62.)  Because the Court concludes that Plaintiff has failed to adequately allege a pattern of

racketeering, the Court will only address the sufficiency of predicate acts and pattern of racketeering.

### 1.     Predicate Acts

A "pattern of racketeering" requires at least two acts of racketeering activity.  18 U.S.C. § 1961(5).  "'Racketeering activity' is any act indictable under several provisions of Title 18 of the United States Code, *see* 18 U.S.C. § 1961."  *Sun Sav. & Loan Ass'n v. Dierdorff*, 825 F.2d 187, 191 (9th Cir. 1987).  Relevant to this case, this includes the predicate acts of mail and wire fraud, 18 U.S.C. § 1341, 1343 as well as theft of trade secrets, 18 U.S.C. § 1832.  18 U.S.C. § 1961(1).

As an initial matter, Defendants claim that because the DTSA claim fails, it cannot serve as a predicate act.  However, because the Court denies Defendants' motion for summary judgment on the DTSA claim, it still serves as one predicate act under RICO.

"The mail and wire fraud statutes are identical except for the particular method used to disseminate the fraud, and contain three elements: (A) the formation of a scheme to defraud, (B) the use of the mails or wires in furtherance of that scheme, and (C) the specific intent to defraud."  *Eclectic Props. East, LLC v. Marcus & Millichap Co*., 751 F.3d 990, 997 (9th Cir. 2014) (citing *Schreiber Distrib. Co. v. Serv–Well Furniture Co*., Inc., 806 F.2d 1393, 1399 (9th Cir. 1986)).  "Where RICO claims under § 1962(c) are asserted against multiple defendants, a plaintiff must allege at least two predicate acts by each defendant."  *Committee to Protect our Agricultural Water v. Occidental Oil and Gas Corp*., 235 F. Supp. 3d 1132, 1177 (E.D. Cal. 2017); *In re Wellpoint, Inc. Out-of-Network "UCR" Rates Litig*., 903 F. Supp. 2d 880, 914 (C.D. Cal. 2012) (*same*).

 On the wire and mail fraud allegations, the FAC presents eleven Predicates Acts. (Dkt. No. 93, FAC ¶¶ 210(b)(i)-(xi).)  The Court notes that Predicate Act No. (v) concerns use of the wires by Defendant Mr. Sadana; however, because the Court concludes it lacks personal jurisdiction over him, Predicate Act (v) must also fail.

### a.     Involving the Mail or Wire

First, Defendants argue that Predicates Acts Nos. (vii), (viii), and (ix) involved in-person meetings, not use of the wire or mail; therefore, they cannot constitute predicate acts under RICO.  (Dkt. No. 453-1 at 32.)  Plaintiffs disagree arguing that the fraudulent communications need not have been sent via the mail or wires as long as the mail or wire was used "in furtherance of the scheme."  (Dkt. No. 472 at 55.)

Predicates Acts Nos. (vii), (viii), and (ix) concern in-person meetings between Mr. Brown and Dr. Ghosheh.  (Dkt. No. 93, FAC ¶¶ 210(b)(vii)-(ix).)  Plaintiffs do not dispute that these Predicate Acts involved in-person meetings yet do not explain how these Predicate Acts were used "in furtherance of the scheme" or provide any relevant legal authority that in-person meetings have been upheld as sufficient to constitute the Predicates Acts of wire or mail fraud.  Because Plaintiffs have not raised a genuine issue of material fact, the Court GRANTS Defendants' motion for summary judgment on Predicate Acts of wire and mail fraud on Predicate Acts Nos. (vii), (viii), and (ix) as not involving the mail or wire.

### b.    Extraterritorial Predicate Act

Defendants next argue that Predicate Acts Nos. (i), (ii), (iii), (iv), (x) and (xi) fail because the allegations in the FAC concern extraterritorial conduct and Plaintiffs have not presented any evidence placing Mr. Brown in the United States at the time he received the communications. [24]  (Dkt. No. 453-1 at 32-33.)  In opposition, Plaintiffs argue that Mr. Brown states he received numerous emails from Defendants while he was in San Diego.  (Dkt. No. 472 at 55.)

As an initial starting point, there is a presumption against extraterritoriality based on "a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the

---

[24] Defendants also argue Predicate Acts Nos. (vii)-(ix) involve extraterritorial conduct.  However, summary judgment was granted as to Predicate Acts (vii)-(ix), as explained in the prior section as not involving the use of the mail or wire.  Therefore, the Court need not address whether Predicate Acts Nos. (vii)-(ix) involve extraterritorial conduct.

United States.'"  *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248 (1991) (quoting *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285 (1949)).  Under this presumption, unless a statute reflects "clearly expressed congressional intent" that it is to apply extraterritorially, it will be "construed to have only domestic application." *RJR Nabisco, Inc. v. European Cmty.,* 579 U.S. 325, 335 (2016).  RICO applies extraterritorially, "but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially. Put another way, a pattern of racketeering activity may include or consist of offenses committed abroad in violation of a predicate statute for which the presumption against extraterritoriality has been overcome." *Id.* at 339.  The question is whether Congress has affirmatively and unmistakably instructed that the statute will apply to foreign conduct.  *Id.* at 335.  "When a statute gives no clear indication of an extraterritorial application, it has none." *Morrison v. Nat'l Australia Bank Ltd*., 561 U.S. 247, 255 (2010).

In *Morrison,* the Supreme Court devised a two-step framework for analyzing whether a statute applies extraterritorially.  561 U.S. at 262-65.  The first step asks "whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco, Inc*., 579 U.S. at 337.  "If the statute is not extraterritorial, then at the second step we determine whether the case involves a domestic application of the statute, and we do this by looking to the statute's 'focus.'" *Id.*

At step one, the circuit courts are split on whether the wire fraud statute applies extraterritorially.  *Compare United States v. Georgiou*, 777 F.3d 125, 138 (3d Cir. 2015) (affirming conviction based a permissible extraterritorial application of the wire fraud statute*); United States v. Lyons,* 740 F.3d 702, 718 (1st Cir. 2014) ("Wire Act expresses such a contrary intent because it explicitly applies to transmissions between the United States and a foreign country.") *with Bascuñán v. Elsaca*, 927 F.3d 108, 121 (2d Cir. 2019) ("[t]he mail and wire fraud statutes do not indicate an extraterritorial reach") (citing *European Cmty. v. RJR Nabisco, Inc*., 764 F.3d 129, 141 (2d Cir. 2014), *rev'd on*

*other grounds*, 136 S. Ct. 2090); *Skillern v. United State*s, No. 20-13380-H, 2021 WL 3047004, at *8 (11th Cir. Apr. 16, 2021) (because the mail and wire fraud statutes are silent as to their extraterritorial application, they are not extraterritorial).

The Ninth Circuit has not yet decided the issue on the first step of whether the presumption against territoriality has been rebutted but has ruled on the second step. *See United States v. Hussain*, 972 F.3d 1138, 1142-43 (9th Cir. 2020) (addressing second step first as permitted by *RJR Nabisco*). Here, because the Court may consider the second step first, *see RJR Nabisco, Inc.*, 579 U.S. at 338 n. 5 ("[b]ecause a finding of extraterritoriality at step one will obviate step two's 'focus' inquiry, it will usually be preferable for courts to proceed in the sequence that we have set forth. But we do not mean to preclude courts from starting at step two in appropriate cases"), it asks "whether the case involves a domestic application of the statute" by "looking to the statute's 'focus.'" *Id.* at 337. A statute's "focus" under step two of *Morrison* is "'the objects of the statute's solicitude,' which can include the conduct it 'seeks to regulate' as well as the parties and interests it 'seeks to protect' or vindicate." *WesternGeco LLC v. ION Geophysical Corp.*, ––– U.S. –––, 138 S. Ct. 2129, 2137 (2018) (quoting *Morrison*, 561 U.S. at 267) (alterations omitted). The question under step two becomes whether the conduct that is proscribed took place in this country to a sufficient extent:

> If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*RJR Nabisco*, 579 U.S. at 337.

In *Hussain*, the Ninth Circuit held that on step two, the "'focus' of the wire fraud statute, 18 U.S.C. § 1343, "is the use of the wires in furtherance of a scheme to defraud." 972 F.3d at 1145. The court explained that as long as the defendant's use of the wires in furtherance of his fraud had a sufficient domestic nexus, the conviction must be upheld as

"permissible domestic application[s]" of the statute. *Id.* In *Hussain*, "[s]ix counts stemmed from phone or video conference calls among participants in the United Kingdom and California, five counts focused on emails originating or terminating in California, and three involved press releases distributed from England to California. Since each count of wire fraud involved the use of a domestic wire, each conviction is a domestic application of the statute." *Id.* at 1145.

Here, Predicate Act Nos. (i) concerns an email dated December 9, 2015 from Carlos Santos ("Mr. Santos"), an employee of IQVIA Ltd., to Mr. Brown expressing interest in acquiring Dimensions and withheld the true motives of the intended acquisition. (Dkt. No. 93, FAC ¶ 210(b)(i).) Predicate Act No. (ii) concerns an email dated December 21, 2015 from Mr. Santos to Mr. Brown stating, "[i]t is not our intention to change the overall operations of the JV at this time – our main intention is to ensure that matters are in order so that we can continue the current JV arrangement." (Dkt. No. 93, FAC ¶ 210(b)(ii).) Plaintiffs allege this was a misrepresentation. (*Id.*) Predicate Act No. (iii) is a consent letter, dated January 4, 2016, signed by Dr. Ghosheh and emailed to Mr. Brown allegedly misrepresenting that he was not aware of any plans to change the business activities of Dimensions by the acquisition by IQVIA AG. (Dkt. No. 93, FAC ¶ 210(b)(iii); Dkt. No. 510-2, Bennett Decl., Ex. 27 at 334; *Id.*, Ex. 28 at 336 (UNDER SEAL).) Predicate Act No. (iv) concerns an email, of March 15, 2016, from Jordan Mitchell, of IMS Health, and now at IQVIA AG, to Mr. Brown about an amendment to the SLC. (Dkt. No. 93, FAC ¶ 210(b)(iv); Dkt. No. 491-45, Swedlow Decl., Ex. 51 at 2; Dkt. No. 529-1, Ds' Reply to SSUF, Nos. 98, 99.) Plaintiffs allege that during the negotiations of the amendment to the SLC, Dr. Ghosheh knew about AIMS but did not disclose it.[25] (Dkt. No. 93, FAC ¶ 210(b)(iv).)

---

[25] As discussed below, to the extent Predicate Acts Nos. (iii) and (iv) apply to Defendant IQVIA AG, they fail because IQVIA AG did not have a duty to disclose and an omissions claim cannot be asserted against it. Similarly, Predicate Act No. (i) cannot allege an omissions fraud claim against IQVIA Ltd. because there was no duty to disclose their motives of acquiring Dimensions.

Defendants argue that Plaintiffs have not provided evidence that Mr. Brown was in San Diego at the time he received the emails from Mr. Santos or Dr. Ghosheh.  (Dkt. No. 453-1 at 32-33.)  Plaintiffs argue that Mr. Brown states he received communications by email and phone calls while he was in San Diego.  (Dkt. No. 472-7, Brown Decl. ¶ 9) ("Over the course of the joint venture . . . Dr. Ghosheh sent to MedImpact employees in San Diego including, to me, countless emails and participated in numerous phone calls with MedImpact employees, including with me, in San Diego.")  Moreover, MedImpact's email is hosted on servers in San Diego, CA.  (*Id.*)

Although Mr. Brown's declaration does not specifically state whether he was in San Diego when he received the emails from Mr. Santos in December 2015, from Dr. Ghosheh on January 4, 2016 and from Jordan Mitchell on March 15, 2016, in viewing the evidence in the light most favorable to the non-moving party, *see Fontana*, 262 F.3d at 876, the Court concludes that Plaintiffs have raised a genuine issue of material fact whether Predicate Acts Nos. (i), (ii), (iii) & (iv) are extraterritorial.

Predicate Act No. (x) concerns the September 12, 2017 board meeting held in Dubai, UAE where Dr. Ghosheh told the board that Dimensions was not going to offer PBM services but had already approached customers to offer PBM services.  (Dkt. No. 93, FAC ¶ 210(b)(x).)  Defendants argue that this meeting was held in Dubai.  Plaintiffs do not dispute that the meeting was held outside the United States in Dubai.  However, to the extent that Plaintiffs would argue that MedImpact Director James Gollaher participated telephonically from San Diego, (Dkt. No. 472-7, Brown Decl. ¶ 18), Predicate Act No. (x) can support a mail or wire fraud as there is a sufficient domestic nexus.

Finally, Predicate Act No. (xi) is a telephone call between Mr. Roberts of MedImpact and Dr. Ghosheh on December 14, 2017 where Dr. Ghosheh refused to allow an inspection of AIMS so that MedImpact could confirm AIMS was not a PBM and not developed using Plaintiffs' trade secrets and actively concealed these facts during the call.  (Dkt. No. 93, FAC ¶ 210(b)(xi).)  While no argument has been raised on this

Predicate Act[26], for the same reasons as Predicate Act Nos. (i), (ii), (iii), (iv), and (x), the Court concludes that Plaintiffs have raised genuine issue of material fact whether this Predicate Act is extraterritorial because Mr. Roberts was in San Diego during that call. (*See* Dkt. No. 472-7, Brown Decl. ¶ 22 ("Then, in late 2017, MIHK board member Aaron Roberts and I had a phone call with Dr. Ghosheh, from San Diego, about the nature of Dimensions' AIMS product.").[27]

### c. No Actionable Fraud [28]

Next, Defendants argue Predicate Act No. (i), concerning pre-acquisition omissions by Mr. Santos and Predicate Act No. (vi), concerning termination of the JV, should be dismissed because they are based on an omission and there was no duty to disclose.[29]  (Dkt. No. 453-1 at 34-35.)  They contend that the alleged pre-acquisition omissions are nothing more than an arms-length business transaction with no legal duty to disclose and the alleged duty concerning termination of the JV arose out of the terms of the JVA, and not a fiduciary duty.  (*Id.*)  Plaintiffs respond that as to IQVIA Defendants, they are alleging affirmative misrepresentation, not omissions.  (Dkt. No. 472 at 54.)  As to the termination of the JV, Plaintiffs claim that Dr. Ghosheh had a fiduciary duty to disclose the existence of the scheme to terminate the JV.  (*Id.* at 55-56.)

A RICO mail or wire fraud claim may be based on a misrepresentation or an omission.  *Eller v. EquiTrust Life Ins. Co.*, 778 F.3d 1089, 1092 (9th Cir. 2015).

---

[26] Defendants do not address Predicate Act No. (xi) in their arguments, but in the factual background, they allege that Predicate Act No. (xi) concerns extraterritorial communications.  (Dkt. No. 453-1 at 16.)

[27] In opposition, Plaintiffs also cite to additional facts to support Predicate Acts of mail or wire fraud not alleged in the FAC.  (Dkt. No. 472 at 55.)  To the extent that Plaintiffs raised these additional facts in the event the Court granted Defendants' motion for summary judgment on the Predicate Acts raised in the FAC, the Court need not consider them as the Court denies summary judgment on Predicate Acts Nos. (ii), (iii), (iv), (vi), (x) and (xi).

[28] The Court does not consider the parties' arguments concerning claims data because they have been dismissed.  Further, because the Court already granted summary judgment on Predicate Act No. (i), the Court need not address Defendants' argument that Predicate Act No. (i) concerning omissions by IQVIA Defendants fail because there was no duty to disclose.

[29] Defendants also move for summary judgment on Predicate Act No. (vii), but that has already been dismissed as discussed above.

However, a non-disclosure or omission, requires the existence of an independent duty to disclose. *Id.* "Absent an independent duty, such as a fiduciary duty or an explicit statutory duty, failure to disclose cannot be the basis of a [RICO] fraudulent scheme." *Id.* (quoting *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987)). An affirmative misrepresentation does not require proof of a fiduciary duty. *United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986) ("Proof of an affirmative, material misrepresentation supports a conviction of mail fraud without any additional proof of a fiduciary duty.").

As to Predicate Act No. (i), while Plaintiffs allege that the December 9, 2015 email from Mr. Santos to Mr. Brown concerns an affirmative misrepresentation, the FAC asserts otherwise. Predicate Act No. (i) states that the email "withheld critical information about the true motives of the transaction" and "the true motives for the transaction were never disclosed" which clearly allege omissions rather than misrepresentations. (*See* Dkt. No. 93, FAC 210(b)(i).) Therefore, Predicate Act No. (i) cannot succeed.

Predicate Act No. (vi) alleges that on July 23, 2017, Dr. Ghosheh sent a letter to MedImpact providing notice of the termination of the JV. (Dkt. No. 93, FAC ¶ 210(b)(vi); Dkt. No. 510-3, Bennett Decl., Ex. 34 at 12 (UNDER SEAL).) In that letter, Dr. Ghosheh stated Dimensions was providing its notice of termination of the JVA but did not state the true reasons for the termination which was to allow IQVIA Defendants to use MedImpact's trade secrets to compete in the PBM market. (*Id.*)

As a board member, it is not disputed that Dr. Ghosheh had a fiduciary duty to the JV. Therefore, a claim for failure to disclose or an omission against Dr. Ghosheh is permitted. Defendants' citation to cases is inapposite and concern the interplay between a breach of contract and fiduciary duty and do not address fraud or fraud claims under RICO. (*See* Dkt. No. 453-1 at 34 n. 18 (citing *Kaul v. Mentor Graphics Corp.*, Case No. 16-cv-02496-BLF, 2016 WL 6249024, at *13 (N.D. Cal. Oct 26. 2016); *Related Westpac*

*LLC v. JER Snowmass LLC*, C.A. No. 5001–VCS, 2010 WL 2929708, at *8 (Del. Ch. July 23, 2010).)  Thus, Predicate Act No. (vi) survives.

Finally, Defendants argue that there is no fraud concerning Mr. Santos' misrepresentation on December 21, 2015, Predicate Act No. (ii) that it "is not our intention to change the overall operations of the JV at this time" and Dr. Ghosheh's misrepresentation on January 4, 2016, Predicate Act No. (iii), that he was "not aware of any plans to change the business activities of" Dimension after the acquisition because there is no evidence that IQVIA Defendants intended to terminate the JV as of December 2015.  (Dkt. No. 453-1 at 35.)  In response, Plaintiffs argue there is ample evidence that IQVIA intended to terminate the JV prior to the acquisition.  (Dkt. No. 472 at 52, 56.)

Prior to the acquisition of Dimensions, on August 26, 2015, Adam Shanti of Dimensions emailed Mr. Sadana and Dr. Ghosheh and inquired about consequences of informing MIL about terminating the JV.  (Dkt. No. 510-2, Bennett Decl., Ex. 8 at 177 (UNDER SEAL).)  On August 28, 2015, Mr. Shanti emailed Mr. Sadana, Dr. Ghosheh and Mr. Santos a presentation entitled "██████████ dated September 2015 with a slide "Options to terminate the JV."  (Dkt. No. 510-2, Bennett Decl., Ex. 9 at 180 (UNDER SEAL); *Id.,* Ex. 10 at 188 (UNDER SEAL).)  Another slide emailed by Mr. Shanti to Mr. Sadana, Mr. Santos and Dr. Ghosheh on the same day is entitled "Options for Dimensions after terminating the JV with MedImpact."  (*Id.*, Ex. 11 at 217 (UNDER SEAL); *Id*., Ex. 12 at 219 (UNDER SEAL).)  The slide states one option after terminating the JV is to stop working with MedImpact, stop offering "PBM" solution but instead offer its AIMS which has the same functionality of a PBM solution as well as other advanced features.  (*Id.*, Ex. 12 at 219 (UNDER SEAL).)  These emails produced by Plaintiffs raise a genuine issue of fact as to whether IQVIA Defendants intended to terminate the JV prior to the acquisition of Dimensions.  Accordingly, Predicate Act Nos. (ii) & (iii) relating to the acquisition of Dimensions and termination of the JV survive.

In sum, the remaining Predicate Act Nos. are (ii), (iii), (iv), (vi), (x), and (xi) on the mail and wire fraud and the Predicate Act of the DTSA.

### 3.     Pattern of Racketeering

A pattern of racketeering activity "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years." 18 U.S.C. § 1961(5).  To prove a pattern of racketeering activity, the plaintiff must show "that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. N.W. Bell Tel. Co*., 492 U.S. 229, 239 (1989) (emphasis in original); *Howard v. American Online, Inc*., 208 F.3d 741, 746 (9th Cir. 2000) (plaintiffs must show "a relationship between the predicates and of the threat of continuing activity.").

In order to prove relatedness, the predicates should "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise [be] interrelated by distinguishing characteristics and . . . not [be] isolated events." *H.J. Inc.*, 492 U.S. at 240.  As to continuity, a plaintiff must simply prove "continuity of racketeering activity, or its threat." *Id.* at 241.  The Supreme Court observed that "'[c]ontinuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241.  "Closed-ended" continuity is established by showing a series of related predicate acts occurred over a "substantial period of time." *Id.* at 242.  The Court thus noted that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement," and concluded that "Congress was concerned in RICO with long-term criminal conduct." *Id.*

Where long-term criminal conduct cannot be established, "open-ended" continuity may be proved. *Id.*  Open-ended continuity requires a showing that either the predicate acts "include a specific threat of repetition extending indefinitely into the future" or that the predicate acts were "part of an ongoing entity's regular way of doing business." *Id.* In sum, continuity is established by (1) a series of predicate acts "over a substantial period of time" that "threaten[s] . . . future criminal conduct" or (2) "a form of predicate misconduct that 'by its nature projects into the future with a threat of repetition.'" *Turner*

1   *v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) (quoting *Religious Tech. Ctr. v.*

2   *Wollersheim*, 971 F.2d 364, 366 (9th Cir. 1992)).

3          The continuity requirement is not met if there is only an allegation of a "single

4   fraud perpetrated on a single victim." *United Energy Owners Committee, Inc. v. U.S.*

5   *Entergy Mgmt. Sys., Inc.*, 837 F.2d 356, 360 (9th Cir. Cir. 1988) (quoting *Cal.*

6   *Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1469 (9th

7   Cir. 1987) (defendants made numerous fraudulent sales to multiple victims)); *see also*

8   *Medallion Tel. Enters., Inc. v. SelecTV of Cal., Inc.*, 833 F.2d 1360, 1363-64 (9th Cir.

9   1987) (RICO does not cover a single alleged fraudulent inducement to enter a contract

10  affecting a single victim and terminating on a date certain); *Sever v. Alaska Pulp Corp.*,

11  978 F.2d 1529, 1535 (9th Cir. 1992) (recognizing precedent that single victim does not

12  support "pattern" of racketeering).

13         Defendants argue that the RICO claims fails because Plaintiffs failed to

14  demonstrate a pattern of racketeering because Plaintiffs are claiming a single scheme

15  against a single alleged victim to misappropriate trade secrets in order to compete in the

16  business.  (Dkt. No. 453-1 at 37-38.)  Plaintiffs disagree arguing that they have

17  demonstrated both closed-ended and open-ended continuity.  They argue that the

18  enterprise's racketeering activity has occurred since 2015, a period of over seven years.

19  (Dkt. No. 471 at 59.)  As to open-ended continuity, they argue that they have shown

20  Defendants' racketeering activity threatens to continue.  (*Id*.)  They also argue that there

21  are multiple schemes and multiple victims and include MHSI, MIL, MI-HK, the JV and

22  "to the extent that Defendants monopolize various PBM markets, any entity that would

23  have competed in those markets."  (Dkt. No. 472 at 61.)

24         The Court finds that the remaining Predicate Acts Nos. (iii), (iv), (vi), (x), and (xi)

25  involve a single victim and reveal a single scheme to acquire MedImpacts trade secrets

26  and use them to create a competing PBM platform.  As to the number of victims,

27  Plaintiffs have not provided legal authority that related corporate entities and/or

28  subsidiaries of corporate entities constitute separate victims in a RICO fraud claim.

Moreover, even three separate but related corporate victims in the same business venture would not sufficiently demonstrate a pattern. *See Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1265 (D.C. Cir. 1995) (combination of "single scheme, single injury, and few victims . . . makes it virtually impossible for plaintiffs to state a RICO claim"); *Efron v. Embassy Suites (Puerto Rico), Inc*., 223 F.3d 12, 19 (5th Cir. 2000) (three partners in a business venture not enough to show pattern).  In addition, besides a summary allegation, Plaintiffs do not explain how the JV was a victim in Defendants' alleged misappropriation of Plaintiffs' trade secrets.  Plaintiffs further do not provide legal authority that future, unidentified victims fall under the definition of "pattern of racketeering."

Given the existence of one victim or, at most, several related corporate victims, the Court finds that Plaintiffs have failed to demonstrate a pattern of racketeering.  *See Palantir Techs. Inc. v. Abramowitz*, Case No. 19-cv-06879-BLF, 2021 WL 2400979, at *9 (N.D. Cal. June 11, 2021) ("the number of victims, is more determinative as the Ninth Circuit rarely upholds a finding of continuity where there is only a single victim.").

Additionally, Defendants argue that the alleged acquisition and termination schemes and misappropriation of trade secrets asserted by Plaintiffs involve a single scheme by Defendants of misappropriating Plaintiffs' trade secrets in order to sell a competing product by (1) acquiring Dimensions, (2) using AIMS, and (3) seeking to terminate the JV.  The Court agrees.  The remaining acquisition and termination schemes as well as DTSA claim involve misappropriation of Plaintiffs' PBM trade secrets, a single scheme.  The alleged purpose of the acquisition of Dimensions and termination of the JV was to ultimately use Dimensions' competing PBM product, AIMS, by misappropriating Plaintiffs' PBM trade secret.  *See Palantir Techs. Inc.*, 2021 WL 2400979, at *9 ("there is a single victim (Palantir) and acts that can properly be characterized as a single episode (stealing Palantir's confidential and proprietary information) for a single purpose (establishing competing businesses based on Palantir's own technology"); *Religious Tech. Ctr. v. Wollersheim*, 971 F.2d 364, 365–67 (9th Cir.

1992) ("[W]hen a plaintiff alleges only a single scheme with a single victim it cuts against a finding of both closed-ended as well as open-ended continuity."); *Oculus Innovative Sciences, Inc. v. Nofil Corp.*, No. C 06-01686 SI, 2007 WL 2600746, at *3 (N.D. Cal. Sept. 10, 2007) ("In the Ninth Circuit, cases which allege only one scheme, perpetrated on one victim, are usually insufficient to establish a pattern."). Thus, the Court GRANTS Defendants' motion for summary judgment on the RICO cause of action for failing to demonstrate a genuine issue of fact as to a pattern of racketeering.

## Conclusion

Based on the reasoning above, the Court GRANTS in part and DENIES in part Defendants' omnibus motion for summary judgment. Specifically, the Court GRANTS Defendants' motion for summary judgment on the claims data allegations, and RICO cause of action. The Court also GRANTS dismissal of Defendants IQVIA Inc. and Mr. Sadana. The Court DENIES Defendants' motion for summary judgment on the misappropriation of trade secret claim under the DTSA and CUTSA, breach of fiduciary duty and civil conspiracy claims. The remaining Defendants are Defendants IQVIA AG and Dr. Ghosheh.

IT IS SO ORDERED.

Dated:   October 7, 2022

Hon. Gonzalo P. Curiel
United States District Judge

19cv1865-GPC(DEB)